# Exhibit 1

# AGREEMENT AND PLAN OF MERGER

BY AND AMONG

INNOGY RENEWABLES US LLC,

AURA MERGER SUB LLC,

TRIREME ENERGY DEVELOPMENT, LLC

TRIREME ENERGY DEVELOPMENT II, LLC,

AND

TRIREME ENERGY HOLDINGS, INC.

AS THE MEMBER REPRESENTATIVE

DATED AS OF DECEMBER 21, 2017

## TABLE OF CONTENTS

**Page**


| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Interpretation | 15 |
| ARTICLE II | THE MERGER | 16 |
| 2.1 | The Merger | 16 |
| 2.2 | Closing; Effective Time | 16 |
| 2.3 | Certificate of Formation; Limited Liability Company Agreement | 16 |
| 2.4 | Managers and Officers | 16 |
| ARTICLE III | EFFECT ON MEMBERSHIP INTERESTS; PAYMENT | 17 |
| 3.1 | Merger Consideration | 17 |
| 3.2 | Effect on Membership Interests | 17 |
| 3.3 | Exchange of Certificates; Payment of Merger Consideration | 18 |
| 3.4 | Merger Consideration Adjustment | 19 |
| 3.5 | Allocation of Merger Consideration | 23 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 23 |
| 4.1 | Corporate Status | 23 |
| 4.2 | Authorization and Enforceability | 23 |
| 4.3 | Authorizations | 24 |
| 4.4 | Non-Contravention | 24 |
| 4.5 | Capitalization | 24 |
| 4.6 | Subsidiaries of the Company | 25 |
| 4.7 | Balance Sheet; Indebtedness | 25 |
| 4.8 | Absence of Changes | 26 |
| 4.9 | Taxes | 27 |
| 4.10 | Compliance with Law; Governmental Authorizations | 28 |
| 4.11 | Contracts | 29 |
| 4.12 | Personal Property | 31 |
| 4.13 | Real Property | 31 |
| 4.14 | Intellectual Property | 32 |
| 4.15 | Litigation | 32 |

## TABLE OF CONTENTS
(continued)

Page


| | | |
|---|---|---|
| 4.16 | Employee Benefits | 33 |
| 4.17 | Labor and Employment Matters | 34 |
| 4.18 | Environmental Matters | 35 |
| 4.19 | Related Party Contracts | 36 |
| 4.20 | Brokers or Finders | 36 |
| 4.21 | Insurance | 36 |
| 4.22 | Certain Disclaimers | 37 |
| 4.23 | Project Data | 38 |
| 4.24 | Books and Records; Minutes | 38 |
| 4.25 | Bank Accounts | 38 |
| 4.26 | Regulatory Status | 38 |
| 4.27 | Development Matters | 38 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB | 39 |
| 5.1 | Organization and Good Standing | 39 |
| 5.2 | Authorization and Enforceability | 39 |
| 5.3 | Governmental Authorizations | 39 |
| 5.4 | Non-Contravention | 39 |
| 5.5 | Brokers or Finders | 40 |
| 5.6 | Litigation | 40 |
| 5.7 | Availability of Funds | 40 |
| ARTICLE VI | COVENANTS OF THE COMPANY | 40 |
| 6.1 | Conduct of the Business | 40 |
| 6.2 | Access; Indemnity | 42 |
| 6.3 | Member Approval | 42 |
| 6.4 | Consents to Assignment and Required Notices | 42 |
| 6.5 | Employment Matters | 42 |
| 6.6 | Confidential Information; Designee Competition | 43 |
| ARTICLE VII | COVENANTS OF PURCHASER | 43 |
| 7.1 | Manager, Director and Officer Indemnification | 43 |
| 7.2 | Employee Matters | 44 |

## TABLE OF CONTENTS
(continued)


| | | Page |
|---|---|---|
| 7.3 | Credit Support Arrangements | 46 |
| 7.4 | Post-Closing Access to Records | 47 |
| 7.5 | R&W Insurance Policy | 47 |
| 7.6 | Payment Milestone | 47 |
| ARTICLE VIII | COVENANTS OF THE PARTIES | 48 |
| 8.1 | CFIUS Notification | 48 |
| 8.2 | Other Regulatory Approvals | 48 |
| 8.3 | Public Announcements | 48 |
| 8.4 | Notification of Certain Matters | 49 |
| 8.5 | Further Assurances | 49 |
| 8.6 | Post-Closing Payment | 49 |
| 8.7 | Conduct of Hardin's Business | 49 |
| 8.8 | Hardin Call Option | 51 |
| ARTICLE IX | TAX MATTERS | 52 |
| 9.1 | Preparation and Filing of Tax Returns | 52 |
| 9.2 | Cooperation | 52 |
| 9.3 | Transfer Taxes | 53 |
| 9.4 | Entity Classification Election | 53 |
| ARTICLE X | CONDITIONS TO CLOSING | 54 |
| 10.1 | Conditions to Obligations of Each Party | 54 |
| 10.2 | Conditions to the Obligations of the Company | 54 |
| 10.3 | Conditions to the Obligation of Purchaser and Merger Sub | 54 |
| 10.4 | Conditions to the Obligations of the Parties to Effect the Hardin Closing | 56 |
| ARTICLE XI | INDEMNIFICATION | 57 |
| 11.1 | Indemnification | 57 |
| 11.2 | Indemnification Actions | 58 |
| 11.3 | Limitation on Actions | 60 |
| 11.4 | Right of Setoff | 60 |
| ARTICLE XII | TERMINATION | 61 |
| 12.1 | Termination | 61 |

# TABLE OF CONTENTS
(continued)


| | | Page |
|---|---|---|
| 12.2 | Effect of Termination | 61 |
| 12.3 | Remedies | 62 |
| ARTICLE XIII | MISCELLANEOUS | 62 |
| 13.1 | Notices | 62 |
| 13.2 | Amendments and Waivers | 64 |
| 13.3 | Fees and Expenses | 64 |
| 13.4 | Successors and Assigns | 64 |
| 13.5 | Governing Law | 64 |
| 13.6 | Consent to Jurisdiction | 64 |
| 13.7 | Counterparts | 65 |
| 13.8 | Third Party Beneficiaries | 65 |
| 13.9 | Entire Agreement | 65 |
| 13.10 | Captions | 65 |
| 13.11 | Severability | 65 |
| 13.12 | Specific Performance | 65 |
| 13.13 | Legal Representation; Privileged Communications | 66 |

<u>Exhibits</u>

Exhibit A – Escrow Agreement
Exhibit B – Form of Transition Services Agreement
Exhibit C – Form of Development Information
Exhibit D – Approved Development Budget
Exhibit E – Form of Resignation

<u>Annexes</u>

Annex 1 – Target Projects, Payment Milestone Amounts, and Minimum Planned Installed Capacities
Annex 2 – Applicable Standards of Care
Annex 3 – Hardin Amount

# AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER, dated as of December 21, 2017 (this "**Agreement**"), by and among Innogy Renewables US LLC ("**Purchaser**"), a Delaware limited liability company, Aura Merger Sub LLC, a Delaware limited liability company and wholly-owned subsidiary of Purchaser ("**Merger Sub**"), Trireme Energy Development II, LLC, a Delaware limited liability company (the "**Company**"), Trireme Energy Development, LLC, a Delaware limited liability company (the "**Company Member**") and, solely in its capacity as the Member Representative, Trireme Energy Holdings, Inc. a Delaware corporation. Purchaser, Merger Sub, the Company and the Member Representative are each sometimes individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, as of the date of this Agreement, the Company is a wholly-owned subsidiary of the Company Member, and the Company Member is a wholly-owned subsidiary of Trireme Energy Investments, Inc. ("**TEII**");

WHEREAS, TEII is the indirect parent of the entities listed on Section 4.6 of the Company Disclosure Schedule (the "**Development Companies**");

WHEREAS, prior to the Closing, the Company, the Company Member and TEII will effect a reorganization (the "**Reorganization**") as a result of which the Development Companies will be direct, wholly-owned subsidiaries of the Company, and the Company Member will be the direct parent of Hardin Wind LLC ("**Hardin**");

WHEREAS, the Reorganization has been approved by the board of managers of the Company; and

WHEREAS, the respective boards of managers of Purchaser and Merger Sub, and the Company Member, as the sole member of the Company, have (a) unanimously approved this Agreement, the merger of Merger Sub with and into the Company (the "**Merger**") and other transactions contemplated by this Agreement, in each case, upon the terms and subject to the conditions set forth in this Agreement and in accordance with Delaware Law, and (b) declared that this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the respective companies' best interests and in the best interests of such companies' respective stockholders or members, as applicable.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, conditions and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 Definitions. When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1, or in the applicable Section of this Agreement to which reference is made in this Section 1.1.

"**Accounting Firm**" is defined in Section 3.4(c).

"**Action**" is defined in Section 4.15.

"**Adjusted Hardin Amount**" is defined in Section 8.8(c).

"**Adverse Change in PTC Law**" means any change in Applicable Law such that the rate at which the PTC is available in respect of sales of electricity produced by the applicable Target Project in the tax year in which the Payment Milestone for such Target Project occurs is less than the PTC Base Rate. For the avoidance of doubt the Base Erosion Anti-Abuse Tax is not an Adverse Change in PTC Law.

"**Affiliate**" with respect to any Person, means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, with "control" (including the terms "controlled by" and "under common control with") in such context meaning the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of such Person, whether through the ownership of voting securities or other equity rights, pursuant to a written agreement, or otherwise.

"**Agreement**" is defined in the Preamble.

"**Amazon PPA**" shall mean that certain Renewable Energy Purchase Agreement dated effective October 14, 2016 by and between Amazon Energy LLC and Hardin Wind LLC, as amended.

"**Applicable Law**" means, with respect to any Person, any international, national, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person or the business conducted by such Person.

"**Approved Development Budget**" means the budget for costs, expenses, and liabilities relating to the development of the Target Projects approved by Purchaser and set forth on Exhibit E-1.

"**Approved Development Expenses**" means those documented costs or expenses set forth in the Approved Development Budget and any other costs or expenses approved by Purchaser in writing that are actually incurred and paid by the Company, any Development Company, or any Involved Company Affiliate prior to Closing.

"**Approved Hardin Development Budget**" means the budget for costs, expenses, and liabilities relating to the development of the Scioto Ridge Project approved by Purchaser and set forth on Exhibit E-2

"**Approved Hardin Development Expenses**" means those documented costs or expenses set forth in the Approved Hardin Development Budget and any other costs or expenses

approved by Purchaser in writing that are actually incurred and paid by Hardin or any Involved Company Affiliate prior to the Hardin Closing.

"**Balance Sheet**" is defined in Section 4.7(a).

"**Balance Sheet Date**" is defined in Section 4.7(a).

"**Business Day**" means each calendar day except Saturdays, Sundays, and any other day on which banks are generally closed for business in New York, New York or Frankfurt am Main, Germany.

"**Cap**" is defined in Section 11.3(c).

"**Cassadaga PPA**" means, collectively, the RPS Class I Renewable Generation Unit Power Purchase Agreements, each dated as of May 25, 2017 between Cassadaga Wind, LLC and the counterparties thereto, all as listed on Section 4.11(b)(ii) of the Company Disclosure Schedule.

"**Cassadaga Project**" means that certain wind energy generation project under development by Cassadaga Wind LLC, commonly known as the "Cassadaga Wind Project."

"**Certificate of Merger**" is defined in Section 2.2(b).

"**CFIUS**" is defined in Section 10.1(b).

"**CFIUS Approval**" is defined in Section 10.1(b).

"**Charter Documents**" means, with respect to any entity, the certificate of formation, certificate of incorporation, articles of incorporation, articles of organization, limited liability company agreement, bylaws, partnership agreement, or other similar organizational documents of such entity (in each case, as amended).

"**Claim Notice**" is defined in Section 11.2(b).

"**Closing**" is defined in Section 2.2(a).

"**Closing Amount**" is defined in Section 3.4(b).

"**Closing Date**" is defined in Section 2.2(a).

"**Closing Net Working Capital**" means the current assets of the Company and the Development Companies (other than Hardin) on a consolidated basis minus the current liabilities (other than Approved Development Expenses) and Indebtedness of the Company and the Development Companies (other than Hardin) on a consolidated basis (excluding the standby letters of credit to be replaced by Purchaser pursuant to Section 7.3), in each case, calculated in accordance with GAAP and calculated as of the close of business on the date immediately preceding the Closing Date in a manner consistent with the accounting practices, principles, procedures and definitions set forth in Schedule 1.1(a). For the avoidance of doubt, any current

liabilities incurred outside of the Approved Development Budget that remain unpaid as of the Closing Date and any Transfer Taxes for which the Company is responsible pursuant to Section 9.3 shall be deemed current liabilities for the purposes of determining the Closing Net Working Capital.

"**Closing Long-Term Liabilities**" means the long-term liabilities (other than Indebtedness) of the Company and the Development Companies (other than Hardin) on a consolidated basis, calculated in accordance with GAAP and calculated as of the close of business on the date immediately preceding the Closing Date in a manner consistent with the accounting practices, principles, procedures and definitions set forth in Schedule 1.1(a).

"**COBRA**" means the United States Consolidated Omnibus Reconciliation Act of 1986, as amended.

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"**Commercial Operation Date**" with respect to a Target Project, means the date upon which the relevant Target Project: (a) has been installed and is fully mechanically complete as defined in the construction contract for such Target Project, except for those punch list items which are not necessary for the safe and continuous operation of such Target Project, (b) is interconnected to the transmission grid, (c) has successfully completed its critical preoperational tests in accordance with Prudent Wind Industry Practices, and all applicable utility or Independent System Operator/Regional Transmission Organization requirements, and (d) has commenced selling commercial quantities of power, which does not include power produced or sold merely for test purposes and meets all requirements under such Target Project's applicable power purchase agreement/offtake agreement.

"**Company**" is defined in the Preamble.

"**Company Disclosure Schedule**" is defined in the preamble to Article IV.

"**Company Equity Plan**" means any equity option plan or other unit or equity-related plan of the Company.

"**Company Intellectual Property**" means any and all Intellectual Property, including Registered Intellectual Property, that is owned by, applied for, used by, or licensed by (whether as licensor or licensee) the Company or any Development Company or is under obligation of assignment to the Company or any Development Company.

"**Company Member**" is defined in the Recitals.

"**Company Member Approval**" is defined in Section 4.2(a).

"**Company Securities**" is defined in Section 4.5(c).

"**Company's 401(k) Plan**" is defined in Section 7.2(c)(i).

"**Confidential Information**" is defined in Section 6.6.

"**Confidentiality Agreement**" is defined in Section 6.2.

"**Contract**" means any written agreement, contract, subcontract, settlement agreement, lease, binding understanding, instrument, note, option, warranty, purchase order, license, sublicense, insurance policy, benefit plan or legally binding, commitment or arrangement, or undertaking of any nature, as in effect from time to time.

"**Credit Support Arrangement**" means any guaranty, letter of credit, bond, surety or other credit support or assurance provided by a Company Member or its Affiliates or any third party in support of any obligations of the Company or any Development Company set forth on Schedule 1.1(e), which Schedule shall be updated prior to the Closing to include any Credit Support Arrangements entered into between the date of this Agreement and the Closing Date either (a) in accordance with the Approved Development Budget or (b) with the written consent of Purchaser.

"**D&O Indemnified Parties**" is defined in Section 7.1.

"**Damages**" is defined in Section 11.1(c).

**"Data Room"** means the Company's electronic virtual data room for the Projects, located at https://services.intralinks.com/web/index.html?#workspace/3759222/documents, as of December 21, 2017.

"**Delaware Law**" means, collectively, the Delaware General Corporation Law and the Delaware Limited Liability Company Act.

"**Designee**" is defined in Section 7.6(b).

"**Designated Persons**" means any Person who appears on the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

"**Development Companies**" is defined in the Recitals.

"**Dispute Period**" is defined in Section 3.3(b)(i).

"**Disputed Amount**" is defined in Section 3.4(b).

"**Easements**" means all easement agreements to which the Company or any Development Company is a party.

"**Effective Time**" is defined in Section 2.2(b).

"**Election Notice**" is defined in Section 8.8(b).

"**Employee Plans**" is defined in Section 4.16(a).

"**Enforceability Exceptions**" is defined in Section 4.2(a).

"**Environment**" means all air, surface water, groundwater, land, including land surface or subsurface, including all fish, wildlife, biota and all other natural resources.

"**Environmental Action**" means any claim, proceeding or other Action brought or threatened in writing (a) under, or asserted to be under any Environmental Law, or (b) regarding any Hazardous Substances.

"**Environmental Laws**" means any and all Applicable Laws and Governmental Authorizations issued, promulgated or entered into by any Governmental Authority relating to the Environment or to the preservation or reclamation of natural resources.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" is defined in Section 4.16(g).

"**Escrow Agent**" means JPMorgan Chase Bank, N.A.

"**Escrow Agreement**" is defined in Section 3.2(d).

"**Escrow Amount**" means the sum of the Working Capital Escrow Amount and the Long-Term Liabilities Escrow Amount.

"**Essential Employee(s)**" means each of the individuals listed under the heading "Essential Employee" on Schedule 1.1(b).

"**EverPower Employees**" means each of those individuals set forth on Schedule 1.1(b) who is employed by the Company or an Involved Company Affiliate as of the date of this Agreement.

"**Excess Amount**" is defined in Section 3.4(d)(i).

"**Expected Installed Capacity**" means, with respect to any Target Project, the greater of: (a) such Target Project's nameplate contract capacity (expressed in megawatts (MW)) as set forth in such Target Project's fully executed power purchase agreement(s) and/or offtake agreement(s) in effect at the time of such Target Project's achievement of its Payment Milestone, if any; and (b) such Target Project's expected nameplate capacity as set forth in the applicable construction contract for such Target Project in effect at the time of such Target Project's achievement of its Payment Milestone.

"**EWG**" means an exempt wholesale generator that meets the criteria as defined in Title 18 of the Code of Federal Regulations. § 366.1, as amended from time to time.

"**FERC**" means the Federal Energy Regulatory Commission, or any successor agency.

"**FPA**" means the Federal Power Act of 1935, as amended, and FERC's implementing regulations.

"**Fundamental Representations**" means the representations and warranties set forth in Sections 4.1, 4.2, 4.5, 4.6, and 4.20.

"**GAAP**" means generally accepted accounting principles, consistently applied, in the United States of America.

"**Governmental Authority**" means any national, state, local, municipal, or other government, and any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and any court or governmental tribunal.

"**Governmental Authorization**" means any authorization, approval, consent, certificate, license, permit, registration, variance, or franchise of or from any Governmental Authority or pursuant to any law (statutory, common law or otherwise), ordinance, code, rule, regulation or other similar requirement.

"**Hardin**" is defined in the Recitals.

"**Hardin Amount**" is defined in Annex 3.

"**Hardin Closing**" is defined in Section 8.8(b).

"**Hardin Closing Date**" is defined in Section 8.8(b).

"**Hardin Escrow Agreement**" means an escrow agreement, in form and substance substantially similar to the Escrow Agreement, reflecting the Hardin Escrow Amount and such other mutually-agreed terms as are applicable to the Hardin Closing.

"**Hardin Escrow Amount**" means the sum of the Hardin Working Capital Escrow Amount and the Hardin Long-Term Liabilities Escrow Amount.

"**Hardin Long-Term Liabilities Escrow Amount**" means an amount equal to $250,000.

"**Hardin Milestone**" means, with respect to Hardin, that: the Company shall have delivered to Purchaser evidence, in form and substance reasonably satisfactory to Purchaser, that (a) the OPSB has issued an order approving Hardin's application to amend the certificate to accommodate ten (10) G114-2.625MW-93T and fifty (50) G132-3.465MW-84T turbine models and (b) the Interconnection Service Agreement shall have been amended to reflect the G114 and G132 turbine models.

"**Hardin Purchase Price**" means the applicable amount set forth under the heading "Hardin Purchase Price" on Annex 3.

"**Hardin Working Capital Escrow Amount**" means an amount equal to $125,000.

"**Hazardous Substances**" means all material, substance or waste that is classified, regulated or characterized as hazardous, toxic, pollutant or contaminant under any

Environmental Laws, including petroleum and petroleum products (including crude oil or any fraction thereof), asbestos or asbestos containing materials, and any other substance the presence of or exposure to which results in liability under any applicable Environmental Laws due to known or suspected adverse impacts on human health or the Environment.

"**Hired EverPower Employees**" is defined in Section 7.2(a).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**IFRS**" means international accounting standards within the meaning of Regulation (EC) No. 1606/2002 (the International Accounting Standards (IAS) Regulation) to the extent applicable to the relevant financial statements delivered under or referred to herein.

"**Indebtedness**" means, without duplication, (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any obligation evidenced by any note, bond, debenture, or other debt security, (c) all indebtedness and obligations in respect of any leases of real or personal property or combination thereof, which obligations are required to be classified and accounted for under GAAP (as in effect as of the date of this Agreement) as capital leases, (d) any indebtedness guaranteed in any manner by a Person, and (e) any outstanding letter of credit, sight draft, bankers' acceptances, performance bond or similar surety obligation of the Company or any Development Company.

"**Indemnified Person**" is defined in Section 11.2(a).

"**Indemnifying Person**" is defined in Section 11.2(a).

"**Independent Engineer**" is defined in Section 3.3(b)(ii).

"**Initial Payment**" is defined in Section 3.1.

"**Intellectual Property**" means all (a) patents, patent applications, and related extensions, continuations, continuations-in-part, divisions, reissues and reexaminations, (b) trademarks, service marks, domain names, logos, and trade names, together with the goodwill associated with any of the foregoing, (c) copyright rights and (d) know-how, trade secrets, confidential and proprietary information.

"**Involved Company Affiliate**" means any Affiliate of the Company or any Development Company which is or has been involved in the development of the Projects or at any time owned any assets related to the development of the Projects prior to the Closing Date.

"**Key Competitor**" includes any company directly in the business of developing solar or wind energy generation projects in any of the states of Ohio, Pennsylvania, Montana, New York, Wyoming, Maryland, or Maine, including but not limited to the following entities and their respective affiliates: Avangrid Renewables; EDF Renewable Energy; EDP Renewables; Enbridge, Inc.; E.ON Climate & Renewables, N.A.; Geronimo Energy; Invenergy, LLC; Leeward Renewable Energy; NextEra Energy Resources; Pattern Energy Group Inc.; PNE Renewables; and the RES Group.

"**Key Employee(s)**" means each of the individuals listed under the heading "Key Employee" on Schedule 1.1(b).

"**Key Projects**" means, collectively, (a) the Cassadaga Project, (b) that certain wind energy generation project commonly known as the "Mud Springs Wind Project" under development by Mud Springs Wind Project LLC, Horse Thief Wind Project, LLC, Pryor Caves Wind Project, LLC, and Bowler Flats Energy Hub, LLC, (c) that certain wind energy generation project under development by Mason Dixon Wind, LLC, (d) that certain wind energy generation project under development by Baron Winds LLC and (e) that certain wind energy generation project under development by Buckeye Wind LLC.

"**Knowledge**" means (i) with respect to the Company, the actual knowledge of those individuals identified on Schedule 1.1(c), and (ii) with respect to Purchaser, the actual knowledge of those individuals identified on Schedule 1.1(d).

"**Leased Real Property**" is defined in Section 4.13(b).

"**Leases**" means the agreements pursuant to which the Company or any Development Company occupy the Leased Real Property.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance, restriction on transfer, or conditional sales or other title retention arrangement.

"**Long-Term Liabilities Escrow Amount**" means an amount equal to $1,000,000.

"**Made Available**" means, with respect to any document or other material, the uploading of such document or other material by the Company or its Representatives to the Data Room for availability to Purchaser and its Representatives through the Closing.

"**Material Adverse Effect**" means any state of facts, development, event, circumstance, condition, occurrence or effect that, individually or taken collectively with all other facts, developments, events, circumstances, conditions, occurrences or effects, has, or would reasonably be expected to have, a material adverse effect on (a) the business, assets, financial condition or results of operations of the Company and the Development Companies taken as a whole; or (b) the ability of the Company to perform its obligations hereunder and consummate the transactions contemplated hereby; provided, however, in no event shall any of the following be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or will be a Material Adverse Effect:

(A) any changes affecting the industries in which the Company, the Development Companies operates, so long as such changes do not disproportionately affect the Company and the Development Companies taken as a whole;

(B) any changes in the economy or in financial, capital or energy markets generally, including changes in interest or exchange rates, so long as such changes do not disproportionately affect the Company and the Development Companies taken as a whole;

(C) changes in Applicable Law, GAAP, IFRS or accounting standards or interpretations thereof, or changes in general legal, regulatory or political conditions, so long as such changes do not disproportionately affect the Company and the Development Companies taken as a whole;

(D) acts of war, sabotage, armed hostilities or terrorism, or any escalation or worsening of any acts of war, sabotage, armed hostilities or terrorism;

(E) natural disasters or acts of God;

(F) any failure by the Company to meet any internal or external projections, forecasts or revenue or earnings predictions;

(G) changes resulting from the announcement of the execution, or the pendency, of this Agreement or the performance of obligations under this Agreement;

(H) actions or inactions required pursuant to this Agreement; and

(I) termination of the Cassadaga PPA.

"**Material Contract**" is defined in Section 4.11(a).

"**Member Closing Payment**" is defined in Section 3.3(a).

"**Member Representative**" means Trireme Energy Holdings, Inc. and any successor member representative designated from time to time by or on behalf of the Company Member.

"**Merger**" is defined in the Recitals.

"**Merger Consideration**" is defined in Section 3.1.

"**Merger Sub**" is defined in the Preamble.

"**Milestone Adjustment Amount**" means (i) in the event that the Company was treated as a corporation as of the Closing Date as described in Section 3.3(d), (A) the Tax Rate multiplied by the Initial Payment, plus (B) the Tax Rate multiplied by all Payment Milestone Amount(s), less (C) the Tax Rate multiplied by the adjusted basis of the Target Projects in the hands of the Company or each relevant Development Company, as applicable, or (ii) in the event that a Development Company was treated as a corporation as of the Closing Date as described in Section 3.3(d), (A) the Tax Rate multiplied by that portion of the Initial Payment allocable to such Development Company or the Target Project it owns, plus (B) the Tax Rate multiplied by all Payment Milestone Amount(s) allocable to such Development Company or the Target Project it owns, less (C) the Tax Rate multiplied by the adjusted basis of the Target Project in the hands of the Development Company; provided that, in each case, the adjusted basis of the relevant Target Project shall be determined as of the Closing Date after taking into account any entity classification election made pursuant to Section 9.4 hereof to the extent permitted by applicable U.S. federal and state and local Tax law.

"**Minimum Planned Installed Capacity**" with respect to a Target Project means the amount set forth opposite such Target Project's name in Section B of Annex 1 attached hereto.

"**Order**" means any award, injunction, judgment, decree, order, ruling, subpoena, verdict, writ, settlement or other decision entered, issued or rendered by any Governmental Authority.

"**Other Antitrust Laws**" means the antitrust and competition laws of all relevant jurisdictions other than those of the United States.

"**Owned Real Property**" is defined in Section 4.13(a).

"**Party**" and "**Parties**" are defined in the Preamble.

"**Pass-Through Tax**" means any U.S. federal or state net income Tax or similar Tax (imposed in lieu of net income Tax) imposed on a consolidated, unitary or other flow-through basis with respect to which the taxable net income (or similar measure) that would be attributable to an entity on an individual basis increases the tax basis in such entity's equity to the owner(s) of its equity or for which such entity is not otherwise liable by reason of Applicable Law.

"**Payment Milestone**" means, (i) with respect to a Target Project (other than the Cassadaga Project or the Scioto Ridge Project), (a) prior to October 1, 2019, either: (1) that all of the following have occurred: (A) such Target Project has secured such land rights, approvals, Governmental Authorizations, and other assets that are reasonably required to finance, develop, construct, own, and operate a wind energy generation project, (B) such Target Project has obtained a valid, enforceable interconnection agreement, and (C) such Target Project has obtained power purchase and/or offtake agreements (including synthetic power purchase agreements, swaps and hedges) for at least its Minimum Planned Installed Capacity, if any; or (2) (x) such Target Project has obtained a valid, enforceable interconnection agreement and construction agreement and (y) a full notice to proceed under such construction contract has been issued for construction of the applicable Target Project; or (b) such Target Project has not achieved the Payment Milestone set forth in (a) above prior to October 1, 2019, but such Target Project has reached its Commercial Operation Date on or before December 31, 2020, and (ii) with respect to the Cassadaga Project, either (x) prior to October 1, 2019, either (1) the occurrence of the events listed in Section C(1) of Annex 1 or (2) the Cassadaga Project has obtained a valid, enforceable interconnection agreement and construction agreement and a full notice to proceed under such construction contract has been issued for construction of the Cassadaga Project or (y) the Cassadaga Project shall have reached its Commercial Operation Date on or before December 31, 2020.

"**Payment Milestone Amount**" means, with respect to a Target Project, the amount set forth in Section A of Annex 1.

"**Permitted Liens**" means:

(A) Liens for Taxes, assessments and governmental charges or levies (i) not yet due and payable or (ii) being contested in good faith by appropriate proceedings, *provided* that adequate reserves shall have been made therefor, so long as levy and execution thereon have not commenced or have otherwise been stayed;

(B) any Liens the existence of which are reflected on the Balance Sheet;

(C) zoning, building restrictions, easements, covenants, rights-of-way and other similar restrictions that do not adversely affect in any material respect the current use of the Company's and the Development Companies' assets, and all rights reserved to or vested in any Governmental Authority to control or regulate any of the Company's and the Development Companies' assets in any manner;

(D) workers', carriers' and mechanics' or other like Liens incurred in the ordinary course of business that are not delinquent or that are being contested in good faith by appropriate proceedings;

(E) Liens that do not materially and adversely interfere with the present use of the properties they affect and that do not materially and adversely reduce the value of such properties, or the assets of the Company or any Development Company; and

(F) matters set forth on Schedule 1.1(d).

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Authority or any agency, instrumentality or political subdivision of a Governmental Authority, or any other entity or body.

"**Policies**" is defined in Section 4.21.

"**Pre-Closing Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"**Projects**" means the renewable energy facility projects contemplated to be developed, owned, operated, maintained, or financed by the Company or any Development Company and as set forth on Schedule 1.1(f).

"**Project Data**" is defined in Section 4.23(a).

"**Prudent Wind Industry Practices**" means any of the practices, methods and acts generally applied or utilized by experienced and prudent industry members in the United States under comparable circumstances in respect of the design, development, construction, commissioning, maintenance, financing and operation of wind generating facilities of comparable type and complexity to the Projects, or such other practices, methods or acts which, in the exercise of reasonable judgment by those experienced in the industry in light of the facts known at the time a decision is made, would be expected to accomplish the result intended. "Prudent Wind Industry Practices" do not necessarily mean the best practice, method, or act in all cases, but is instead intended to encompass a range of acceptable practices, methods, and acts under the circumstances.

"**PTC**" means the renewable electricity production credit described in Code Section 45.

"**PTC Base Rate**" means $24 per megawatt hour of electricity produced.

"**PUHCA**" means the Public Utility Holding Company Act of 2005 and FERC's implementing regulations.

"**Purchaser**" is defined in the Preamble.

"**Purchaser Indemnified Persons**" means Purchaser and its Affiliates, and each of their respective directors, managers, officers, employees, stockholders, members, agents, attorneys and representatives.

"**Purchaser's 401(k) Plan**" is defined in Section 7.2(c)(i).

"**QF**" means a "qualifying small power production facility" as such term is defined in Section 3(17)(C) of the FPA and the implementing regulations of FERC at 18 C.F.R. § 292.203(a).

"**R&W Insurance Policy**" means that certain representation and warranty insurance policy issued by the insurer of Purchaser's choice in favor of Purchaser.

"**Real Property Agreements**" means, collectively, the Easements, the Leases and all option agreements granting the Company or any Development Company the option to lease real property or enter into easement agreements.

"**Records**" is defined in Section 4.24.

"**Registered Intellectual Property**" means all Intellectual Property owned by the Company or any Development Company that is subject to registrations, applications for registration, or other filings with or issuance by any Governmental Authority.

"**Reorganization**" is defined in the Recitals.

"**Representatives**" is defined in Section 6.2.

"**Required Third Party Consents**" is defined in Section 6.4.

"**Resolution Period**" is defined in Section 3.3(b)(ii).

"**Section 280G Payments**" means, with respect to any Person, any payments and/or benefits that may separately or in the aggregate constitute "excess parachute payments" within the meaning of Section 280G of the Code and the applicable rulings and final regulations promulgated thereunder.

"**Section 280G Waiver**" means, with respect to any Person, a written agreement waiving such Person's right to receive any 280G Payments and to accept in substitution therefor the right to receive such payments only if approved by the stockholders of the Company in a manner that complies with Section 280G(b)(5)(B) of the Code.

"**Section 721**" is defined in Section 10.1(b).

"**Scioto Ridge Project**" means that certain wind energy generation project under development by Hardin Wind LLC, commonly known as the "Scioto Ridge Wind Project."

"**Shortfall Amount**" is defined in Section 3.4(d)(ii).

"**Straddle Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any party, any Person, of which (a) such party or any Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interest in such partnership), (b) at least a majority of the securities or other equity interests in such Person is directly or indirectly owned or controlled by such party and/or by any one or more of its Subsidiaries, (c) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such Person is directly or indirectly owned or controlled by such party and/or by any one or more of its Subsidiaries or (d) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date. With respect to the Company, the term "Subsidiary" shall include each of the Development Companies.

"**Surviving Company**" is defined in Section 2.1.

"**Target Project**" means the renewable energy facility projects contemplated to be developed, owned, operated, maintained, or financed by any Development Company.

"**Tax**" and "**Taxes**" means (i) all federal, national, state and local income, profits, franchise, sales, use, ad valorem, property, severance, production, excise, stamp, documentary, real property transfer or gain, gross receipts, goods and services, registration, capital, transfer, value added, payroll, employment, withholding, environmental, alternative minimum, or add-on minimum taxes or other assessments, duties, fees or charges imposed by any Governmental Authority, including any interest, penalties or additional amounts which may be imposed with respect thereto or otherwise in respect of any Tax Return and (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of any written obligation to indemnify any other Person, being a transferee or successor in interest to any party, or as a member of an affiliated, consolidated, combined or unitary group for any period.

"**Tax Authority**" means any Governmental Authority competent to impose any Tax in any jurisdiction.

"**Tax Rate**" means the highest applicable U.S. federal income tax rate, plus the highest applicable state and local income or similar tax rate, in each case to the extent applicable to a corporation that owns the relevant Target Project on the Closing Date.

"**Tax Return**" means any return, report or other information required to be supplied to a Tax Authority in connection with Taxes.

"**TEII**" is defined in the Preamble.

"**Third Party Claim**" is defined in Section 11.2(b).

"**Transition Services Agreement**" means the transition services agreement by and between Purchaser and Company Member, substantially in the form of Exhibit B attached hereto.

"**Transfer Taxes**" means all sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer taxes and fees, including any interest, penalties or additional amounts which may be imposed with respect thereto or otherwise in respect of any Tax Return.

"**Working Capital Escrow Amount**" means an amount equal to $500,000.

1.2 Interpretation.

(a) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(b) The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c) When a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified.

(d) The word "include", "includes", and "including" when used in this Agreement shall be deemed to be followed by the words "without limitation", unless otherwise specified.

(e) A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(f) The Parties have participated jointly in the negotiation and drafting of this Agreement. Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.

(g) All references to $ are to United States dollars.

ARTICLE II

THE MERGER

2.1 The Merger. Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Merger Sub shall be merged with and into the Company, whereupon the separate corporate existence of Merger Sub shall cease and the Company shall be the Surviving Company (the "**Surviving Company**") and shall continue to exist with all its rights, privileges, powers and franchises unaffected by the Merger. The Merger shall have the effects specified in Delaware Law.

2.2 Closing; Effective Time.

(a) The closing of the Merger (the "**Closing**") shall take place at the offices of Morgan, Lewis & Bockius LLP, 301 Grant Street, Pittsburgh, Pennsylvania, on the date that is (i) not earlier than two (2) Business Days after satisfaction or waiver of the conditions set forth in Article X (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) occurs and (ii) the first to occur following the satisfaction of the conditions set forth in subclause (i) of the 15th day of the calendar month or the last day of the calendar month, or on such other date or at such other place as Purchaser and the Company may mutually agree (the "**Closing Date**").

(b) Upon the Closing, the Company and Merger Sub shall file with the Secretary of State of the State of Delaware a certificate of merger, executed in accordance with the relevant provisions of Delaware Law (the "**Certificate of Merger**") and shall make all other filings or recordings required under Delaware Law in connection with the Merger, in such form as is required by, and executed in accordance with, the relevant provisions of Delaware Law. The Merger shall become effective at such time as the Certificate of Merger is so filed or at such later time as may be agreed by Purchaser and the Company and specified in the Certificate of Merger (the "**Effective Time**").

2.3 Certificate of Formation; Limited Liability Company Agreement.

(a) The certificate of formation of the Company shall be amended at the Effective Time in the form attached to the Certificate of Merger and, as so amended, shall be the certificate of formation of the Surviving Company until amended thereafter in accordance with such certificate of formation and Applicable Law.

(b) The limited liability company agreement of Merger Sub in effect immediately prior to the Effective Time shall be the limited liability company agreement of the Surviving Company until thereafter amended in accordance with Applicable Law.

2.4 Managers and Officers. From and after the Effective Time, until successors are duly elected or appointed and qualified in accordance with Applicable Law, (i) the managers of Merger Sub immediately prior to the Effective Time shall be the managers of the Surviving Company, and (ii) the officers of Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Company.



Confidential IRUS0064137

## ARTICLE III

## EFFECT ON MEMBERSHIP INTERESTS; PAYMENT

3.1 Merger Consideration. The aggregate amount of consideration (the "**Merger Consideration**") to be paid by Purchaser with respect to the outstanding membership interests of the Company shall be an amount equal to (a) (i) $50,000,000, plus (ii) any Approved Development Expenses (collectively, the "**Initial Payment**"), plus (b) all Payment Milestone Amounts paid in accordance with Section 3.3(b) in an aggregate amount of up to $112,200,000, if any.

3.2 Effect on Membership Interests. At the Effective Time, by virtue of the Merger and without any action on the part of Purchaser, Merger Sub, the Company or Company Member:

(a) The Company membership interests issued and outstanding immediately prior to the Effective Time shall be cancelled and converted into the right to receive the Merger Consideration, without interest.

(b) All membership interests of the Company held or owned by the Company in treasury shall be cancelled and no consideration shall be payable with respect thereto.

(c) Each membership interest of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become a membership interest in the Surviving Company.

(d) Notwithstanding the foregoing, an amount otherwise payable to the Company Member equal to the Escrow Amount will be deposited by Purchaser on the Closing Date with the Escrow Agent in an escrow fund in accordance with the Escrow Agreement in substantially the form attached hereto as Exhibit A (the "**Escrow Agreement**"). The Escrow Amount shall be used to satisfy any payment obligation in respect of Section 9.3 and any adjustment to the Merger Consideration pursuant to Section 3.4(d)(ii). The Escrow Amount shall be withheld from the Merger Consideration that would otherwise be payable to the Company Member.

(e) After the Effective Time, there shall be no transfers of any Company membership interests on the transfer books of the Company or the Surviving Company.

(f) The portion of the Merger Consideration delivered upon surrender of and in exchange for Company membership interests in accordance with the terms of this Section 3.2 will be deemed to have been delivered in full satisfaction of all rights pertaining to such membership interests. At the Effective Time, all Company membership interests issued before the Effective Time will cease to exist, and each certificate, if any, previously representing any such units will represent only the right to receive the Merger Consideration determined in accordance with this Section 3.2.

3.3 Exchange of Certificates; Payment of Merger Consideration.

(a) At the Effective Time, Purchaser shall deliver, by wire transfer of immediately available funds, (i) to the Company Member, an amount in cash equal to (such amount, the "**Member Closing Payment**") the Closing Amount minus the Escrow Amount and (ii) to the Escrow Agent, the Escrow Amount.

(b) If a Target Project reaches a Payment Milestone, then within seven (7) Business Days after such Target Project achieves such Payment Milestone, Purchaser shall deliver, by wire transfer of immediately available funds, to the Company Member, an amount in cash equal to the applicable Payment Milestone Amount.

(i) In the event that the Member Representative believes that a Target Project has achieved a Payment Milestone, the Member Representative shall promptly notify Purchaser in writing. If Purchaser disputes that such Target Project has achieved the Payment Milestone, Purchaser shall notify the Member Representative in writing (the "**Dispute Notice**") of such dispute within fifteen (15) Business Days (the "**Dispute Period**") after Purchaser's receipt of such notice from the Member Representative. If Purchaser fails to deliver the Dispute Notice within the Dispute Period or otherwise accepts the Member Representative's belief, then such Target Project shall be deemed to have achieved the Payment Milestone and Purchaser shall deliver, within ten (10) Business Days thereafter, by wire transfer of immediately available funds, to the Company Member, an amount in cash equal to the applicable Payment Milestone Amount.

(ii) If Purchaser delivers the Dispute Notice within the Dispute Period, then Purchaser and the Member Representative shall, in good faith, attempt to resolve such dispute. If the parties are unable to resolve such dispute within thirty (30) days (the "**Resolution Period**") after the date Purchaser delivers the Dispute Notice, such dispute will be submitted to an independent engineer reasonably acceptable to both the Member Representative and Purchaser for resolution (the "**Independent Engineer**"). If Purchaser and the Member Representative are unable to agree on the Independent Engineer within ten (10) days of the expiration of the Resolution Period, then each of Purchaser and the Member Representative shall designate an independent engineer not later than fifteen (15) days after such failure to agree, and the two designated independent engineers shall mutually select the Independent Engineer; provided, that if either party fails to designate an independent engineer by the expiration of such fifteen (15) day period, then the independent engineer designated by the other party shall be the Independent Engineer.

(iii) The parties shall use their respective reasonable efforts to cause the Independent Engineer to resolve such dispute as soon as practicable, but in any event shall direct the Independent Engineer to render a determination within forty-five (45) days after its retention. The determination of the Independent Engineer shall be conclusive and binding upon the parties. The fees, costs and expenses of the Independent Engineer in resolving such dispute shall be borne by the party which, in the conclusive judgment of the Independent Engineer, is not the prevailing party.

(c) Purchaser or the Company Member will be entitled to deduct and withhold from the Merger Consideration and any other payments contemplated by this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax law. To the extent that amounts are so withheld, such amounts shall be timely paid over to the proper Governmental Authority and treated for all purposes of this Agreement as having been paid to the Company Member. The Company Member will provide Purchaser or the Company (to the extent not previously provided) any Forms W-4, W-8, W-9 or other certificates or forms Purchaser may reasonably request prior to Closing, in order to allow Purchaser or the Company to meet its withholding obligations under any applicable Tax law.

(d) If at any time (i) the Internal Revenue Service determines that the Company or any Development Company was treated as a corporation for U.S. federal income tax purposes as of the Closing Date, and (ii)(A) the applicable election provided to the Purchaser by the Company Member pursuant to Section 10.3(k) if filed by Purchaser as provided in Section 9.4 is insufficient to change such U.S. federal income tax treatment such that the Company or Development Company (as the case may be) will instead be classified as a disregarded entity for U.S. federal income tax purposes as of the Closing Date or (B) Purchaser, despite commercially reasonable efforts to obtain a written response from the Internal Revenue Service, has not obtained a written response from the Internal Revenue Service in regard to any election requested in accordance with Section 9.4 prior to the date on which a Payment Milestone Amount in respect of a relevant Target Project or Development Company is due, then Purchaser may deduct from any subsequent Payment Milestone Amount(s) an amount equal to the Milestone Adjustment Amount; provided that, in the circumstances described in Section 3.3(d)(ii)(B), any amount deducted from a subsequent Payment Milestone Amount shall be paid to Seller promptly following Purchaser's receipt of a written response from the Internal Revenue Service that the relevant election request has been granted such that the Company or the relevant Development Company was treated as a disregarded entity for U.S. federal income tax purposes as of the Closing Date. In the event that the Hardin Closing Date takes place pursuant to Section 8.8, this Section 3.3(e) shall apply to Hardin as if Hardin were a Development Company but by substituting the Hardin Closing Date for the Closing Date when applying this Section 3.3(e) to Hardin.

3.4 <u>Merger Consideration Adjustment</u>.

(a) The Initial Payment shall be adjusted as follows:

(i) If the Closing Net Working Capital is less than $0, the Initial Payment shall be decreased dollar for dollar by an amount equal to such deficiency. If the Closing Net Working Capital is greater than $0, the Initial Payment shall be increased dollar for dollar by an amount equal to such excess.

(ii) If the Closing Long-Term Liabilities is greater than $50,000, the Initial Payment shall be decreased dollar for dollar by an amount equal to the amount of Closing Long-Term Liabilities in excess of $0.

(b) Not later than seven (7) Business Days prior to the Closing Date, the Company shall prepare and deliver to Purchaser (i) an estimated balance sheet of the Company and the Development Companies as of the close of business on the date immediately preceding the Closing Date and (ii) a preliminary statement estimating (A) the Closing Net Working Capital and showing the calculation thereof, (B) the Closing Long-Term Liabilities and showing the calculation thereof and (C) the Initial Payment, after giving effect to the estimated Closing Net Working Capital and the estimated Closing Long-Term Liabilities adjustment (the "**Closing Amount**"). In the event Purchaser notifies the Company of any objection to the Closing Statement not later than two (2) Business Days prior to the Closing, then Purchaser and the Company shall discuss in good faith and endeavor to resolve any such objections prior to the Closing Date. In the event that the Purchaser and the Company are unable to resolve the objections prior to the Closing Date, then the amount in dispute (the "**Disputed Amount**") shall be included in the calculation of the Initial Payment, provided that if the Disputed Amount results in an increase to the Closing Amount in excess of $500,000, then the portion of the Disputed Amount in excess of $500,000 shall be added to the Working Capital Escrow Amount.

(c) On or before the 45th day following the Closing Date, Purchaser shall prepare and deliver to the Member Representative (i) a balance sheet of the Company and the Development Companies as of the close of business on the date immediately preceding the Closing Date and (ii) a statement (the "**Closing Statement**") setting forth (A) the Closing Net Working Capital and showing the calculation thereof, (B) the Closing Long-Term Liabilities and showing the calculation thereof and (C) the Initial Payment after giving effect to the Closing Net Working Capital and the Closing Long-Term Liabilities. As soon as reasonably practicable but not later than the 45th day following the Member Representative's receipt of the Closing Statement, the Member Representative shall deliver to Purchaser a written report containing any changes that the Member Representative proposes be made to such statement. Purchaser (i) shall reasonably cooperate and assist, and shall use its commercially reasonable efforts to cause its Representatives to assist, the Member Representative and its Representatives in the review of Purchaser's statement, as and to the extent reasonably requested and (ii) shall provide the Member Representative and its Representatives with any information reasonably requested by them. The Parties shall undertake to agree on the final statement of the Initial Payment no later than thirty (30) days after Purchaser's receipt of the Member Representative's report. In the event that the Parties cannot reach agreement within such period of time, either Party may refer the remaining matters in dispute for review and final determination to KPMG US LLP (or if such firm shall decline or is unable to act, to another internationally recognized independent accounting firm mutually acceptable to Purchaser and the Member Representative, the "**Accounting Firm**"). Once appointed, the Accounting Firm shall have no *ex parte* communications with any of the Parties concerning the determination required hereunder. All communications between any Party, or its Affiliates, and the Accounting Firm shall be conducted in writing, with copies sent simultaneously to the other Parties in the same manner, or at a meeting to which the representatives of the Parties have been invited with at least five (5) days prior written notice. Within ten (10) days of appointment of the Accounting Firm, Purchaser shall present the Accounting Firm with its statement of proposed changes, and the Member Representative shall present the Accounting Firm with its response within ten (10) days after receipt of Purchaser's statement, in each case together with all other supporting information that such Party desires, with a copy to the other Party. The Accounting Firm's determination shall be made within thirty (30) days after the deadline for the Member Representative's

submissions and shall be final and binding on the Parties, without right of appeal. The Accounting Firm shall limit its review to (i) whether the Closing Net Working Capital and the Closing Long-Term Liabilities have been calculated in accordance with the definitions and procedures in Schedule 1.1(a) and (ii) whether there are any mathematical errors in the computations. In determining the proper amount of any adjustment to the Initial Payment, the Accounting Firm shall not increase the Initial Payment more than the increase proposed by the Member Representative nor decrease the Initial Payment more than the decrease proposed by Purchaser, as applicable. The Accounting Firm shall act as an expert for the limited purpose of determining the specific disputed matters submitted by the Parties in accordance with this Section, shall not act as an arbitrator, and may not award damages or penalties to either Party with respect to any matter. Each Party shall bear its own legal fees and other costs of presenting its case. The Member Representative shall bear one-half and Purchaser shall bear one-half of the costs and expenses of the Accounting Firm. The Parties agree to execute, if requested by the Accounting Firm, a reasonable engagement letter, including customary indemnities in favor of the Accounting Firm.

(d) Promptly but in any event within ten (10) days after the earlier of (i) the expiration of the Member Representative's forty-five (45)-day review period without delivery of any written report or (ii) the date on which the Parties or the Accounting Firm, as applicable, finally determines the disputed matters:

(i) if the Initial Payment, as finally determined pursuant to Section 3.4(c), is greater than the Closing Amount (such difference, the "**Excess Amount**"), Purchaser shall pay to the Company Member by wire transfer of immediately available funds the Excess Amount and the Escrow Agent shall distribute the Working Capital Escrow Amount to the Company Member; and

(ii) if the Initial Payment, as finally determined pursuant to Section 3.4(c), is less than the Closing Amount (such difference, the "**Shortfall Amount**"), Purchaser shall be entitled to receive the Shortfall Amount, (A) to the extent the Shortfall Amount is attributable to Closing Long-Term Liabilities, from the Long-Term Liabilities Escrow Amount and (B) to the extent the Shortfall Amount is attributable to Closing Net Working Capital, first, from the Working Capital Escrow Amount, and second by wire transfer of immediately available funds by the Company Member, and the Escrow Agent shall distribute any remaining portion of the Working Capital Escrow Amount to the Company Member.

(e) On or before the date that is six months following the Closing Date, Purchaser shall prepare and deliver to the Member Representative (i) a balance sheet of the Company and the Development Companies as of the close of business on the date immediately preceding the Closing Date and (ii) a statement setting forth any Closing Long-Term Liabilities that were not included in the final determination of the Initial Payment pursuant to Section 3.4(d) and showing the calculation thereof. As soon as reasonably practicable but not later than the 45th day following the Member Representative's receipt of Purchaser's statement hereunder, the Member Representative shall deliver to Purchaser a written report containing any changes that the Member Representative proposes be made to such statement. Purchaser (i) shall reasonably cooperate and assist, and shall use its commercially reasonable efforts to cause its Representatives to assist, the Member Representative and its Representatives in the review of

Purchaser's statement, as and to the extent reasonably requested and (ii) shall provide the Member Representative and its Representatives with any information reasonably requested by them. The Parties shall undertake to agree on the final statement of the Closing Long-Term Liabilities no later than thirty (30) days after Purchaser's receipt of the Member Representative's report. In the event that the Parties cannot reach agreement within such period of time, either Party may refer the remaining matters in dispute for review and final determination to the Accounting Firm. Once appointed, the Accounting Firm shall have no *ex parte* communications with any of the Parties concerning the determination required hereunder. All communications between any Party, or its Affiliates, and the Accounting Firm shall be conducted in writing, with copies sent simultaneously to the other Parties in the same manner, or at a meeting to which the representatives of the Parties have been invited with at least five (5) days prior written notice. Within ten (10) days of appointment of the Accounting Firm, Purchaser shall present the Accounting Firm with its statement of proposed changes, and the Member Representative shall present the Accounting Firm with its response within ten (10) days after receipt of Purchaser's statement, in each case together with all other supporting information that such Party desires, with a copy to the other Party. The Accounting Firm's determination shall be made within thirty (30) days after the deadline for the Member Representative's submissions and shall be final and binding on the Parties, without right of appeal. The Accounting Firm shall limit its review to (i) whether the Closing Long-Term Liabilities have been calculated in accordance with the definitions and procedures in Schedule 1.1(a), (ii) whether the Closing Long-Term Liabilities were included in the final determination of the Initial Payment pursuant to Section 3.4(d), and (iii) whether there are any mathematical errors in the computations. The Accounting Firm shall act as an expert for the limited purpose of determining the specific disputed matters submitted by the Parties in accordance with this Section, shall not act as an arbitrator, and may not award damages or penalties to either Party with respect to any matter. Each Party shall bear its own legal fees and other costs of presenting its case. The Member Representative shall bear one-half and Purchaser shall bear one-half of the costs and expenses of the Accounting Firm. The Parties agree to execute, if requested by the Accounting Firm, a reasonable engagement letter, including customary indemnities in favor of the Accounting Firm.

(f) Promptly but in any event within ten (10) days after the earliest of (i) the expiration of the Member Representative's forty-five (45)-day review period without delivery of any written report or (ii) the date on which the Parties or the Accounting Firm, as applicable, finally determines the disputed matters:

(i) if the amount of Long-Term Liabilities, as finally determined pursuant to Section 3.4(e), is less than $50,000, provided that all payment obligations with respect to Section 9.3 have been satisfied, the Escrow Agent shall distribute the Long-Term Liabilities Escrow Amount to the Company Member; and

(ii) if the amount of Long-Term Liabilities, as finally determined pursuant to Section 3.4(e), is greater than $50,000 (such amount of Long-Term Liabilities, the "**Long-Term Liabilities Shortfall Amount**"), Purchaser shall be entitled to receive the Long-Term Liabilities Shortfall Amount from the Long-Term Liabilities Escrow Amount and, provided that all payment obligations with respect to Section 9.3 have been satisfied, the Escrow Agent shall distribute any remaining portion of the Long-Term Liabilities Escrow Amount to the Company Member.

3.5 Allocation of Merger Consideration. The Parties acknowledge and agree that the Merger shall be treated, for federal income tax purposes, as a purchase and sale of the assets held by the Company. Each Party shall allocate the payments made under this Agreement among the assets held by the Company in accordance with the law applicable to such Party.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedules of the Company (the "**Company Disclosure Schedule**") attached hereto and delivered to Purchaser concurrently herewith, the Company Member hereby represents and warrants to Purchaser as of the date of this Agreement, and as of the Closing Date, as follows:

4.1 Corporate Status. The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, has the requisite company power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted. To the extent such concept or a similar concept exists in the relevant jurisdiction, the Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased or held under license by it make such licensing or qualification necessary, except where the failure to be so licensed or qualified would not have a Material Adverse Effect. The Company has made available to Purchaser a complete and correct copy of the Company's Charter Documents as in effect on the date hereof.

4.2 Authorization and Enforceability.

(a) The Company has all requisite company power and authority to enter into this Agreement, and, subject to obtaining the Company Member Approval, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Company, subject to obtaining the Company Member Approval. The affirmative vote of the Company Member (the "**Company Member Approval**") is the only vote of the holders of any class of equity interests of the Company necessary in connection with the consummation of the Reorganization and the Merger and the other transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by the Company and, assuming the due execution of this Agreement by Purchaser and Merger Sub, constitutes the valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to creditors' rights generally, and the availability of injunctive relief and other equitable remedies (the "**Enforceability Exceptions**").

(b) The board of managers of the Company, by resolutions duly adopted, has (i) declared this Agreement advisable and determined that it is in the best interests of the Company and its members to enter into this Agreement, (ii) approved the execution, delivery

and, subject to obtaining the Company Member Approval, performance of this Agreement and the consummation of the transactions contemplated hereby, including the Merger, (iii) recommended that the Company Member vote in favor of the adoption of this Agreement, and (iv) directed that the Company submit the adoption of this Agreement to a vote of the Company Member.

4.3 Authorizations. The execution, delivery and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby require no action by, consent, approval, authorization or permit of, or in respect of, or filing or notification with, any Governmental Authority, other than (a) compliance with the applicable requirements of the HSR Act and the Other Antitrust Laws and (b) the filing of the Certificate of Merger with the Delaware Secretary of State and appropriate documents with the relevant authorities of other states in which the Company is qualified to do business.

4.4 Non-Contravention. Assuming compliance with the matters referred to in Section 4.3, the execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the Merger and the other transactions contemplated hereby do not and will not (a) violate, or result in the breach of, any provision of the Charter Documents of the Company or any Development Company, (b) violate, or result in the breach of, any provision of any Applicable Law or Order, (c) require any consent or other action by any Person under, violate, or result in a breach of, any Material Contract, (d) result in a violation or revocation of any Governmental Authorization held by the Company or any Development Company, or (e) result in the creation or imposition of any Lien on any asset of the Company or any Development Company, with such exceptions, in the case of each of clauses (b), (d) and (e), as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.5 Capitalization.

(a) The authorized capital of the Company is comprised of membership interests, one hundred percent (100%) of which are issued and outstanding as of the date hereof and held by the Company Member. All outstanding Company membership interests have been duly authorized and validly issued and are fully paid and nonassessable.

(b) There are no Company Equity Plans. Neither the Company nor any Development Company maintains any plans or programs under which options, restricted units, unit appreciation rights, performance units or other compensatory equity-based awards have been granted and remain outstanding.

(c) Except as set forth in this Section 4.5, there are no outstanding (i) units, membership interests or other equity interests of the Company, (ii) securities of the Company convertible into or exchangeable for units, membership interests or other equity interests of the Company, (iii) obligations, options, warrants or other rights, commitments or arrangements to acquire from the Company, or other obligations or commitments of the Company to issue, sell or otherwise transfer, any units or membership interests in, or any securities convertible into or exchangeable for units, membership interests or other ownership interests in, the Company or (iv) restricted units, unit appreciation rights, performance units, contingent value rights, "phantom" unit or similar securities or rights that are derivative of, or provide economic benefits

based, directly or indirectly, on the value or price of, any Company membership or ownership interests in, the Company (the items in clauses (i)-(iv) being referred to collectively as the "**Company Securities**").

(d) There are no (i) voting trusts, proxies or other similar agreements or understandings to which the Company is a party or by which the Company is bound with respect to the voting or transfer of any units or membership interests of the Company, (ii) obligations or commitments restricting the transfer of, or requiring the registration for sale of, any units or membership interests of the Company, or (iii) obligations or commitments of the Company to repurchase, redeem or otherwise acquire any of the Company Securities. Except as set forth in this Section 4.5, the Company has no outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible or exchangeable into or exercisable for securities having the right to vote) with the holders of equity interests of the Company or any Development Company on any matter.

4.6 Subsidiaries of the Company. Section 4.6 of the Company Disclosure Schedule sets forth a list of the Development Companies, which, after giving effect to the Reorganization will be all of the Subsidiaries of the Company, which list sets forth for each such Development Company its name, its jurisdiction of organization, the number and type of its authorized, issued and outstanding equity interests, and the current record and beneficial ownership of such securities. Each Development Company is validly existing and, to the extent applicable, in good standing under the laws of the jurisdiction of its organization or formation, has all requisite power to carry on its business as now being conducted and is duly qualified to do business and is in good standing in each jurisdiction where such qualification is necessary, except where the failure to be so qualified would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Other than the Development Companies, there is no other Person in which the Company owns, of record or beneficially, any direct or indirect equity or other similar interest or any right (contingent or otherwise) to acquire the same. All the outstanding equity interests of each Development Company are validly issued, fully paid and nonassessable, and are free of preemptive rights, and, after giving effect to the Reorganization, will be owned, directly or indirectly, by the Company free and clear of any Lien other than Permitted Liens. There are no outstanding options, warrants or other securities or rights convertible into or exercisable for any equity interests in any of the Development Companies.

4.7 Balance Sheet; Indebtedness.

(a) Section 4.7(a) of the Company Disclosure Schedule contains a true and complete copy of the *pro forma* unaudited consolidated balance sheet (the "**Balance Sheet**") of the Company and the Development Companies as of December 31, 2017 (the "**Balance Sheet Date**"). The Balance Sheet presents fairly, in all material respects, the consolidated financial position of the Company and the Development Companies as at the Balance Sheet Date (subject to the absence of notes).

(b) As of the date hereof, the Company is a newly formed entity, conducts no business activities and has no material liabilities or obligations, other than its obligations under this Agreement.

(c) Section 4.7(c) of the Company Disclosure Schedule sets forth a list of the Indebtedness of the Company and the Development Companies as of the date of this Agreement.

(d) As of the Closing Date, the Development Companies do not have any material liabilities, except for: (i) liabilities set forth on the Balance Sheet, (ii) trade payables incurred in the ordinary course of business, which shall be deemed current liabilities for the purpose of determining Closing Net Working Capital, (iii) other liabilities that have been incurred since the date of this Agreement in accordance with the Approved Development Budget or the Approved Hardin Development Budget, and (iv) liabilities and obligations set forth on Section 4.7(d) of the Company Disclosure Schedule.

4.8 Absence of Changes. From June 30, 2017 to the date of this Agreement, the Development Companies have conducted their respective businesses in the ordinary course and with respect to the Company and the Development Companies there has not been:

(a) any change, circumstance, event, occurrence or development that has had or would reasonably be expected to have a Material Adverse Effect;

(b) any amendment to the Charter Documents of the Company or any Development Company;

(c) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, membership interests or property) with respect to any Company Securities or Development Company securities, or any repurchase, redemption or other acquisition by the Company or any Development Company of any outstanding securities of the Company or any Development Company;

(d) any sale, transfer, pledge or other disposition by the Company or any Development Company of any material portion of its respective assets or properties not in the ordinary course of business;

(e) any purchase or other acquisition by the Company or any Development Company of any assets or properties not in the ordinary course of business;

(f) any change in any method of accounting or accounting practices by the Company or any Development Company, except for any such change required by reason of a concurrent change in GAAP;

(g) except for the Merger and the Reorganization, adoption of a plan or agreement of liquidation, dissolution, restructuring, merger, consolidation, restructuring, recapitalization, amalgamation or other reorganization;

(h) any (i) issuance, sale, transfer, pledge, disposal of or sufferance of any Lien on any units of membership interests (or other equity interests) or other securities, (ii) grant of any options, warrants or other rights to purchase or obtain any units of membership interests (or other equity interests) or other securities, or (iii) split, combination, subdivision or reclassification of any units of membership interests (or other equity interests);

(i) any (i) incurring of Indebtedness or (ii) granting of any Lien (other than Permitted Liens) on any assets to secure any Indebtedness;

(j) with respect to the Company, any loan, advance or capital contribution to or investment in any Person other than the Development Companies;

(k) with respect to the Development Companies, any loan, advance or capital contribution to or investment in any Person;

(l) any failure to maintain in full force and effect the material insurance policies covering the Company and the Development Companies and their respective properties, assets and businesses in a form and amount consistent with past practices; or

(m) any agreement, whether in writing or otherwise, to do any of the foregoing.

4.9 Taxes.

(a) The Company and the Development Companies have timely filed or caused to have been timely filed all Tax Returns required to have been filed by or with respect to the Company or any Development Company. Each such Tax Return was correct and complete in all material respects. All Taxes (whether or not shown as owed by the Company or any Development Company on any such Tax Return) owed by the Company or any Development Company have been timely paid.

(b) The Company and the Development Companies have timely withheld and timely paid all Taxes required to have been withheld and paid by them and have complied in all respects with Applicable Law relating to the withholding of Taxes.

(c) There is no claim, audit, action, suit or proceeding pending, or, to the Company's Knowledge, threatened in writing against or with respect to the Company or any Development Company in respect of any Tax or Tax Return.

(d) There are no Liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of the Company or any Development Company. There are no outstanding agreements, waivers or arrangements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes due from or with respect to the Company or any Development Company for any taxable period. Neither the Company nor any Development Company is a party to any contract the primary function of which is to serve as a Tax allocation or sharing agreement.

(e) Neither the Company nor any Development Company has received any written notice from any Tax Authority that the Company or any Development Company should have filed Tax Returns in a jurisdiction in which it failed to file.

(f) Since their formations, the Company and each Development Company have at all times been classified as a disregarded entity for Tax purposes and no election has

been filed pursuant to Treasury Regulations Section 301.7701-3 to cause any of such entities to be treated as an association taxable as a corporation for U.S. federal Tax purposes.

(g) No grants have been provided by the United States, a state thereof, a political subdivision of a state or any other Governmental Authority for use in the development, permitting, acquisition, installation, ownership, marketing, sale, financing and planned operation of any asset held by the Company or the Development Companies. No proceeds of any issue of state or local government obligations have been used to provide financing for the development, permitting, acquisition, installation, ownership, marketing, sale, financing and planned operation of any asset held by the Company or the Development Companies, the interest on which is exempt from Tax under Section 103 of the Code. No subsidized energy financing (within the meaning of Section 45(b)(3) of the Code) has been provided, directly or indirectly, under a federal, state or local program to the Company or any Development Company or with respect to any asset held by the Company or the Development Companies.

(h) None of the Company or any Development Companies has entered into any "listed transactions" as defined in Treasury Regulation Section 1.6011-4(b)(2), and any reportable transactions in which the Company or any Development Company have entered into have been properly reported as required by Treasury Regulation Section 1.6011-4, including filing Form 8886 with Tax Returns and with the Office of Tax Shelter Analysis.

4.10 Compliance with Law; Governmental Authorizations.

(a) Except as set forth in Section 4.10(a) of the Company Disclosure Schedule, each of the Company, the Development Companies and the Involved Company Affiliates is, and since November 30, 2009 has been in compliance, in all material respects, with all Applicable Laws and Orders. Except as set forth in Section 4.10(a) of the Company Disclosure Schedule, since November 30, 2009, neither the Company, any Development Company nor any Involved Company Affiliate has received any written notice (i) of any administrative, civil or criminal investigation or audit by any Governmental Authority relating to the Company, any Development Company or any Involved Company Affiliate, or (ii) from any Governmental Authority alleging that the Company, any Development Company or any Involved Company Affiliate are not in compliance in any material respect with any material Applicable Law or Order.

(b) Neither the Company, any Development Company, any Involved Company Affiliate nor, to the Company's Knowledge, any of their respective directors, officers, agents, employees or any other Persons acting on their behalf has (i) made, directly or indirectly, any bribe or kickback, illegal political contribution, payment from company funds that was incorrectly recorded on the books and records of any of the aforementioned Persons, or any unlawful payment from company funds to any Governmental Authority or any officials of any Governmental Authority, (ii) used any corporate or other funds for unlawful contributions, payments, gifts or entertainment, or made any unlawful expenditures relating to political activity to officials, candidates or members of any Governmental Authority or political party or organization, or established or maintained any unlawful or unrecorded funds in violation of Section 104 of the Foreign Corrupt Practices Act of 1977, as amended, or any other similar Applicable Law, (iii) paid, accepted or received any unlawful contributions, payments, expenditures or gifts, (iv) violated in any material respect or operated in material non-compliance

with any export restrictions, anti-boycott regulations, embargo regulations or other Applicable Law, or (v) conducted business with any Designated Persons.

(c) Except as set forth in Section 4.10(c) of the Company Disclosure Schedule, for each of the Company, the Development Companies, and the Involved Company Affiliates, there is not and since November 30, 2009 has not been any governmental or other investigation, inquiry or action (including any suspension, fine, penalty or citation) against any of them, or to the Company's Knowledge, their employees, managing directors, officers, agents or any other Persons acting for or on their behalf concerning the Projects, and to the Company's Knowledge, none is pending or threatened.

(d) There is no outstanding or unsatisfied Order or decision of a court, tribunal, arbitrator or Governmental Authority against any of the Company, the Development Companies or the Involved Company Affiliates, or, to the Company's Knowledge, their respective employees, managing directors, officers, agents or any other Persons acting for or on their behalf concerning the Projects, and none of them is party to any current undertaking or assurance given to a court, tribunal, Governmental Authority or any other Person in connection with the determination or settlement of any claim or proceedings in relation to the Projects which remains outstanding.

(e) Section 4.10(e) of the Disclosure Schedule lists all Governmental Authorizations that are held by the Company, any Development Company or any Involved Company Affiliate with respect to any Projects. Each of the Governmental Authorizations held by the Company, any Development Company or any Involved Company Affiliate is in full force and effect, final, and non-appealable. The Company has Made Available a true, correct and complete copy of each Governmental Authorizations listed in Section 4.10(e) of the Disclosure Schedule. The Company, each Development Company, and each Involved Company Affiliate are in, and have been in, material compliance with all Governmental Authorizations and neither the Company, any Development Company, nor any Involved Company Affiliate has received written notice from any Governmental Authority of any material violations of any such Governmental Authorizations. Each of the Company, the Development Companies, and the Involved Company Affiliates holds all material Governmental Authorizations necessary for it to own, lease or otherwise hold and to operate its properties and assets and to carry on its businesses and operations as now conducted.

4.11 Contracts.

(a) "**Material Contract**" shall mean each Contract existing on the date hereof to which the Company or any Development Company is a party or by which their assets are bound, and under which there are ongoing obligations (other than customary confidentiality obligations):

(i) for the purchase of materials, supplies, goods, services, equipment or other assets and that involves or would reasonably be expected to involve aggregate payments by the Company or any Development Company of $200,000 or more (other than customary purchase orders made in the ordinary course of business);

(ii) for the sale by the Company or any Development Company of materials, supplies, goods, services, equipment or other assets, and that provides for aggregate payments to the Company or any Development Company of $100,000 or more, or pursuant to which the Company or any Development Company received payments of more than $100,000 in the year ended December 31, 2016 or expects to receive payments of more than $100,000 in the year ending December 31, 2017;

(iii) that continues over a period of more than twelve (12) months from the date hereof and provides for payments to or by the Company or any Development Company exceeding $100,000, except for arrangements disclosed pursuant to clauses (i) and (ii) above;

(iv) that is an employment, consulting, termination or severance Contract, except for any such Contract that is terminable at-will by the Company or any Development Company without material liability to the Company or such Development Company;

(v) that is a partnership, joint venture or similar Contract;

(vi) that is (A) a real property lease, (B) an option for a real property lease, (C) easement over real property or (D) for the lease of personal property which provides for payments to or by the Company or any Development Company of $100,000 or more over the term (excluding any optional extension) of such personal property lease;

(vii) that is a note, debenture, bond, equipment trust, letter of credit, loan or other Contract for Indebtedness or lending of money (other than advances or reimbursements to employees in the ordinary course of business);

(viii) for any capital expenditures or leasehold improvements in excess of $100,000;

(ix) that restricts the right of the Company or any Development Company to engage in any line of business or to compete with any Person (other than exclusivity provisions in power purchase agreements);

(x) that relates to the acquisition or disposition of any material business or material assets (whether by merger, sale of membership interests, sale of assets or otherwise);

(xi) that is a collective bargaining Contract with any labor organization, union or association; and

(xii) any commitment to enter into any agreement of the type described in clauses (i) through (xi) of this Section 4.11.

(b) Set forth in Section 4.11(b) of the Disclosure Schedule is a complete and accurate list of each Material Contract existing as of the date of this Agreement. The Company has provided or made available to Purchaser accurate and complete copies of each Material Contract. Each Material Contract is in full force and effect and is the legal, valid and

enforceable obligation of the Company and, to the Company's Knowledge, each other party thereto in accordance with its terms, subject to the Enforceability Exceptions.

(c) Neither the Company nor any Development Company is, and to the Company's Knowledge, no other party thereto is, in material default in the performance, observance or fulfillment of any obligation, covenant, condition or other term contained in any Material Contract, and neither the Company nor any Development Company has given or received written notice to or from any Person relating to any such alleged or potential default that has not been cured, nor, to the Company's Knowledge, has any event or circumstance occurred that, with notice or lapse of time or both, would constitute an event of default thereunder.

4.12 Personal Property.

(a) With respect to all personal properties and assets owned by the Company or any Development Company (other than personal properties and assets disposed of in the ordinary course of business since the date hereof), the Company or one of the Development Companies has good and valid title to all of such properties and assets, free and clear of all Liens other than Permitted Liens.

(b) With respect to personal properties and assets that are leased, the Company or one of the Development Companies has a valid leasehold interest in such properties and assets and all such leases are in full force and effect in all material respects and, to the Company's Knowledge, constitute valid and binding obligations of the other party(ies) thereto, except as such obligations may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting or relating to creditors' rights generally, and the availability of injunctive relief and other equitable remedies. Neither the Company nor any Development Company nor, to the Company's Knowledge, any other party thereto is in violation in any material respect of any of the terms of any such lease nor, to the Company's Knowledge, has any event or circumstance occurred that, with notice or lapse of time or both, would constitute an event of default thereunder.

4.13 Real Property.

(a) Section 4.13(a) of the Disclosure Schedule contains a list of all real property owned in fee by the Company or any Development Company (the "**Owned Real Property**"). The Company or one of the Development Companies has valid title to each parcel of Owned Real Property free and clear of all Liens, except Permitted Liens.

(b) The Company or one of the Development Companies has a valid and existing leasehold interest in, and the right to make use of, all real property leased by the Company or any Development Company (the "**Leased Real Property**") in accordance with the terms of the Leases and a valid and existing easement interest in, and a right to make use of, the real property subject to each of the Easements, except where the failure to have such interest or right, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. With respect to each Real Property Agreement (i) such Real Property Agreement is valid, binding and enforceable, subject to the Enforceability Exceptions, and in full force and effect against the Company or one of the Development Companies and, to the

Company's Knowledge, the other party thereto and all rentals, royalties or other payments accruing thereunder prior to the date hereof have been fully paid, (ii) neither the Company nor one of the Development Companies has received or given any written notice of default or breach under any of the Real Property Agreements; and (iii) there does not exist under any Real Property Agreement any event which, with notice or lapse of time or both, would become a default by the Company or one of the Development Companies or, to the Company's Knowledge, the other party thereto.

(c) None of the Owned Real Property, Leased Real Property, nor any other real property contemplated to be used in connection with the Projects is located on Native American tribal lands or reservations.

4.14 Intellectual Property.

(a) Section 4.14(a) of the Disclosure Schedule lists all Company Intellectual Property, including the jurisdiction where any Registered Intellectual Property has been filed and all registration numbers. The Company or a Development Company owns all Company Intellectual Property free and clear of any Liens. All registration, maintenance and renewal fees related to the Registered Intellectual Property that are used in and necessary for the businesses of the Company and the Development Companies that are currently due have been paid and all documents and certificates related to such Registered Intellectual Property have been filed with the relevant Governmental Authority or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Registered Intellectual Property. All Company Intellectual Property is held in compliance in all material respects with all applicable legal requirements and enforceable in all material respects by the Company and/or one or more of the Development Companies.

(b) To the Company's Knowledge, there is, and has been, no unauthorized use, unauthorized disclosure, infringement, violation or misappropriation of any Company Intellectual Property by any Person. Neither the Company nor any Development Company has received written notice that any Person is infringing, violating or misappropriating any Company Intellectual Property or otherwise making any unauthorized use or disclosure of any Company Intellectual Property.

(c) As of the date hereof, there are no claims pending or, to the Company's Knowledge, threatened in writing against the Company or any Development Company alleging that the business of the Company or any Development Company as now conducted violates or infringes the Intellectual Property of any Person.

4.15 Litigation. There is no action, suit or proceeding, claim, complaint, arbitration, litigation, investigation or other similar proceeding, whether civil or criminal, at law or in equity, by or before any Governmental Authority (each, an "**Action**") pending or, to the Company's Knowledge, threatened (a) against the Company or any Development Company, or, to the Company's Knowledge, any of their respective managers, directors, officers or employees in their respective capacities as officers, managers, directors and/or employees of the Company or any Development Company, or (b) that challenges or seeks to prevent, enjoin or otherwise delay the Reorganization or the Merger. There is no unsatisfied judgment, penalty or award against or



Confidential IRUS0064153

affecting the Company, any Development Company, or, to the Company's Knowledge, any of the Company's or any Development Company's respective managers, directors, officers or employees in their respective capacities as officers, managers, directors and/or employees of the Company or any Development Company, or any of the Company's or any Development Company's respective properties or assets. There is no Order to which the Company or any Development Company or any of their respective properties or assets are subject that would reasonably be expected to have a Material Adverse Effect.

4.16 Employee Benefits.

(a) Section 4.16(a) of the Company Disclosure Schedule sets forth a list of all plans, agreements, policies or other obligations providing for fringe benefits (including vacation, paid holidays, personal leave, employee discounts, educational benefits or similar programs) and each other benefit, bonus, incentive compensation, deferred compensation, change in control, profit sharing, severance, retirement, health, life, disability, group insurance, employment, equity option, equity purchase right, unit appreciation right, performance unit, supplemental unemployment, layoff, consulting or other similar plan, agreement, policy or understanding whether funded or not funded, in each case, that is sponsored or maintained by, or required to be contributed to, or with respect to which any potential liability is borne by the Company or any of its Affiliates (the "**Employee Plans**").

(b) The Employee Plans have been maintained, operated, and administered in compliance with their terms and any related documents or agreements and in compliance with Applicable Law, in each case in all material respects, and all material contributions, premiums and benefit payments under or in connection with the Employee Plans that are required to have been made as of the date hereof in accordance with the terms of the Employee Plans or Applicable Law have been timely made or properly accrued in compliance with Applicable Law.

(c) There are no pending or, to the Company's Knowledge, threatened claims and no pending or, to the Company's Knowledge, threatened litigation with respect to any Employee Plans, other than ordinary and usual claims for benefits by participants and beneficiaries.

(d) Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and, to the Company's Knowledge, nothing has occurred that would adversely affect the qualification or tax exemption of any such Employee Plan. With respect to any Employee Plan, neither the Company nor any of its Affiliates has engaged in a transaction in connection with which the Company or any of its Affiliates would reasonably be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a material tax imposed pursuant to Section 4975 or 4976 of the Code.

(e) Neither the Company nor any of its Affiliates has any agreement, commitment, or obligation to modify or amend any existing Employee Plan.

(f) No Employee Plan exists that, as a result of the execution of this Agreement, the Company Member Approval, or the transactions contemplated by this

Agreement, would reasonably be expected to (i) result in the payment of severance or any increase in severance pay upon any termination of employment after the date of this Agreement; (ii) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Employee Plans; or (iii) result in payments under any of Employee Plan that would not be deductible under Section 280G of the Code or (iv) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Employee Plan on or following the Effective Time.

(g) Neither the Company nor its ERISA Affiliates has contributed (or had any obligation of any sort) in the last six years to a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA. For purposes of this Agreement, "**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code in the last six years.

(h) Neither the Company nor any ERISA Affiliate has maintained, established, participated in or contributed to, or is or has been obligated to contribute to, or has otherwise incurred any obligation or liability (including any contingent liability) under, any "multiemployer plan" as that term is defined in Section 3(37) of ERISA in the last six years. No Employee Plan is a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(i) No Employee Plan provides for post-employment or post-retirement health, medical or life insurance benefits for current, former or retired employees of the Company or any Development Company, other than continuation coverage required under the "COBRA" provisions of ERISA and the Code.

(j) Each Employee Plan that is a "nonqualified deferred compensation plan" (within the meaning of Section 409A of the Code) is in documentary compliance with, and has been operated and administered in all material respects in compliance with, Section 409A of the Code and the guidance issued by the Internal Revenue Service provided thereunder such that no adverse tax consequences will result for the Company, any Affiliate, or any applicable service provider.

(k) Neither the Company nor any Affiliate has any obligation to provide, and no Employee Plan or other agreement provides any individual with the right to, a gross up, indemnification, reimbursement or other payment for any excise or additional taxes, interest or penalties incurred pursuant to Section 409A or Section 4999 of the Code or due to the failure of any payment to be deductible under Section 280G of the Code.

4.17 Labor and Employment Matters.

(a) Section 4.17(a) of the Company Disclosure Schedule sets forth a complete and accurate list of the Essential Employees and Key Employees with their position/titles, dates of hire, salary/bonus/commissions in the last 12 months, and, if applicable, any visa needs, as of the date set forth on such schedule.

(b) Section 4.17(b) of the Company Disclosure Schedule sets forth a list of all employment agreements, other than employee offer letters, including but not limited to, any stand-alone confidentiality, non-solicitation and/or non-compete agreements as well as any retention agreements to which the Company or any Development Company is a party as of the date set forth on such Schedule that relate to any Essential Employees or Key Employees. Neither the Company nor any Involved Company Affiliate is a party to any collective bargaining agreement with a labor union that relates to any EverPower Employees.

(c) The Company and the Involved Company Affiliates are in compliance in all material respects with all Applicable Laws relating to employment and labor, including but not limited to, laws relating to wages, hours, collective bargaining, employment discrimination, safety and health, workers' compensation and the collection and payment of withholding or social security taxes.

(d) Except for any limitations of general application which may be imposed under Applicable Law, the Company and each Involved Company Affiliate has the right to terminate the employment of each of its employees at will without payment to such employee other than for the services rendered through termination and without incurring any penalty or liability, unless otherwise provided in an employment agreement.

(e) No Actions are pending against the Company or any Involved Company Affiliate under any Applicable Laws with respect to the employment relationship of any current or former employee of the Company or any Involved Company Affiliate, and no such Actions have occurred in the last two years.

(f) There are no pending or, to the Company's Knowledge, threatened labor disputes, work stoppages, requests for representation, union organizing campaigns, pickets, work slow-downs due to labor disagreements or any Actions which involve the labor or employment relations of the Company or any Involved Company Affiliate, and no such disagreement or Actions have occurred in the last two years.

4.18 Environmental Matters.

(a) Each of the Company and the Development Companies has been since November 30, 2009 and is in compliance in all material respects with all Environmental Laws;

(b) Except as Made Available, neither the Company, any Development Company, nor any Involved Company Affiliate has made any written commitments for any of the Projects with respect to compliance with Environmental Laws, including with respect to commitments for curtailment of turbine operations, commitments for turbine cut-in speeds, and/or commitments for mitigation related to turbine operations;

(c) The Company has Made Available true, correct and complete copies of all environmental assessments, reports, correspondence to or from any Governmental Authority or any other Person, or other documentation regarding the Environment at the Projects, including, but not limited to, all documents relating to: (i) all environmental investigations, studies, audits, and tests and related agency correspondence; (ii) compliance of the Company and any

Development Company with Environmental Laws; or (iii) any Actions pursuant to or relating to any Environmental Law.

(d) There are no pending or, to the Company's Knowledge, threatened Environmental Actions against or affecting the Company or any Development Company;

(e) Neither the Company nor any Development Company has entered into, agreed to or is the subject of any Order relating to compliance with any Environmental Law or to the investigation or cleanup of a Hazardous Substance under any Environmental Law;

(f) (i) Neither the Company nor any Development Company has generated, disposed of, or arranged for the disposal of any Hazardous Substances at the Owned Real Property or Leased Real Property; and (ii) to the Company's Knowledge, no Hazardous Substances or other environmental conditions are present at or affecting any Owned Real Property or Leased Real Property or for which any of them is responsible, under circumstances that could reasonably be expected to result in liability to, or affect the operations or costs of, the Company or any Development Company; and

(g) Neither the Company nor any Development Company nor, to the Company's Knowledge, any entity for which any of them is responsible, has assumed or retained, by contract or, to the Company's Knowledge, operation of law, any liability, fixed or contingent, asserted or unasserted, under any Environmental Law or regarding any Hazardous Substances that could reasonably be expected to result in liability to any of them.

4.19 Related Party Contracts. Except for the Contracts set forth on Section 4.19 of the Company Disclosure Schedule, there are no Contracts between the Company or any Development Company, on the one hand, and any officer, manager, director, or member of the Company or, to the Company's Knowledge, any Affiliate of any of them, on the other hand, except in each case, for (a) employment agreements, fringe benefits and other compensation paid to managers, directors, officers and employees consistent with previously established policies, (b) reimbursements of expenses incurred in connection with their employment or service, and (c) amounts paid pursuant to Employee Plans.

4.20 Brokers or Finders. There is no investment banker, broker, finder, financial advisor or other intermediary that has been retained by or is authorized to act on behalf of the Company or the Company Member who is entitled to any fee or commission in connection with the transactions contemplated by this Agreement, other than Barclays Capital Inc. and KeyBanc Capital Markets Inc.

4.21 Insurance. Section 4.21 of the Company Disclosure Schedule sets forth, as of the date of this Agreement, an accurate and complete list of each insurance policy, binder of insurance and fidelity bond which covers the Company or any Development Company or their respective businesses, properties, assets, managers, directors or employees (the "**Policies**"). The Policies are in full force and effect, neither the Company nor any Development Company is in default in any material respect under any Policy, and no claim for coverage under any Policy, other than contested claims under the Company's or a Development Company's workers' compensation policies or subject to any Employee Plans, has been denied during the past two (2)

years. Neither the Company nor any Development Company has received a written notice of cancellation of any Policy or of any material changes that are required in the conduct of the business of the Company or any Development Company as a condition to the continuation of coverage under, or renewal of, any such Policy. The Development Companies (or the Company) currently maintain in all material respects all insurance required to be maintained by the applicable Contracts relating to the Projects.

4.22 Certain Disclaimers.

(a) The representations and warranties set forth in this Article IV are the only representations and warranties made by the Company. Except as specifically set forth in this Article IV, (i) neither the Company nor the Company Member makes any, and disclaims all, warranties, express or implied, as to any matter whatsoever relating to Company Member, the Company, its businesses, assets, liabilities or any other matter relating to the transactions contemplated by this Agreement including as to the activities or operations of the Company after the Closing or the probable success, revenues or profitability of the Company after the Closing, and (ii) no Company Member or any of their Affiliates, or any of their respective officers, managers, directors, employees, agents, representatives, members or stockholders will have, or will be subject to, any liability or indemnification obligation to Purchaser or any other Person resulting from the distribution to Purchaser or its Affiliates or Representatives of, or Purchaser's use of, any information relating to the Company Member, the Company, and any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to Purchaser or its Affiliates or Representatives, whether orally or in writing, in certain "data rooms", management presentations, functional "break-out" discussions, site visits, responses to questions submitted on behalf of Purchaser or in any other form in expectation of the transactions contemplated by this Agreement.

(b) Inclusion of information in the Company Disclosure Schedule shall not be construed as an admission that such information is material to the business, assets, liabilities, financial condition or results of operations of the Company, or otherwise material, or that such information is required to be included in the Company Disclosure Schedule, and inclusion of a matter on a Schedule addressing matters having a Material Adverse Effect shall not necessarily be deemed an indication that such matter does, or may, have a Material Adverse Effect. Matters may be disclosed on the Company Disclosure Schedule for purposes of information only. In addition, the Company Disclosure Schedule may include other matters not required by the terms of this Agreement to be listed therein, which additional matters are disclosed for purposes of information only, and inclusion of any such matter does not mean that all such matters are included.

(c) A matter scheduled as an exception for any representation shall be deemed to be an exception to all representations, and any indemnifications under Section 11.1, for which it is relevant.

4.23 Project Data.

(a) Section 4.23(a) of the Company Disclosure Schedule is a true, correct and complete list of the onsite meteorological data and all other material studies, reports, analyses and evaluations prepared by the Company, any Development Company, any of their Affiliates, or any consultants retained by any of them, in each case with respect to the Projects (collectively the "**Project Data**"). Such Project Data comprises all such data held by the Company, any Development Company, or any of their Involved Company Affiliates. With respect to each item of Project Data identified on Section 4.23(a) of the Company Disclosure Schedule:

(i) The Company possesses all right, title (if applicable), and interest in and to the item, free and clear of any Lien;

(ii) to the Company's Knowledge, there are no disputes relating to any Project Data; and

(iii) there is no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to the Company's Knowledge, is threatened which challenges the legality, validity, enforceability, use, or ownership of the Project Data.

(b) The Company has delivered or made available to Purchaser true and correct copies of all Project Data. To the Company's Knowledge, the Project Data supplied by the Company, any Development Company or any Involved Company Affiliate to Purchaser has been compiled and transmitted in accordance with Prudent Wind Industry Practices.

4.24 Books and Records; Minutes. The Company has made available to Purchaser the records and minute books, or equivalent records and documents, related to the Company and each Development Company (the "**Records**") and all such Records have been kept and maintained in all material respects as required by Applicable Law.

4.25 Bank Accounts. Neither the Company nor any Development Company has, and since its inception has not had, any savings, checking, or other bank account of any nature or any safe deposit boxes.

4.26 Regulatory Status. None of the Company, Hardin, nor any Development Company is itself subject to regulation as a "public utility" or an "electric utility" under the FPA, or as a "holding company" or "public utility company" under PUHCA. None of the Company, Hardin, nor any Development Company is itself subject to rate, organizational or financial regulation by a "state commission" (as that term is defined under 18 C.F.R. § 1.101(k)). Each Development Company and Hardin satisfies the applicable requirements set forth in the FPA and PUHCA and the implementing regulations in 18 C.F.R. § 366.1 and 18 C.F.R. § 292.203 to qualify as EWG or QF; provided, however, that neither Hardin nor any Development Company, with the exception of Horse Thief Wind Project LLC, Mud Springs Wind Project LLC, and Prior Caves Wind Project LLC, has filed with the FERC any application, certification, or self-certification as an EWG or a QF.

4.27 Development Matters. As of the Closing Date, all assets, Governmental Authorizations, Material Contracts, and Project Data necessary for the construction,

development, maintenance, or operation of the Projects and held by an Involved Company Affiliate shall have been validly assigned to Company or a Development Company.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MERGER SUB

Purchaser and Merger Sub hereby represent and warrant to the Company as follows:

5.1 Organization and Good Standing. Each of Purchaser and Merger Sub is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all corporate or limited liability company powers required to carry on its business as now conducted. Since the date of its formation, Merger Sub has not engaged in any activities other than in connection with or as contemplated by this Agreement. Neither Purchaser nor Merger Sub is in violation of its Charter Documents. Neither the Purchaser nor Merger Sub is itself a "public utility," as that term is defined under the FPA.

5.2 Authorization and Enforceability. Each of Purchaser and Merger Sub has the requisite corporate or limited liability company power and authority to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby. The execution, delivery and performance by each of Purchaser and Merger Sub of this Agreement, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary corporate or limited liability company action on the part of Purchaser and Merger Sub. This Agreement has been duly executed and delivered by Purchaser and Merger Sub, and, assuming due authorization, execution and delivery by the Company, this Agreement constitutes the valid and binding obligation of Purchaser and Merger Sub, enforceable against it in accordance with its terms, subject to the Enforceability Exceptions.

5.3 Governmental Authorizations. The execution, delivery and performance by Purchaser and Merger Sub of this Agreement and the consummation by Purchaser and Merger Sub of the transactions contemplated hereby require no action by, approval, authorization or permit of or in respect of, or filing or notification with, any Governmental Authority, other than (a) compliance with the applicable requirements of the HSR Act and the Other Antitrust Laws and (b) the filing of the Certificate of Merger with the Delaware Secretary of State.

5.4 Non-Contravention. Assuming compliance with the matters referred to in Section 5.3, the execution, delivery and performance by Purchaser and Merger Sub of this Agreement and the consummation by Purchaser and Merger Sub of the transactions contemplated hereby do not and will not (a) violate, or result in the breach of, any provision of the Charter Documents of Purchaser or Merger Sub, (b) violate, or result in the breach of, any provision of any Applicable Law or Order, (c) require any consent or other action by any Person under, violate, or result in a breach of, constitute a default under, result in the acceleration, cancellation, termination or modification of, or create in any party any right to accelerate, terminate, cancel or modify any contract binding upon Purchaser or Merger Sub, or (d) result in a violation or revocation of any Governmental Authorization affecting Purchaser or Merger Sub, with such exceptions, in the case of each of clauses (b) through (d) above, as would not

reasonably be expected to prevent, materially delay or materially impair Purchaser's or Merger Sub's ability to consummate the transactions contemplated by this Agreement.

5.5 Brokers or Finders. There is no investment banker, broker, finder, financial advisor or other intermediary that has been retained by or is authorized to act on behalf of Purchaser who is entitled to any fee or commission in connection with the transactions contemplated by this Agreement that will be payable by the Company or any Development Company in the event the Closing does not occur or payable by the Company Member if the Closing does occur.

5.6 Litigation. There are no actions, suits or proceedings pending, or to Purchaser's Knowledge, threatened in writing before any Governmental Authority or arbitrator against Purchaser or Merger Sub which would materially delay or materially impair Purchaser's or Merger Sub's ability to perform its obligations under this Agreement.

5.7 Availability of Funds. Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to pay all amounts required to be paid hereunder, including payment of the Closing Amount at the Closing and the Merger Consideration, and otherwise consummate the transactions contemplated by this Agreement.

ARTICLE VI

COVENANTS OF THE COMPANY

6.1 Conduct of the Business.

(a) Except as set forth on Schedule 6.1(a), during the period from the date hereof until the earlier of the Closing Date or the termination of this Agreement, the Company shall cause the Development Companies to carry on their businesses in all material respects in the ordinary course, consistent with past practice.

(b) Except as set forth on Schedule 6.1(b), without the prior written consent of Purchaser, during the period from the date hereof until the earlier of the Closing Date or the termination of this Agreement, the Company and each Development Company shall not:

(i) effect any change, circumstance, event, occurrence or development that would reasonably be expected to have a Material Adverse Effect;

(ii) sell, transfer, pledge or otherwise dispose of any material portion of their respective assets or properties not in the ordinary course of business;

(iii) other than in accordance with the Approved Development Budget or the Approved Hardin Development Budget, terminate, amend, supplement or otherwise modify, waive any material right under any Material Contract, or enter into any contract, agreement, arrangement, or instrument that would constitute a Material Contract;

(iv) purchase or otherwise acquire any assets or properties not in the ordinary course of business;

(v) change any method of accounting or accounting practices by the Company or any Development Company, except for any such change required by reason of a concurrent change in GAAP;

(vi) except for the Merger and the Reorganization, adopt a plan or agreement of liquidation, dissolution, restructuring, merger, consolidation, restructuring, recapitalization, amalgamation or other reorganization;

(vii) fail to maintain in full force and effect the material insurance policies covering the Company and the Development Companies and their respective properties, assets and businesses in a form and amount consistent with past practices; or

(viii) amend its certificate of formation or limited liability company agreement, other than in connection with the Reorganization;

(ix) other than in connection with the Reorganization, issue, redeem or otherwise acquire any Company membership interests or other equity interests, issue any option, warrant or right relating to Company membership interests or other equity interests or any securities convertible into or exchangeable for any Company membership interests or other equity interests;

(x) make an equity investment in any other Person;

(xi) acquire by merger or consolidation or purchase of equity interests in any company, corporation, partnership, association or other business organization or division thereof;

(xii) other than in the ordinary course of business (including annual salary increases and bonus payments), grant any material bonus to or materially increase the salary or employee benefits of any employee of the Company or any Development Company, except as required by existing employment agreements, plans or arrangements, or Applicable Law;

(xiii) make any election pursuant to Treasury Regulations Section 301.7701-3 to treat the Company or any Development Company as a corporation for U.S. federal income tax purposes;

(xiv) incur any Indebtedness or grant any Lien (other than Permitted Liens) on any assets to secure any Indebtedness; or

(xv) agree to do any of the foregoing.

Purchaser's approval of any action restricted by this Section 6.1(b) shall not be unreasonably withheld, conditioned or delayed and shall be considered granted within five (5) Business Days of receipt by Purchaser of the Company's notice requesting such consent unless Purchaser notifies the Company to the contrary during that period.

6.2 Access; Indemnity. During the period from the date hereof until the earlier of the Closing Date or the termination of this Agreement, the Company shall give Purchaser and its managers, directors, officers, employees, agents and representatives (collectively, "**Representatives**") access, at Purchaser's risk and expense, to the Company's properties, and access to and a right to copy, at Purchaser's expense, the Records, but only to the extent the Company may do so without violating Applicable Laws or any obligations to any third party and to the extent that the Company has authority to grant such access without breaching any restriction binding on the Company. Neither Purchaser nor any of its Representatives shall make any requests for access directly or indirectly to any Representative of the Company. Such access by Purchaser shall be limited to the Company's normal business hours, and Purchaser's investigation shall be conducted in a manner that minimizes interference with the operations of the Company. In addition, Purchaser and its Representatives shall not have access to employment records of individual employees of the Company or any Development Company prior to the Closing except on such terms as may be agreed by the Company and Purchaser in order to protect confidential information and ensure compliance with all Applicable Laws and the Company's policies. All information obtained by Purchaser and its Representatives under this Section shall be subject to the terms of that certain confidentiality and non-disclosure agreement between TEII and Purchaser, dated as of March 2, 2017 (the "**Confidentiality Agreement**"). Notwithstanding anything herein to the contrary, prior to the Closing, without the prior written consent of the Company, which may be withheld for any reason, neither Purchaser nor any of its Representatives shall have the right to perform any invasive or subsurface investigation, testing, or sampling of any real property in which the Company or any Development Company has an interest.

6.3 Member Approval. As soon as practicable after the date of this Agreement, the Company shall use its reasonable best efforts to obtain the Company Member Approval. The Company shall seek to obtain the Company Member Approval by written consent, in lieu of a meeting.

6.4 Consents to Assignment and Required Notices. Should any consent of any third party, other than a Governmental Authority, be required to be obtained by the Company in connection with the transactions contemplated by this Agreement or should any Person be entitled to notice from the Company prior to Closing of the transactions contemplated by this Agreement (such consents and notices, collectively, the "**Required Third Party Consents**"), the Company shall, promptly after the date hereof, prepare and send (a) notices to the holders of any required consents to assignment in compliance with the terms of such requirements, requesting such consents and (b) notices to any required recipients of notice in compliance with the terms of the notice requirement. The Company shall use commercially reasonable efforts to cause any such consents to assignment to be obtained and delivered prior to Closing, provided that neither the Company nor any Development Company shall be required to make payments or undertake obligations to or for the benefit of the holders of such rights in order to obtain the required consents. Purchaser shall cooperate with the Company in seeking to obtain any such consents.

6.5 Employment Matters. The Company and/or each Development Company will cooperate with Purchaser and/or Merger Sub to permit Purchaser and/or Merger Sub to present to any of the employees of the Company and/or any Development Company prior to the Closing

Date, employment, retention, reaffirmation or separation/severance agreements, provided that any such agreements shall not become effective prior to the Closing.

6.6 Confidential Information; Designee Competition.

(a) Company Member agrees that from and after the Closing Date until the second anniversary of the last disclosure of information to Company Member pursuant to Section 7.6(b), except as may be required by Applicable Law, Company Member shall not, and shall cause its Affiliates, the Designee, and all of their respective Representatives, successors and assigns not to, directly or indirectly, disclose or use for their own benefit or for the benefit of any Person (other than Purchaser or any of its Subsidiaries or Affiliates), any Confidential Information. Company Member will notify Purchaser as far in advance as is reasonably practical of any disclosure of Confidential Information required by Applicable Law and will use commercially reasonably efforts (at Purchaser's cost) to assist Purchaser in limiting such disclosure, including by cooperating with Purchaser's efforts to seek a protective order limiting further disclosure of, or otherwise with respect to, such Confidential Information. Following the Closing, at the request of Purchaser, Company Member will use commercially reasonable efforts to promptly provide to the Company all papers, books or documents containing Confidential Information. For purposes hereof, "**Confidential Information**" shall mean any and all non-public confidential or proprietary information of or relating to the Company and the Development Companies, trade secrets, techniques, know-how, processes, software programs, design details and specifications, financial information, customer lists, business forecasts, sales and marketing plans as well as all notes, analysis, reports, compilations, studies, interpretations, summaries or other documents.

(b) Company Member agrees no Designee shall be engaged at the time serving as Designee (whether as an employee, officer or manager) by a Key Competitor. If after appointment, a Designee becomes so engaged, Company Member shall notify Purchaser within three (3) Business Days of becoming aware of such engagement and Purchaser shall have the right within three (3) Business Days to require that a replacement Designee be appointed. Notwithstanding anything to the contrary set forth herein, no Confidential Information shall be provided to any Designee who is so engaged. Purchaser and Company Member acknowledge that with respect to James Spencer, the provisions of the agreements entered into by and between James Spencer and Purchaser shall apply while James Spencer serves as the Designee, and not the provisions of this Section 6.6(b).

ARTICLE VII

COVENANTS OF PURCHASER

7.1 Manager, Director and Officer Indemnification.

(a) From and after the Effective Time, for a period of six (6) years from the Effective Time, Purchaser and the Surviving Company shall, and Purchaser shall cause the Surviving Company to, indemnify, defend and hold harmless, and provide advancement of expenses to each Person who was, is now or who becomes prior to the Effective Time, an officer, manager or director of any Development Company (the "**D&O Indemnified Parties**") against

all losses, claims, damages, costs, fees, disbursements, expenses, liabilities or judgments or amounts that are paid in settlement of, investigation of or otherwise in connection with, including preparation for defending against, any Action that is based in whole or in part on, or arises in whole or in part out of, the fact that such Person is or was a manager, director or officer of any Development Company, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby).

(b) Purchaser shall cause the Surviving Company to maintain in effect for a period of six (6) years after the Effective Time, in respect of acts or omissions occurring at or prior to the Effective Time, policies of directors' and officers' liability insurance, or a seven-year tail insurance policy, covering the Persons currently covered by the existing directors' and officers' liability insurance policies that covers the managers, directors and officers of the Development Companies and providing coverage in amount and scope no less favorable than the existing policies; provided that the Surviving Company and Purchaser shall not be obligated to expend annually in excess of 300% of the annual premium currently paid by an Affiliate of the Company for the existing policies.

(c) This Section 7.1 shall survive the consummation of the Merger and is intended to benefit, and shall be enforceable by, the D&O Indemnified Parties and their respective heirs and personal representatives and shall be binding on Purchaser and the Surviving Company and their respective successors and assigns. In the event the Surviving Company or Purchaser or any of their successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or Surviving Company or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each case, proper provision shall be made so that the successors and assigns of the Surviving Company or Purchaser, as applicable, assume the indemnification obligations set forth in this Section 7.1.

7.2 Employee Matters.

(a) Purchaser shall, for the calendar year in which the Closing Date occurs, cause the Surviving Company to provide any EverPower Employees who accept employment with the Purchaser or its Affiliates (the "**Hired EverPower Employees**") with (i) base salary that is not less than the base salary set forth on Schedule 1.1(b) and (ii) employee benefit plans and programs that are substantially comparable, in the aggregate, to similar employee benefit plans and programs (excluding any equity compensation, bonus or incentive payments) provided by the Company to Hired EverPower Employees that was in effect immediately prior to the Closing Date.

(b) Purchaser shall, and shall cause the Surviving Company to, recognize the service of Hired EverPower Employees with the Company or any Development Company (and any Affiliate of the Company) or its Affiliates prior to the Closing Date as service with Purchaser and its Affiliates in connection with any tax-qualified pension plan, 401(k) savings plan, welfare benefit plans and policies (including vacations and holiday policies but excluding any severance) maintained by Purchaser or any of its Affiliates which is made available following the Closing

by Purchaser or one of its Affiliates for purposes of any waiting period, vesting, eligibility and benefit entitlement (but excluding benefit accruals) provided that such service need not be recognized to the extent that such recognition would result in a duplication of benefits. Purchaser shall or, as appropriate, shall cause the Surviving Company to, (i) waive, and use commercially reasonable efforts to cause its or their insurance carriers to waive, all limitations as to pre-existing and at-work conditions, if any, with respect to participation and coverage requirements applicable to Hired EverPower Employees under any welfare benefit plan (including any welfare benefit as defined in Section 3(1) of ERISA) which is made available to Hired EverPower Employees following the Closing by Purchaser or any of its Affiliates, and (ii) provide credit to Hired EverPower Employees for any co-payments, deductibles and out-of-pocket expenses paid by such employees under the employee benefit plans, programs and arrangements of the Company during the portion of the relevant plan year including the Closing Date provided that adequate documentation of amounts paid are provided to Purchaser. Company Member shall be responsible for any obligations under COBRA, whether arising before or after the Closing, for any Hired EverPower Employee who experiences a "qualifying event" (as that term is defined in COBRA) before or on the Closing Date.

(c) 401(k) Plan.

(i) As soon as administratively practicable after the Closing Date, Purchaser agrees to cause its defined contribution plan that is maintained or contributed to by Purchaser or one of its Affiliates that is intended to be qualified under Section 401(a) of the Code and tax-exempt under Section 501(a) of the Code ("**Purchaser's 401(k) Plan**") to provide each Hired EverPower Employee an opportunity to make a direct rollover to Purchaser's 401(k) Plan of an eligible distribution from the 401(k) plans of Company or any of its Affiliates ("**Company's 401(k) Plan**") that includes promissory notes reflecting such Hired EverPower Employee's then outstanding participant loans under Company's 401(k) Plan; provided, that Purchaser provides the Company with reasonable evidence that Purchaser's 401(k) Plan is qualified within the meaning of section 401(a) of the Code.

(ii) Neither the Company nor the Company's 401(k) Plan shall place any Hired EverPower Employee's loan into default on account of the actions contemplated by this Agreement so long as such Hired EverPower Employee transfers such Hired EverPower Employee's account balance under Company's 401(k) Plan, together with the loan, to Purchaser's 401(k) Plan through a direct rollover, provided that such Hired EverPower Employee elects such a direct rollover within 60 days following the Closing Date.

(d) No Amendments; No Third Party Beneficiaries. All provisions contained in this Section 7.2 are included for the sole benefit of the Parties, and nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employee, any participant in any Employee Plan, or any dependent, alternative payee or beneficiary thereof, or (ii) to continued employment with the Company, Purchaser or any of their respective Affiliates or continued participation in any Employee Plan.

(e) Section 280G Matters.

(i) Prior to the Closing, the Company shall use commercially reasonable efforts to (A) obtain an executed Section 280G Waiver from each Person who is a "disqualified individual" within the meaning of Section 280G and who might otherwise receive or have the right to receive a Section 280G Payment unless approval of such Section 280G Payment by the members of the Company is obtained; (B) provide the members of the Company with adequate disclosure, within the meaning of Section 280G(b)(5)(B)(ii) of the Code, of all material facts concerning the Section 280G Payments; and (C) obtain approval of such Section 280G Payments, in a manner which satisfies the requirements of Section 280G of the Code, to the extent failure to obtain such approval would be reasonably expected, based on all facts known to the Company as of the date hereof, to result in a failure of such Section 280G Payments to be fully tax deductible by the Company; provided, that the Company shall be required to take into account, in undertaking such efforts, 280G Payments payable to any disqualified individual by Purchaser or any of its Affiliates under a plan or agreement entered into by Purchaser or any of its Affiliates and such disqualified individual prior to the Closing Date only if and to the extent that Purchaser discloses to the Company all relevant documents and factual information necessary to include such 280G Payments in the 280G Waiver and in the relevant disclosures to members.

(f) Prior to soliciting executed Section 280G Waivers and member approval as provided in Section 7.2(e)(i), the Company shall provide drafts of the member approval materials and Section 280G Waivers to Purchaser and Purchaser's advisors for their review, and the Company shall consider in good faith Purchaser's reasonable comments. Prior to the Closing Date, the Company shall deliver to Purchaser evidence that a vote of the members of the Company was solicited in accordance with Section 7.2(e)(i) with respect to each person who executes a Section 280G Waiver and that either (i) the requisite member approval was obtained with respect to each person who executes a Section 280G Waiver, or (ii) the requisite member approval was not obtained and, as a consequence, the Section 280G Payments shall not be made to any person who executes a Section 280G Waiver.

7.3 Credit Support Arrangements.

(a) Purchaser shall provide to the respective beneficiary, in form and substance reasonably satisfactory to the Company Member, within five (5) Business Days after the Closing, replacement credit support for any liability or obligation under any Credit Support Arrangement in effect as of the Closing (other than Credit Support Arrangements relating to the Scioto Ridge Project) by furnishing letters of credit, instituting escrow arrangements, posting surety or performance bonds or making other arrangements as the counterparty may reasonably request. Purchaser shall provide to the respective beneficiary, in form and substance reasonably satisfactory to the Company Member, within five (5) Business Days after the Hardin Closing, replacement credit support for any liability or obligation under any Credit Support Arrangement in effect as of the Hardin Closing relating to the Scioto Ridge Project by furnishing letters of credit, instituting escrow arrangements, posting surety or performance bonds or making other arrangements as the counterparty may reasonably request.

(b) Purchaser and the Surviving Company shall indemnify and hold harmless the Company Member and its Affiliates from and after the Closing for any losses, claims, damages, costs, fees, disbursements, expenses, liabilities or judgments or amounts arising out of

or relating to any Credit Support Arrangement to the extent not fully released at the Closing or Hardin Closing, as applicable.

7.4 Post-Closing Access to Records. Purchaser shall maintain the Records for seven (7) years after the Closing Date and afford the Company Member and its Affiliates reasonable access to the Records and to Purchaser's and its Affiliates' personnel who have Knowledge of the Records, and a right to copy the Records at the requesting Company Member's expense as reasonably requested by the Company Member.

7.5 R&W Insurance Policy. The R&W Insurance Policy obtained by Purchaser shall contain a waiver, other than with respect to fraud, of subrogation against the Company Member by the insurer. From and after the issuance of the R&W Insurance Policy, Purchaser shall not amend, modify or otherwise waive such subrogation provision of the R&W Insurance Policy in a manner adverse to the Company Member.

7.6 Payment Milestone.

(a) From and after Closing Date, Purchaser shall use commercially reasonable efforts to cause the Company and the applicable Development Companies to continue to develop the Key Projects in accordance with the applicable standards of care set forth on Annex 2. Subject to the preceding sentence, the details and manner of such development efforts and the schedule therefor shall be within the sole discretion of Purchaser. In the event Purchaser determines to cease development of and abandon any such Key Project prior to October 1, 2019, Purchaser shall so inform the Member Representative, including the reason therefor, and thereafter Purchaser shall have no further obligation with respect to development of any such Key Project.

(b) Purchaser shall keep the Member Representative informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of each Key Project, by delivering information in the form set forth in Exhibit C to an individual appointed by the Member Representative (the "**Designee**"), who shall initially be James Spencer. From and after the time a Key Project has executed a valid, enforceable interconnection agreement and a valid, enforceable construction agreement, Purchaser shall also reasonably cooperate with the Designee to respond to the Designee's reasonable ad-hoc inquiries regarding the development of such Key Project; provided, however, the Designee shall limit such inquires to a reasonable level, taking into account the stage of development of the applicable Key Project and in any event no more than three inquiries per month.

(c) Purchaser shall not sell assign, transfer or otherwise dispose of any of the assets, rights and other properties of a Target Project or the equity interests of a Development Company prior to December 31, 2020 without the consent of the Member Representative, unless prior to or contemporaneously with such sale, assignment, transfer or other disposition Purchaser pays the Payment Milestone Amount that would have been payable with respect to such Target Project if the Target Project had achieved the Payment Milestone as of the date of such sale, assignment, transfer or other disposition.

## ARTICLE VIII

## COVENANTS OF THE PARTIES

8.1 CFIUS Notification.

(a) Each of the Company and Purchaser shall use its reasonable best efforts to file, as promptly as practicable, the voluntary notice to CFIUS under Section 721. Each of the Company and Purchaser shall furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under Section 721. Purchaser shall be responsible for all filing fees and local counsel fees payable in connection with the filings pursuant to this Section 8.1.

(b) The Company and Purchaser shall use their commercially reasonable efforts to promptly obtain any clearance required under Section 721 for the consummation of this Agreement and the transactions contemplated hereby and shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from any Governmental Entity and shall comply promptly with any such inquiry or request.

(c) The parties hereto shall instruct their respective counsel to cooperate with each other and use commercially reasonable efforts to facilitate and expedite the identification and resolution of any issues arising in connection with obtaining the CFIUS Approval at the earliest practicable dates. Such commercially reasonable efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of any reviewing Governmental Entity, and (ii) to confer with each other regarding appropriate contacts with and response to personnel of any such Governmental Entity and the content of any such contacts or presentations. Neither the Company nor Purchaser shall participate in any meeting or discussion with any Governmental Entity in respect of any such filings, applications, investigation, or other inquiry without giving the other party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Entity, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Purchaser or the Company, shall be limited to outside antitrust counsel only). The Company and Purchaser shall each approve the content of any presentations, white papers or other written materials to be submitted to any Governmental Entity in advance of any such submission.

8.2 Other Regulatory Approvals. In addition to complying with their respective obligations under Section 8.1, each of the Company, Purchaser and Merger Sub shall use reasonable best efforts to obtain or make, as applicable, all Governmental Authorizations, Orders, declarations and filings with, and notices to, any Governmental Entity required to be obtained or made by it for the consummation of the transactions contemplated hereby. Each party shall cooperate with and promptly furnish information to the other parties reasonably necessary in connection with any requirements imposed upon such other parties in connection with the consummation of the Merger.

8.3 Public Announcements. Neither Purchaser, the Member Representative or any of their respective Affiliates shall issue any press release or other public announcement



Confidential IRUS0064169

concerning this Agreement or the transactions contemplated hereby without obtaining the mutual written approval of Purchaser and the Member Representative, unless disclosure is otherwise required by applicable Law, provided that, to the extent required by Applicable Law, the Party intending to make such release shall, prior to such release, consult with the other Party with respect to the text thereof. Notwithstanding anything to the contrary in the foregoing, nothing in this Section 8.3 shall prevent any Party from releasing its financial statements or financial reports as required by applicable Law or the applicable rules of any stock exchange.

8.4 Notification of Certain Matters. Each of the Company Member and Purchaser shall promptly notify the other of:

(a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b) any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement; and

(c) any litigation, investigation, arbitration, proceeding, or other claim that relates to the consummation of the transactions contemplated by this Agreement.

8.5 Further Assurances. Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under Applicable Law to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

8.6 Post-Closing Payment. From and after the Closing, if any Involved Company Affiliate receives any payment (including any refund or reimbursement of any deposit or prepaid expense) due to the Company or any Development Company, the Involved Company Affiliate shall promptly remit such amount to Purchaser.

8.7 Conduct of Hardin's Business.

(a) During the period from the date hereof until the earlier of the Hardin Closing or the termination of the right of the Purchaser to deliver an Election Notice under Section 8.8, Company Member shall not (i) convey, sell, transfer or otherwise dispose of, or permit or agree to the sale, transfer or other disposal of, all or any part of the membership interests in Hardin (other than the transfer to Company Member or the Company, as applicable of the membership interests in Hardin) or (ii) create, incur, assume, or suffer to exist any Lien with respect to the membership interest or assets of Hardin (other than Permitted Liens).

(b) During the period from the date hereof until the earlier of the Hardin Closing or the termination of the right of the Purchaser to deliver an Election Notice under Section 8.8, Company Member shall (i) cause Hardin to carry on its businesses in all material respects in the ordinary course, consistent with past practice and (ii) keep Purchaser informed and allow Purchaser to participate in the negotiation of an amendment to the Amazon PPA,

including reviewing drafts and attending negotiations; provided that Purchaser shall not have discussions with Amazon without representatives of the Company Member.

(c) During the period from the date hereof until the earlier of the Closing Date or the termination of this Agreement, Company Member shall cause Hardin to continue the development of the Scioto Ridge Project in accordance with the applicable standards of care set forth on Annex 2 and the Approved Hardin Development Budget. From and after the Closing Date, Purchaser shall continue the development of the Scioto Ridge Project in accordance with the applicable standards of care set forth on Annex 2 and pursuant to the Transition Services Agreement. For the avoidance of doubt, at no time prior to the Hardin Closing shall Purchaser be liable for any third party costs relating to the development of the Scioto Ridge Project, including any costs, expenses, and liabilities set forth in the Approved Hardin Development Budget.

(d) Without the prior written consent of Purchaser, during the period from the date hereof until the earlier of the Hardin Closing or the termination of this Agreement, Company Member shall (and shall cause each Involved Company Affiliate to) cause Hardin not to:

(i) amend its certificate of formation or limited liability company agreement, other than in connection with the Reorganization;

(ii) other than in accordance with the Approved Hardin Development Budget, terminate, amend, supplement or otherwise modify, waive any material right under any Material Contract, or enter into any contract, agreement, arrangement, or instrument that would constitute a Material Contract;

(iii) enter into or permit to exist any transaction between Hardin and any of its Affiliates other than on terms that are at least as favorable to Hardin as would be available from a Person that is not an Affiliate of Hardin;

(iv) create, incur, assume, or suffer to exist any Indebtedness;

(v) open or maintain any bank accounts except as in existence on the date of this Agreement;

(vi) other than in connection with the Reorganization, issue, redeem or otherwise acquire any membership interests or other equity interests, issue any option, warrant or right relating to membership interests or other equity interests or any securities convertible into or exchangeable for any membership interests or other equity interests;

(vii) transfer (or consent to or approve the transfer of) any material assets held by Hardin;

(viii) make an equity investment in any other Person;

(ix) acquire by merger or consolidation or purchase of equity interests any Person or division thereof, or merger or consolidate with or into any other Person;

(x) relocate its state of organization, change the type of entity, or change its legal name;

(xi) hire any employee; or

(xii) agree to do any of the foregoing.

Purchaser's approval of any action restricted by this Section 8.7 shall not be unreasonably withheld, conditioned or delayed.

8.8 Hardin Call Option.

(a) Purchaser shall have the option (the "**Hardin Option**") to require the Company Member to sell to Purchaser all of the membership interests of Hardin, which option is exercisable by delivery of an Election Notice at any time prior to the later to occur of (i) (30) days after the Hardin Milestone has been achieved and (ii) April 30, 2018. Purchaser shall have the right to terminate the Hardin Option at any time upon written notice to the Company Member, and following delivery of such termination notice, Purchaser shall have no further obligations to effect the Hardin Closing or to develop the Scioto Ridge Project (whether under the Transition Services Agreement or otherwise), and shall have no liability to Company Member or any Party with respect to the foregoing.

(b) In order to exercise the Hardin Option, the Purchaser shall deliver a notice (the "**Election Notice**") to the Company Member. The closing of the purchase and sale of the membership interests in Hardin (the "**Hardin Closing**") shall take place at the offices of Morgan, Lewis & Bockius LLP, 301 Grant Street, Pittsburgh, Pennsylvania, as soon as possible but in any event no later than thirty (30) days after the delivery of an Election Notice (except in the case that Purchaser delivers an Election Notice prior to (i) the achievement of the Hardin Milestone, in which case the Hardin Closing shall occur as soon as possible but in any event no later than thirty (30) days after achievement of the Hardin Milestone or (ii) after the achievement of the Hardin Milestone but prior to the Closing Date, in which case the Hardin Closing shall occur on the Closing Date (or such later date that is no later than thirty (30) days after the achievement of the Hardin Milestone), or on such other date or at such other place as Purchaser and Company Member may mutually agree (the "**Hardin Closing Date**"); provided that if the Hardin Closing has not occurred on or prior to November 15, 2018 then no Party shall have any further obligation to effect the Hardin Closing or any liability to any other Party with respect thereto.

(c) The Hardin Amount shall be subject to adjustment for the Closing Net Working Capital of Hardin and Closing Long Term Liabilities of Hardin, and the provisions of Section 3.4 shall be applied, mutatis mutandis, to the Hardin Amount as though the Closing Date were the Hardin Closing Date (such adjusted amount, the "**Adjusted Hardin Amount**"). The provisions of this Agreement relating to the escrow shall be applied, mutatis mutandis, to the Hardin Closing as if the Escrow Amount were the Hardin Escrow Amount and the Escrow Agreement were the Hardin Escrow Agreement.

## ARTICLE IX

## TAX MATTERS

9.1 Preparation and Filing of Tax Returns.

(a) The Member Representative shall prepare and file, or cause to be prepared and filed, in a manner consistent with past practice (except as otherwise required by Applicable Law), all Pass-Through Tax Returns of Member Representative or its parent entities that include the operations of the Company and the Development Companies. In no event shall Member Representative be obligated to share any such Tax Return with Purchaser.

(b) Purchaser shall prepare and file, or cause to be prepared and filed (including by direction of the Surviving Company), in a manner consistent with past practice (except as otherwise required by Applicable Law), (i) all Tax Returns of the Company and any Development Company for all taxable periods ending on or prior to the Closing Date that are filed after the Closing Date (excluding any Pass-Through Tax Returns prepared and filed pursuant to Section 9.1(a)) and (ii) all Straddle Period Tax Returns for the Company and the Development Companies. Purchaser shall provide the Member Representative with copies of each such Tax Return at least fourteen (14) days prior to filing for the Member Representative's review and comment, and Purchaser shall not file or cause to be filed any such Tax Return without the Member Representative's consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Member Representative shall be deemed to have consented in case of any failure of the Member Representative to respond within ten (10) days following the day on which Purchaser transmitted such Tax Return to the Member Representative.

(c) Except as required by Applicable Law, Purchaser shall not amend any Tax Return of the Company that relates to a Pre-Closing Period, change any Tax accounting or Tax Return filing procedures, or enter into any voluntary disclosure process for a Pre-Closing Period without the prior written consent of the Member Representative, which consent shall not be unreasonably withheld, conditioned or delayed, provided that the Member Representative shall be deemed to have consented in case of any failure of the Member Representative to respond within thirty (30) days following the day on which Purchaser transmitted a draft amended Tax Return to the Member Representative.

(d) No Party or its Affiliates shall cause to be made any extraordinary transaction or event on the Closing Date that would reasonably be expected to result in any increased Tax liability for the other Party or its Affiliates.

9.2 Cooperation. From and after the Closing, the Parties shall, and in the case of any Affiliates of any Party, shall cause such Affiliate to, provide to the other Party such cooperation and information and make such of its officers, managers, directors, employees and agents available, as and to the extent reasonably requested by such Party, in connection with the filing of any Tax Return, amended Tax Return or claim for refund, determining liability for Taxes or a right to refund of Taxes, or in conducting any audit, litigation or other proceeding with respect to Taxes, in each case, solely to extent such Tax or Tax Return is attributable to a

Pre-Closing Period. Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Returns, together with relevant accompanying schedules and relevant work papers, relevant documents relating to rulings and other determinations by Taxing Authorities, and relevant records concerning the ownership and Tax basis of property, which any such Party may possess.

9.3 Transfer Taxes. Each of Purchaser and the Company shall be responsible for one-half of any Transfer Taxes associated with this Agreement or the Merger, and the Company's portion shall be deemed to be a current liability for purposes of determining Closing Net Working Capital; provided that, for avoidance of doubt, Purchaser shall not have any liability for or obligation to pay any Transfer Taxes arising from (a) the Reorganization or (b) any pre-Closing: (i) direct or indirect change in the ownership of the Projects or any asset of the Company or any Development Company; or (ii) election to treat the Company as a corporation for U.S. federal and applicable state and local Tax purposes, which amounts, if any, shall in each case be deemed to be a current liability for purposes of determining Closing Net Working Capital. Purchaser shall promptly file all necessary documentation and Tax Returns with respect to any Transfer Taxes associated with this Agreement or the Merger and the Member Representative shall provide such cooperation in connection with the preparation and filing of such documentation and Tax Returns as may be reasonably requested by Purchaser. No later than five days prior to the due date for any Transfer Taxes for which the Company is responsible pursuant to this Section 9.3, Company Member shall remit to Purchaser the amount of any such Transfer Taxes, in each case to the extent any such Transfer Taxes are not included as a liability in the Closing Net Working Capital or have not been properly paid to the relevant Tax Authority at such time.

9.4 Entity Classification Election. If at any time it is determined that the Company or any Development Company was treated as a corporation for U.S. federal income tax purposes as of the Closing Date in the absence of a properly filed election pursuant to this Section 9.4 either by (i) the U.S. Internal Revenue Service or (ii) the Purchaser through delivery to the Member Representative of a written "should" level opinion of a nationally recognized law firm or accounting firm knowledgeable in U.S. tax matters including only reasonable and customary assumptions, disclaimers, representations, and conditions, then the Parties hereby agree that Purchaser shall, to the extent permitted by Applicable Law, properly complete and file with the Internal Revenue Service any of those certain IRS Forms 8832 provided by Company Member pursuant to Section 10.3(k) hereof that are relevant to the Company or any Development Company, as applicable in an attempt to change such U.S. federal income treatment so that the Company or Development Company (as the case may be) will instead be classified as a disregarded entity for U.S. federal income tax purposes as of the Closing Date. The Company Member and Member Representative shall make all commercially reasonable efforts to provide to Purchaser and, as needed, the Internal Revenue Service any other information or documentation required to effect any election made pursuant to such IRS Forms 8832. In the event that the Hardin Closing Date takes place pursuant to Section 8.8., this Section 9.4 shall apply to Hardin as if Hardin were a Development Company but by substituting the Hardin Closing Date for the Closing Date when applying this Section 9.4 to Hardin.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1 Conditions to Obligations of Each Party. The obligations of Purchaser, Merger Sub and the Company to consummate the Merger are subject to the satisfaction (or, to the extent permissible, waiver) on or prior to the Closing Date of the following conditions.

(a) The Committee on Foreign Investment in the United States ("**CFIUS**") shall have provided the Parties a written notice that review under Section 721 of the U.S. Defense Production Act of 1950, as amended ("**Section 721**"), of the transactions contemplated by this Agreement has been concluded and (a) CFIUS shall have determined that there are no unresolved national security concerns with respect to the transactions contemplated by this Agreement or (b) if CFIUS has recommended that the President prohibit the transaction contemplated by this Agreement, the President has rejected the recommendation of CFIUS and declined to prohibit such transactions (the "**CFIUS Approval**").

(b) No Applicable Law or Order shall restrain, enjoin or prohibit the consummation of the Merger.

10.2 Conditions to the Obligations of the Company. The obligation of the Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by the Company in its sole discretion) of the following conditions.

(a) The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as if made as of such date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such specific date), and the Company shall have received a certificate dated the Closing Date signed on behalf of Purchaser by the chief executive officer or chief financial officer of Purchaser to such effect.

(b) Purchaser and Merger Sub shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Closing Date. The Company shall have received a certificate signed on behalf of Purchaser by the chief executive officer or chief financial officer of Purchaser to such effect.

(c) Purchaser shall have executed and delivered the Escrow Agreement.

(d) Purchaser shall have executed and delivered the Transition Services Agreement.

(e) Purchaser shall have delivered the Member Closing Payment to the Company Member, and the Escrow Amount to the Escrow Agent, in each case, by wire transfer of immediately available funds.

10.3 Conditions to the Obligation of Purchaser and Merger Sub. The obligations of Purchaser and Merger Sub to consummate the transactions contemplated by this Agreement are

subject to the satisfaction (or waiver by Purchaser in its sole discretion) of the following conditions.

(a) The representations and warranties of the Company set forth in this Agreement (without regard to materiality or Material Adverse Effect qualifiers contained therein), shall be true and correct as of the Closing Date as if made as of such date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate would not have a Material Adverse Effect. Purchaser shall have received a certificate dated the Closing Date signed on behalf of the Company by the chief executive officer or the chief financial officer of the Company to the effect of the foregoing.

(b) The Company shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date. Purchaser shall have received a certificate dated the Closing Date signed on behalf of the Company by the chief executive officer or the chief financial officer of the Company to the effect of the foregoing.

(c) The Company shall have delivered to Purchaser good standing certificates from the Secretary of State of the State of Delaware for the Company and each Development Company dated not more than five (5) Business Days before the Closing Date.

(d) The Company Member shall have executed and delivered the Transition Services Agreement.

(e) The Member Representative shall have satisfied all "know your client" requirements of Escrow Agent, responded to all of Escrow Agent's related requests for information and documents, and executed and delivered the Escrow Agreement.

(f) The Company shall have delivered to Purchaser a certification of the Company's non-foreign status in accordance with Section 1445(b)(2) of the Code in form and substance reasonably satisfactory to Purchaser.

(g) Either:

(i) The Company shall be the sole member of Sand Creek Winds, LLC, or

(ii) Everpower Wind Holdings, Inc. shall have delivered an assignment, in form and substance reasonably satisfactory to Purchaser, to the Company of all of its rights under that certain Option Agreement (Sand Creek Project) dated as of April 20, 2016 by and between Everpower Wind Holding, Inc., Sand Creek Winds, LLC and the members of Sand Creek Winds, LLC.

(h) The Company shall have delivered to Purchaser evidence, in form and substance reasonably satisfactory to Purchaser, that the consents set forth on Schedule 10.3(h) have been obtained.

(i) The condition set forth on Schedule 10.3(i) shall have been satisfied.

(j) The Company shall have delivered to Purchaser resignations, in the form attached as Exhibit E.

(k) Company Member shall have provided to Purchaser an IRS Form 8832 for each of the Company and each Development Company (other than Hardin), which IRS Forms 8832 shall be retained by Purchaser until such time, if any, that any of such IRS Forms 8832 must be filed pursuant to Section 9.4 hereof. Each such IRS Form 8832 shall include (i) the identifying information required at the top of page 1 of the IRS Form 8832, (ii) the information required in Part I, Lines 1 through 5, and (iii) an *undated* signature of a person authorized to sign such IRS Forms 8832 on behalf of the relevant entity in each of Parts I and II of such IRS Form 8832.

10.4 Conditions to the Obligations of the Parties to Effect the Hardin Closing. The obligations of the Parties to consummate the Hardin Closing are subject to the satisfaction (or, to the extent permissible, waiver) of the following conditions:

(a) Conditions to the Obligations of Company Member.

(i) The representations and warranties of Purchaser set forth in this Agreement applicable to Development Companies (including the Fundamental Representations) shall be true and correct in all material respects with respect to Hardin as of the Hardin Closing Date as if made as of such date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such specific date), and Company Member shall have received a certificate dated the Closing Date signed on behalf of Purchaser by the chief executive officer or chief financial officer of Purchaser to such effect.

(ii) Purchaser shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Hardin Closing Date. Company Member shall have received a certificate signed on behalf of Purchaser by the chief executive officer or chief financial officer of Purchaser to such effect.

(iii) Purchaser shall have executed and delivered the Hardin Escrow Agreement.

(iv) Purchaser shall have delivered the Adjusted Hardin Amount to the Company Member and the Hardin Escrow Amount to the Escrow Agent, in each case by wire transfer of immediately available funds.

(b) Conditions to the Obligations of the Purchaser.

(i) The representations and warranties of the Company Member set forth in this Agreement with respect to any Development Company (without regard to materiality or Material Adverse Effect qualifiers contained therein), shall be true and correct as of the Hardin Closing Date as if made as of such date with respect to Hardin (except for any such representations and warranties that are made as of a specific date, which representations and

warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate would not have a Material Adverse Effect. Purchaser shall have received a certificate dated the Hardin Closing Date signed on behalf of Company Member affirming the representations and warranties made by the Company with respect to Hardin and certifying to the effect of the foregoing.

(ii) Prior to the Closing, the Company and from and after the Closing, Company Member shall have performed in all material respects all obligations required to be performed by them under this Agreement at or prior to the Hardin Closing Date. Purchaser shall have received a certificate dated the Closing Date signed on behalf of the Company by the chief executive officer or the chief financial officer of the Company to the effect of the foregoing.

(iii) Company Member shall have delivered to Purchaser a duly executed, valid assignment of membership interests in Hardin, such that the membership interests in Hardin shall be transferred to Purchaser or Purchaser's designee, free and clear of all Liens, other than Permitted Liens.

(iv) Company Member shall have delivered to Purchaser evidence, in form and substance reasonably satisfactory to Purchaser, that any Required Third Party Consents or governmental consents required with respect to the purchase of the membership interests in Hardin have been obtained.

(v) Company Member shall have delivered to Purchaser a good standing certificate from the Secretary of State of the State of Delaware for Hardin dated not more than five (5) Business Days before the Hardin Closing Date.

(vi) Company Member shall have provided to Purchaser an IRS Form 8832 for Hardin, which IRS Forms 8832 shall be retained by Purchaser until such time, if any, that any of such IRS Forms 8832 must be filed pursuant to Section 9.4 hereof. Such IRS Form 8832 shall include (i) the identifying information required at the top of page 1 of the IRS Form 8832, (ii) the information required in Part I, Lines 1 through 5, and (iii) an *undated* signature of a person authorized to sign such IRS Forms 8832 on behalf of Hardin in each of Parts I and II of such IRS Form 8832.

(vii) The Member Representative shall have satisfied all "know your client" requirements of Escrow Agent, responded to all of Escrow Agent's related requests for information and documents, and executed and delivered the Hardin Escrow Agreement.

## ARTICLE XI

## INDEMNIFICATION

11.1 Indemnification.

(a) If the Closing occurs, subject to the terms and conditions contained in this Article XI, the Company Member shall indemnify, defend and hold harmless the Purchaser Indemnified Persons from and against all Damages incurred or suffered by Purchaser caused by or arising out of or resulting from any breach of the Fundamental Representations contained in

this Agreement. When determining the existence of any such breach, or the amount of any Damages resulting therefrom for purposes of this Article XI, such representations and warranties shall be interpreted without giving effect to any qualification regarding "materiality," "Material Adverse Effect," or other terms of similar import (as if such standard or qualification were deleted from such representation or warranty).

(b) Notwithstanding anything to the contrary contained in this Agreement, from and after the Closing, and subject to Section 3.4, (i) the indemnification provided in Section 11.1(a) contains the sole and exclusive remedy of the Purchaser Indemnified Persons against the Company Member for any matter arising out of the transactions contemplated by this Agreement; provided, however, that this exclusive remedy provision shall not preclude (x) any claims under the R&W Insurance Policy or (y) any claims based upon, arising out of or relating to fraud; and (ii) each of Purchaser and Merger Sub hereby waives, to the fullest extent permitted under Applicable Law, any and all rights, claims and causes of action it may have against the Company Member relating to the subject matter of this Agreement arising under or based upon any federal, state, local or foreign statute, law, ordinance, rule or regulation or otherwise, other than those claims made in accordance with the provisions and applicable limitations of this Article XI or under the R&W Insurance Policy, or those claims, if any, based upon, arising out of or relating to fraud.

(c) "**Damages**" shall mean the amount of any liability, loss, cost, expense, claim, award or judgment incurred or suffered by any Indemnified Person arising out of or resulting from the indemnified matter, whether attributable to personal injury, property damage, contract claims (including contractual indemnity claims), torts, or otherwise, including court costs and reasonable fees and expenses of attorneys and advisors, costs of investigation and other expenses of litigation or other similar Actions, as well as the cost of enforcing any right to indemnification hereunder; provided, however, that no Purchaser Indemnified Person shall be entitled to indemnification under this Section 11.1 for, and "Damages" shall not include, any Taxes that may be assessed on payments made under this Article XI or any Tax benefits to which the Indemnified Person may be entitled.

(d) The indemnity of the Company Member provided in this Section 11.1 shall be for the benefit of and extend to the Purchaser Indemnified Persons. Any claim for indemnity under this Section 11.1 by any Purchaser Indemnified Person must be brought and administered by Purchaser. No Indemnified Person other than Purchaser shall have any rights against the Company Member under the terms of this Section 11.1 except as may be exercised on its behalf by Purchaser, pursuant to this Section 11.1(d).

(e) The Parties shall treat, for Tax purposes, any amounts paid under this Article XI as an adjustment to the Merger Consideration.

11.2 Indemnification Actions. All claims for indemnification under Section 11.1 shall be asserted and resolved as follows:

(a) For purposes of this Article XI, the term "**Indemnifying Person**" when used in connection with particular Damages shall mean the Person or Persons having an obligation to indemnify another Person or Persons with respect to such Damages pursuant to this

Article XI, and the term "**Indemnified Person**" when used in connection with particular Damages shall mean the Person or Persons having the right to be indemnified with respect to such Damages by another Person or Persons pursuant to this Article XI.

(b) To make a claim for indemnification under Section 11.1, an Indemnified Person shall notify the Indemnifying Person of its claim under this Section 11.2 in writing, including the specific details of and specific basis under this Agreement for its claim (the "**Claim Notice**"). In the event that the claim for indemnification is based upon a claim by a third Person against the Indemnified Person (a "**Third Party Claim**"), the Indemnified Person shall provide its Claim Notice promptly, but in no event more than ten (10) days after the Indemnified Person's receipt of the Third Party Claim, and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim. In the event that the claim for indemnification is based upon an inaccuracy or breach of a representation, warranty, covenant or agreement, the Claim Notice shall specify the representation, warranty, covenant or agreement which was inaccurate or breached.

(c) In the case of a claim for indemnification based upon a Third Party Claim, the Indemnifying Person shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnified Person whether it will assume the defense of such Third Party Claim under this Article XI.

(d) If the Indemnifying Person assumes the defense of the Third Party Claim, it shall have the right to defend, at its sole cost and expense, the Third Party Claim. The Indemnifying Person shall not consent to a settlement of or the entry of any judgment arising from any such Third Party Claim without the prior written consent of the Indemnified Person (which consent shall not be unreasonably withheld or delayed). The Parties will use commercially reasonable efforts to minimize Damages from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims. The Parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto.

(e) If the Indemnifying Person notifies the Indemnified Person that it will not assume the defense of the Third Party Claim, then the Indemnified Person shall have the right to defend against the Third Party Claim (at the sole cost and expense of the Indemnifying Person, if the Indemnified Person is entitled to indemnification hereunder), with counsel of the Indemnified Person's choosing, subject to the right of the Indemnifying Person to assume the defense of the Third Party Claim at any time prior to settlement or final determination thereof. Whether or not the Indemnifying Person has assumed the defense of the Third Party Claim, the Indemnifying Person will not be obligated to indemnify the Indemnified Person for any settlement entered into or any judgment that was consented to without the Indemnifying Person's prior written consent.

(f) In the case of a claim for indemnification not based upon a Third Party Claim, the Indemnifying Person shall have thirty (30) days from its receipt of the Claim Notice to (i) cure the Damages complained of, (ii) admit its obligation to provide indemnification with respect to such Damages or (iii) dispute the claim for such Damages.

(g) Notwithstanding anything to the contrary herein, this Section 11.2 shall

not permit, nor shall it be construed as permitting, any Indemnifying Person from assuming the defense of a Third Party Claim if the assumption of the defense of such Third Party Claim by such Indemnifying Party would reasonably be expected to cause any Purchaser Indemnified Person's coverage or remedies under the R&W Insurance Policy to be adversely affected.

11.3 Limitation on Actions. Without limiting or otherwise adversely affecting Purchaser's ability to recover under the R&W Insurance Policy (including by way of affecting any survival periods thereunder) or claims, if any, based upon, arising out of or relating to fraud:

(a) The representations and warranties of the Company, other than the Fundamental Representations, shall not survive the Closing. The Fundamental Representations of the Company shall survive the Closing for a period of twelve (12) months and, if the Hardin Closing occurs, the Fundamental Representations with respect to Hardin shall survive the Hardin Closing for a period of twelve (12) months. Representations and warranties shall be of no further force and effect after the date of their expiration, provided that there shall be no termination of any claim for indemnification properly asserted pursuant to this Agreement with respect to such a representation or warranty prior to its expiration date. In any such case, such representation or warranty shall survive only for the purpose of resolving such asserted claim (and not for the purpose of any other claim for indemnification which went unasserted, or was improperly asserted, prior to such date of expiration) until such asserted claim is resolved.

(b) The Company Member shall not have any liability for any indemnification under Section 11.1(a) for any Damages with respect to any occurrence, claim, award or judgment unless and until the aggregate Damages for which Claim Notices are delivered by Purchaser in accordance herewith exceed $250,000 (the "**Aggregate Claim Threshold**").

(c) The Company Member shall not be required to indemnify Purchaser under this Agreement for aggregate Damages in excess of $6,500,000 (the "**Cap**"). Amounts in excess of the Cap may be recovered under the R&W Insurance Policy.

(d) The amount of any Damages for which an Indemnified Person is entitled to indemnity under this Article XI shall be reduced by the amount of insurance proceeds realized by the Indemnified Person or its Affiliates with respect to such Damages (net of any collection costs). For the avoidance of doubt, this Section 11.3(d) shall not apply to matters covered by (or recoveries under) the R&W Insurance Policy.

(e) In no event shall any Indemnified Person be entitled to duplicate compensation with respect to the same Damage, liability, loss, cost, expense, claim, award or judgment under more than one provision of this Agreement and the various documents delivered in connection with the Closing.

(f) The covenants of the Parties to be performed at or prior to the Closing shall not survive the Closing. The covenants of the Parties to be performed from and after the Closing shall survive in accordance with their terms until performed.

11.4 Right of Setoff. Purchaser shall have the right to withhold and set off against the Hardin Amount or any Payment Milestone Amount (a) subject to the limitation set forth in Section 11.3, the amount of Damages to which Purchaser is entitled pursuant to this Article XI,

(b) any Damages or other amounts owed to Purchaser, Company, or any Development Company by the Member Representative pursuant to that certain Assignment, Assumption and Cross-Indemnification Agreement of even date herewith by and among Company, Member Representative, and TEII, and (c) any amounts paid by Purchaser, the Company or any Development Company with respect to the matters set forth on Schedule 11.4(c).

## ARTICLE XII

## TERMINATION

12.1 Termination.

(a) This Agreement may be terminated at any time prior to the Closing:

(i) by mutual written consent of Purchaser and the Member Representative;

(ii) by Purchaser or the Member Representative if:

(A) the Closing has not occurred on or prior to July 1, 2018; provided, however, neither Party shall have the right to terminate this Agreement under this Section 12.1(a)(ii)(A) if the Closing has failed to occur because such Party has failed to perform or observe in any material respect its covenants and agreements hereunder; or

(B) a Governmental Authority shall have issued an order or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Closing, which order or other action is final and non-appealable;

(iii) by Purchaser, if the Company has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (A) would cause one or more of the conditions set forth in Sections 10.3(a) or 10.3(b) not to be satisfied and (B) cannot be cured or, if curable, is not cured within thirty (30) days after written notice of such breach is given to the Company by Purchaser;

(iv) by the Member Representative, if Purchaser has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (A) would cause one or more of the conditions set forth in Sections 10.2(a) or 10.2(b) not to be satisfied and (B) cannot be cured or, if curable, is not cured within thirty (30) days after written notice of such breach is given to Purchaser by the Company.

(b) The Party desiring to terminate this Agreement pursuant to Section 12.1(a)(ii), (iii) or (iv) shall give written notice of such termination to the other Party hereto specifying the provision hereof pursuant to which such termination is made

12.2 Effect of Termination. In the event of termination of this Agreement as provided in Section 12.1, this Agreement shall immediately become void and there shall be no liability or obligation on the part of Purchaser or the Company or their respective officers,

managers, directors, members, stockholders or Affiliates, except as set forth in Section 12.3; provided, however, that the provisions of Section 8.3 (Public Announcements), Section 12.2 (Effect of Termination), Section 12.3 (Remedies) and Article XIII of this Agreement, and the Confidentiality Agreement, shall remain in full force and effect and survive any termination of this Agreement.

12.3 Remedies. The termination of this Agreement shall not affect any Party's right to recover damages sustained by such Party as a result of any willful breach by the other Party of any covenant or agreement contained in this Agreement or in respect of fraud.

## ARTICLE XIII

## MISCELLANEOUS

13.1 Notices. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally; (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier; (c) on the date sent by facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next Business Day; or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

If to Purchaser, to:

Innogy Renewables US LLC
200 N. LaSalle St, Suite 2301
Chicago, IL
Attn: Andrew Young
Tobias Bage
Gunnar Helberg
Email: a.young@innogy.com
tobias.bage@innogy.com
gunnar.helberg@innogy.com

With a required copy (which will not constitute notice) to:

K&L Gates, LLP
10100 Santa Monica Blvd.
Los Angeles, CA 90071
Attn: Andrea Lucan
Email: andrea.lucan@klgates.com

If to the Company, to:

Trireme Energy Development, LLC
1251 Waterfront Place
Pittsburgh, PA 15222
Attn: James Spencer

With required copies (which will not constitute notice) to:

Trireme Energy Holdings, Inc.
c/o Terra Firma Capital Partners Limited
2 More London Riverside
London SE1 2AP
Attn: William Burnand

and

Morgan, Lewis & Bockius LLP
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Attn: Marlee S. Myers
Kimberly A. Taylor

If to the Member Representative, to:

Trireme Energy Holdings, Inc.
c/o Terra Firma Capital Partners Limited
2 More London Riverside
London SE1 2AP
Attn: William Burnand

With a required copy (which will not constitute notice) to:

Morgan, Lewis & Bockius LLP
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Attn: Marlee S. Myers
Kimberly A. Taylor

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the sending Party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

13.2 Amendments and Waivers.

(a) Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c) To the maximum extent permitted by law, (i) no waiver that may be given by a Party shall be applicable except in the specific instance for which it was given and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand.

13.3 Fees and Expenses. All fees, costs and expenses incurred in connection with the negotiation of this Agreement, the performance of the respective obligations hereunder and the consummation of the transactions contemplated by this Agreement, shall be paid by the Party incurring such fees, costs or expenses (including fees, costs and expenses of legal counsel, investment bankers, brokers or other representatives and consultants), whether or not the Closing occurs.

13.4 Successors and Assigns. This Agreement may not be assigned by any Party hereto without the prior written consent of the other Party. Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective executors, heirs, personal representatives, successors and assigns. Any purported assignment not permitted under this Section 13.4 shall be null and void.

13.5 Governing Law. This Agreement, the rights and obligations of the Parties under this Agreement, and any claim or controversy directly or indirectly based upon or arising out of this Agreement or the transactions contemplated by this Agreement (whether based upon contact, tort or any other theory), including all matters of construction, validity and performance, shall be governed by and interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of laws rules or provisions (whether of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than New York.

13.6 Consent to Jurisdiction. Each Party hereto irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and in the absence of such federal jurisdiction, the Parties consent to be subject to the exclusive jurisdiction of the state courts located in New York, New York, and hereby waive the right to assert the lack of personal or subject matter jurisdiction or improper venue in connection with any such suit, action or other proceeding. In furtherance of the foregoing, each of the Parties (i) waives the defense of inconvenient forum, (ii) agrees not to commence any suit, action or other proceeding

arising out of this Agreement or any transactions contemplated hereby other than in any such court, and (iii) agrees that a final judgment in any such suit, action or other proceeding shall be conclusive and may be enforced in other jurisdictions by suit or judgment or in any other manner provided by Law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

13.7 Counterparts. This Agreement may be executed in any number of counterparts, and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Parties hereto. The Parties agree that the delivery of this Agreement may be effected by means of an exchange of facsimile or portable document format signatures with original copies to follow by mail or courier service.

13.8 Third Party Beneficiaries. Nothing in this Agreement, express or implied, shall entitle any Person other than the Parties to any claim, cause of action, remedy or right of any kind, except those Persons expressly entitled to indemnification pursuant to Sections 11.1(d) and 13.13(d).

13.9 Entire Agreement. This Agreement and the documents, instruments and other agreements specifically referred to herein or delivered pursuant hereto set forth the entire understanding of the Parties hereto with respect to the transactions contemplated hereby. All exhibits and schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, other than the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

13.10 Captions. All captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

13.11 Severability. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.12 Specific Performance. Purchaser and the Company each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not

performed by them in accordance with the terms hereof and that each Party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity. Each Party hereto irrevocably waives any defenses based on adequacy of any other remedy, whether at law or in equity, that might be asserted as a bar to the remedy of specific performance

13.13 Legal Representation; Privileged Communications. Following consummation of the transactions contemplated in this Agreement, Morgan, Lewis & Bockius LLP may serve as counsel to the Member Representative or any of its Affiliates, in connection with any litigation, claim or obligation arising out of or relating to this Agreement or the transactions this Agreement contemplates, consistent with the applicable Rules of Professional Conduct, notwithstanding representation of any other Person (including the Company or any of the Development Companies), and each of the Parties hereto (on behalf of itself and its Affiliates) consents thereto and waives any conflict of interest arising therefrom. The decision to represent the Member Representative or any of its Affiliates shall be that of Morgan, Lewis & Bockius LLP. Any privilege attaching as a direct result of Morgan, Lewis & Bockius LLP representing the Company or any of the Development Companies in connection with the transactions this Agreement contemplates shall survive the Closing and shall remain in effect. Likewise, any privilege between Morgan, Lewis & Bockius LLP, on the one hand, and the Company and/or any Development Companies, on the other, related or pertaining directly to legal work on the transactions contemplated by this Agreement shall be assigned to and controlled by the Member Representative. In furtherance of the foregoing, each of the Parties agrees to take the steps necessary to ensure that any privilege attaching as a result of Morgan, Lewis & Bockius LLP representing the Company or any of the Development Companies in connection with the transactions this Agreement contemplates shall survive the Closing, remain in effect and be assigned to and controlled by the Member Representative.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



Confidential IRUS0064187

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties hereto on the date first written above.

**COMPANY:**
Trireme Energy Development II, LLC

By:____________________
Name: **James Spencer**
Title: **President & CEO**

**COMPANY MEMBER:**
Trireme Energy Development, LLC

By:____________________
Name: **James Spencer**
Title: **President & CEO**

**MEMBER REPRESENTATIVE:**
Trireme Energy Holdings, Inc.

By:____________________
Name: **James Spencer**
Title: **President & CEO**

**PURCHASER:**
Innogy Renewables US LLC

By:______________________________
Name: Frank Falkenhof
Title: Officer

By:______________________________
Name: Andrew Young
Title: Officer

**MERGER SUB:**
Aura Merger Sub LLC

By: IRUS WIND HOLDINGS LLC, a Delaware limited liability company, its sole member

By: INNOGY RENEWABLES US LLC, a Delaware limited liability company, its sole member

By:______________________________
Name: Frank Falkenhof
Title: Officer

By:______________________________
Name: Andrew Young
Title: Officer

**Schedule 1.1(a)**

## Closing Net Working Capital Procedures[1]

**Trireme Energy Development II, LLC**

1. Current assets of Trireme Energy Development II, LLC: $2,766
2. Current liabilities of Trireme Energy Development II, LLC, incurred outside of the Approved Development Budget: $0
3. Closing Net Working Capital of Trireme Energy Development II, LLC: $2,766 - $0 = $2,766
4. Any liabilities incurred outside of the Approved Development Budget, any Transfer Taxes for which the Company is responsible pursuant to Section 9 and any other liability as defined in Sections 4.7 (b) and (d) shall be deemed current liabilities for the purposes of determining the Closing Net Working Capital.

**Current Assets**

*Prepaid and other current assets.* Prepaid and other current assets are classified as current assets under U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and represent payments for future interconnection studies or payments to landowners for which the Development Companies will receive a future benefit. The remaining balance represents current deposits. These assets are all reasonably expected to be realized in cash or consumed within one year and are directly attributable to the assets to be acquired by the Purchaser.

**Current liabilities**

*Trade and other payables.* Trade and other payables are classified as current liabilities under U.S. GAAP and represent amounts owed to third parties and employees, are due within one year and are directly attributable to the assets to be acquired by Purchaser. Employee related payables represent amounts due only to employees who have been approved by Purchaser to remain with the Company post-closing and choose to remain with the Company post-closing.

**Hardin Wind LLC**

1. Current assets of Hardin Wind LLC: $118
2. Current liabilities of Hardin Wind LLC incurred outside of the Approved Development Budget: $0
3. Closing Net Working Capital at Hardin Wind LLC: $118 - $0 = $118

[1] All dollar amounts are expressed in thousands (000s).

4. Any liabilities incurred outside of the Approved Development Budget, any Transfer Taxes for which the Company is responsible pursuant to Section 9 and any other liability as defined in Sections 4.7 (b) and (d) shall be deemed current liabilities for the purposes of determining the Closing Net Working Capital.

**Current Assets**

*Prepaid and other current assets.* Prepaid and other current assets are classified as current assets under U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and represent payments for future interconnection studies or payments to landowners for which Hardin Wind LLC will receive a future benefit. These assets are all reasonably expected to be realized in cash or consumed within one year and are directly attributable to the assets to be acquired by the Purchaser.

**Current liabilities**

*Trade and other payables.* Trade and other payables are classified as current liabilities under U.S. GAAP and represent amounts owed to third parties, are due within one year and are directly attributable to the assets to be acquired by Purchaser.

## Schedule 1.1(b)

**Employees**

1. Please see Confidential Schedule 1.1(b) of the Schedules to the Agreement and Plan of Merger, which is incorporated herein by reference.



Confidential

## Schedule 1.1(c)

## Company Knowledge

1. Jim Spencer
2. Masahiro Ogiso
3. Michael Current
4. Katie Bellezza

## Schedule 1.1(d)

**Purchaser Knowledge**

1. Frank Falkenhof
2. Andrew Young



Confidential IRUS0064194

## Schedule 1.1(e)

## Credit Support Arrangements

| | | |
|---|---|---|
| 1 | **Scioto Ridge PPA Development Security** | |
| | Beneficiary | Amazon Energy LLC |
| | LC # | TFTS-981491 |
| | Contact Name(s) | Russel Baruffi |
| | Email | baruffi@amazon.com |
| | Balance as of the date of the Agreement | $4,730,000.00 |
| 2 | **Cassadaga PPA Development Security** | |
| | Beneficiary | Connecticut Light and Power Company |
| | LC # | CPCS-838475 |
| | Contact Name(s) | James Daly |
| | Email | James.Daly@Eversource.com |
| | Balance as of the date of the Agreement | $1,075,725.00 |
| 3 | **Cassadaga PPA Development Security** | |
| | Beneficiary | Massachusetts Electric Co and Nantucket Electric Co |
| | LC # | CPCS-838478 |
| | Contact Name(s) | Tatiana Gamarra |
| | Email | Tatiana.GamarraEnriquez@nationalgrid.com |
| | Balance as of the date of the Agreement | $377,622.00 |
| 4 | **Cassadaga PPA Development Security** | |
| | Beneficiary | Narragansett Electric Company |
| | LC # | CPCS-838470 |
| | Contact Name(s) | Tatiana Gamarra |
| | Email | Tatiana.GamarraEnriquez@nationalgrid.com |
| | Balance as of the date of the Agreement | $283,500.00 |
| 5 | **Cassadaga PPA Development Security** | |
| | Beneficiary | NSTAR Electric Company |
| | LC # | CPCS-838481 |
| | Contact Name(s) | James Daly |
| | Email | James.Daly@Eversource.com |
| | Balance as of the date of the Agreement | $356,076.00 |
| 6 | **Cassadaga PPA Development Security** | |
| | Beneficiary | United Illuminating Company |
| | LC # | CPCS-838488 |
| | Contact Name(s) | Alan Trotta |
| | Email | Alan.trotta@uinet.com |
| | Balance as of the date of the Agreement | $263,025.00 |
| 7 | **Cassadaga PPA Development Security** | |

| | |
|---|---|
| Beneficiary | Fitchburg Gas and Electric Light Company |
| LC # | CPCS-838471 |
| Contact Name(s) | Robert Furino |
| Email | furino@unitil.com |
| Balance as of the date of the Agreement | $7,560.00 |

**8 Cassadaga PPA Development Security**

| | |
|---|---|
| Beneficiary | Western Massachusetts Electric Co |
| LC # | CPCS-838492 |
| Contact Name(s) | James Daly |
| Email | James.Daly@Eversource.com |
| Balance as of the date of the Agreement | $61,992.00 |

**9 Buckeye Interconnection Security**

| | |
|---|---|
| Beneficiary | PJM Interconnection, LLC |
| LC # | TFTS-729161 |
| Contact Name(s) | Jeannette Mittan |
| Email | Jeannette.Mittan@pjm.com |
| Balance as of the date of the Agreement | $1,112,296.00 |

**10 Kimberly Run Interconnection Security**

| | |
|---|---|
| Beneficiary | PJM Interconnection, LLC |
| LC # | TFTS-775374 |
| Contact Name(s) | Jeannette Mittan |
| Email | Jeannette.Mittan@pjm.com |
| Balance as of the date of the Agreement | $1,047,483.00 |

**11 Scioto Ridge Interconnection Security**

| | |
|---|---|
| Beneficiary | PJM Interconnection, LLC |
| LC # | TFTS-771276 |
| Contact Name(s) | Jeannette Mittan |
| Email | Jeannette.Mittan@pjm.com |
| Balance as of the date of the Agreement | $983,936.00 |

**12 Terrapin Hills Interconnection Security**

| | |
|---|---|
| Beneficiary | PJM Interconnection, LLC |
| LC # | TFTS-999263 |
| Contact Name(s) | Jeannette Mittan |
| Email | Jeannette.Mittan@pjm.com |
| Balance as of the date of the Agreement | $589,929.00 |

**13 Buckeye Interconnection Security**

| | |
|---|---|
| Beneficiary | PJM Interconnection, LLC |
| LC # | TFTS-729163 |
| Contact Name(s) | Jeannette Mittan |
| Email | Jeannette.Mittan@pjm.com |
| Balance as of the date of the Agreement | $586,964.00 |

**14 Champaign Wind LLC Guaranty**
Guaranty, dated as of December 19, 2011, by EverPower Wind Holdings, Inc. for the benefit of Union Wind Energy

## Schedule 1.1(f)

**Company Projects**

| Name | Project LLC(s) |
|---|---|
| Scioto Ridge | Hardin Wind LLC |
| Buckeye | Buckeye Wind LLC |
| Mason Dixon | Mason Dixon Wind LLC |
| Mud Springs | Sunrise Wind Holdings LLC<br>Bowler Flats Energy Hub LLC<br>Horse Thief Wind Project LLC<br>Mud Springs Wind Project LLC<br>Pryor Caves Wind Project LLC |
| Cassadaga | Cassadaga Wind LLC |
| Kimberly Run | Kimberly Run LLC |
| Coyote Crest | Pe Ell North LLC |
| Baron Winds | Baron Winds LLC |
| Sand Creek | Sand Creek Winds LLC |
| Terrapin Hills | Terrapin Hills LLC |
| Blueberry Hills | Blueberry Hills LLC |
| Bobcat Solar | EverPower Solar LLC |
| Buckeye Solar | EverPower Solar LLC |
| Buckeye Storage | EverPower Solar LLC |
| Rockwood Solar | EverPower Solar LLC |
| Aurum Peaks | EverPower Wind Development LLC |
| Bryant Mountain | EverPower Maine LLC |
| Chestnut Ridge | EverPower Wind Development LLC |
| Great Northern | EverPower Maine LLC |
| Mahanoy Mountain | Mahanoy Mountain LLC |
| Terra Alta | EverPower Wind Development LLC |
| Decatur Wind | EverPower Wind Development LLC |
| Midland Wind | EverPower Wind Development LLC |
| Spartan Solar | EverPower Solar LLC |
| Sunshine Solar | EverPower Solar LLC |
| Scioto Solar | EverPower Solar LLC |
| Scioto Storage | EverPower Solar LLC |
| Northwest Wind | EverPower Wind Development LLC |
| Harrisun Solar | EverPower Solar LLC |
| Tussey Mountain | EverPower Wind Development LLC |
| Highland III | Highland III LLC |
| Broad Top Mountain | EverPower Wind Development LLC |
| Wilson Creek | EverPower Wind Development LLC |

| | |
|---|---|
| Breezewood Wind | EverPower Wind Development LLC |
| Sideling Hill | EverPower Wind Development LLC |



Confidential IRUS0064199

## Schedule 1.1(g)

**Permitted Liens**

None.

## Schedule 6.1(a)

### Conduct of the Business

None.

## Schedule 6.1(b)

### Conduct of the Business

**(iii):**

1. First Amendment to Renewable Energy Purchase Agreement between Amazon Energy LLC and Hardin Wind LLC.

**(iv):**

1. Exercising the Option Agreement between EverPower Wind Holdings Inc. and Sand Creek Winds, LLC effective April 20, 2016.

2. SODAR unit being delivered to Baron Winds in December 2017.

**(xiv):**

1. Up to Three Hundred Thousand Dollars ($300,000.00) loan to Robert Fahy and Douglas Fahy for the purchase of James T. Fahy's ownership interest in property needed for Baron Winds, LLC project infrastructure.

2. Posting of the Baron Winds NYSERDA REC Security deposit in the amount of approximately $6,733,566.00.

3. Posting of the Cassadaga PPA Development Security deposit in the amount of approximately $724,500.



Confidential IRUS0064202

## Schedule 10.3(h)

**Consents**

1. The Renewable Energy Purchase Agreement between Amazon Energy LLC and Hardin Wind LLC, effective as of October 14, 2016
2. RPS Class I Renewable Generation Unit Power Purchase Agreement between The Connecticut Light & Power Company d/b/a EverSource Energy, and Cassadaga Wind LLC, as of May 25, 2017
3. RPS Class I Renewable Generation Unit Power Purchase Agreement between Massachusetts Electric Company and Nantucket Electric Company d/b/a National Grid, and Cassadaga Wind LLC, as of May 25, 2017
4. RPS Class I Renewable Generation Unit Power Purchase Agreement between NSTAR d/b/a EverSource Energy, and Cassadaga Wind LLC, as of May 25, 2017
5. RPS Class I Renewable Generation Unit Power Purchase Agreement between The Narragansett Electric Company d/b/a National Grid, and Cassadaga Wind LLC, as of May 25, 2017
6. RPS Class I Renewable Generation Unit Power Purchase Agreement between The United Illuminating Company, and Cassadaga Wind LLC, as of May 25, 2017
7. RPS Class I Renewable Generation Unit Power Purchase Agreement between Fitchburg Gas and Electric Light Company d/b/a Unitil, and Cassadaga Wind LLC, as of May 25, 2017
8. RPS Class I Renewable Generation Unit Power Purchase Agreement between Western Massachusetts Electric Company d/b/a EverSource Energy, and Cassadaga Wind LLC, as of May 25, 2017

**Schedule 10.3(i)**

1. Please see Confidential Schedule 10.3(i), which is incorporated herein by reference.

## Schedule 11.4(c)

In the event that the Company does not obtain an amendment to the Mud Springs Purchase Agreement prior to the Closing providing that the indirect sale, transfer or change of control of the equity interests in Sunrise Wind Holdings, LLC is not a sale of the Project (as defined in the Mud Springs Purchase Agreement) pursuant to Section 2.02(c) of the Mud Springs Purchase Agreement and that the Final Payment (as defined in the Mud Springs Purchase Agreement) will not be due or payable in the event of such sale, transfer or change of control, then Purchaser shall have the setoff right set forth in this Schedule 11.4(c). If Purchaser or any of its Affiliates is obligated to make any payment pursuant to Section 2.02(c) of the Mud Springs Purchase Agreement as a result of the consummation of the Merger, then Purchaser shall be entitled to setoff against the Hardin Amount or any Payment Milestone Amount the amount of such payment (not to exceed $1,300,000); provided, that (i) the Parties will use commercially reasonable efforts to minimize Damages from any claim made under the Mud Springs Purchase Agreement and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims and (ii) Purchaser shall not make any payment under or enter into any settlement with respect to or amendment of the Mud Springs Purchase Agreement without the Company Member's consent (such consent not to be unreasonably withheld).

For purposes of this Schedule 11.4(c), "**Mud Springs Purchase Agreement**" means that certain Membership Interest and Asset Purchase Agreement, entered into between John S. Husar and Sunrise Wind Holdings, LLC, dated as of October 14, 2014, as amended on December 9, 2014, as further amended on May 29, 2015, and as further amended on May 18, 2017.

**EXHIBITS**

**Exhibit A**

**Escrow Agreement**

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT is entered into as of [•], 2017 (this "Agreement"), by and among Innogy Renewables US LLC ("Purchaser"), a Delaware limited liability company, Trireme Energy Holdings, Inc., a Delaware corporation ("Member Representative", and together with Purchaser, sometimes referred to individually as "Party" and collectively as the "Parties"), and JPMorgan Chase Bank, N.A. (the "Escrow Agent").

**WHEREAS**, Purchaser, the Member Representative, Aura Merger Sub LLC, a Delaware limited liability company and wholly-owned subsidiary of Purchaser ("Merger Sub"), and Trireme Energy Development II, LLC, a Delaware limited liability company (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), dated as of [•], 2017, whereby upon the merger of Merger Sub with and into the Company (the "Merger"), the Company shall become the wholly owned subsidiary of Purchaser;

**WHEREAS**, pursuant to the Merger Agreement, on the Closing Date, Purchaser will deposit an amount otherwise payable to Trireme Energy Development, LLC, the sole member of the Company (the "Company Member"), by the Purchaser in an escrow fund subject to the terms and conditions set forth herein to satisfy any payment obligation in respect of any adjustment to the Merger Consideration pursuant to the Merger Agreement; and

**WHEREAS**, pursuant to the Merger Agreement, the Member Representative has been designated as agent and attorney-in-fact for the Company Member, with full power and authority to represent the Company Member with respect to all matters arising under this Escrow Agreement, and all actions taken by the Member Representative under this Escrow Agreement will be binding upon the Company Member as if expressly authorized, ratified and confirmed in writing by the Company Member.

**NOW THEREFORE**, in consideration of the promises and agreements of the parties and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **Appointment**. The Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2. **Fund; Investment.**

(a) Upon the execution hereof, Purchaser agrees to deposit with Escrow Agent an amount equal to $[•] ("Escrow Deposit") in immediately available funds. Escrow Agent shall hold the Escrow Deposit in one or more demand deposit accounts and shall invest the Escrow Deposit and the proceeds thereof ("Fund") in an interest bearing demand deposit account at JPMorgan Chase Bank, N.A or a successor investment offered by the Escrow Agent. The Parties acknowledge that interest bearing demand deposit accounts have rates of interest or compensation that may vary from time to time as determined by the Escrow Agent. Instructions to invest the Fund in an alternate manner (an "Alternative Investment"), and any instruction to change any such investments, must be set forth in a subsequent joint written instruction signed by an Authorized Representative (as defined in Section 3 below) of Purchaser and the Member Representative, substantially in the form of Exhibit A-1 annexed hereto (a "Joint Instruction"). Such

Joint Instruction regarding an Alternative Investment shall specify the type and identity of the investments to be purchased and/or sold.

(b) The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity and the Escrow Agent or any affiliated entity may act as counterparty with respect to such investments. Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Fund or the purchase, sale, retention or other disposition of any investment described herein, and each Party acknowledges that it was not offered any investment, tax or accounting advice or recommendation by Escrow Agent with regard to any investment and has made an independent assessment of the suitability and appropriateness of any investment hereunder for purposes of this Agreement. Market values, exchange rates and other valuation information (including without limitation, market value, current value or notional value) of any Alternative Investment furnished in any report or statement may be obtained from third party sources and is furnished for the exclusive use of the Parties. Escrow Agent has no responsibility whatsoever to determine the market or other value of any Alternative Investment and makes no representation or warranty, express or implied, as to the accuracy of any such valuations or that any values necessarily reflect the proceeds that may be received on the sale of an Alternative Investment. Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of an Authorized Representative of each of the Parties to give Escrow Agent instructions to invest or reinvest the Fund. Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.

(c) All interest or other income earned under this Agreement shall be allocated to the Company Member and reported, by Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow Deposit by the Company Member whether or not said income has been distributed during such year. Any other tax returns required to be filed will be prepared and filed by Purchaser or the Member Representative with the IRS and any other taxing authority as required by law.

3. **Disposition and Termination.**

(a) The Escrow Agent shall release the Fund and disburse the Fund as directed upon receipt of a Joint Instruction or upon receipt of a written instruction from an Authorized Representative of the instructing Party given to effectuate an attached final and non-appealable court order along with a written certification of counsel stating that such order is final and non-appealable and the Escrow Agent shall be entitled conclusively to rely upon any such instruction and opinion and shall have no responsibility to review the court order to which such instruction and opinion refers or to make any determination as to whether such court order is final.

(b) Notwithstanding anything to the contrary set forth in Section 8, any instructions setting forth, claiming objecting or in any way related to the transfer or distribution of the Fund must be in writing and must be executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons signing this Agreement or one of their designated persons as set forth on the Designation of Authorized Representatives attached hereto as Schedules 1-A and 1-B (each an "Authorized Representative"). Each Designation of Authorized Representatives shall be signed by the Secretary, any Assistant Secretary or other duly authorized officer of the named Party. No instructions shall be deemed delivered and effective unless Escrow Agent actually shall have received it on a Business Day as a

Portable Document Format ("PDF") attached to an email at the email address set forth in Section 8 and the Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Fund if delivered to any other email address, including but not limited to a valid email address of any employee of Escrow Agent. In the event any funds transfer instructions are set forth in a permitted instruction from a Party or the Parties in accordance with this Agreement, Escrow Agent will confirm such funds transfer instructions by a telephone callback or email confirmation to an Authorized Representative of such Party or the Parties, and Escrow Agent may rely upon the confirmation of anyone purporting to be that Authorized Representative. It is understood and agreed that if multiple disbursements are provided for under this Agreement utilizing prior funds transfer instructions that have been confirmed, the date, amount and/or description of payments may change without requiring a verifying callback.

(c) The persons designated as Authorized Representatives and contact information for same may be changed only in a writing executed by an Authorized Representative or other duly authorized officer of the applicable Party setting forth such changes and actually received by Escrow Agent via facsimile or as a PDF attached to an email. Escrow Agent will confirm any such change in Authorized Representatives by a telephone callback or email confirmation to an Authorized Representative and Escrow Agent may rely and act upon the confirmation of anyone purporting to be that Authorized Representative.

(d) Escrow Agent and other financial institutions, including the beneficiary's bank, may rely upon the identifying number of the beneficiary, the beneficiary's bank or any intermediary bank included in a funds transfer instruction, even if the identifying number identifies a person different from the beneficiary, the beneficiary's bank or intermediary bank identified by name.

(e) As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed. The Parties acknowledge that the security procedures set forth in this Section 3 are commercially reasonable. Upon delivery of the Fund in full by Escrow Agent pursuant to this Section 3, this Agreement shall terminate and the related account(s) shall be closed, subject to the provisions of Sections 6 and 7.

(f) Notwithstanding anything to the contrary contained in this Agreement, in the event that an electronic signature is affixed to an instruction issued hereunder, such instruction shall be confirmed by a verifying callback (or email) to an Authorized Representative.

4. **Escrow Agent**. Escrow Agent shall have only those duties as are specifically and expressly provided herein, and no other duties, including but not limited to any fiduciary duty, shall be implied. Escrow Agent has no knowledge of, nor any obligation to comply with, the terms and conditions of any other agreement between the Parties, nor shall Escrow Agent be required to determine if any Party has complied with any other agreement. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by the Parties believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice instruction or request. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. In the event Escrow Agent shall be uncertain, or believes there is some

ambiguity, as to its duties or rights hereunder, or receives instructions, claims or demands from any Party hereto which in Escrow Agent's judgment conflict with the provisions of this Agreement, or if Escrow Agent receives conflicting instructions from the Parties, Escrow Agent shall be entitled either to: (a) refrain from taking any action until it shall be given (i) a Joint Instruction or (ii) a court order issued by a court of competent jurisdiction (it being understood that Escrow Agent shall be entitled conclusively to rely and act upon any such court order and shall have no obligation to determine whether any such court order is final); or (b) file an action in interpleader. Escrow Agent shall have no duty to solicit any payments which may be due it or the Fund, including, without limitation, the Escrow Deposit, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Parties grant to Escrow Agent a lien and security interest in the Fund in order to secure any indemnification obligations of the Parties or obligation for fees or expenses owed to the Escrow Agent hereunder. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action; provided, however, that the foregoing shall not apply to the extent such losses or damage is caused by fraud on the part of the Escrow Agent.

5. **Succession.** Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving not less than thirty (30) days advance notice in writing of such resignation to the Parties, or may be removed, with or without cause, by the mutual written agreement of the Parties at any time after giving not less than thirty (30) days prior joint written notice to the Escrow Agent. Escrow Agent's sole responsibility after such applicable thirty (30) day notice period expires shall be to hold the Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed by the Parties, or such other person designated by the Parties, or in accordance with the directions of a final court order, at which time Escrow Agent's obligations hereunder shall cease and terminate. If prior to the effective resignation or removal date, the Parties have failed to appoint a successor escrow agent, or to instruct the Escrow Agent to deliver the Fund to another person as provided above, or if such delivery is contrary to applicable law, at any time on or after the effective resignation date, Escrow Agent either (a) may interplead the Fund with a court located in the State of New York and the costs, expenses and reasonable attorney's fees which are incurred in connection with such proceeding may be charged against and withdrawn from the Fund; or (b) appoint a successor escrow agent of its own choice. Any appointment of a successor escrow agent shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of Escrow Agent. Escrow Agent shall deliver the Fund to any appointed successor escrow agent, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

6. **Compensation; Acknowledgment.**

(a) The Parties agree jointly and severally to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing by the Parties and the Escrow Agent, shall be as described in Schedule 2.

(b) Each of the Parties further agrees to the disclosures and agreements set forth in Schedule 2.

7. **Indemnification and Reimbursement.** The Parties agree jointly and severally to indemnify and hold harmless Escrow Agent and its agents, employees, officers and directors (the "Agent Indemnitees") from and against any and all losses, damages, claims, liabilities, costs or expenses (including attorneys' fees) (collectively "Agent Losses"), resulting directly or indirectly from (a) Escrow Agent's performance of this Agreement, except to the extent that such Agent Losses are determined by a court of competent jurisdiction to have been caused by the gross negligence, bad faith or willful misconduct of such Agent Indemnitee; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions, whether joint or singular, from the Parties received in accordance with this Agreement. The Parties hereby grant Escrow Agent a right of set-off against the Fund for the payment of any claim for indemnification, fees, expenses and amounts owing to Escrow Agent or an Agent Indemnitee. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

8. **Notices.** Except as otherwise expressly required in Section 3, all communications hereunder shall be in writing or set forth in a PDF attached to an email, and shall be delivered by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

If to Purchaser:

200 N. LaSalle Street
Suite 2301
Chicago, Illinois 60606
Attention: Andrew Young
Tobias Bage
Gunnar Helberg
Tel No.:
Fax No.:
Email Address: a.young@innogy.com
tobias.bage@innogy.com
gunnar.helberg@innogy.com

Account statements and billing:

[Insert address if different from above]

With copies to:

K&L Gates, LLP
10100 Santa Monica Blvd.
Los Angeles, CA 90071
Attention: Andrea Lucan
Tel No.:
Fax No.:
Email Address: andrea.lucan@klgates.com

If to Member Representative:

Trireme Energy Holdings, Inc.
c/o Terra Firma Capital Partners Limited
2 More London Riverside
London SE1 2AP

Attention: William Burnand
Tel No.:
Fax No.:
Email Address:

Account statements and billing: [Insert address if different from above]

With copies to: Morgan, Lewis & Bockius LLP
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219
Attention: Marlee S. Meyers
Kimberly A. Taylor

If to Escrow Agent: JPMorgan Chase Bank, N.A.
Escrow Services
4 New York Plaza, 11th Floor
New York, NY 10004
Attention: Orla McDonald/Donna Fitzsimmons
Email Address:
(New York) ec.escrow@jpmorgan.com

9. **Compliance with Court Orders.** In the event that a legal garnishment, attachment, levy restraining notice or court order is served with respect to any of the Fund, or the delivery thereof shall be stayed or enjoined by an order of a court, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to any of the Parties hereto or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

10. **Miscellaneous.** (a) The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and the Parties. This Agreement and any right or interest hereunder may be assigned by a Party only in a writing agreed upon and signed by the Agent and the Parties. This Agreement shall be governed by and construed under the laws of the State of New York. Each Party and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of New York. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party shall not claim, and hereby irrevocably waives, such immunity. Escrow Agent and the Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

(b) No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement and any joint instructions from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and

the same instrument or instruction, as applicable. This Agreement may be executed and transmitted by facsimile or as a PDF attached to an email and each such execution shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-inked signature. If any provision of this Agreement is held to be illegal, invalid, or unenforceable, the validity of the remaining portions of this Agreement shall not be affected. The Parties each represent, warrant and covenant that (i) each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations; (ii) such Party has full power and authority to enter into, execute and deliver this Agreement and to perform all of the duties and obligations to be performed by it hereunder; and (iii) the person(s) executing this Agreement on such Party's behalf and certifying Authorized Representatives in the applicable Schedule 1 have been duly and properly authorized to do so, and each Authorized Representative of such Party has been duly and properly authorized to take the actions specified for such person in the applicable Schedule 1. Except as expressly provided in Section 7 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Fund or this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**INNOGY RENEWABLES US LLC**

By:______________________________

Name:___________________________

Title: ____________________________

**TRIREME ENERGY HOLDINGS, INC.**

By:______________________________

Name:___________________________

Title: ____________________________

**JPMORGAN CHASE BANK, N.A.,**

As Escrow Agent

By:______________________________

Name:___________________________

Title:_____________________________

EXHIBIT A-1

**Form of Escrow Release Notice – Joint Instructions**

JPMorgan Chase Bank, N.A., Escrow Services
Attn: Orla McDonald/Donna Fitzsimmons
Email Address: ec.escrow@jpmorgan.com

Date:

Re: Innogy Renewables/Trireme Energy Holdings – Escrow Agreement dated [•], 2017
Escrow Account no. [ ]

Dear Sir/Madam:

We refer to an escrow agreement, dated as of [•], 2017, by and among Innogy Renewables US LLC, Trireme Energy Holdings, Inc., and JPMorgan Chase Bank, N.A., as Escrow Agent (the "Escrow Agreement").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

The Parties instruct the Escrow Agent to release the Fund, or the portion specified below, to the specified party as instructed below.

Amount
(In writing)
Beneficiary
City
Country

**US Instructions:**

Bank
Bank address
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
FFC A/C Name:
FFC A/C #:
FFC A/C Address:

**International Instructions:**

Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
FFC A/C Name:
FFC A/C # (IBAN #):
FFC A/C Address:

**FOR AND ON BEHALF OF**
**INNOGY RENEWABLES US LLC:**

| | |
|---|---|
| Name: | Name: |
| Date: | Date: |
| Title: | Title: |

**FOR AND ON BEHALF OF TRIREME ENERGY HOLDINGS, INC.:**

| | |
|---|---|
| Name: | Name: |
| Date: | Date: |
| Title: | Title: |

DB1/ 94283305.3

**Schedule 1-A**

**INNOGY RENEWABLES US LLC**

**DESIGNATION OF AUTHORIZED REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of Innogy Renewables US LLC ("Purchaser"), does hereby certify:

That each of the following Representatives is as of the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, dated as of [•], 2017, by and among Purchaser, Trireme Energy Holdings, Inc. ("Member Representative"), and JPMorgan Chase Bank, N.A., as Escrow Agent (the "Escrow Agreement"), that the signature appearing opposite each Representative's name is the true and genuine signature of such Representative, and that each Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by Purchaser such that only the Authorized Representative who issued the instruction is to receive a callback or email confirmation, or (c) Purchaser is an individual. Purchaser acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if Purchaser nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, Purchaser agrees to be bound by any instruction, whether or not authorized, confirmed by callback to the issuer of the instruction.

| NAME | SIGNATURE | TELEPHONE, CELL NUMBERS and EMAIL ADDRESSES |
|---|---|---|
| ________________ ___________ | ________________ ___________ | ___________________________(cell)________________ ______(email)____________________ |
| ________________ ___________ | ________________ ___________ | ___________________________ (cell)_____________________ (email)____________________ |

DB1/ 94283305.3

Confidential IRUS0064218

| | | |
|---|---|---|
| ________________ __________ | ________________ __________ | ___________________________(cell)________________ ______ (email)____________________ |
| | | |
| | | |

1. Email confirmation is only permitted to a corporate email address for purposes of this Schedule. Any personal email addresses provided will not be used for email confirmation.
2. This Schedule may be signed in counterparts and the undersigned certifies any signature set forth on an attachment to this Schedule is the true and genuine signature of any Authorized Representative and that each such Representative's contact information is current and up-to-date at the date hereof.
3. That pursuant to Purchaser's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of Purchaser, and that the undersigned has so executed this Designation on this _____ day of [•], 2017.

| | |
|---|---|
| | **Signature: ______________________________** |
| | Name: ______________________________ |
| | Title: ______________________________ |

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-A**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement), of the Authorized Representative authorizing said funds transfer on behalf of such Party.

**Schedule 1-B**

**TRIREME ENERGY HOLDINGS, INC.**

**DESIGNATION OF AUTHORIZED**

**REPRESENTATIVES**

The undersigned, ________________________, being the duly elected, qualified and acting ________________________ of Trireme Energy Holdings, Inc. ("Member Representative"), does hereby certify:

That each of the following persons is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, as of [•], 2017, by and among Innogy Renewables US LLC, Member Representative, and JPMorgan Chase Bank, N.A. as Escrow Agent (the "Escrow Agreement"), that the signature appearing opposite each Representative's name is the true and genuine signature of such Representative, and that each Representative's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback or email confirmation and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement. Callbacks or emails confirming an instruction shall be made to an Authorized Representative other than the Authorized Representative who issued the instruction unless (a) only a single Authorized Representative is designated below, (b) the information set forth below changes and is not updated by the Member Representative such that only the Authorized Representative who issued the instruction is to receive a callback or email confirmation, or (c) Member Representative is an individual. The Member Representative acknowledges that pursuant to this Schedule, Escrow Agent is offering an option for callback or email confirmation to a different Authorized Representative, and if the Member Representative nevertheless names only a single Authorized Representative or fails to update Authorized Representative information, the Member Representative agrees to be bound by any instruction, whether or not authorized, confirmed by callback to the issuer of the instruction.

| NAME | SIGNATURE | TELEPHONE, CELL NUMBERS and EMAIL ADDRESSES |
|---|---|---|
| _____________________________ | _____________________________ | ____________________________(cell)______________________ (email)____________________ |
| _____________________________ | _____________________________ | ____________________________(cell)______________________ |

| | | |
|---|---|---|
| ____________________ _______ | ____________________ _______ | (email)____________________ ___________________________(cell)_________ _____________ (email)____________________ |
| | | |
| | | |

1. Email confirmation is only permitted to a corporate email address for purposes of this Schedule. Any personal email addresses provided will not be used for email confirmation.
2. This Schedule may be signed in counterparts and the undersigned certifies any signature set forth on an attachment to this Schedule is the true and genuine signature of any Authorized Representative and that each such Representative's contact information is current and up-to-date at the date hereof.
3. That pursuant to the Member Representative's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of the Member Representative, and that the undersigned has so executed this Designation on this _____ day of [•], 2017.

| | |
|---|---|
| | **Signature: ______________________________** |
| | Name: ______________________________ |
| | Title: ______________________________ |

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-B**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature (or electronic signature subject to the conditions set forth in the Escrow Agreement) of the Authorized Representative authorizing said funds transfer on behalf of such Party.

*Schedule 2*

J.P.Morgan

## Schedule of Fees and Disclosures for Escrow Agent Services

Schedule of Fees for Escrow Agent Services

**Account Acceptance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .......$**

Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,500 per annum**

The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

**Additional Fees and Expenses**

The Escrow Agent or any of its affiliates may receive compensation with respect to any Alternative Investment directed hereunder including without limitation charging any applicable agency fee or trade execution fee in connection with each transaction. Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses, will be billed at the Escrow Agent's then standard rate. The Escrow Agent may impose, charge, pass-through and modify fees and/or charges for any account established and services provided by the Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees, agency or trade execution fees, and other charges, including those levied by any governmental authority.

Payment of each invoice is due upon receipt.

**Disclosures and Agreements**

**Taxes**. The Parties shall duly complete such tax documentation or other procedural formalities necessary for Escrow Agent to complete required tax reporting and for the relevant Party to receive

interest or other income without withholding or deduction of tax in any jurisdiction. Should any information supplied in such tax documentation change, the Parties shall promptly notify Escrow Agent. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, including without limitation, the Foreign Account Tax Compliance Act ("FATCA") and shall remit such taxes to the appropriate authorities.

**Representations Relating to Section 15B of the Securities Exchange Act of 1934 (Rule 15Ba1-1 et seq.) (the "Municipal Advisor Rule).** Each Party represents and warrants to the Escrow Agent that for purposes of the Municipal Advisor Rules, none of the funds (if any) currently invested, or that will be invested in the future, in money market funds, commercial paper or treasury bills under this Agreement constitute or contain (i) proceeds of municipal securities (including investment income therefrom and monies pledged or otherwise legally dedicated to serve as collateral or a source or repayment for such securities) or (ii) municipal escrow investments (as each such term is defined in the Municipal Advisor Rule). Each Party also represents and warrants to the Escrow Agent that the person providing this certification has access to the appropriate information or has direct knowledge of the source of the funds to be invested to enable the forgoing representation to be made. Further, each Party acknowledges that the Escrow Agent will rely on this representation until notified in writing otherwise.

**Patriot Act Disclosure.** Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, you acknowledge that Section 326 of the USA PATRIOT Act and Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm your identity including without limitation name, address and organizational documents ("identifying information"). You agree to provide Escrow Agent with and consent to Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

**OFAC Disclosure.** Escrow Agent is required to act in accordance with the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. Escrow Agent is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payee is a person or entity with whom the Escrow Agent is prohibited from doing business by any law or regulation applicable to Escrow Agent, or in any case where compliance would, in Escrow Agent's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where Escrow Agent does not execute a payment order or effect a transaction for such reasons, Escrow Agent may take any action required by any law or regulation applicable to Escrow Agent including, without limitation, freezing or blocking funds. Transaction screening may result in delays in delays in the posting of transactions.

**Abandoned Property.** Escrow Agent is required to act in accordance with the laws and regulations of various states relating to abandoned property, escheatment or similar law and, accordingly, shall be entitled to remit dormant funds to any state as abandoned property in accordance with such laws and regulations. Without limitation of the foregoing, notwithstanding any instruction to the contrary, Escrow Agent shall not be liable to any Party for any amount disbursed from an account maintained under this Agreement to a governmental entity or public official in compliance with any applicable abandoned property, escheatment or similar law.

**Information.** Escrow Agent agrees to take customary and reasonable measures to maintain the confidentiality of the Parties' confidential information. The Parties authorize the Escrow Agent to disclose information with respect to this Agreement and the account(s) established hereunder, the Parties, or any transaction hereunder if such disclosure is: (i) necessary in the Escrow Agent's opinion, for the purpose of allowing the Escrow Agent to perform its duties and to exercise its powers and rights hereunder or for compliance with legal, tax and regulatory requirements, including without limitation FACTA; (ii) to a proposed assignee of the rights of Escrow Agent; (iii) to a branch, affiliate, subsidiary, employee or agent of the Escrow Agent or to their auditors, regulators or legal advisers or to any competent court; (iv) to the auditors of any of the Parties; or (v) required by applicable law, regardless of whether the disclosure is made in the country in which each Party resides, in which the Escrow Account is maintained, or in which the transaction is conducted. The Parties agree that such disclosures by the Escrow Agent and its affiliates may be transmitted across national boundaries and through networks, including those owned by third parties.

**Foreign Exchange.** If Escrow Agent accepts a joint written instruction under this Agreement for payment in a currency (the "Non-Account Currency") other than the currency of the account (the "Account Currency"), Escrow Agent is authorized to enter into a foreign exchange transaction to sell to the Party or Parties the amount of Non-Account Currency required to complete the funds transfer and debit the account for the purchase price of the Non-Account Currency. If Escrow Agent accepts payment to the account in a Non-Account Currency, Escrow Agent is authorized to purchase the Non-Account Currency from the Party or Parties, and to credit the purchase price to the account in lieu of the Non-Account Currency. The purchase price for the foregoing transactions shall be at a rate and spread as Escrow Agent determines in its discretion and may differ from rates at which comparable transactions are entered into with other customers or the range of foreign exchange rates at which Escrow Agent otherwise enters into foreign exchange transactions on the relevant date. Further, (i) Escrow Agent has full discretion to execute such foreign exchange transactions in such manner as Escrow Agent determines in its sole discretion and (ii) Escrow Agent may manage the associated risks of Escrow Agent's own position in the market in a manner it deems appropriate without regard to the impact of such activities on the Parties. Imbedded within the applicable foreign exchange rate or otherwise generated in connection with Escrow Agent's execution of any such transaction or management of its risk related thereto may be a profit to Escrow Agent. Any such foreign exchange transaction will be between Escrow Agent and a Party or Parties as principals, and Escrow Agent will not be acting as agent or fiduciary for the Parties.

**Acknowledgment of Compensation and Multiple Roles.** Escrow Agent is authorized to act under this Agreement notwithstanding that Escrow Agent or any of its subsidiaries or affiliates (such subsidiaries and affiliates hereafter individually called an "Affiliate" and collectively called "Affiliates") may (A) receive fees or derive earnings (float) as a result of providing an investment product or account on the books of Escrow Agent pursuant to this Agreement or for providing services or referrals with respect to investment products, or (B) (i) act in the same transaction in multiple capacities, (ii) engage in other transactions or relationships with the same entities to which Escrow Agent may be providing escrow or other services under this Agreement (iii) refer clients to an Affiliate for services or (iv) enter into agreements with clients or third parties for referrals of escrow or related transactions to Escrow Agent. JPMorgan Chase Bank, N.A. may earn compensation from any of these activities in addition to the fees charged for services under this Agreement.

**THE FOLLOWING DISCLOSURES ARE REQUIRED TO BE PROVIDED UNDER APPLICABLE U.S. REGULATIONS, INCLUDING, BUT NOT LIMITED TO, FEDERAL**

**RESERVE REGULATION D. WHERE SPECIFIC INVESTMENTS ARE NOTED BELOW, THE DISCLOSURES APPLY ONLY TO THOSE INVESTMENTS AND NOT TO ANY OTHER INVESTMENT.**

**Demand Deposit Account Disclosure.** Escrow Agent is authorized, for regulatory reporting and internal accounting purposes, to divide an escrow demand deposit account maintained in the U.S. in which the Fund is held into a non-interest bearing demand deposit internal account and a non-interest bearing savings internal account, and to transfer funds on a daily basis between these internal accounts on Escrow Agent's general ledger in accordance with U.S. law at no cost to the Parties. Escrow Agent will record the internal accounts and any transfers between them on Escrow Agent's books and records only. The internal accounts and any transfers between them will not affect the Fund, any investment or disposition of the Fund, use of the escrow demand deposit account or any other activities under this Agreement, except as described herein. Escrow Agent will establish a target balance for the demand deposit internal account, which may change at any time. To the extent funds in the demand deposit internal account exceed the target balance, the excess will be transferred to the savings internal account, unless the maximum number of transfers from the savings internal account for that calendar month or statement cycle has already occurred. If withdrawals from the demand deposit internal account exceeds the available balance in the demand deposit internal account, funds from the savings internal account will be transferred to the demand deposit internal account up to the entire balance of available funds in the savings internal account to cover the shortfall and to replenish any target balance that Escrow Agent has established for the demand deposit internal account. If a sixth transfer is needed during a calendar month or statement cycle, it will be for the entire balance in the savings internal account, and such funds will remain in the demand deposit internal account for the remainder of the calendar month or statement cycle.

**MMDA Disclosure and Agreement.** If MMDA is the investment for the escrow deposit as set forth above or anytime in the future, you acknowledge and agree that U.S. law limits the number of pre-authorized or automatic transfers or withdrawals or telephonic/electronic instructions that can be made from an MMDA to a total of six (6) per calendar month or statement cycle or similar period. Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days' notice prior to a withdrawal from a money market deposit account.

**Unlawful Internet Gambling.** The use of any account to conduct transactions (including, without limitation, the acceptance or receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling is strictly prohibited.

**Use of Electronic Records and Signatures.** As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute", "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-inked signature; provided, however, that any such electronic signature must be an actual and not a typed signature. Any electronically signed agreement shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meanings ascribed to them in 15 USC § 7005. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

**Exhibit B**

**Form of Transition Services Agreement**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "**TSA**"), dated as of [•], is by and between Trireme Energy Development, LLC, a Delaware limited liability company ("**TED**"), and Trireme Energy Development II, LLC, a Delaware limited liability company (the "**Company**"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Agreement and Plan of Merger, dated as of December 21, 2017, by and among Innogy Renewables US LLC, Aura Merger Sub LLC, a Delaware limited liability company ("**Merger Sub**"), the Company, and, solely in its capacity as the Member Representative, Trireme Energy Holdings, Inc. (the "**Merger Agreement**"). TED and the Company are each a "**Party**" and collectively the "**Parties**."

WHEREAS, as of immediately prior to the Closing, the Company is a wholly-owned subsidiary of TED;

WHEREAS, pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into the Company; and

WHEREAS, upon consummation of the transactions contemplated by the Merger Agreement, each of TED and the Company will provide to the other certain services during a transitional period on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and of the covenants and agreements set forth herein and in the Merger Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1. Services.

(a) As used herein, (i) the term "**Provider**" means the Party (or its Affiliate), as applicable, providing Services pursuant to the terms of this TSA, and (ii) the term "**Recipient**" means the Party (or its Affiliate), as applicable, receiving Services pursuant to the terms of this TSA.

(b) TED shall provide, or cause one or more of its Affiliates to provide, to the applicable Recipient the services set forth on Annex A (the "**TED Services**").

(c) The Company shall provide, or cause one or more of its Affiliates to provide, to the applicable Recipient the services set forth on Annex B (the "**Company Services**" and together with the TED Services, the "**Services**").

(d) If the Recipient reasonably requests additional services directly related to and reasonably necessary in connection with the Services or the operation of its business, the Parties shall negotiate in good faith regarding such additional services. Any mutually agreed additional services ("**Additional Services**") will be reflected on Annex A or Annex B, as applicable, and any Additional Services shall be deemed to be Services hereunder.

(e) The Parties have set forth on Annex A and Annex B the time period during which the Services will be provided (if different from the Term), a description of the

Service to be provided, the location from which such Service will be provided, the fee for such Service (the "**Service Fee**") and any other terms applicable thereto.

(f) The Provider shall provide the Services with substantially the same degree of skill, attention and care as it exercises in performing the same or similar services for itself and its Affiliates, as applicable. The nature, quality, standard of care and service levels of the Services shall be at least substantially equivalent to those which were provided immediately prior to the Closing Date, as applicable.

(g) All employees and representatives of the Provider shall be deemed for purposes of all compensation and employee benefits matters to be employees or representatives of such Provider and not employees or representatives of the Recipient. In performing the Services, such employees and representatives shall be under the direction, control and supervision of the Provider, and the Provider shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such employees and representatives.

(h) Nothing in this TSA shall preclude the Recipient from obtaining, in whole or in part, services of any nature from its own employees or from providers other than the Provider.

(i) Unless expressly provided otherwise on Annex A or Annex B, as applicable, the Provider shall not be required to expand its facilities, incur new long-term capital expenses or employ additional personnel in order to provide the Services to the Recipient.

(j) In providing the Services, the Provider, as it deems necessary or appropriate in its reasonable judgment, may (i) use the personnel of the Provider or its Affiliates, or (ii) employ the services of third parties to the extent such third party services are routinely utilized to provide similar services to other businesses of the Provider, are listed in Annex A or Annex B, as applicable, or are reasonably necessary for the efficient performance of any of such Services. The Provider will only employ the services of third parties who, as applicable, have entered into written agreements that obligate such third parties to maintain the confidentiality of the Recipient's Confidential Information and that prohibit the third party from using such information for any purpose other than in connection with providing the Services.

(k) Each Party shall be responsible for its own compliance with Applicable Law with respect to its performance under this TSA.

(l) EXCEPT AS EXPRESSLY SET FORTH HEREIN, EACH PARTY HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

2. Cooperation. The Recipient shall, in a timely manner, take necessary or reasonably requested actions in order to enable or assist the Provider in the Provider's provision of Services, including providing necessary information and specific written authorizations and consents, and the Provider shall be relieved of its obligations hereunder to the extent that the

Recipient's failure to take any such action renders performance by the Provider of such obligations unlawful or impracticable. In addition to any Recipient resources or responsibilities listed in Annex A or Annex B, as applicable, the Recipient shall provide reporting from, or reasonable access to, its information resources to the extent reasonably necessary for the Provider to perform the Services. Upon request, the Recipient shall assist the Provider in obtaining licenses to use certain software as reasonably necessary for the Provider to provide, or for the Recipient to receive, the Services.

3. Compensation; Payment.

(a) As consideration for the provision of the Services, the Recipient shall, for each Service performed, pay the Provider the Service Fees for the Services set forth in Annex A or Annex B, as applicable. In addition to the Service Fees, the Provider shall also be entitled to reimbursement from the Recipient upon receipt of reasonable supporting documentation for all reasonable out-of-pocket expenses incurred in connection with the Provider's provision of the Services that are not included as part of the Service Fee ("**Expenses**"). In the event a Service is terminated, the Service Fee will be prorated based on the portion of the applicable period during which the Service is provided. Provider shall not incur any Expenses, individually or in the aggregate, exceeding $5,000 without obtaining the prior written approval of the Recipient, which approval shall not be unreasonably withheld, conditioned, or delayed.

(b) After the end of each month, the Provider, together with its Affiliates providing Services, will submit one invoice to the Recipient for all Services provided to the Recipient during such month and all Expenses incurred in connection therewith. Each invoice shall include a summary list of the previously agreed upon Services for which there is a Service Fee together with such documentation as may reasonably be required by the Recipient to verify the amount of any Expenses and that such Expenses were incurred in connection with providing the Services. Payment of all invoices in respect of Services and Expenses shall be made by check or electronic funds transmission in U.S. Dollars, without any offset or deduction of any nature whatsoever, within 30 days of the date of the invoice. Invoices unpaid as of such date shall accrue interest at the rate of [•]% per annum. All payments shall be made to the account designated in the invoice by the Provider to the Recipient.

(c) All Service Fees are exclusive of applicable taxes. Except as otherwise expressly set forth in this TSA, the Recipient shall bear any taxes imposed on, or payable in connection with, any Services or any Service Fee (excluding any taxes based on the Provider's property or net income). The Parties will reasonably cooperate in connection with filing or minimizing the imposition or amount of any applicable taxes, and the Recipient will provide any applicable valid tax exemption certificate.

(d) Notwithstanding anything herein to the contrary, at no time prior to the Harding Closing shall Company be liable for any third party costs relating to the development of the Scioto Ridge Project, including any costs, expenses, and liabilities set forth in the Approved Hardin Development Budget.



Confidential 

4. Term; Termination.

(a) Subject to the further provisions of this Section 4 and except as expressly provided with respect to a specific Service in Annex A or Annex B, the term of this TSA shall begin on the Closing Date and expire [•] thereafter.

(b) Notwithstanding anything to the contrary contained herein or in Annex A or Annex B, the Recipient may terminate any individual Service on a Service-by-Service basis (and/or location-by-location basis where an individual Service is provided at multiple locations of Recipient) upon prior written notice to the Provider identifying the particular Service (or location) to be terminated and the effective date of termination, which date shall be not less than [•] days after such notice.

(c) This TSA may be terminated as to all of the Services upon written notice as set forth below:

(i) by the Provider if the Recipient fails to pay any amount within 30 days after such amount is due hereunder unless the Recipient is disputing such amount in good faith; or

(ii) by either Party if the other Party commits a material breach of this TSA and such material breach continues for a period of 30 days following a written request to cure such breach.

(d) Following any termination of this TSA, the Provider shall cooperate in good faith with the Recipient to transfer records and otherwise reasonably enable the Recipient to make alternative arrangements for the provision of services substantially consistent with the Services provided pursuant to this TSA.

(e) The Recipient specifically agrees and acknowledges that all obligations of the Provider to provide each Service for which the Provider is responsible hereunder shall immediately cease upon the termination of this TSA. Upon the cessation of the Provider's obligation to provide any Service, the Recipient shall immediately cease using, directly or indirectly, such Service (including any and all software of the Provider or third party software provided through the Provider, telecommunications services or equipment, or computer systems or equipment).

(f) Upon termination of a Service with respect to which the Provider holds books, records or files, including current or archived copies of computer files, owned by the Recipient and used by the Provider in connection with the provision of a Service to the Recipient, the Provider will return all of such books, records or files as soon as reasonably practicable; provided, however, that the Provider may make a copy, at its expense, of such books, records or files for archival purposes only and subject to continuing obligations of confidentiality.

5. Confidentiality.

(a) Each Party agrees to maintain the confidentiality of any information provided or made available by or on behalf of the other Party in connection with the performance or receipt of the Services, which is known or should be reasonably understood to be confidential or proprietary (collectively, "**Confidential Information**"), and to use the other Party's Confidential Information solely for the purposes of providing or receiving the Services as contemplated hereunder. Each Party retains title to its Confidential Information and reserves all rights in its Confidential Information not expressly granted to the other Party under this TSA.

(b) The Parties shall not, and shall not authorize any Person to, disclose to any other Person any Confidential Information of the other Party; provided, however, that each Party may disclose Confidential Information of the other Party: (i) to its Representatives, who are bound by confidentiality obligations at least substantially equivalent to the receiving Party's obligations herein, on a need-to-know basis in connection with such Party's performance under this TSA; or (ii) in order to comply with Applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding. In the event that a Party becomes legally compelled (based on advice of counsel) to disclose any Confidential Information of the other Party, such disclosing Party (to the extent legally permitted) shall provide the other Party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other Party (at such other Party's expense) to obtain a protective order or similar remedy to prevent or limit the disclosure of such Confidential Information. In the event that such protective order or other similar remedy is not obtained, the disclosing Party shall furnish only that portion of the Confidential Information that has been legally compelled, and shall exercise its commercially reasonable efforts (at such other Party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information.

(c) Each Party shall protect the Confidential Information of the other Party by using the same degree of care, but no less than reasonable care, to prevent the unauthorized access or disclosure of such Confidential Information as the Party uses to protect its own confidential information of a like nature.

(d) Except for information that, either individually or when combined with other information, could be used to distinguish or trace an individual's identity, the obligations in this Section 5 shall not apply to information to the extent such information (i) is or becomes part of the public domain without any violation of confidentiality obligations owed to the disclosing Party; (ii) is known to the receiving Party, as demonstrated by the receiving Party's written records, prior to receipt from the disclosing Party; (iii) is independently developed by the receiving Party, as demonstrated by the receiving Party's written records, without reference to or use of the disclosing Party's Confidential Information; or (iv) is received or obtained by the receiving Party, without confidentiality obligations, from a source with the right to make such disclosure.

6. Limitation of Liability.

(a) Except to the extent resulting from a Party's gross negligence or willful misconduct, each Party's (including its Affiliates') maximum total liability to, and the sole remedy of, the other Party (including its Affiliates) for breach of this TSA or otherwise with respect to Services is a refund of the price paid for the particular Service or, if mutually agreed by the Parties, performance or reperformance of the Service.

(b) EXCEPT FOR A BREACH OF SECTION 5, OR AN AWARD OF DAMAGES BY A COURT IN A THIRD PARTY CLAIM THAT IS SUBJECT TO THE INDEMNIFICATION OBLIGATIONS IN SECTION 7, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY OR SPECIAL DAMAGES, OR ANY LOST PROFITS, REVENUE OR GOODWILL, ARISING OUT OF THIS TSA (OR ANY BREACH HEREOF), REGARDLESS OF WHETHER ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7. Indemnification. Subject to Section 6, each Party will defend, indemnify and hold harmless the other Party and its Affiliates and their respective directors, managers, officers, employees, stockholders, members, agents and representatives (the "**Indemnified Parties**") from and against any and all third party claims, and associated liabilities, losses, damages, fines, penalties and expenses, including reasonable attorneys' fees and expenses, to the extent arising or resulting from the indemnifying Party's (a) gross negligence or willful misconduct, or (b) violation of Applicable Law.

8. Amendments and Waivers. Any provision of this TSA may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this TSA, or in the case of a waiver, by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right or privilege. To the maximum extent permitted by Applicable Law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it was given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand.

9. Assignment. Neither this TSA nor any of the Parties' respective rights or obligations hereunder may be assigned by either Party without the prior written consent of the other Party, except that each Party, in its capacity as a Provider, may assign any of its rights or obligations hereunder without the prior written consent of the Recipient to (a) any of its Affiliates, or (b) third parties to the extent such third parties are routinely used to provide such Services to affiliates or businesses of the Provider. Neither Party will unreasonably withhold consent to an assignment of this TSA by the other Party in connection with a merger or consolidation. Subject to the first sentence of this Section 9, this TSA shall be binding upon and enure to the benefit of the Parties and their respective successors and assigns. Any attempted assignment or transfer in violation of this Section 9 shall be void.

10. Entire Agreement. This TSA and the documents, instruments and other agreements specifically referred to herein or delivered pursuant hereto, set forth the entire understanding of the Parties with respect to the subject matter hereof. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this TSA.

11. Notices. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date sent by facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next business day, or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

(i) if to TED:

__________________
__________________
__________________
Attn:
Facsimile:

With a copy (which shall not constitute notice) to:

__________________
__________________
__________________
Attn:
Facsimile:

(ii) if to the Company:

__________________
__________________
__________________
Attn:
Facsimile:

With a copy (which shall not constitute notice) to:

__________________
__________________
__________________
Attn:
Facsimile:

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the sending Party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

12. No Third Party Beneficiaries. No provision of this TSA is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided that, in the case of Section 6, the Indemnified Parties and their respective heirs, executors, administrators, legal representatives, successors and assigns, are intended third party beneficiaries of such indemnification and shall have the right to enforce such indemnification in their own names.

13. Headings. All captions contained in this TSA are for convenience of reference only, do not form a part of this TSA and shall not affect in any way the meaning or interpretation of this TSA.

14. Counterparts. This TSA may be executed in any number of counterparts, and any Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

15. Severability; Enforcement. Any provision of this TSA which is invalid or unenforceable in any jurisdiction shall be ineffective solely to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

16. Governing Law; Submission to Jurisdiction. This TSA shall in all respects be governed by, and construed and enforced in accordance with, the Applicable Laws of the **[State of New York]**, including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the Applicable Laws of any other jurisdiction and without the requirement to establish commercial nexus in New York County. Each Party agrees that any action shall only be resolved in the Courts of the State of New York sitting in the County of New York or the United States District Court for the Southern District of New York and the appellate courts having jurisdiction of appeals in such courts.

17. Independent Contractor. The relationship between the Parties hereunder is that of independent contractors. Nothing contained in this TSA shall be deemed or construed to create a partnership or joint venture, or to create the relationships of employee/employer or principal/agent.

18. Survival. The provisions of Section 1(l) and Sections 3 through 19 shall survive the expiration or earlier termination of this TSA for any reason whatsoever.

19. Force Majeure. Neither Party shall be in breach of this TSA, or otherwise liable, for any failure or delay in the performance of its obligations hereunder where such failure or delay results from any cause beyond its reasonable control (each, a "**Force Majeure Event**").

Upon discovery of a Force Majeure Event, the affected Party shall promptly notify the other Party and use commercially reasonable and diligent efforts to restore performance as soon as practicable. The Recipient shall not be liable for payment of any applicable Service Fees or Expenses during the period in which such Services could not be provided by reason of a Force Majeure Event. The Recipient may terminate, upon written notice to the Provider, or seek an alternative service provider with respect to Services affected by a Force Majeure Event.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this TSA to be executed as of the date first set forth above.

Trireme Energy Development, LLC

By: ______________________________
Name: ______________________________
Title: ______________________________

Trireme Energy Development II, LLC

By: ______________________________
Name: ______________________________
Title: ______________________________

[Signature Page to Transition Services Agreement]

## ANNEX A

## Schedule of TED Services

| No. | Service Name | Service Description | Provider | Provider Contact Person | Third Party Vendor (or N/A) | Recipient | Recipient Contact Person | Term | Location | Fee | Recipient Resources (or N/A) | Other Terms (or N/A)[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

[1] Consider adding clarifications, as applicable and as necessary, including with respect to (a) whether Services will also be received by the Provider or a third party, and (b) any restrictions on receipt or use of the Services.



Confidential IRUS0064237

# ANNEX B

## Schedule of Company Services

| No. | Service Name | Service Description | Provider | Provider Contact Person | Third Party Vendor (or N/A) | Recipient | Recipient Contact Person | Term | Location | Fee | Recipient Resources (or N/A) | Other Terms (or N/A)[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Tax Return Support | Prepare necessary materials to support tax filings of TED | Innogy Renewables US LLC | Jairo Cholico | N/A | Trireme Energy Development, LLC | Member Representative | TBD | Pittsburgh and Chicago, with deliverables transmitted electronically | None | N/A | N/A |
| 2 | Scioto Ridge Accounting | Track accounts payable and receivable for the Scioto Ridge project; make necessary payments to third parties on behalf of TED/Hardin Wind, LLC | Innogy Renewables US LLC | Jairo Cholico | N/A | Trireme Energy Development, LLC | Member Representative | From the Closing Date to the Hardin Closing Date | Pittsburgh and Chicago | None | N/A | N/A |
| 3 | Scioto Ridge Development | Perform day to day management and development advancement of the Scioto Ridge project | Innogy Renewables US LLC | Tim Vought | N/A | Trireme Energy Development, LLC | Member Representative | From the Closing Date to the Hardin Closing Date | Pittsburgh and Chicago | None | N/A | N/A |
| | | | | | | | | | | | | |

[2] Consider adding clarifications, as applicable and as necessary, including with respect to (a) whether Services will also be received by the Provider or a third party, and (b) any restrictions on receipt or use of the Services.



Confidential IRUS0064238

**Exhibit C**

**Form of Development Information**

## Exhibit C – Form of Development Information

| STATUS UPDATE | LAND RIGHTS | INTERCONNECT | PERMITTING AND ENVIRONMENTAL STUDIES | PPA / COMMERCIAL OFFTAKE | OTHER MAJOR DEVELOPMENT ITEMS |
|---|---|---|---|---|---|
| **Scioto Ridge** (if applicable) | | | | | |
| **Cassadaga** | | | | | |
| **Mud Springs** | | | | | |
| **Mason Dixon** | | | | | |
| **Buckeye** | | | | | |
| **Baron Winds** | | | | | |

**Exhibit D-1**

**Approved Development Budget (for Development Companies other than Hardin)**

## Exhibit E-1

### Approved Development Budget (Excludes Hardin)

| Approved Development Budget 12/1/17 - 6/30/18 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | TOTAL |
| **Development Project Spend[1]** | $803,587 | $1,031,697 | $756,787 | $998,237 | $918,437 | $871,681 | $1,285,900 | $6,666,325 |

[1] Excludes development costs for Hardin, scheduled separately in Exhibit E-2.

Expenses related to the continued development of the Target Projects other than the Scioto Ridge Project (such expenses, "Development Expenses") that are incurred and/or paid in any month that do not, in the aggregate, exceed 115% of such month's Approved Development Budget (as set forth in the table above) shall be deemed to be included in such month's Approved Development Budget; provided, however, that the sum of all expenses incurred pursuant to the Approved Development Budget through the Closing shall not exceed the total Approved Development Budget set forth above.

Company shall obtain Purchaser's prior written consent (email is acceptable) for any Development Expense exceeding $100,000, other than the Development Expenses set forth below, which have been deemed approved by Purchaser. Notwithstanding the foregoing, Purchaser shall not be deemed to have approved any Development Expense(s) set forth below that individually or in the aggregate exceed 115% of the Approved Development Budget for the month in which such Expense(s) is incurred.

**Baron Winds**

1. Interconnection – Facilities study and substation review – approximately $180,000
2. Landowner payment on Fahy property - approximately $300,000
3. Existing landowner payments – approximately $105,000
4. New landowner signing and payments – approximately $360,000
5. Article 10 support - approximately $300,000

**Buckeye Wind**

1. Supplemental EIS – approximately $100,000
2. New and existing landowner payments – approximately $175,000

**Cassadaga**

1. Interconnection – Facilities study – approximately $175,000
2. PILOT agreement fees - approximately $200,000
3. Purchase payments on land - approximately $170,000
4. New and existing landowner payments – approximately $165,000
5. Article 10 support/permits - approximately $100,000

**Mud Springs**

1. Bat and avian studies (ECP & NEPA) - approximately $100,000
2. PAC litigation and PSC complaint - approximately $130,000
3. New and existing landowner payments – approximately $120,000

**Sand Creek**

1. Exercise of Option – approximately $230,000

**General Development (Prospecting Sites)**

1. New landowner payments – approximately $110,000

For the avoidance of doubt, the payment of any ISO-NE application fees or study costs applicable to the Projects commonly known as "Bryant Mountain" and "Great Northern," must be mutually agreed to by Company and Purchaser before Company, any Company Affiliate, or any Development Company enters into any agreement that would require payment for such fees and study costs.

**Exhibit D-2**

**Approved Development Budget (for Hardin)**

**Exhibit E-2**

**Approved Hardin Development Budget**

| Approved Development Budget 12/1/17 - 8/31/18 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | TOTAL |
| Scioto Ridge | $21,000 | $35,184 | $16,000 | $33,355 | $12,162 | $6,000 | $36,259 | $13,655 | $28,620 | $202,236 |

Expenses related to the continued development of the Scioto Ridge Project that are incurred and/or paid in any month that do not, in the aggregate, exceed 115% of such month's Approved Hardin Development Budget (as set forth in the table above) shall be deemed to be included in such month's Approved Hardin Development Budget; provided, however, that the sum of all expenses incurred pursuant to the Approved Hardin Development Budget through the Hardin Closing shall not exceed the total Approved Hardin Development Budget set forth above.

The Approved Hardin Development Budget shall be deemed to be $35,000 per month, from and after September 1, 2018 until the earlier to occur of (a) the Hardin Closing and (b) November 15, 2018. Any extension beyond November 15, 2018 shall require the agreement of the Parties.

**Exhibit E**

**Form of Resignation Letter**

_________, 2018

[Company / Development Company]

I hereby resign as a [director / manager /officer] of [Company / Development Company] effective as of the Closing (as defined in that certain Agreement and Plan of Merger by and among Trireme Energy Development, LLC, Trireme Energy Development II, LLC, Innogy Renewables US LLC, Aura Merger Sub LLC, and Trireme Energy Holdings, Inc., a Delaware corporation, in its capacity as the Member Representative).

Very truly yours,

____________________________________

# ANNEXES

## Annex 1
## Target Projects, Payment Milestone Amounts, and Expected Installed Capacities

**A.**

| Row | Project | Payment Milestone Amount |
|---|---|---|
| 1 | Cassadaga Project | $69,700,000, provided the Cassadaga Project has an Expected Installed Capacity of at least 113.4 MW, subject to adjustment as set forth in Section C(2) below. |
| 2 | Any Target Project (other than the Cassadaga Project or the Scioto Ridge Project) reaching its Payment Milestone | An amount equal to $25,000 per MW, for the first 200 MW of the Target Projects' aggregate Expected Installed Capacity, up to a maximum aggregate amount of $5,000,000<br><br>*Plus*<br><br>An amount equal to $75,000 per MW, for the next 500 MW of the Target Projects' aggregate Expected Installed Capacity exceeding the first 200 MW, up to a maximum aggregate amount of $37,500,000 |

**B. Minimum Planned Installed Capacities**

| Project | Minimum Planned Installed Capacities (MW) |
|---|---|
| | |
| Buckeye OH | 75 |
| Baron Winds NY | 225 |
| Mud Springs MT | 180 |
| Kimberly Run PA | 60 |
| Mason Dixon PA/MD | 60 |
| Coyote Crest WA | 96 |
| Sand Creek, MT | 56 |
| Terrapin Hills MD | 38 |
| Blueberry Hills ME | 188 |
| Bryant Mountain ME | 30 |
| Great Northern ME | 300 |

| | |
|---|---|
| Bobcat Solar MD | 38 |
| Buckeye Solar OH | 60 |
| Rockwood Solar PA | 38 |
| Aurum Peaks PA | 60 |
| Chestnut Ridge PA | 60 |
| Mahanoy Mountain PA | 56 |
| Terra Alta WV | 60 |
| Scioto Solar OH | 38 |

C.

**1. Payment Milestone for the Cassadaga Project**

The Cassadaga Project shall have achieved its Payment Milestone upon the occurrence of the following:

(a) Issuance of the Article X Certificate by the New York State Board on Electric Generation Siting and the Environment (the "Siting Board");

(b) Completion by the New York Independent System Operator of 2017 Class Year Facilities Study;

(c) Each Cassadaga PPA shall be in full force and effect;

(d) Obtaining a valid and enforceable grid connection agreement;

(e) All required determinations of No Hazard to Air Navigation from the Federal Aviation Administration; and

(f) Securing such land rights and Governmental Authorizations as are reasonably required to finance, develop, construct, own, and operate the Cassadaga Project.

**2. Cassadaga Project Payment Milestone Amount Reductions:**

**a. If the Cassadaga Project achieves the Payment Milestone with less than 126 MW of Expected Installed Capacity**

If there is a permanent reduction of the Expected Installed Capacity of the Cassadaga Project as a result of a Governmental Authority requiring the removal of one or more turbine locations, which turbine location(s) is not relocated and is not reasonably capable of being relocated:

for each MW by which the Expected Installed Capacity of the Cassadaga Project is less than 126MW, the Payment Milestone Amount shall be reduced by $1.41 million; provided, however, in no event shall the adjustments pursuant to this Section 2(a) and 2(b) cause a reduction of more than $20.0 million to the Payment Milestone Amount.

**b. If the Article X Certificate provides for Cut-In Speeds of 6.0 m/s or greater**

If the Article X Certificate as finally issued by the Siting Board imposes a cut-in speed equal to or greater than 6.0 meters per second, but less than 6.9 meters per second, the Payment Milestone Amount shall be reduced by $1.7 million plus $311,111 for every 0.1 meter per second of cut-in speed above 6.0 meters per second; and

If the Article X Certificate as finally issued by the Siting Board imposes a cut-in speed equal to or greater than 6.9 meters per second, the Payment Milestone Amount shall be reduced by $4.5 million plus $311,111 for every 0.1 meter per second of cut-in speed above 6.9 meters per second.

**c. If an Adverse Change in PTC Law occurs**

If there is an Adverse Change in PTC Law with respect to the Cassadaga Project on or before the date on which it reaches its Payment Milestone, the Payment Milestone Amount shall be reduced by $3.5 million for every $1 per megawatt hour by which the PTC Base Rate is reduced as a consequence of such Adverse Change in PTC Law; provided, that if the PTC Base Rate is reduced to less than $9 per megawatt hour, constituting a reduction of more than $15 per megawatt hour, the Payment Milestone Amount for the Cassadaga Project shall be $0.

## Annex 2
## Applicable Standards of Care

| PROJECT NAME | LAND RIGHTS | INTERCONNECT | PERMITTING AND ENVIRONMENTAL STUDIES | PPA / COMMERCIAL OFFTAKE | OTHER DEVELOPMENT ITEMS |
|---|---|---|---|---|---|
| **Scioto Ridge** | Maintain land rights necessary to fulfill capacity obligations under the Amazon PPA (as amended). | Maintain PJM queue #U2-072 and its associated ISA and CSA, and remove from suspension when warranted to meet construction schedule requirements. | Pursue OPSB and FAA approvals to install G114-2.625 MW and G132-3.465 MW WTGs at Project site. | Advance any on-going PPA amendment discussions, post and maintain required security for the Amazon PPA to remain effective. | |
| **Cassadaga** | Maintain land to support required project facilities to meet capacity obligations under current PPAs. | Maintain NYISO queue position ref. # 387 and support completion of required amendments and completion of Large Generator Interconnection Agreement and related agreements | Continue Article 10 permitting process to definitive decision. Use best efforts to obtain Department of Environmental Conservation documents allowing collection line crossings at Boutwell Hill State Forest. | Maintain existing PPAs in good standing with the understanding of impacts in the event the project does not receive Article 10 approvals. | |
| **Mud Springs** | Maintain land rights required for at least 60 MW of WTGs at each one of the three separate facilities that make up the Project. | Maintain PacifiCorp Generation Interconnection Queue positions #542-A, #542-B and #542-C. Remove from suspension when warranted to meet construction schedule requirements ensuring that the relevant securities are posted in a timely manner. | Pursue permits to install suitable WTGs at site including avian and habitat studies in an effort to comply with USFWS requirements and any other relevant bodies. | Pursue legal proceedings with the Wyoming Public Service Commission toward a viable QF PPA price. | |
| **Mason Dixon** | Maintain land rights for at least 75% of the WTG locations currently permitted by the Somerset County Planning Commission. | Maintain PJM queues #AB2-038 and #AB2-041 and sign the Facilities Study Agreement, ISA and CSA for #AB2-041 as long as they contain commercially reasonable terms. | Pursue NPDES permit. | Pursue offtake contracts via response to RFPs where the project is expected to be competitive and pursue other bilateral discussions where appropriate. | |
| **Buckeye** | Maintain land rights for at least 50% of the WTGs in | Maintain PJM queues #R52 and #R52A and each associated ISA | Pursue OPSB approvals to install appropriate WTGs at the site. | Pursue offtake contracts via response to RFPs | |

| | | | | | |
|---|---|---|---|---|---|
| | L11R20170519_55WTGs. | and CSA, and remove from suspension when warranted to meet construction schedule requirements | Perform avian studies to support continued applicability of Project's Habitat Conservation Plan and Incidental Take Permit. | where the project is expected to be competitive and pursue other bilateral discussions where appropriate. | |
| **Baron Winds** | Maintain at least 70% of existing land rights. | Maintain NYISO queue position ref. #396 and support completion of required amendments and completion of Large Generator Interconnection Agreement and related agreements | Continue Article 10 permitting process efforts. | Pursue offtake contracts via response to RFPs where the project is expected to be competitive and pursue other bilateral discussions where appropriate. | |

- Purchaser shall maintain on-site wind and meteorological data collection towers on-site through 2020 unless required to remove by law, permit expiration, lease expiration, for safety issues/concerns (broken, damaged, or otherwise), or by the landowner whose property towers sits on.
- Purchaser shall have ability to terminate any lands containing Recognized Environmental Conditions (RECs) as revealed through Phase 1 Environmental Site Assessments (ESAs) performed in accordance with relevant ASTM standards.
- For all Projects, the details and manner of development efforts and the schedule therefor shall be consistent with the requirements set forth in Section 7.6 of this Agreement.

## Annex 3

## Hardin Amount

The "**Hardin Amount**" shall equal the Base Amount plus the Approved Hardin Development Expenses minus the Hardin Escrow Amount.

The "**Base Amount**" shall be determined as follows:

(a) if at the time an Election Notice is delivered, new federal income Tax legislation has been enacted into law after December 18, 2017 which law does not result in an Adverse Change in PTC Law with respect to the Scioto Ridge Project, the "Base Amount" shall be equal to the Hardin Purchase Price amount set forth in the table below.

(b) if at the time an Election Notice is delivered, (i) new federal income Tax legislation has been enacted into law after December 18, 2017, which law results in an Adverse Change in PTC Law with respect to the Scioto Ridge Project or (ii) no new federal income Tax legislation has been enacted into law, the "Base Amount" shall equal $5,000,000.

The following table sets forth the Hardin Purchase Price amount, based upon the applicable starting energy price (either busbar delivery or AD Hub settled delivery) as set forth in the Amazon PPA, as amended prior to the Hardin Closing; provided that such energy price escalates annually at 3% per year. In the event that such energy price does not escalate at 3% per year, the Parties shall negotiate in good faith to agree to a comparable Base Amount.

| **PPA Starting Energy Price** Delivered at Project Interconnection Busbar ($/MWh) | **PPA Starting Energy Price** Settled at AD Hub ($/MWh) | **Hardin Purchase Price** ($MMs) |
|---|---|---|
| $20.00 | $21.50 | $15.0 |
| $20.50 | $22.00 | $16.5 |
| $21.00 | $22.50 | $18.0 |
| $21.50 | $23.00 | $19.5 |
| $22.00 | $23.50 | $21.0 |

If the Base Amount is $5,000,000 and the Scioto Ridge Project reaches its Commercial Operation Date on or before December 31, 2019, then Purchaser shall pay to Company Member, by wire transfer of immediately available funds, an additional amount equal to the applicable Hardin Purchase Price set forth in the table above minus the Base Amount within seven (7) Business Days of such Commercial Operation Date.

If the Base Amount is $5,000,000 due to no new federal income Tax legislation having been enacted into law at the time an Election Notice is delivered, and subsequent to the Election Notice being delivered, new federal income Tax legislation is enacted into law which law does not result in an Adverse Change in PTC Law, then Purchaser shall pay to Company Member, by wire transfer of immediately available funds, an additional amount equal to the applicable Hardin Purchase Price set forth in the table above minus the Base Amount within seven (7) Business Days of such legislation having been enacted or, if later, at the Hardin Closing