UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRIREME ENERGY DEVELOPMENT,
LLC, et al.,

                                Plaintiffs,

                -against-

RWE RENEWABLES AMERICAS, LLC, et
al.,

                                Defendants.

22-cv-07439 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

    Plaintiffs Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC

(collectively, "Trireme" or "Plaintiffs") bring this action against Defendants RWE Renewables

Americas, LLC and RWE Renewables Services, LLC (collectively, "RWE" or "Defendants") for

breach of contract.  *See* ECF No. 36 ("SAC" or "Second Amended Complaint").  The alleged

breach occurred when Defendants internally restructured company assets without either seeking

Plaintiffs' consent or paying Plaintiffs a pre-designated payment.  *See id.*  Defendants move to

dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) on the grounds of claim

splitting and failure to state a claim.  *See* ECF No. 31 ("Mot.").  For the reasons stated below,

Defendants' motion to dismiss is DENIED.

## BACKGROUND

### I.  The Parties

    Plaintiff Trireme Energy Holdings, Inc. ("Trireme Holdings") is a Delaware corporation

that maintains a principal place of business in Pittsburgh, Pennsylvania.  SAC ¶ 9.  Plaintiff

Trireme Energy Development, LLC ("Trireme LLC") is a limited liability company with two

members: Trireme Holdings and James Spencer ("Spencer").  *Id.* ¶ 10.  Through its members,

Trireme LLC is a citizen of Delaware and Pennsylvania.  *Id.* ¶¶ 10-11.  In connection with another company, EverPower, Trireme "developed, owned, and operated large-scale wind farms" in the United States.  *Id.* ¶ 19.  Trireme used separate special-purpose entities to manage each of its energy projects.  *Id.* ¶ 20.  In 2017, Trireme sold all of its business assets.  *Id.* ¶¶ 21-22.

Prior to December 31, 2020, Innogy Renewables US LLC ("IRUS") was a limited liability company wholly owned by Innogy SE, a German utility.  *Id.* ¶¶ 11, 25.  On December 31, 2020, IRUS merged into Defendant RWE Renewables Services, LLC ("RWE Services").  *Id.* ¶ 11.  Through the merger, RWE Services inherited IRUS's duties, obligations, and liabilities.  *Id.* ¶ 12.  RWE Services is a limited liability company with one member: Defendant RWE Renewables Americas, LLC ("Renewables Americas").  *Id.* ¶ 13.  Renewables Americas is a limited liability company that Plaintiffs allege, on information and belief, is "owned by a chain" of limited liability companies whose sole member is RWE Renewables International Participations BV, a citizen of the Netherlands.  *Id.* ¶¶ 14, 15.

## II. The Merger Agreement

On December 21, 2017, Trireme sold its energy projects still in development to IRUS.  *Id.* ¶¶ 1, 23.  The terms of the sale were set out in a merger agreement.  *Id.* ¶ 23; *see* ECF No. 33-3 ("Merger Agreement").  Under the Merger Agreement, Trireme sold Trireme Energy Development II, LLC, an entity holding the special-purpose entities for Trireme's ongoing energy development projects, to IRUS.  SAC ¶ 24.  IRUS, in turn, merged Trireme Energy Development II, LLC (and its subsidiaries and assets) into IRUS.  *Id.*  At the time the Merger Agreement was signed, IRUS was wholly owned by Innogy SE.  *Id.* ¶ 25.

Pursuant to the Merger Agreement, IRUS agreed to pay Trireme $50 million upfront, plus up to $112 million in milestone payments if IRUS met certain performance benchmarks.  *Id.*

¶¶ 1, 26.  Those milestone payments are connected to each renewable-energy project that IRUS acquired.  *Id.* ¶ 27.  Additionally, under Section 7.6(c) of the Merger Agreement, IRUS agreed that it would:

> not sell[,] assign, transfer or otherwise dispose of any of the assets,
> rights and other properties of a Target Project or the equity
> interests of a Development Company prior to December 31, 2020
> without the consent of the Member Representative, unless prior to
> or contemporaneously with such sale, assignment, transfer or other
> disposition Purchaser pays the Payment Milestone Amount that
> would have been payable with respect to such Target Project if the
> Target Project had achieved the Payment Milestone as of the date
> of such sale, assignment, transfer or other disposition.

Merger Agreement § 7.6(c); *see* SAC ¶ 28.

As a result of the Merger Agreement, IRUS owned 100 percent of the equity interests in the renewable energy development companies that Trireme previously owned.  SAC ¶ 29. Specifically, IRUS owned IRUS Wind Holdings LLC, which itself owned IRUS Wind Development LLC, which in turn owned 100 percent of the energy development companies.  *Id.* ¶ 30.  Similarly, through a series of limited liability companies, IRUS owned 100 percent of Trireme's solar development projects.  *Id.* ¶ 31.  Plaintiffs portray the ownership interests of the development companies as follows:



*Id.* ¶ 32.

### III. The Reorganization

In March 2018, two German utilities, E.ON SE ("E.ON") and RWE AG ("RWE"), restructured the German utilities industry through a series of transactions. *Id.* ¶ 33.  As part of this reorganization, IRUS's parent, Innogy SE, was acquired by E.ON and RWE. *Id.* ¶¶ 3, 33. RWE acquired Innogy SE's renewable energy assets, such as IRUS and its subsidiaries. *Id.* ¶¶ 4, 33.  Plaintiffs allege that after RWE acquired IRUS, IRUS transferred and disposed of its interests in the energy development companies in violation of the parties' Merger Agreement. *Id.* ¶ 34.

Plaintiffs allege that, on May 29, 2020, IRUS "effected the assignment, conveyance, and transfer of all the right, title, and interest" in a development company named Cassadaga Wind LLC from IRUS Wind Development LLC to a new subsidiary called Cassadaga Wind Holdings LLC. *Id.* ¶ 35.  Similarly, Plaintiffs allege that, on July 1, 2020, IRUS transferred all of its interests in the other energy development companies to other RWE subsidiaries. *Id.* ¶ 36.  The transferred energy development companies include: IRUS Wind Operations LLC, IRUS Wind Development LLC, and IRUS Solar Development LLC. *Id.*  As a result of the transfers, IRUS no longer possessed direct or indirect ownership of the energy development companies. *Id.* ¶ 37. Although Innogy maintained a 100 percent equity interest in IRUS Wind Holdings LLC and IRUS Solar Holdings, LLC through the reorganization, those limited liability companies no longer owned any of the energy development companies, as pictured by Plaintiffs below. *Id.* ¶ 38.



*Id.*

Plaintiffs allege that they "reasonably believed" that the E.ON-RWE asset swaps did not implicate Section 7.6(c) of the Merger Agreement "[b]ased on Innogy's representations about the transaction." *Id.* ¶ 39.  IRUS did not ask for Plaintiffs' consent, nor did IRUS pay Plaintiffs any milestone payments "[p]rior to transferring and disposing" of its equity interests in the energy development companies pursuant to Section 7.6(c) of the Merger Agreement.  *Id.* ¶¶ 40-41.

### IV. Alleged Concealment of the Transfers

Plaintiffs allege that IRUS "concealed the transfers" of the energy development companies and that Plaintiffs were "not on notice" of those alleged transfers "until late 2021, when the relevant facts were disclosed in another litigation."  *Id.* ¶ 42.  In support of these assertions, Plaintiffs allege that "public records do not contain any information" about the alleged transfers, and the alleged transfers are instead "only recorded in RWE's internal records," which Defendants did not "voluntarily disclose[]" to Plaintiffs.  *Id.* ¶¶ 43, 55.

Plaintiffs further allege that IRUS and RWE provided "materially misleading" information about the "transfers" to Plaintiffs on several occasions.  *Id.* ¶ 44.  First, in June or July of 2018, Trireme's chief executive officer ("CEO"), James Spencer ("Spencer"), learned that RWE planned to potentially acquire Innogy's renewable energy business.  *Id.* ¶ 45.  IRUS's CEO, Andrew Young ("Young"), told Spencer that IRUS would request Trireme's consent to transfer Innogy's obligations "under a certain parent guarantee to RWE."  *Id.*  In connection with that request, on September 20, 2018, Young and Spencer met in person and discussed the transfer, and Spencer asked Young if IRUS planned to transfer the energy development companies in connection with the RWE transaction.  *Id.* ¶¶ 46-47.  Young reported that IRUS would maintain ownership of the energy development companies and the E.ON-RWE

reorganization would not require IRUS to make a milestone payment under the Merger Agreement. *Id.*

Second, in August 2019, Innogy sent Plaintiffs a memorandum (the "2019 Memo") about the E.ON-RWE reorganization that Plaintiffs allege was misleading. *Id.* ¶¶ 48, 54. The 2019 Memo explained that RWE would acquire Innogy's renewable assets through the asset swap. *Id.* ¶ 48. It described RWE's desire to become a market leader in electricity production in Europe, which RWE hoped to achieve by diversifying its portfolio of energy assets. *Id.* ¶ 49. Describing the specifics of the asset swap, RWE reported in the 2019 Memo that it:

> intends to (indirectly) transfer to E.ON all its shares in innogy SE ("innogy"), which currently amount to a stake of approximately 76.8% in the share capital of innogy ("Share Transfer"). In a second step, in line with the Overall Transaction Objectives, the renewables business of E.ON ("E.ON RES Business") will be carved-out from E.ON and be operated by a subsidiary of RWE in the future. In addition, the renewables business of Innogy ("innogy RES Business") shall be carved out from innogy and also be operated by such subsidiary of RWE.

*Id.* The 2019 Memo also reported that when RWE acquired Innogy, Innogy staff with industry experience would transfer with the business to maintain continuity. *Id.* ¶ 50. The 2019 Memo did not state that IRUS planned to transfer or dispose of the energy development companies. *Id.* ¶ 51.

Third, on April 22, 2020, IRUS shared allegedly misleading information about the asset swap with Plaintiffs, including an organizational chart depicting the envisioned post asset-swap structure of IRUS within RWE, as shown below. *Id.* ¶ 52.



Plaintiffs allege that this chart communicated to Plaintiffs that IRUS would maintain ownership over its subsidiaries, including the energy development companies, but IRUS ultimately did not maintain such control.  *Id.* ¶ 53.

Plaintiffs assert that these representations were "materially misleading" because they incorrectly led Plaintiffs to conclude that "IRUS would not transfer or dispose of any [d]evelopment [c]ompanies in connection with the E.ON-RWE asset swap," and Plaintiffs "had no reason to conduct any further investigation concerning a potential breach of Section 7.6(c) in connection with the E.ON-RWE asset swap."  *Id.* ¶ 54.  In short, Plaintiffs allege that they "had no way to discover[] the . . . [t]ransfers through due diligence."  *Id.* ¶ 55.  Instead, Plaintiffs allege that they only obtained information concerning the alleged transfers in "November and December 2021" when RWE produced organizational charts and documents to Plaintiffs through discovery in a prior litigation, as discussed below.  *Id.* ¶ 56.

## V.  Prior Litigation

On June 30, 2020, Plaintiffs commenced an earlier litigation against IRUS, Innogy SE, and Cassadaga Wind LLC captioned *Trireme Energy Holdings, Inc. et al v. Innogy Renewables US LLC et al.* ("*Trireme I*"), 20-cv-05015 (JLR) (S.D.N.Y.), which is also pending before the undersigned.  In that action, Plaintiffs allege that the defendants there – which are in privity with Defendants in this action – breached Sections 7.6(a) and 7.6(b) of the same Merger Agreement

that is at issue here.  *See Trireme I*, ECF No. 43 ("*Trireme I* SAC.").  Plaintiffs amended the complaint in *Trireme I* once as of right, and filed a second amended complaint in that action with the defendants' consent on January 13, 2021.  *See id.*  The court granted in part and denied in part the defendants' motion to dismiss on August 17, 2021.  *See Trireme I*, ECF No. 67.

On April 8, 2022, after fact discovery had closed and well after the deadline to move to amend the pleadings, Plaintiffs moved for leave to amend the complaint a third time in *Trireme I* to add a claim for breach of Section 7.6(c) of the Merger Agreement – the claim that Plaintiffs now assert here, in *Trireme II*.  *See Trireme I*, ECF Nos. 148, 149.  As they do here, Plaintiffs alleged in support of that motion that they first learned during the course of discovery in "late 2021" of facts to support a claim for breach of Section 7.6(c) based on the asset-swaps.  *Id.*; SAC ¶ 42; Opp. at 6-7.  The defendants disputed when Plaintiffs were or should have been on notice of the newly asserted claim and opposed Plaintiffs' motion.  *See Trireme I*, ECF No. 151; Br. at 20.

On August 5, 2022, the court denied Plaintiffs' motion for leave to file a third amended complaint in *Trireme I* from the bench, stating in part:

> First the Court finds that plaintiffs have not shown good cause to modify the scheduling order under Rule 16.  Good cause is primarily a question of diligence.  *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000) . . . .  [P]laintiffs have not shown diligence here.  As defendants argue, plaintiffs were on notice of a potential breach before this case was even filed.  Public documents from May 2019 filed with the New York State Public Service Commission show that the development companies were outside of IRUS' control at that time.

> But, even without that, they were on notice earlier in the discovery period, as soon as defendants submitted organizational charts and documents in April of 2020 and July of 2021 showing that the development companies were outside of their control, and certainly by September 2021 when a witness testified that the development companies were outside of IRUS' control.

Diligence would counsel that plaintiffs investigated the potential breach much sooner than they did; but even if they were not on notice until the end of 2021, as they admit, the four-month delay between when they believe they were officially on notice and when they moved to amend is inconsistent with the diligence required to demonstrate "good cause." *See, [e.g.], Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) (holding that the district court "acted well within its discretion" in concluding that plaintiff's three month failure to move for amendment prevented plaintiff from demonstrating the diligence necessary to satisfy Rule 16).

When a party "had an opportunity to assert [an] amendment earlier" in a case but failed to do so, as plaintiffs did here, "a court may exercise its discretion more exactingly" in deciding whether to grant leave to amend. *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008). The Court therefore finds, because plaintiffs have no plausible explanation for their delay, they have not shown good cause to modify the scheduling order under Rule 16.

Although the Court need not reach the [R]ule 15 inquiry, the Court knows that even if plaintiff had demonstrated good cause to modify the scheduling order, the Court would deny leave to amend pursuant to Rule 15 because amendment would unduly prejudice defendants[.] *Foman v. Davis*, 371 U.S. 178, 182 (1962). Whether the amendment is or is not futile, discovery has long since closed and plaintiffs are asserting an entirely different breach than the one that is in their existing complaint. Although plaintiffs assert that no additional discovery would be necessary, defendants are entitled to seek additional discovery to present defenses to this new factually distinct claim. The Court finds that because granting leave would be unduly prejudicial to defendants, plaintiffs are not entitled [to] leave to amend pursuant to Rule 15. As a result, plaintiffs' motion is denied.

ECF No. 33-1 at 40:2-42:2 (internal record citations omitted). A bench trial is currently scheduled to commence in *Trireme I* on November 13, 2023. *Trireme I*, ECF No. 216.

## VI. Procedural Background

Three weeks after the court denied leave to amend in *Trireme I*, Plaintiffs filed the instant action on August 31, 2022. *See* Compl. The action was reassigned to the undersigned as a

related case on September 28, 2022.  ECF No. 20.  Plaintiffs filed an amended complaint on

October 4, 2022.  *See* ECF No. 21 ("AC" or "Amended Complaint").  The Amended Complaint

asserts a single claim for breach of contract arising from Section 7.6(c) of the Merger

Agreement, i.e., the same claim for which Plaintiffs were denied leave to amend in *Trireme I.*

*See id.*  Plaintiffs seek $112,000,000 in damages.  *Id.* ¶ 8.

On October 27, 2022, Defendants moved to dismiss the Amended Complaint.  Mot.; *see*

ECF Nos. 32 ("Br."), 33 ("Gross Decl.").  Eight days later, Plaintiffs filed a "corrected amended

complaint" without seeking leave from the Court or otherwise complying with Rule 15.  *See*

SAC.  Notwithstanding these deficiencies, the Court accepted Plaintiffs' corrected pleading as

the now-operative Second Amended Complaint, *see* ECF No. 40, and Defendants confirmed that

they would rest on their already-filed motion to dismiss, *see* ECF No. 42.  On November 18,

2022, Plaintiffs opposed the motion to dismiss.  ECF No. 47 ("Opp.").  On December 1, 2022,

Defendants filed their reply.  ECF No. 51 ("Reply").  Defendants also filed a letter with

supplemental authority on May 3, 2023, *see* ECF No. 54, and Plaintiffs responded to that letter

on May 4, 2023, *see* ECF No. 55.  Accordingly, before the Court is Defendants' motion to

dismiss the Second Amended Complaint.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678, 680 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all

non-conclusory allegations of fact.  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir.

2021); *see also Iqbal,* 556 U.S. at 678.  However, a complaint must allege "more than a sheer

possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In considering a motion to dismiss under Rule 12(b)(6), "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co*., 102 F.3d 660, 662 (2d Cir. 1996). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (internal citation omitted).

## DISCUSSION

Defendants argue that Plaintiffs' Second Amended Complaint, which asserts a single breach of contract claim, should be dismissed on two grounds. First, Defendants principally contend that Plaintiffs' breach of contract claim is barred by the rule against claim splitting because Plaintiffs previously sued for breach of the same contract in *Trireme I* but did not assert the breach alleged here. *See* Br. at 15-22. Second, Defendants argue that Plaintiffs fail to state a claim for breach of contract in any event. *See id.* at 22-25. Plaintiffs argue that their Second Amended Complaint is neither precluded by *Trireme I* nor fails to state a claim. *See* Opp. The Court will address the parties' arguments in turn.

## I.      Claim Splitting

"As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019) (quoting *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000)).  Under the doctrine of claim splitting, dismissal of the second suit "is a common disposition because plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Curtis*, 226 F.3d at 139.  Precluding a second action based on the rule against claim splitting or duplicative litigation is "distinct from but related to the doctrine of claim preclusion or *res judicata*" in that the former applies when two cases remain pending, while the latter doctrines apply when an earlier action has already been adjudicated.  *Sacerdote*, 939 F.3d at 504-05.  Whether a suit is duplicative of another action depends on whether "the same or connected transactions are at issue and [whether] the same proof is needed to support the claims in both suits or, in other words, whether facts essential to the second suit were present in the first suit." *Curtis*, 226 F.3d at 139.[1]

The Second Circuit has cautioned that there is no "rigid test" for claim splitting, and courts should not dismiss a second suit as duplicative merely because it has a "rough

---

[1] Neither party argues that the Court, exercising its diversity jurisdiction, should apply New York's rule against claim splitting; both parties cite to the federal rule against claim splitting. *See generally* Br.; Opp.; Reply.  However, the Court would reach the same outcome if it applied New York's claim splitting doctrine because the relevant legal principles overlap.  *See Reilly v. Reid*, 45 N.Y.2d 24, 30 (1978) ("It is true that even when two successive actions arise out of the identical course of dealing, the second may not be barred, it has been said, if the requisite elements of proof and hence the evidence necessary to sustain recovery vary materially" (internal citation and quotation marks omitted; alteration adopted)); *Melcher v. Greenberg Traurig LLP*, 135 A.D.3d 547, 552-53 (2016) ("A party invoking the narrow doctrine against splitting a cause of action must show that the challenged claim raised in the second action is based upon the same liability in the prior action, and that the claim was ascertainable when the prior action was commenced.").

resemblance" to another action. *Curtis*, 226 F.3d at 136, 138. Rather, courts should assure themselves "that beyond the resemblance . . . the claims asserted in both suits are also the same" and it should "consider the equities of the situation when exercising its discretion." *Id.* at 136-38. At its core, the rule against claim splitting (like claim preclusion or *res judicata*) is meant "to foster judicial economy and the 'comprehensive disposition of litigation.'" *Id.* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84 (1952)). It is also meant to "protect parties from the vexation of concurrent litigation over the same subject matter." *Id.* (quoting *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (internal citation omitted)).

There are exceptions to the rule against claim splitting. First, the rule does not apply to claims that arose after the operative complaint was filed in the earlier action, since a plaintiff "has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events." *Id.* at 139; *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) ("If a defendant engages in actionable conduct after a lawsuit is commenced, the plaintiff may seek leave to file a supplemental pleading to assert a claim based on the subsequent conduct . . . [b]ut he is not required to do so, and his election not to do so is not penalized by the application of *res judicata* to bar a later suit on that subsequent conduct."). Second, the rule does not bar claims based on evidence that "was either fraudulently concealed or [that] could not have been discovered with due diligence." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 168 (2d Cir. 2021) (quoting *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999)).

With respect to breach of contract cases, like this case, "[i]t is well-settled that multiple claims based upon a single contract are considered part of the same transaction, unless the plaintiff could not have asserted a claim in the original action." *Kamdem-Ouaffo v. PepsiCo, Inc.*, 160 F. Supp. 3d 553, 564 (S.D.N.Y. 2016). Thus, "[w]here an action includes a cause of

action for breach of a particular contract, a second action seeking additional recovery for breach of that same contract is generally considered part of the same factual 'transaction' and is precluded, where the grounds for additional recovery might have been included in the first action." *Phx. Canada Oil Co. v. Texaco, Inc.*, 749 F. Supp. 525, 535 (S.D.N.Y. 1990); *see Prime Mgmt. Co. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) (stating that "when the parties have entered into a contract to be performed over a period of time and one party has sued for a breach, *res judicata* will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit").

Here, the Court concludes that Plaintiffs' claim for breach of Section 7.6(c) of the Merger Agreement in this action is part of the same set of transactions as Plaintiffs' claims for breach of Sections 7.6(a) and 7.6(b) of the Merger Agreement in *Trireme I*. There is no dispute that the parties in the two actions are the same and/or in privity with each other for purposes of the breach of contract claims. *See generally* Br.; Opp. The contract claims in both actions involve the same Merger Agreement, and although they rely on different subsections, all of the claims arise from Section 7.6 located on the same page of that agreement. *Compare Trireme I* SAC ¶¶ 153-157, *with* SAC ¶¶ 57-64. The parties also agree that the breach alleged in the present action occurred before Plaintiffs filed their operative complaint in *Trireme I* (the Second Amended Complaint filed on January 13, 2021), seeking recovery for breach of the same contract. Therefore, absent some exception, the well-settled rule that "multiple claims based upon a single contract are considered part of the same transaction," and therefore subject to the rule against claim splitting, applies squarely to Plaintiffs' claims. *Kamdem-Ouaffo*, 160 F. Supp. 3d at 564.

Plaintiffs argue that this rule is inapposite because it does not apply to "claims involving factually *unrelated* breaches of *different* contract provisions" like those asserted here.  Opp. at 12-15.  Plaintiffs further argue that this case "does not involve the same transactions" as in *Trireme I* because "it will not require the same proof."  *Id.* at 9-11.  These arguments fail on the facts and the law.

The Court agrees that there are some factual differences between Plaintiffs' successive contract claims.  In *Trireme I*, Plaintiffs alleged that the defendants breached the Merger Agreement by failing to use commercially reasonable efforts to complete a windfarm project, thereby depriving Plaintiffs of a milestone payment.  *Trireme I* SAC ¶¶ 71-100.  Plaintiffs also alleged that the defendants breached the duty of good faith and fair dealing by failing to complete the windfarm project by a contractually significant date.  *Id.* ¶¶ 17-20, 61-100.  Here, by contrast, Plaintiffs allege that Defendants breached the Merger Agreement by transferring or otherwise disposing of energy development projects without seeking Plaintiffs' consent or paying Plaintiffs milestone payments.  SAC ¶¶ 33-41.  Indeed, when denying Plaintiffs' motion for leave to amend in *Trireme I*, the court observed that defendants would be "entitled to seek additional discovery to present defenses to th[e] new factually distinct claim" that Plaintiff subsequently filed in this action.  ECF No. 33-1 at 41:21-41:23.

However, distinctions between the contract claims in *Trireme I* and *II* are not as substantial as Plaintiffs posit.  Notably, in *Trireme I*, it was <u>Plaintiffs</u> that argued in the context of the motion to amend proceedings that "no additional discovery would be necessary" for the new claim while the <u>defendants</u> asserted that the new claim was distinct and would require additional discovery.  *Id.*  As noted above, Plaintiffs' contract claims in both actions seek to recover milestone payments arising from the same contractual section in the same agreement.

Plaintiffs also concede that a substantial portion of the damages they seek in this action are the same damages sought in *Trireme I* and it would be a "double recovery" for Plaintiffs to obtain those damages in both actions. *See* Opp. at 12 n.6. Therefore, even if the Court did not apply the well-settled rule that claims for breach of the same contract generally constitute the same transaction, the Court would still find that Plaintiffs' contract claims in both actions involve a sufficiently common set of operative facts. *See, e.g.*, *Davis v. Norwalk Econ. Opportunity Now, Inc*, 534 F. App'x 47, 48 (2d Cir. 2013) (holding that claim splitting "does not require that all aspects of the new and prior suits be identical but rather, focuses on whether the two claims arise from the same 'nucleus of operative fact'" (quoting *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000))).

Second, and contrary to Plaintiffs' argument, courts in this District have held that claims involving different breaches of different provisions of the same contract, like here, constitute the same transaction for purposes of claim splitting and preclusion. In *Phoenix Canada Oil Co. v. Texaco, Inc.*, the plaintiff filed successive actions claiming different breaches of the same contract. 749 F. Supp. at 527-29. Applying the "transactional" approach to determine whether the plaintiffs' actions shared a "factual predicate," which Plaintiffs in this case concede is the correct approach (*see* Opp. at 8), the court concluded that the plaintiff's second action was precluded by "the rule against splitting claims for breach of a single contract . . . ." *Id.* at 535-36. The court reasoned that, "[w]here an action includes a cause of action for breach of a particular contract, a second action seeking additional recovery for breach of that same contract is generally considered part of the same factual 'transaction' and is precluded, where the grounds for additional recovery might have been included in the first action." *Id.* In support, the court relied on *Buchanan v. General Motors Corp.*, 158 F.2d 728 (2d Cir. 1947), in which the Second

Circuit held that a second breach of contract action was precluded by an earlier action arising from the same contract. *Phoenix Canada Oil Co.*, 749 F. Supp. at 536. The court concluded: "That plaintiffs' original action was for an entirely *different* aspect of the royalty agreement and involved *different* factual and legal issues . . . did not prevent the operation of res judicata in *Buchanan*, and it should not here." *Id.* (emphasis added).

Similarly, in *Isbrandtsen Marine Services, Inc. v. Derecktor Shipyard, Inc.*, the plaintiff first brought an action alleging that the defendants breached their contract by failing to re-power a ship. No. 98-cv-00276 (WK), 2001 WL 799765, at *1 (S.D.N.Y. July 16, 2001). The plaintiff then brought a second action alleging that the defendants breached the same contract by failing to redress mechanical problems after the first action had already begun. *Id.* Even though the earlier action asserted a different breach based on a different obligation, the court found that the evidence in both actions would be "relate[d]" and that the second action sought "additional recovery for breach of the same contract and, thus, is part of the 'same factual transaction' as the [first] [a]ction." *Id.* at *2.

The Second Circuit, in reinforcing the longstanding principle that breaches of the same contract form the same set of transactions for purposes of claims splitting or *res judicata*, likewise does not distinguish cases where the contractual obligations underlying the breaches are different. For example, in *SEC v. First Jersey Securities, Inc.*, the Second Circuit explained that "when a contract [i]s to be performed over a period of time and one party has sued for a breach but has not repudiated the contract, res judicata will preclude the party's subsequent suit for *any* claim of breach that had occurred prior to the first breach-of-contract suit, but will not preclude a subsequent suit for a breach that had not occurred when the first suit was brought." 101 F.3d at 1464 (emphasis added). The Second Circuit repeated this rule in *TechnoMarine SA v.*

*Giftports, Inc.* stating that, "if a party sues for a breach of contract, '*res judicata* will preclude the party's subsequent suit for any claim of breach that had occurred *prior* to the first suit.'" 758 F.3d 493, 501 (2d Cir. 2014) (quoting *Prime Mgmt. Co.*, 904 F.2d at 816).

The Restatement (Second) of Judgments, relied on by the Second Circuit for purposes of preclusion, offers additional support for the principle that all claims for breach of a single contract generally should be brought in one action if they occurred prior to that action, even if the breaches arise from different facts or obligations. *See* Restatement (Second) Judgments § 25. The Restatement illustrates the rule as follows: "A sues B for breach of a contract calling for delivery of certain appliances, alleging as the breach that the appliances did not meet the agreed specifications. After judgment for B, A commences a second action, this time alleging late delivery of the appliances as the breach. The second action is precluded." *Id.* § 25 cmt. b. Illus. 2; *see generally First Jersey Secs., Inc.*, 101 F.3d at 1464 (relying on the Restatement for this principle); *see also Isbrandtsen Marine Servs., Inc.*, 2001 WL 799765, at *2 n.2 (relying on this illustration for purposes of claim splitting analysis); *Phx. Canada Oil Co.*, 749 F. Supp. at 535 (same).

New York appellate courts, too, have articulated a similar principle for more than a century. Recognizing in 1921 that "[i]t is, of course, well settled that a cause of action arising out of an entire contract cannot be divided into two or more parts, so as to permit the plaintiff to make each part the subject of a separate action," New York's Appellate Division remarked that "[n]o rule is more firmly established than that against splitting up a single cause of action. The citation of authorities is superfluous." *Lessler v. Unger*, 186 N.Y.S. 825, 827 (App. Div. 2nd Dept. 1921); *see also Goldberg v. E. Brewing Co.*, 136 A.D. 692, 693 (App. Div. 2nd Dept. 1910) ("The principle is well stated . . . where there are breaches of several and distinct

covenants contained in the same instrument, all these breaches must be sued for together; while independent stipulations may be sued for as the breaches occur, all the breaches existing at the time the action is brought are only one cause of action." (internal citation omitted and quotation marks omitted)).  Plaintiffs have offered no compelling reason to depart from these principles here.

The cases that Plaintiffs assert have held otherwise do not concern breaches of contracts. *See, e.g.*, *Won v. Amazon.com, Inc.*, No. 22-cv-02867 (NGG) (RER), 2022 WL 3576738, at *15 (E.D.N.Y. Aug. 19, 2022) (rejecting claim splitting argument where two actions involved an individual action for retaliation and discrimination and an earlier putative class action for violations of the Uniformed Services Employment and Reemployment Rights Act of 1994); *Pujols v. RTS Solutionz, Inc.*, No. 22-cv-05455 (KHP), 2023 WL 137749, at *5 (S.D.N.Y. 2023) (rejecting motion to dismiss for claim splitting in the context of employment actions because "the causes of action asserted against the[] new defendants are different from the causes of action asserted in the original action, and different relief is sought").  Plaintiffs' heavy reliance on *American Builders & Contractors Supply Co. v. Macaluso Enterprises, Ltd.*, No. 21-cv-06433 (CJS), 2022 WL 1809401 (W.D.N.Y. June 2, 2022) is also unavailing.  In that case, the court did not evaluate the general rule against splitting claims for breaches of the same contract, and instead ultimately consolidated all of the plaintiff's claims into a single action.  *Id.*

Finally, Plaintiffs argue that regardless of the rule applied, "the equities of the situation" do not warrant dismissal here.  Opp. at 16-17 (internal citation omitted).  The Court agrees as a general matter that courts "consider the equities of the situation when exercising [their] discretion" for purposes of claim-splitting.  *Curtis*, 226 F.3d at 138.  It is also generally preferable to hear claims on the merits rather than resolve them on discretionary case

management grounds.  *See, e.g.*, *Hughes v. Lebron*, 14-cv-09479 (PAE), 2016 WL 5107030, at *5 (S.D.N.Y. Sept. 19, 2016) ("[T]he Court strongly prefers to resolve parties' claims on the merits, rather than to dispose of them based on procedural default.").

However, the Court is not persuaded that the equities fall squarely in Plaintiffs' favor. The Second Circuit has cautioned that plaintiffs "have no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time." *Curtis*, 226 F.3d at 139.  In *Trireme I*, the court denied Plaintiffs leave to amend as untimely (among other reasons), noting that Plaintiffs admittedly had notice of the alleged breach of Section 7.6(c) for at least four months but nevertheless waited until after the close of discovery to make the request to amend.  *See* ECF No. 33-1 at 40:19-40:25.  Even if "unhappy with a district court's denial of an eleventh-hour motion," Plaintiffs do not have the right to file this action seeking to "neutraliz[e] the district court's ruling on the motion to amend."  *Wang v. Ren*, No. 20-4216, 2023 WL 1977233, at *2 (2d Cir. Feb. 14, 2023) (affirming dismissal for claim splitting where the plaintiff moved to amend three months after discovering new information and then filed a second action rather than challenge the denial of leave to amend in the first action).  Thus, the Court finds that Plaintiffs' breach of contract claims involve an overlapping set of transactions and facts, and that the equities do not tip decidedly in Plaintiffs' favor.

The only remaining question is whether an exception to the rule against claim splitting applies.  As the Court noted earlier, preclusion rules apply "even where new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence."  *Cho*, 991 F.3d at 168 (quoting *L-Tec Elecs. Corp.*,

198 F.3d at 88).[2]  The Court finds that Plaintiffs have alleged facts that plausibly support the application of these exceptions here.

In support of invoking the preclusion exceptions, Plaintiffs allege that they "did not know that the[] transfers had occurred because IRUS actively concealed the transfers from [Plaintiffs] and falsely represented that no such transfers or dispositions had or would occur."  SAC ¶ 7. Specifically, Plaintiffs allege that at a meeting held on September 20, 2018 at 3:00 p.m. in Pittsburgh, Pennsylvania, Plaintiffs' chief executive, Spencer, asked Defendants' chief executive, Young, "if IRUS expected to transfer or assign any of the[] Development Companies in connection with the RWE transaction, or words to that effect."  *Id.* ¶¶ 46-47.  Young responded that "IRUS would continue to own the Development Companies and that the 'milestone' payments would not be triggered by the E.ON-RWE asset swap."  *Id.* ¶ 47.  Plaintiffs allege that Innogy SE sent Plaintiffs the 2019 Memo about the asset swap in August 2019, which suggested the development companies would be "carved out from innogy" and the same staff would continue working on the companies after the asset swap, but "did not disclose that IRUS would transfer or dispose of any of the Development Companies."  *Id.* ¶¶ 48-51.  Plaintiffs further allege that on April 22, 2020, IRUS emailed Plaintiffs an organizational chart that "communicated to [Plaintiffs] that after the E.ON-RWE asset swap closed, IRUS would continue to own 100% of the equity of all of its then-existing subsidiaries . . . which included the Development Companies . . . ."  *Id.* ¶¶ 52-53.  Based on these representations, Plaintiffs allege

---

[2] Although courts have generally applied these exceptions in the context of preclusion doctrines like *res judicata*, both Plaintiffs' and Defendants' briefs appear to assume that the exceptions are similarly applicable to the rule against claim splitting.  *See* Br. at 20 (relying on analysis of this issue in *Cho*); Opp. at 18 (applying exceptions to claim splitting); Reply at 6-8 (not disputing applicability of exceptions to claim splitting).  For this reason, and because the parties have presented no reason why these exceptions would not apply in the claim splitting context, the Court follows the parties' lead and considers the preclusion exceptions here.

that they concluded "IRUS would not transfer or dispose of any Development Companies" and Plaintiffs "had no reason to conduct any further investigation" of the issue.  *Id.* ¶ 54.  Further, Plaintiffs allege that "public records do not contain any information" about the allegedly improper transfers, so Plaintiffs had "no way to discover[] [them] through due diligence."  *Id.* ¶ 55.  Finally, Plaintiffs allege that they only obtained information concerning the alleged improper transfers "in November and December 2021, when RWI produced certain organizational charts and related documents" in *Trireme I.  Id.* ¶ 56.

In response, Defendants principally argue that the court in *Trireme I* rejected Plaintiffs' notice argument when denying leave to amend, and Plaintiffs are therefore precluded from relitigating the issue here.  Reply at 5-6.  Although it has a surface appeal, Defendants' argument ultimately fails because in denying leave to amend, the court in *Trireme I* only concluded that there was not good cause to modify the scheduling order at that stage in the action under Rule 16 and, alternatively, that there would be undue prejudice under Rule 15.  *See* ECF No. 33-1 at 40:2-40:5.  In doing so, the court noted, among other things, that Plaintiffs were "on notice of a *potential* breach" before that case was filed, that "[p]ublic documents from May 2019" showed the transfer of the development companies (which Plaintiffs allege did not take place until May 2020), and that Plaintiffs only admitted they were on notice of the alleged breach in late 2021, four months before moving to amend.  ECF No. 33-1 at 40:7-40:25 (emphasis added).  But the "inquiry governing leave to amend is not the same as that governing whether [preclusion] bars subsequent claims, and the district court [in *Trireme I*] did not address, nor did it necessarily implicitly conclude, that the claims against [Defendants] could . . . have been brought in their [operative] complaint" filed on January 13, 2021 in *Trireme I.  Cho*, 991 F.3d at 169 (distinguishing determinations made on leave to amend in prior action when assessing preclusion

in subsequent action).  The court in *Trireme I* applied facts to a different legal standard than is at issue here, focused on Plaintiffs' four-month delay in moving to amend in April 2022 that does not bear on the question of Plaintiffs' notice of the alleged breach prior to January 2021 at issue here, and did not enter a final judgment.  ECF No. 33-1 at 40:7-40:25.  Thus, the motion to amend decision in *Trireme I* does not preclude consideration of these issues here.

Based on the extrinsic information offered by Defendants, Plaintiffs may not ultimately be able to show on a fuller factual record and at a different posture of this case that an exception to the rule against claim splitting applies.  At this stage, however, the Court must accept the well-pleaded allegations in the Second Amended Complaint as true and draw all reasonable inferences in Plaintiffs' favor.  *See Francis*, 992 F.3d at 72.  Therefore, on the present motion to dismiss, the Court finds that it is at least plausible that Defendants concealed information from Plaintiffs and Plaintiffs could not have discovered the information with reasonable diligence before the filing of the operative complaint in *Trireme I.  See, e.g.*, *Util. Audit Grp. v. Cap. One, N.A.*, No. 14-cv-00097 (SJF) (GRB), 2015 WL 1439622, at *10-11 (E.D.N.Y. Mar. 26, 2015) (denying motion to dismiss on preclusion grounds because the defendant had "not established that the claims asserted against it in this action were, or could have been raised, in the prior action"); *see also 9Global, Inc. v. Avant Credit Corp.*, No. C-15-05543 (WHA), 2016 WL 1611063, at *3 (N.D. Cal. Apr. 22, 2016) ("While Avant may be able to demonstrate that *Avant II* violates the rule against claim splitting on a fuller record on summary judgment, at the pleading stage, Avant has not established that 9Global violated the rule against claim splitting."); *King v. Galluzzo Equip. & Excavating, Inc.*, No. 00-cv-06247 (ILG), 2001 WL 1402996, at *10 (E.D.N.Y. Nov. 8, 2001) (denying summary judgment on preclusion grounds because the evidence, "viewed in the

light most favorable to plaintiffs, creates a factual dispute as to whether" the defendants

fraudulently concealed information from the plaintiffs).

Accordingly, the Court concludes that the rule against claim splitting does not warrant

dismissal of this action on the present motion.

## II.      Failure to State a Claim

Defendants argue that the Second Amended Complaint also fails to state a claim for

breach of Section 7.6(c) of the Merger Agreement.  *See* Br. at 22-25.  Section 7.6(c) provides

that the "[p]urchaser shall not sell[,] assign, transfer or otherwise dispose of any of the assets,

rights and other properties of a Target Project or the equity interests of a Development Company

prior to December 31, 2020" without Plaintiffs' consent, unless the purchaser pays Plaintiffs the

milestone payments that would have been payable if the milestones had been achieved.  Merger

Agreement § 7.6(c); *see* SAC ¶ 28.  Defendants argue that the claim for breach of Section 7.6(c)

should be dismissed because this clause does not apply to intracompany transfers, like the

transfer that Plaintiffs allege here, but only to dispositions like third-party sales.  Br. at 22-25.

Plaintiffs, in turn, argue that the plain language of the Merger Agreement not only bars sales, but

also covers instances in which Defendants "assign, transfer or otherwise dispose of" the relevant

assets and does not specify that such transactions must be with third parties.  Opp. at 22.

Because the contract does not unambiguously support Defendants' proposed construction, the

Court concludes that Defendants have not sustained their burden on the motion to dismiss, and

declines to dismiss the claim on this ground.

To state a claim for breach of contract under New York law, a party must allege: (i) the

existence of a contract; (ii) performance by the plaintiff; (iii) breach by the defendant; and (iv)

damages attributable to the breach.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr.*

*Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).  The parties do not dispute that the Merger

Agreement is a valid contract and that Plaintiffs performed under the contract.  *See generally* Br.;

Opp.  Rather, the central question is the meaning of Section 7.6(c) and whether Defendants

breached that provision.  "It is axiomatic under New York law . . . that the fundamental objective

of contract interpretation is to give effect to the expressed intentions of the parties."  *Judd*

*Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 312 (S.D.N.Y. 2016) (citing *Lockheed Martin Corp.*

*v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)).  "In a dispute over the meaning of a

contract, the threshold question is whether the contract is ambiguous, which is a question of law

for the court[.]" *Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018)

(internal citation and quotation marks omitted).

     "A contract term is unambiguous if it has a definite and precise meaning, unattended by

danger of misconception in the purport of the contract itself, and concerning which there is no

reasonable basis for a difference of opinion."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95

(2d Cir. 2015) (internal citation and quotation marks omitted).  "Furthermore, the ambiguity

analysis should be constrained by normal rules of contract interpretation: words and phrases . . .

should be given their plain meaning and a contract should be construed so as to give full

meaning and effect to all of its provisions."  *Id.* (internal citation and quotation marks omitted).

If a contract's language is unambiguous, "the parties' intent is determined within the four corners

of the contract, without reference to external evidence." *Maniolos v. United States*, 741 F. Supp.

2d 555, 566 (S.D.N.Y. 2010) (quoting *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir.

2002)).

     For a defendant to prevail on a motion to dismiss for a breach of contract, the contract

must unambiguously support the defendant's position.  *See Novartis Pharma AG v. Incyte Corp.*,

520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021) ("On a motion to dismiss, 'a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.'" (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016))); *see also Eternity Glob. Master Fund Ltd.*, 375 F.3d at 178 ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). Courts are not "'obliged to accept the allegations of the complaint as to how to construe' a contract," but they "'should resolve any contractual ambiguities in favor of the plaintiff' on a motion to dismiss." *Maniolos*, 741 F. Supp. 2d at 567 (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

Defendants argue that a "practical" reading of the agreement requires dismissal. *See* Br. at 22-24. The Court disagrees at this juncture. The Court must review the plain meaning of the words of the Merger Agreement, *see Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000), and look only to the contract's four corners without considering extrinsic evidence, *see Maniolos*, 741 F. Supp. 2d at 566. Beginning with the clause in question, the Merger Agreement states that IRUS (and later RWE) shall "not sell[,] assign, transfer or otherwise dispose of" the assets in question unless they obtain Plaintiffs' consent or pay a milestone payment. Merger Agreement § 7.6(c). The definition of "sell" is "to transfer (property) by sale." *Sell*, Black's Law Dictionary (10th ed. 2014). "Assign" means "to convey in full; to transfer (rights or property)." *Assign*, Black's Law Dictionary (10th ed. 2014). "Transfer" means "to convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of" or "to sell or give." *Transfer*, Black's Law Dictionary (10th ed. 2014). Dispose of means "to get rid of" or "to transfer to the control of another." *Dispose of*, Merriam Webster Dictionary, https://www.merriam-

webster.com/dictionary/dispose%20of (last visited Aug. 18, 2023).  The definitions of these words do not include a limitation to third party transactions.  Defendants urge the Court to ascertain the meaning of "assign" and "transfer" in Section 7.6(c) by looking to the surrounding words "sale" and "dispose of."  Br. at 24.  But even if the Court does so, Section 7.6(c) still does not unambiguously apply to *third party* transfers only and exclude intracompany transfers.  Nor do Defendants point to any other language in the Merger Agreement that limits Section 7.6(c) to third party transactions.  *See generally* Br.

None of the three cases Defendants cite in support of their contention that "corporate reorganizations . . . do not amount to 'sales' or 'transfers' as defined in contractual provisions" are persuasive.  Br. at 24.  Defendants cite to a three-sentence-long opinion holding that a merger, acquisition, and transfer of title did not amount to a sale under the particular facts of that case.  *See Bd. Of Managers of the York River House Condo. v. Kinney York Ave., Inc.*, 35 A.D.3d 160, 161 (1st Dep't 2006).  Defendants similarly cite to *Torrey Delivery, Inc. v. Chautauqua Truck Sales & Service, Inc.*, 47 A.D.2d 279, 283 (4th Dep't 1975), where the court found that a corporate merger did not constitute a sale because property remained in the same corporate entity even after it was merged with another corporation.  *Id.* at 283.  But these cases shed no light on the other terms in Section 7.6(c), including "assignment," "transfer," or "otherwise dispose of." Finally, in *New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99-cv-12409 (RMB) (AJP), 2002 WL 31749396 (S.D.N.Y. Dec. 9, 2002), the contract provided for a termination payment if there was a "transfer to an unrelated third party," and a parent's acquisition of a subsidiary's stock did not qualify as such.  *Id.* at *8.  The inclusion of "unrelated third party" is precisely the language that is lacking in Section 7.6(c).

The Merger Agreement is far from a model of draftsmanship.  Defendants may well prevail at a later stage of litigation and on a more fulsome assessment to show that Section 7.6(c) does not support Plaintiffs' breach of contract claim.  But on a motion to dismiss, the Court must draw all reasonable inferences and resolve all ambiguities in the non-movant's favor.  *See Maniolos*, 741 F. Supp. 2d at 567.  At this stage the Court finds only that Section 7.6(c) does not unambiguously exclude intracompany transfers, and that the Merger Agreement is at most ambiguous on this issue.  Dismissal is not appropriate on this basis.  *See Orchard Hill*, 830 F.3d at 156 ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."); *Jackson v. Harvest Cap. Credit Corp.*, No. 17-cv-05276 (JFK), 2018 WL 2041389, at *4 (S.D.N.Y. Apr. 30, 2018) (denying motion to dismiss because "the contractual language is not unambiguous so as to clearly support [the defendant]'s arguments"); *Carlton Grp., Ltd. v. Mirabella SG SpA*, No. 16-cv-06649 (LGS), 2017 WL 3530370, at *4-5 (S.D.N.Y. Aug. 16, 2017) (denying motion to dismiss because the agreements did "not unambiguously support [the defendant]'s position"); *Greer v. Mehiel*, No. 15-cv-06119 (AJN), 2017 U.S. Dist. LEXIS 136402, at *17 (S.D.N.Y. Aug. 23, 2017) (holding that "[i]t is enough, for purposes of resolving the motion to dismiss, to hold that the provision does not *unambiguously*" support the defendant's construction).

The Court therefore denies the motion to dismiss for failure to state a claim because Section 7.6(c) does not unambiguously provide that it is triggered only by a sale, transfer, assignment, or disposal to third parties unrelated to the Merger Agreement.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is DENIED.

IT IS HEREBY ORDERED that Defendants shall file their Answer no later than **21 days** after the date of this Opinion and Order.  IT IS FURTHER ORDERED that, within **14 days** of service of the Answer, the parties shall file a proposed Civil Case Management Plan and Scheduling Order, which is available at **https://www.nysd.uscourts.gov/hon-jennifer-l-rochon**.

The Clerk of Court is respectfully directed to terminate ECF No. 31.

Dated: August 24, 2023
     New York, New York

                                   SO ORDERED.

                                   JENNIFER L. ROCHON
                                   United States District Judge