UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRIREME ENERGY HOLDINGS, INC., et al.,

                              Plaintiffs,

                -against-

RWE RENEWABLES AMERICAS, LLC, et al.,

                              Defendants.

Case No. 1:22-cv-07439 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC (collectively, "Trireme" or "Plaintiffs") bring this action against Defendants RWE Renewables Americas, LLC and RWE Renewables Services, LLC (collectively, "RWE" or "Defendants") for breach of contract. *See* Dkt. 36 ("SAC" or "Second Amended Complaint"). In 2017, Trireme and RWE's predecessor in interest, Innogy Renewables US LLC ("IRUS"), entered into a Merger Agreement whereby IRUS acquired a portfolio of development-stage renewable-energy projects (the "Development Companies"). In exchange, IRUS paid Trireme $50 million up front, with an additional $112 million in earnout or "milestone" payments that would be paid if certain conditions were met. For various reasons, including development delays resulting from COVID-19, the milestones related to one of the largest development projects in the Merger Agreement were not achieved, and the Court rejected Trireme's suit to recover the associated earnout payment. Trireme now argues in its second time before this Court that it is entitled to collect *all* the milestone payments set forth in the Merger Agreement. Under its latest breach of contract theory, Trireme asserts that Defendants

breached the Merger Agreement by internally restructuring the Development Companies without first seeking Plaintiffs' consent or paying Plaintiffs the associated earnout payments.

Trireme's claim hinges on the meaning of Section 7.6(c) of the parties' Merger Agreement, which restricts IRUS's ability to "sell[,] assign, transfer, or otherwise dispose of" its interests in the Development Companies unless it receives Trireme's consent. *See* SAC ¶¶ 28, 41. Following a complex series of transactions between two German energy companies, RWE AG and E.ON, the Development Companies were shuffled between subsidiaries within the same corporate family. With respect to the parties' rights and liabilities under the Merger Agreement, the only practical effect of this internal reorganization was that IRUS was replaced as the Development Companies' parent by an IRUS affiliate. This, Trireme argues, amounted to a breach of Section 7.6(c). Trireme now seeks $112 million in damages for this alleged breach — the entirety of the contingent milestone payments set forth under the Merger Agreement.

On August 16, 2024, the parties submitted their proposed findings of fact and conclusions of law. Dkts. 136, 140. The Court held a bench trial from October 7 through October 11, 2024, during which it received live testimony from seven witnesses,[1] video

---

[1] Those witnesses included Ishan Bharadwaj, a principal at Terra Firma Capital Partners, Tr. at 76-166; Ross Brinklow, a director of Trireme and a principal at Terra Firma Capital Partners, Tr. at 167-379; James Spencer, the former CEO of EverPower and former President of Trireme, Tr. at 381-487; Richard Casey, the former General Counsel of IRUS, and then the Vice President of Ethics, Integrity, and Compliance at RWE US, Tr. at 564-743; Juan Rodriguez, the former Senior Director of Finance at IRUS and subsequently Vice President, Head of Project M&A at RWE US, Tr. at 492-563; Mark Brusius, the former Vice President of Tax at RWE US, Tr. at 744-777; and Clint James Nicholson, the former Head of Accounting at IRUS and later RWE US, Tr. at 778-809.

testimony of deposition excerpts from two other witnesses,[2] deposition designations, and hundreds of exhibits.[3]  The parties subsequently submitted updated post-hearing findings of fact and conclusions of law on October 21, 2024.  Dkts. 167, 168.

Having considered the parties' submissions and the evidence presented at trial, the Court enters judgment in favor of Defendants.  The Court finds that *res judicata* bars Plaintiffs' claims, which arise from the same Merger Agreement that was the subject of Plaintiffs' earlier litigation against Defendants' predecessor in interest, IRUS.  *See Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC* (*Trireme I*), 706 F. Supp. 3d 409 (S.D.N.Y. 2023).  Plaintiffs have not shown that any exception to *res judicata* applies. Moreover, even if *res judicata* did not bar Plaintiffs' newest breach of contract claim, the Court finds that Plaintiffs' claim separately fails on the merits because Plaintiffs have not shown that Defendants' purely internal restructuring amounted to a breach of Section 7.6(c) of the Merger Agreement.

## FINDINGS OF FACT[4]

### I.    The Parties and Relevant Non-Parties

Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC (together, "Trireme" Or "Plaintiffs") are two holding companies with "no current operations" apart from consulting on this litigation.  DX 324 at 4; Tr. at 245:20-25 (Brinklow); 421:4-6, 421:12-14

---

[2] Portions of designated video depositions were played of Andrew Young, the former CEO of IRUS, Tr. at 29:6-18, and James Klempir, the Associate General Counsel at RWE US, Tr. at 810:14-811:2.

[3] Citations to "PX" refer to a plaintiff exhibit; "DX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep." to deposition designations of the person indicated.  Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

[4] The Court's findings of fact are primarily contained in this section but appear as well in its conclusions of law.

(Spencer).  In 2009, Trireme Energy Development, LLC acquired EverPower Wind Holdings, Inc. ("EverPower"), a renewable-energy company that developed, owned, and operated wind farms throughout the United States.  Tr. at 80:2-8 (Bharadwaj); 382:13-20 (Spencer).  From 2009 until mid-2021, an investment fund called Terra Firma Capital Partners III ("TFCP III"), controlled by a British private-equity firm called Terra Firma Capital Partners ("Terra Firma"), owned approximately 95 percent of Trireme, with Jim Spencer, Trireme's CEO, owning the remaining 5 percent.  Tr. at 99:17-24 (Bharadwaj); 260:13-15 (Brinklow); 382:24-383:1 (Spencer).  In June 2021, another Terra Firma–controlled investment vehicle called Boron Holdings assumed TFCP III's 95 percent ownership in Trireme.  Tr. at 135:24-136:4 (Bharadwaj); 382:24-383:1 (Spencer).

All of Plaintiffs' witnesses are affiliated with either Terra Firma or Trireme and have direct pecuniary interests in the outcome of this litigation.  *See, e.g.*, Tr. at 136:2-15 (Bharadwaj: Principal at Terra Firma); 168:15-16, 247:12-248:7 (Brinklow: Principal at Terra Firma); Tr. at 382:21-383: 4 (Spencer: former President of Trireme and now 5 percent owner of Trireme).  Terra Firma, while not a party to the litigation, continues to advise Boron Holdings on litigation strategy.  Tr. at 248:11-249:10 (Brinklow); DX 322 ("Spencer Dep. Tr.") at 40:10-41:17.  In contrast, none of the defense witnesses have a direct financial interest in the outcome of the litigation.

In 2017, Trireme sold its wind farm projects still in development to IRUS.  The parties referred to this transaction as "Project Aura."  Tr. at 87:5-8 (Bharadwaj).  As of the time of the Merger Agreement, in Trireme's own estimation, only one of Trireme's Development Companies was "[s]hovel-[r]eady," meaning that it was ready to start construction.  DX 403 at 4; Tr. at 503:1-20 (Rodriguez: noting that characterizations of the projects' development status in DX 403 "came from the seller itself").  Prior to June 30, 2020, IRUS was a limited

liability company wholly owned by German energy company Innogy SE.  PX 104A at 2.

Innogy SE was a large renewables player in Europe that generated over €40 billion in revenue

in FY 2016.  PX 104A at 2; Tr. at 572:9-12 (Casey).  Innogy SE was majority owned by RWE

AG, which at the time was one of the largest German utilities.  Tr. 572:12-16 (Casey); DX 98

at 1; DX 102 at 3.  IRUS, however, was a nascent company with little to no experience in the

U.S. renewable-energy market.  Tr. at 387:10-14 (Spencer); 571:8-572:5 (Casey).

 Defendants RWE Renewables Americas LLC ("RWE US") and RWE Renewables

Services LLC ("RES") are direct and indirect successors to IRUS following a complex

transaction between RWE and another German energy company, E.ON (the "Asset Swap").

DX 99.  As a result of the Asset Swap, on June 30, 2020, IRUS was acquired by the German

energy company RWE AG and transferred under an RWE AG subsidiary, RWE US.  DX 273

at 3.  Later, on December 31, 2020, IRUS merged into RES.  DX 283 at 2.  RES thereafter

inherited IRUS's duties, obligations, and liabilities.

 RWE and IRUS had a pre-existing relationship that pre-dated the Asset Swap.  At the

time of the Merger Agreement's execution, IRUS's direct parent, Innogy SE, was majority

owned by RWE AG.  DX 98 at 1.  RWE AG owned 76.8 percent of Innogy SE's publicly

traded shares, but Innogy SE operated independently.  *Id.*; DX 102 at 3.  Prior to executing the

Merger Agreement, IRUS informed Trireme and Terra Firma of IRUS's upstream corporate

structure, including that IRUS's parent company was "a carve-out from RWE AG" and

"majority owned by RWE AG."  DX 103 at 3; Tr. at 140:7-11 (Bharadwaj).  Indeed, RWE

AG's approximately 77 percent stake in Innogy SE (in turn, the 100 percent owner of IRUS)

was expressly set forth in IRUS's August 28, 2017 offer letter.  PX 104A at 2.  Trireme

therefore understood and appreciated that its counterparty was "part of the RWE group."  DX

93 at 1; Tr. 140:4-16 (Bharadwaj).

## II.    The Merger Agreement

Beginning in 2017, Terra Firma started seeking bidders for a sale of EverPower's developmental and operational assets.[5]  Tr. at 81:8-82:5, 83:20-85:8 (Bharadwaj).  Initially, Trireme explored the possibility of one-off sales of EverPower's development projects to third-party buyers.  DX 404 at 16 (March 2017 EverPower Portfolio Business Review: "Settlement proposal received from PacifiCorp . . . for the purchase of the [Mud Springs] wind farm."); DX 388; Tr. at 138:25-139:15 (Bharadwaj: discussing DX 388); 258:1-19 (Brinklow).  Trireme abandoned this approach, however, after one-off sales of the Scioto Ridge Project to American Electric Power ("AEP") and the Mud Springs Project to PacifiCorp did not come to pass.  Tr. at 506:18-507:7 (Rodriguez); DX 325 ("Second Young Dep. Tr.") at 38:10-25; DX 045 at 4 ("EverPower's current late stage projects demonstrate the difficulty in selling projects on a stand-alone basis as well as potential valuation risk.").  Trireme therefore elected to proceed with sale of the entire development portfolio to a single bidder.

Beginning in or around mid-2017, Trireme and IRUS commenced months-long negotiations over IRUS's potential acquisition of EverPower's renewable-energy projects.  Tr. at 173:7-19 (Brinklow); DX 290 ("First Young Dep. Tr.") at 36:10-14; DX 318 ("Brinklow Dep. Tr.") at 83:11-15.  As noted above, at the time, IRUS was a newly formed company, established in 2016 by German energy giant Innogy SE to establish a presence in the U.S. onshore wind energy market.  Tr. at 494:9-19; DX 102 at 6.  IRUS had fewer than five employees, no renewable-energy experience in the U.S. market, and no development or operational assets.  Tr. at 494:7-22 (Rodriguez); 571:2-575:5 (Casey); First Young Dep. Tr. at

---

[5] As Brinklow explained at trial, "operational" wind development projects are in operation and therefore generating revenue.  Tr. at 253:4-8.  "Developmental" assets are projects that are engaged in pre-construction activities, such as securing discretionary permits, grid access, and land rights, and therefore are not yet generating revenue.  Tr. at 253:9-16; 493:15-494:4.

18:10-13.  IRUS therefore sought to acquire a portfolio of development-stage assets it could develop to achieve its goal of accomplishing 500 megawatts of operating renewables in the United States by the end of 2020.  Tr. at 497:15-498:1 (Rodriguez).  Conversely, IRUS's parent, Innogy SE, which was majority owned by RWE, was a large player in the European energy market with "thousands of employees globally."  Tr. at 572:6-16 (Casey).  Innogy SE therefore assumed the role of IRUS's "financial backer."  Tr. at 572:6-12 (Casey); DX 102 at 2-3.

Throughout negotiations, both parties were advised by sophisticated counsel and financial transaction advisors: Trireme and Terra Firma were represented by the law firm of Morgan, Lewis & Bockius ("Morgan Lewis") and Barclays, Tr. at 81:14-82:2 (Bharadwaj), while IRUS was represented by the law firm of K&L Gates and Marathon Capital ("Marathon"), First Young Dep. Tr. at 17:3-5, 17:13-15.  The primary negotiators from Terra Firma included Ishan Bharadwaj, a principal at Terra Firma; Ross Brinklow, a director of Trireme and a principal at Terra Firma; and Mary Lappas, Terra Firma's in-house counsel. Tr. 82:3-83:1 (Bharadwaj).  Terra Firma had final sign-off on negotiation decisions, and Barclays and Morgan Lewis took direction from Terra Firma.  Tr. at 100:10-14 (Bharadwaj); 260:13-19, 280:4-11 (Brinklow).  From EverPower, the primary individuals involved in negotiating the Merger Agreement included Jim Spencer, EverPower's CEO, and Mike Current, EverPower's CFO.  Tr. at 83:2-19 (Bharadwaj).  IRUS CEO Andrew Young; Senior Director at Innogy SE, Jens Gemmecke; and Frank Falkenhof, IRUS's Chief Operating Officer, were the primary negotiators from the IRUS side.  Tr. at 171:3-4 (Brinklow); 575:5-8 (Casey).  IRUS outbid Blackrock for EverPower's portfolio, offering $20 million more in guaranteed consideration than Blackrock.  *See* Tr. at 257:10-17, 271:11-18 (Brinklow). Trireme believed IRUS was offering a "significant premium" over the value of Trireme

continuing to hold and develop the EverPower projects.  DX 45 at 2; *see* DX 46 at 1; DX 345 ("*Trireme I* Tr.") at 306:5-7 ("[W]e thought it was an attractive bid . . . .").

On December 21, 2017, Trireme and IRUS entered into an agreement under which IRUS acquired a portfolio of approximately forty renewable-energy projects in development from Trireme.  *See* PX001 (the "Merger Agreement" or "Agreement"), Schedule 1.1(f). These projects included associated real-estate rights, such as easements, licenses, and rights of way, as well as studies required by local and federal authorities prior to construction and operation.  Tr. at 383:13-384:19 (Spencer).  In exchange, IRUS agreed to pay Trireme $50 million up front, plus additional payments "in an aggregate amount of up to $112,200,000, if any," conditioned on various milestones associated with the development and construction of the projects.  Agreement § 3.1; Tr. at 175:19-176:2 (Brinklow).  Witnesses testified that such earnout structures are common in the U.S. renewables market and provide a way to "balanc[e] the risk and the value capture potential" of projects that are "still in various stages of development."  First Young Dep. Tr. at 74:14-75:13; Tr. at 176:21-177:1 (Brinklow).  Each of the EverPower projects was defined as a "Target Project" in the Merger Agreement, and each of the Target Projects was in turn associated with one or more "Development Companies" that owned the project's assets.  Agreement § 1.1.  Each Target Project could trigger a separate earnout payment.  *Id*. Annex 1.

Relevant here, the Merger Agreement incorporates a choice-of-law provision, providing that "any claim or controversy directly or indirectly based upon or arising of this Agreement . . . including all matters of construction, validity, and performance, shall be governed by and interpreted and enforced in accordance with the laws of the State of New York."  *Id.* § 13.5.  The Merger Agreement also contains an integration clause, stating that the agreement "set[s] forth the entire understanding of the Parties hereto with respect to the

transactions contemplated hereby" and "supersede[s]" "[a]ny and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral." *Id.* § 13.9.

Trireme and Terra Firma understood that Innogy SE would be financing both the proposed transaction and the construction of the development projects. Tr. at 268:13-269:8 (Brinklow); PX 103E at 3 ("Innogy will finance the Proposed Transaction . . . ."). Indeed, IRUS's initial and ultimate bid offer both underscored its upstream corporate structure. PX 103E at 1, 2, 4; PX 104A at 4. In its offer letter, IRUS represented that "we" have "an extensive and successful track record in acquiring, developing, financing, constructing, and operating renewable assets" — a clear reference to Innogy SE, given IRUS's inexperience. PX 103E at 1. In the section of the bid offer entitled "Identity of the Bidder," IRUS further underscored Innogy SE's scale and experience, including that Innogy SE "owns and operates more than 3 GW of renewable power generation across Europe," and that it generated over €40 billion in revenue in FY 2016. PX 103E at 2; PX 104A at 2. Trireme knew that IRUS, in turn, was a new and relatively small company without a "track record in the U.S." Tr. at 387:10-14 (Spencer).

Trireme viewed IRUS as "more or less a shell company," with Innogy SE "standing behind the obligations . . . set out in the merger agreement." DX 344 (*Trireme I* Tr.) at 121:16-23 (Spencer); Tr. at 387:5-8 (Spencer: "[IRUS] had a very deep-pocketed parent."). Therefore, contemporaneously with the Merger Agreement's execution, Innogy SE and Trireme executed, at Trireme's insistence, a Parent Company Guarantee ("PCG") under which Innogy "irrevocably and unconditionally guarantee[d] . . . the payment when due of [IRUS's] payment obligations arising under the [Merger Agreement]." PX 004 at 2; Tr. at 109:18-110:4 (Bharadwaj: IRUS was a "relatively new company at the time and . . . we wanted to

make sure that . . . there was a higher entity that backs up their financial obligations in terms of the upfront, but also the earnouts which would come in over a number of years."); *see* Tr. at 269:9-12 (Brinklow) (similar). Innogy SE's ability to provide the financial backing for the deal was an "important consideration" for Trireme in electing to move forward with the transaction. Tr. at 268:13-269:8 (Brinklow).

To prepare for the divestiture of its assets, Trireme undertook an intracorporate reorganization, whereby the Development Companies were rendered direct, wholly owned subsidiaries of Trireme Energy Development II LLC ("TED II"), which was, in turn, wholly owned by Plaintiff Trireme Energy Development LLC ("TED"). Agreement at 6; Tr. at 149:12-24 (Bharadwaj). The transaction effectuated Aura Merger Sub LLC's (a wholly-owned subsidiary of IRUS) merger into TED II, which — subsequently renamed IRUS Wind Development LLC — was the surviving entity post-merger. DX 393 at 4, 7; Tr. at 473:21-474:2, 476:3-23 (Spencer).

As a result of the Merger Agreement, IRUS acquired 100 percent of the equity interests in the wind and solar development projects that Trireme previously owned. SAC ¶¶ 29-31. Post-close, IRUS held the Development Companies through intermediary subsidiaries. Those subsidiaries had no employees. Tr. at 547:20-548:6 (Rodriguez).



SAC ¶ 32.

### III.    The Parties' Negotiation of Section 7.6(c)

During the parties' negotiations, IRUS was intent on maintaining control over the development and pace of the wind farm projects so that it would not be forced to pursue a project that was not profitable or economically viable.  First Young Dep. Tr. at 49:20-50:17, 53:16-54:12, 54:14-55:11; DX 23 at 1; Tr. 510:15-24 (Rodriguez: "[I]t was a key deal point that as Innogy, as IRUS, we retain the ability to have discretion and control of how projects get developed, to be able to determine which projects continue to move forward based on our assessment of their economic viability . . . .").  Trireme, in turn, was primarily concerned with ensuring the continued development of its renewable-energy assets and payout of the associated milestones.  As Brinklow testified, Trireme wanted to ensure that it was transacting with a party that had the financial wherewithal to stand by the contract's payment obligations. Tr. at 267:3-18 (Brinklow: testifying that Trireme wanted to ensure "certainty of funding"). To balance the parties' interests, the Merger Agreement contemplated at least three development alternatives post-close: IRUS's (1) continued development of the projects; (2) abandonment of the projects; or (3) sale of the projects.  Agreement § 7.6(a), (c); *see also* Tr. at 96:24-97:16 (Bharadwaj); DX 345 ("*Trireme I* Tr.") at 318:11-22 (Brinklow).  Under Section 7.6(a) of the Merger Agreement, IRUS was obligated to exercise "commercially reasonable efforts" to continue to develop the projects, but otherwise retained "sole discretion" over the details, manner, and schedule of those development efforts.  Agreement § 7.6(a).  As for abandonment of projects deemed unprofitable or unviable, Section 7.6(a) allowed IRUS to abandon any project prior to October 1, 2019, as long as it provided notice to Trireme of its intent to do so.  *Id.*   IRUS did not owe Trireme a Milestone Payment if it elected to abandon a project.  Brinklow Dep. Tr. at 72:14-18.  Consistent with the terms of Section 7.6(a), IRUS ultimately discontinued several Development Projects based on

challenges impacting their development or economic viability, including the Buckeye Wind, Kimberly Run, and Sand Creek projects.  Tr. at 513:23-517:6 (Rodriguez).

The central issue in this litigation, however, is IRUS's obligation under Section 7.6(c), which governed IRUS's ability to sell or otherwise dispose of the development projects. Section 7.6(c) provides that:

> Purchaser shall not sell, assign, transfer, or otherwise dispose of any of the assets, rights[,] and other properties of a Target Project or the equity interests of a Development Company prior to December 31, 2020 without the consent of the Member Representative, unless prior to or contemporaneously with such sale, assignment, transfer or other disposition Purchaser pays the Payment Milestone Amount that would have been payable with respect to such Target Project if the Target Project had achieved the Payment Milestone as of the date of such sale, assignment, transfer[,] or other disposition.

Agreement § 7.6(c).[6]  Section 7.6(c) does not state with whom it intends to restrict sales, assignments, transfers, or other dispositions of the renewable-energy development projects.

As evinced by the contemporaneous transaction documents and witness' testimony at trial, the negotiating parties only ever discussed Section 7.6(c) in relation to sales to third parties.  Specifically, during the drafting of Section 7.6(c), the parties' disagreement boiled down to what should happen to the milestone payments in the event of a sale of a development project to an external third-party.  Trireme sought to obtain the benefit of the milestone payment upfront; IRUS, in turn, sought to transfer its payment obligations under the contract to the new third-party purchaser.  Tr. at 282:12-283:9, 283:24-284:6 (Brinklow); First

---

[6] As discussed later, the parties subsequently amended the Merger Agreement to account for the sale of the Mud Springs project and the extension of the Baron Winds' milestone. However, the parties retained Section 7.6(c)'s "sell, assign, transfer, or otherwise dispose of" language without change.  *See* PX003 at 3 ("Purchaser shall not sell[,] assign, transfer or otherwise dispose of any of the assets, rights and other properties of a Target Project or the equity interests of Development Company. . . .]"); Tr. at 197:1-14 (Brinklow).

Young Dep. Tr. at 36:21-37:12; Brinklow Dep. Tr. at 95:11-18.  Trireme was concerned that a transfer or sale would force it to chase a non-contracting third party for payment and that the third-party purchaser would lack the means to satisfy the milestone obligations.  Tr. at 285:5-286:14 (Brinklow).  Trireme articulated these concerns to IRUS.  *Id.*  Notably, Brinklow conceded at trial that Terra Firma would have no objection to a third-party sale if Trireme had already received the associated milestone payment.  Tr. at 275:13-19.  This testimony underscores that Trireme's first and foremost concern in the event of a sale was securing its right to recovery under the contract.

The drafting of Section 7.6 further illustrates the parties' focus on third-party transactions.  On August 28, 2017, Marathon sent Barclays a revised binding offer for EverPower's development assets on behalf of IRUS.  PX 104, PX 104A; Tr. at 86:5-25 (Bharadwaj: discussing PX 104).  In the appended draft Merger Agreement, IRUS inserted Section 7.6, requiring the exercise of "commercially reasonable efforts to cause and/or cooperate with [Trireme] to cause the applicable Development Companies to reach each of their respective Payment Milestones."  PX 104C at 50; Tr. at 90:11-91:7 (Bharadwaj).

Trireme believed that Section 7.6 "required a lot more specificity" and a "clearer framework" as to IRUS's obligations vis-à-vis the milestone payments.  Tr. at 90:21-93:7 (Bharadwaj).  Therefore, on September 15, 2017, Barclays, at Terra Firma's instruction, circulated a revised Merger Agreement reflecting changes made by Morgan Lewis.  PX 107, PX 107A at 51-52; Tr. at 280:22-281:4 (Brinklow).  Under proposed Section 7.6(a), IRUS had a right of abandonment if it "reasonably determine[d] that continuing to proceed with any one or more of the Target Projects would not be (i) commercially reasonable and (ii) consistent with Prudent Wind Industry Practices."  PX 107A § 7.6(a).  Trireme also inserted language in Section 7.6(b) providing that, if IRUS elected to abandon any target project, it should

"promptly notify the Member Representative of such abandonment," at which time the Member Representative could "require Purchaser [IRUS] to cause such Target Project to be transferred to an entity designated by the Member Representative on behalf of the Company Members for no consideration." *Id.* § 7.6(b). In Section 7.6(c), Trireme further qualified Section 7.6(b) by incorporating additional restraints on IRUS's ability to abandon a project. *Id.* § 7.6(c). IRUS ultimately rejected this proposal for Section 7.6(c), which was not included in the Merger Agreement.

In addition to the above revisions, Trireme sought to negotiate the topic of future sales of the projects. Tr. at 510:4-7 (Rodriguez: The topic of future sales of projects was "discussed and part of negotiations."). The issue was top of mind for Trireme and Terra Firma because, contemporaneously with merger negotiations, Trireme was engaged in discussions with PacifiCorp and AEP regarding potential sales of the Mud Springs and Scioto Ridge projects. DX 034 at 2; Second Young Dep. Tr. at 38:10-25. Although Trireme did not ultimately consummate those sales prior to the merger, Terra Firma and Trireme underscored third-party interest in the Development Companies in their sales pitch to IRUS. Trireme assured IRUS that, even if IRUS determined that internal development of the projects was not economically viable, "there [were] potential[ly] buyers for those projects that [were] very interested that would be willing to pay quite a bit for them." Second Young Dep. Tr. at 51:19-52: 24. Indeed, "flipping" — that is, buying a development project, developing and operationalizing it, and then selling it to a third party — is common practice in the renewable-energy market. Tr. at 215:1-15 (Brinklow); *see also* Tr. at 508:11-509:1 (Rodriguez: "[I]t happens often enough where these projects change hands during the development stage."); Second Young Dep. Tr. at 135:6-18 ("[I]t was known that some projects might make sense [to sell], because the fate of them was uncertain."). Trireme had considered "flipping" the Development

Companies itself through one-off sales to third parties, but ultimately determined that the approach was not practicable.  DX 043 at 4 ("The develop and flip approach on a project-by-project basis would . . . require substantial resources and/or fees from an M&A perspective, involving hiring advisors, buyer origination[,] and negotiating a purchase agreement for each project.").

The September 15, 2017 draft Merger Agreement from Trireme thus contained the first iteration of what subsequently became Section 7.6(c).  PX 107; PX 107A § 7.6(e); Tr. at 280:22-281:4 (Brinklow).  The first iteration of Section 7.6(c), then designated 7.6(e), provided that "Purchaser shall not sell, assign, transfer[,] or otherwise dispose of any of the assets, rights[,] and other properties of a Target Project or the equity interests of a Development Company" unless, prior to or contemporaneously with such transaction, "Purchaser pays the [associated] Payment Milestone Amount."  PX 107A § 7.6(e).  This language was informed by Trireme's ongoing negotiations with PacifiCorp and AEP.  Second Young Dep. Tr. at 53:2-5 (Q: "Was the fact that there were potential purchasers for the assets part of the reason why you were negotiating the language in [Section] 7.6(c)?"  A: "That's exactly correct.").

Contemporaneous transaction documents from at or around the same time, including term sheets and issue lists, uniformly reference Section 7.6(c) (then Section 7.6(e)) in the context of asset sales.  For instance, in talking points prepared for a call with Trireme's Jim Spencer on September 21, 2017, IRUS's financial advisor, Marathon, wrote that Marathon recognizes Trireme's request for Section 7.6(e) as "set[ting] restrictions to asset sales of a Project Company *to prevent the loss of critical project assets without the triggering of the Payment Milestones*."  PX 108 at 2 (emphasis added).  IRUS's financial advisor flagged options for dealing with Trireme's concerns regarding "the payment of the Milestone

Payments": (1) "Innogy will retain the Milestone Payment obligations as the project is progressed by the Buyer," or (2) "Innogy can transfer the Milestone Payment obligation to a Qualified Transferee." *Id.* at 2-3. Other internal documents drafted by IRUS's counsel and financial advisors likewise reference Section 7.6(c) in the context of sales to third parties. *See, e.g.*, DX 015 at 3 (Section 7.6(c) would "preven[t] [IRUS] from selling the projects unless [IRUS] paid the relevant earn-out amounts at the time it sells the projects"); DX 034 at 2 (defining Section 7.6 as involving the "Sale of Projects to 3rd Parties"); DX 064 at 3 (identifying "Sales of Projects [7.6(c)]" as an issue for discussion and noting "the only way we can sell a project post-closing is with consent or by paying the full Payment Milestone Amount upon the sale"); DX 078 at 5 (same); DX 080 at 3 (similar).

On October 9, 2017, Marathon sent Barclays, Morgan Lewis, and Terra Firma revised language providing that IRUS "shall not sell, assign, transfer[,] or otherwise dispose of" the development projects *unless* IRUS "causes such Third Party Buyer to assume Purchaser's obligations to pay such Payment Milestone Amount." PX 110; PX 110B at 56. On October 18, 2017, Trireme's counsel at Morgan Lewis responded with a draft deleting the "Third Party Buyer" language, and reinserting language requiring IRUS to pay the associated milestone payment in the event of a sale, assignment, transfer, or other disposition. PX 112; PX 112A at 53. In exchange for removing the "Third Party Buyer" language, however, Trireme inserted a consent provision, providing for a carve-out to Section 7.6(c) if IRUS obtained Trireme's consent to sell, assign, transfer, or otherwise dispose of the Development Companies. PX 112A at 53; Tr. at 108:1-8 (Bharadwaj); 287:18-291:22 (Brinklow). Brinklow testified that the provision allowed Trireme to consent to sale transactions when it was in its economic interest to do so. Tr. at 289:5-8. Accordingly, when it made sense to do so, Trireme could agree to receive less than the associated milestone payment in connection with a third-party

sale. Tr. at 305:15-18 (Brinklow).[7]  The consent provision therefore allowed Trireme and

Terra Firma to share in any sale proceeds and to obtain an upfront payment as part of any sale

transaction.

      IRUS thereafter sought to assuage Trireme's concerns regarding the payment of

earnouts in the event of a sale by inserting contractual language providing for sale to an

"Approved Third Party" who would assume IRUS's payment obligations.  Tr. at 294:10-13

(Brinklow); Second Young Dep. Tr. at 32:15-22, 48:7-48:18 ("So I think the third-party

buyer, we wanted to meet the intent of having the flexibility to sell a target project . . . to a

third party.  But the third party would have a definition that the parties would be allowed to

mutually agree upon.").  On October 26, 2017, IRUS introduced the defined term of an

"Approved Third Party" purchaser: "a Person having "(a) equal or greater net worth than

EverPower Wind Holdings, LLC and (b) at least three years of experience in developing

utility-scale wind projects."  PX 113C at 8, 56-57; Tr. at 293:6-294:9 (Brinklow).  This

language was intended to address Trireme's concerns that a prospective buyer would lack

either the financial wherewithal or development expertise to satisfy the parties' contractual

obligations.  On November 16, 2017, IRUS circulated yet another draft regarding the

"Approved Third Party" language, this time incorporating a refined definition of the

"Approved Third Party" as (a) "a Person having a net worth of at least $180 million and at

least three years of experience in developing utility-scale wind projects"; (b) "American

---

[7] Brinklow insisted, however, that the consent provision did not provide Trireme with the ability to consent to transfer of the milestone obligation to a third-party buyer.  Tr. at 305:19-22.  There is nothing on the face of the contract that would support such a limited reading of the consent provision, and the parties' course of negotiations preceding the insertion of the consent provision supports a contrary interpretation.  It also strikes the Court as illogical that Trireme would insert a consent provision that would allow it to agree to lower up-front payment, but not to the shifting of the entirety of the milestone obligation to a third party, if Trireme deemed doing so in its best interest.

Electric Power or its Affiliates"; or (c) "PacifiCorp or its Affiliates."  PX 116; PX 116B at 8, 52; Tr. at 295:17-296:10.  Young explained that IRUS sought to gain "preapproval on those two potential entities" — PacifiCorp and AEP — "that Trireme and EverPower had already had discussions with regarding a potential sale."  Second Young Dep. Tr. at 50:3-51:5; DX 034 at 2.  As of this time, Trireme had already signed a term sheet with PacifiCorp pertaining to a potential sale of the Mud Springs project and was in discussions with AEP regarding a sale of Scioto Ridge.  DX 388; Tr. at 258:1-10 (Brinklow); Second Young Dep. Tr. at 38:10-25.

In late November, the parties met in person to discuss unresolved issues related to the Merger Agreement.  Second Young Dep. Tr. at 165:4-12.  Issue lists circulated by Trireme's counsel at Terra Firma's direction, immediately prior to and following that meeting, reflect that the parties identified Section 7.6(c) as governing the "Treatment of Sale of Project."  PX 124; PX 124A at 2; DX 085 at 6; Tr. at 299:22-300:11 (Brinklow).[8]  On November 28, 2017, Trireme's counsel circulated an updated issues list reflecting outstanding issues after the parties' November 28, 2017 meeting, including Section 7.6 and the "[t]reatment of [s]ale of [p]roject" thereunder.  DX 082 at 2.  Trireme's counsel noted, however, that the parties had agreed that the "Approved Third Party Buyer concept [was] to be removed" from the Agreement.  *Id.*; Tr. at 302:14-18 (Brinklow).

---

[8] Bharadwaj testified that it was his understanding as of the date of these documents that the Section 7.6(c) prohibitions were not limited to sales but applied to "any movement . . . [o]f the development assets outside of IRUS."  Tr. at 118:8-18.  Even if the Court were to credit this testimony, as set forth *infra*, the Court gives the parties' subjective understandings of the contractual language little weight.  *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006) ("[S]tatements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." (citations omitted)), *aff'd*, 284 F. App'x 82 (2d Cir. 2008) (summary order).

The "Approved Third Party" concept was therefore omitted from the final Merger Agreement.  *See* Agreement § 7.6(c).  Instead, Trireme and IRUS agreed that IRUS would have the right to pay either an upfront payment of the relevant milestones and move forward with a proposed sale without Trireme's consent thereto, *or*, in the alternative, to obtain Trireme's consent to any sale (presumably so the parties could negotiate a division of the sales proceeds or any other mutually agreeable conditions).  *Id.*  ("[IRUS] shall not sell[,] assign, transfer[,] or otherwise dispose of" any of the assets or equity interests of a Development Company "*without the consent of the Member Representative*, unless prior to or contemporaneously" with such transaction, "[IRUS] pays the Payment Milestone Amount.") (emphasis added)); Tr. at 277:4-278:3 (Brinklow: "[I]f a project was sold or assigned or transferred or any movement, under 7.6(c), Trireme was owed the payment milestone . . . [o]r we could provide consent."); Dkt. 168 (Defs.' Proposed Findings of Fact and Conclusions of Law) ¶ 104 ("[T]he operative language of Section 7.6(c) provided IRUS with two pathways to sell a Development Company: IRUS could either pay Trireme the Milestone Amount contemporaneously with such a sale *or* IRUS could obtain Trireme's consent to the sale.").  Therefore, while the parties failed to reach agreement on a pre-defined subcategory of "Approved Third Party" purchasers, Section 7.6(c)'s consent provision enabled Trireme to authorize transactions with third parties on a case-by-case basis.  The final provision also accrued to Trireme's benefit: for those projects that IRUS did not view as economically viable, the alternative to a sale was an abandonment of the project all together, foreclosing any possibility of Trireme recovering payment under the Agreement.  *See* DX 169 at 2 (noting, with respect to a prospective sale of the Mud Springs project, that Trireme "consider[s] it extremely unlikely that Innogy will look to build the project themselves" and that there

"would be very little prospect of receiving any earn-out payment on Mud Springs" absent a sale).

Witnesses agreed that the negotiating parties never discussed Section 7.6(c)'s application to internal reorganizations. *See, e.g.*, Second Young Dep. Tr. at 29:4-15 ("I don't think [internal reorganization] was discussed."); Tr. at 147:5-22 (Bharadwaj: expressing "[n]o recollection" of oral conversations regarding Section 7.6(c)'s application to intracorporate reorganizations); Tr. at 286:15-21 (Brinklow: "I don't recall anyone explicitly talking about an internal reorganization."); Tr. at 430:3-10 (Spencer: expressing he was "not aware" of Trireme or Terra Firma ever expressing to anyone at IRUS that Section 7.6(c) restricts internal reorganizations); Tr. at 510:25-511:10 (Rodriguez: "I have no recollection of that ever being discussed.").[9]

_____

[9] At trial, Plaintiffs introduced a single document that mentions Section 7.6(c)'s potential application to intracorporate reorganizations. On September 27, 2017, Rodriguez forwarded the most recent iteration of Aura transaction documents to a finance employee at Innogy SE, Martin Modzelewski, for input. PX 386 at 5-6. On October 5, 2017, Modzelewski responded with his feedback, including with respect to then Section 7.6(e), stating: "It should be allowed to transfer the projects if it was purely for internal reorganisation reasons as we cannot rule out that we will reorganise internally some years ahead. Also, we should not agree on pledging our equity interests." *Id.* at 4. In response, Rodriguez stated: "We are not accepting this language from the seller. This entire section is under heavy negotiation." *Id.* First, the hearsay contained in this document from Modzelewski is not considered for the truth of the matters asserted. Tr. at 526:16-527:7, 530:21-532:8 (Rodriguez). Second, while Rodriguez supported the negotiation team, he was not involved in any of the meetings negotiating the contract language and did not have face-to-face interactions with Terra Firma principals or relay any information to Trireme or Terra Firma. Tr. at 116:5-9 (Bharadwaj); Tr. at 171:12-18 (Brinklow); Tr. at 499:7-12 (Rodriguez: "I wasn't the face of the negotiations with the seller, but I was closely involved in conversations with our internal team . . . ."); Tr. at 521:19-25 (Rodriguez: "I did not participate in and I was . . . not there physically for the face-to-face negotiations during the negotiating of those documents."); Tr. at 523:1-19 (Rodriguez) (similar). In any event, given the other evidence presented, there is no indication that anyone involved in the actual negotiations with Trireme (or even Rodriguez) agreed or expressed to Trireme that Section 7.6(c) could potentially apply to internal reorganizations or thought that a future corporate restructuring was pertinent to Section 7.6(c) negotiations.

The final Merger Agreement was ultimately signed on December 21, 2017.
Agreement at 1.

## IV.    Internal Reorganizations and the Asset Swap

On March 12, 2018, RWE AG and E.ON issued a joint press release announcing that
the parties planned to engage in a complex series of transactions that would result in RWE
AG acquiring E.ON and Innogy SE's renewable-energy businesses, including E.ON's U.S.-
based renewables subsidiary, E.ON Climate and Renewables North America ("EC&R").  *See*
DX 098 at 1.  RWE AG would in turn transfer its 76.8 percent stake in Innogy SE to E.ON.
*Id.*  The transaction would have no effect, however, on IRUS's ultimate parent, which
remained RWE AG both pre- and post-close.  The public announcement made clear that the
Asset Swap would remove Innogy SE as IRUS's direct parent and that it would bring EC&R
and IRUS together under the RWE umbrella.  *Id.* at 3 ("The two renewables
businesses . . . will be brought together within the RWE group alongside RWE's existing
segments."); DX 100 at 2.  The Asset Swap was news to Young, who was "not privy to any of
the details" of upstream transactions executed at the Innogy SE and RWE AG level.  Second
Young Dep. Tr. at 67:5-68:7; PX 133 at 1.

Trireme was aware of the Asset Swap from the day that it was announced.  Young
forwarded the joint press release the same day to Spencer and Brinklow, reiterating IRUS's
commitment to closing the parties' transaction and highlighting that, following close, "the
Renewable Energy businesses of E.ON and innogy would be united under the umbrella of
RWE."  DX 101 at 3; Tr. at 315:12-18 (Brinklow); Second Young Dep. Tr. at 73:8-17
(testifying that he "[j]ust wanted to highlight that the transaction means that the ultimate
parent of Innogy Renewables US is just that much bigger, stronger, and more relevant in the
renewable energy space").  In internal correspondence, Brinklow flagged that the complicated

transaction involved "assets and shares moving in both directions." DX 101 at 1. The same

day as the Asset Swap was announced, Brinklow emailed his Terra Firma colleagues an IRUS

presentation as a "refresher on how [IRUS] was structured," Tr. at 319:1-12, writing: "This is

useful to remind us what innogy actually entails." DX 102 at 1. The appended presentation

underscored IRUS's upstream structure, including that Innogy SE was actually a carve-out

from, and majority owned by, RWE AG and that it "consolidate[d] the power of a large,

diversified group" of subsidiaries. DX 102 at 4.

Therefore, as of March 2018, Trireme and Terra Firma were aware of the Asset Swap

and that it might have implications for the Aura transaction. Indeed, Terra Firma immediately

began investigating the potential consequences of the Asset Swap on the parties' respective

rights and obligations under the Merger Agreement. DX 101 at 1 (Bharadwaj: The Asset

Swap "may have some limited implications for the Aura transaction (we are checking

particularly in relation to the parent company guarantees that Innogy may have to provide and

if anything changes there.)").

Notice of the transaction ultimately did not, however, dissuade Trireme or Terra Firma

from moving forward with the close of the Aura transaction. Tr. at 154:15-22, 155:19-156:12

(Bharadwaj). Terra Firma did not have any discussions with IRUS about amending the

Merger Agreement, delaying the closing, or refusing to close on the transaction because of the

Asset Swap. Tr. at 320:12-23 (Brinklow); 436:21-437:6 (Spencer).

## V.    Trireme's Internal Reorganization and Filings to the New York Public Service Commission

Although the parties executed the Merger Agreement on December 21, 2017, the

transaction did not close for several months. Agreement at 6; First Young Dep. Tr. at 115:9-

24. In that intervening period, it became apparent to IRUS that, in connection with the

Merger Agreement, the parties would need to submit a regulatory filing with the New York

Public Service Commission ("PSC").  Tr. at 576:7-577:24 (Casey).  On March 13, 2018,

IRUS informed Trireme that the parties needed to notify the PSC of the merger transaction

given the receipt of state authorization to commence construction of the Cassadaga Project,

one of the Development Companies, which arguably qualified Cassadaga as an "electric

corporation" subject to PSC's oversight.  DX 106 at 2; DX 117 at 3.  The parties sought a

declaratory ruling from the PSC that the indirect change of control of the Cassadaga Project

pursuant to the Merger Agreement would not require additional review or approval under

section 70 of the New York Public Service Law.  DX 106 at 2; Tr. at 576:16-577:1 (Casey);

First Young Dep. Tr. at 114:8-19; DX117 at 3; DX 363 at 5.  Drafts of the filing were shared

with both parties.  DX 338; DX 339.  On June 1, 2018, IRUS, Trireme, and Cassadaga Wind

LLC publicly filed the joint petition for declaratory ruling with the PSC.  DX 363; PX 002 at

46-58; Tr. at 469:25-470:13 (Spencer).  Notably, the filing included charts reflecting the

Development Company's upward corporate structure pre- and post-Aura transaction.  DX 363

at 8; Tr. at 470:24-471:24.

That same day, the parties executed an amendment to the Merger Agreement (the

"First Amendment") to permit a two-stage closing.  The PSC petition containing the projected

post-close organizational charts was included as an exhibit to the First Amendment.  PX 002

at 46, 51.  The Amendment provided that the Cassadaga Project would close separately upon

approval from the PSC, with the broader merger transaction proceeding in the interim.  PX

002 at 1; DX 117 at 3; Tr. at 575:20-576:15.[10]  To facilitate this two-stage closing, Trireme

performed a second, intracorporate reorganization.  EverPower Wind Holdings transferred

---

[10] A second development project, Hardin Wind (also known as Scioto Ridge), would also close separately.  Tr. at 575:20-576:6 (Casey); PX 002 at 1.

Cassadaga to Trireme Energy Development III LLC ("TED III"), which was wholly owned by

TED.  PX 002 at 47-48; Tr. at 149:12-24, 150:10-15 (Bharadwaj discussing DX 116); DX 116

at 3 (email from Michael Current, CFO of EverPower, referring to the intracorporate

reorganization as "shuffling around disregarded entities").  Before and after the

reorganization, Terra Firma Capital Partners III, L.P., "remain[ed] Cassadaga's ultimate

parent."  PX 002 at 48.

The broader merger transaction closed on June 1, 2018.  DX 121 at 4; PX 002 at 5; Tr.

at 314:12-18 (Brinklow).  The same day, as required by Section 2.2(b) of the Merger

Agreement, Agreement at 21, Trireme filed a Certificate of Merger with the State of

Delaware, Division of Corporations, stating that Aura Merger Sub LLC merged into TED II,

and that TED II was thereafter renamed IRUS Wind Development LLC.  DX 393 at 4; Tr. at

475:4-477:3 (Spencer).

Within a week, on June 7, 2018, Young held a companywide town hall meeting for the

combined Innogy, EverPower, and Trireme employees in Pittsburgh.  DX 121 at 2; Second

Young Dep. Tr. at 78:19-23.  The Town Hall meeting also covered the implications of the

Asset Swap.  Young explained that RWE AG would remain IRUS's ultimate parent, and that

the renewables platforms of E.ON and Innogy SE would be "combined" under the RWE AG

umbrella.  DX 121 at 19-21; Second Young Dep. Tr. at 68:25-69:7, 77:24-75:18, 79:13-18.

On July 17, 2018, the PSC issued a favorable declaratory ruling on the Cassadaga

petition.  DX 126 at 1; Tr. at 578:16-579:1 (Casey).  As a result, the second stage of the Aura

transaction closed on July 25, 2018.  DX 130 at 1.  At closing, TED III was sold to Innogy US

by merging into an Innogy US-owned special-purpose entity.  DX 363 at 7.  After the merger,

the special-purpose entity was dissolved, leaving Innogy US as the sole owner of interests in

TED III.  *Id.*  In connection with the second closing, IRUS paid Trireme $50 million in
upfront consideration under the Merger Agreement.  Tr. 320:24-321:1 (Brinklow).

During the same month as closing, IRUS proceeded with sales negotiations for the
Mason Dixon and Mud Springs projects.  Tr. at 581:3-584:24 (Casey).  In a July 31, 2018
quarterly update to Trireme, IRUS noted that it had "commenced the process of marketing
[the] Mason Dixon project for potential sale with support from Marathon Capital" and that
any such sale "would be subject to Section 7.6 (c) of the Merger Agreement."  DX 127 at 1.
Likewise, IRUS continued to pursue a potential sale of Mud Springs to PacifiCorp.  *Id.* at 2
("Reached out to PacifiCorp regarding potential sale of project.  Work-in-progress.").
Notably, both projects were experiencing development challenges that made the prospect of a
third-party sale more attractive.  IRUS had not yet procured an acceptable purchaser for the
electricity generated by Mason Dixon's grid.  Tr. at 582:13-583:10 (Casey); *see* Tr. at 583:13-
19 (Casey: If a project is "not able to find a PPA, power-purchase agreement, to execute,
which means an offtaker, a buyer . . . the project is dead in the water.").  Likewise, Mud
Springs had received "[u]nfavorable results" from the Wyoming Public Service Commission
in connection with IRUS's request for a power-purchase agreement, impacting the project's
ability to connect with a grid and commence construction.  DX 127 at 2; Second Young Dep.
Tr. at 84:19-85:20 ("[W]ithout a power purchase agreement with this particular project, it
doesn't have a line of sight . . . for being commercialized or financed or ready to go."); Tr. at
583:20-584:12 (Casey).

## VI.  Spencer and Young's Starbucks Meeting

On September 20, 2018, Spencer and Young met at a Starbucks in Pittsburgh for a
catch-up meeting.  PX 205; DX 301 ¶ 6; Tr. 396:8-14 (Spencer).  The meeting was brief,
lasting approximately thirty minutes, and was relatively informal — there was no agenda and

neither party brought materials with them.  Tr. at 442:9-443:5 (Spencer); Second Young Dep.

Tr. at 87:5-88:16.  Spencer and Young both recall discussing the potential sale of the Mason

Dixon and Mud Springs projects and personnel issues.  DX 301 ¶¶ 5-6; PX 205 at 1; Tr. at

396:12-397:4 (Spencer: "At that time, my employees had basically told me that there were

very senior changes being made, that RWE people were coming in and they were being given

positions of authority."); Second Young Dep. Tr. at. 87:5-13, 97:10-13 (recalling that the

parties discussed the resignation of Mas Ogiso, the previous lead for EverPower's

development).

At trial, Spencer testified that he specifically asked Young about the Development

Companies and whether they were going to be transferred to RWE.  Tr. at 396:16-397:4

(Spencer).  According to Spencer, Young stated that "nothing's going to change" and that

IRUS would "continue to own the development companies."  Tr. at 396:22-397:4 (Spencer).

Spencer acknowledged that the parties did not discuss rights or obligations under Section

7.6(c) specifically.  Tr. at 444:2-13 (Spencer).  Spencer further testified that, after this

meeting, he met with Young for a second time at the "Twisted French" restaurant in

Pittsburgh, where Young supposedly made substantially similar representations.  Tr. at

398:18-399:4 (Spencer: Young "again said [the Development Companies] would continue to

be owned by IRUS.").

Spencer's trial testimony regarding the Starbucks meeting departs from his earlier

statements regarding the meeting.  Spencer's declaration, dated February 29, 2022, and filed

in support of Plaintiffs' motion for leave to file an amended complaint in *Trireme I*, stated that

Young assured him, in substance, that IRUS would continue to own the Development

Companies *and* that "milestone payments would not be triggered" by the RWE transaction.

DX 301 ¶ 7.  At trial, Spencer made no reference to any discussion of the milestone payments.

Moreover, Spencer's declaration in *Trireme I* did not mention a second meeting at Twisted French. Nor was there any reference to the Twisted French meeting in the complaint in this action, SAC, or during Spencer's deposition in his personal capacity, Spencer Dep. Tr. at 171:20-172:7. The first time Spencer mentioned any dinner was during his deposition as Trireme's corporate representative in June 2024, when he stated that that Young had assured him IRUS would retain ownership of the Development Companies at a dinner at the "Dirty French." PX 229 ("Trireme 30(b)(6) Spencer Dep. Tr.") at 71:24-77:12. In light of these inconsistencies, and given Spencer's financial interest in characterizing these meetings in the light most helpful for Plaintiffs, the Court does not credit Spencer's testimony that he and Young discussed the specifics of IRUS's downstream corporate structure as it related to Section 7.6(c).

Young's recollection, which the Court deems credible, differs. Young, who no longer has any association with IRUS or Innogy SE and has no financial interest in this case, *see* Second Young Dep. Tr. at 14:20-15:11, testified that he did not recall any discussion about whether the Asset Swap would impact any of the milestone payment obligations under the Merger Agreement. *Id*. at 95:5-15. Nor did Young recall making any representations as to IRUS's continued ownership of the Development Companies. *Id.* Rather, Young testified that he may have indicated that "IRUS would stand behind advancing the development of the projects and continue to develop those." *Id.* at 95:15-22. Young recalled stating, in effect, that the mission would stay the same, meaning the "mission to advance and develop and stand behind the . . . payment milestone commitments and . . . advance the projects, the same people would generally be behind that effort." *Id.* at 96:8-15. The Court finds more plausible that the parties discussed IRUS's continued commitment to development of the projects and the milestone payments, as opposed to addressing the specifics of IRUS's downstream corporate

structure and the implications of that structure for Trireme's contractual rights. Indeed, Young was not entrenched in the specific corporate restructuring of the Asset Swap, which Spencer knew since Young had relayed earlier that the transaction was "news to him" and was being done "at a much higher level than him." Tr. at 436:6-12 (Spencer); PX 133 at 1. With the merger not yet closed, Young sought to assure Spencer that IRUS still stood behind the deal and the development of Trireme's renewable energy projects. That is consistent with Spencer's recollection that Young told him "nothing's going to change" in terms of IRUS's commitment to the projects. Tr. at 396:22-397:4 (Spencer).

Young's account of the Starbucks meeting is also reinforced by the email sent by Spencer the next day, in which Spencer followed up on the topics of his discussion with Young, including the potential sales of Mason Dixon and Mud Springs. *See* PX 205 at 1. Spencer wrote: "Great news on Mason. Sounds like you don't need our permission according to the docs but once we are paid the $2mm earnout you can execute the sale." *Id.* Because the parties agreed at the time that IRUS would pay the full earnout milestone for Mason Dixon in the event of a sale, IRUS was not required to obtain Trireme's consent for that sale. *See* Agreement § 7.6(c). With respect to a potential sale of Mud Springs, however, Spencer conveyed Trireme's expectation that Trireme would have "full visibility on any sale process" if IRUS elected to forego making the full associated earnout payment. PX 205 at 1. The emails contain no reference to IRUS's corporate structure after the Asset Swap as it related to the Development Companies or whether any milestone payments (or Section 7.6(c)) would be triggered by the transaction. *See* PX 205 at 1; Tr. at 447:16-448:11 (Spencer).

## VII.    The Parties' Negotiation of the Sale of Mud Springs to PacifiCorp

The parties continued to discuss potential sales of Mud Springs and Mason Dixon over the next several months. In its Q4 2018 update to Trireme pursuant to Section 7.6(b) of the

Merger Agreement, IRUS represented that the "term sheet for the potential sale of [Mud Springs] to PacifiCorp was under negotiation," and that it planned to "negotiate an asset purchase and sale agreement if mutually acceptable terms can be agreed with TED."  DX 137; DX 138 at 1.  With respect to Mason Dixon, IRUS indicated that the "[s]ale process resulted in one attractive buyer for [the] project," but that a potential sale would depend on various factors, including GE (a wind turbine generator ("WTG") supplier) confirming WTG suitability for the project.  DX 138 at 1.

On January 9, 2019, upon learning that GE's WTG — "the only WTG . . . whose economics seemed to make the Mason Dixon Project viable" — would not in fact work at Mason Dixon, IRUS notified Trireme that it "anticipate[d] winding down the potential sale of Mason Dixon."  DX 141 at 2 (noting that the incompatibility of GE's WTG "effectively kill[s] the economics" of Mason Dixon).  Therefore, consistent with its "sole discretion" over the "details and manner" of development efforts under the Merger Agreement, Agreement § 7.6(a), IRUS determined that "selling the [Mason Dixon] project does not make sense for [I]nnogy" because no other offers would result in a "net positive gain to Innogy from the sale."  DX 141 at 1.

 IRUS moved full steam ahead, however, with a potential sale of Mud Springs to PacifiCorp — the same party with whom Trireme had discussed a one-off sale of Mud Springs pre-merger.  DX 141 at 2 (noting that the discussions with PacifiCorp regarding a potential sale "still continue in a positive direction").  IRUS ultimately determined, however, that it would not make economic sense for them to proceed with the deal if they had to make the full milestone payment to Trireme.  Tr. at 328:9-21 (Brinklow).  For that reason, IRUS sought to negotiate a mutually acceptable deal structure with Trireme in order to obtain Trireme's consent to the sale.  DX 141 at 2; Tr. at 585:10-587:5 (Casey).  Following some

back-and-forth as to the proper division of sale proceeds, the parties reached agreement that

$3.7 million of the proceeds from the PacifiCorp sale would be paid to Trireme and that $1.6

million would remain with IRUS, with IRUS retaining 100 percent of the earnout payment.

DX 169 at 1; Tr. at 328:22-329:25 (Brinklow); 585:15-587:5 (Casey).  Under this deal

structure, IRUS accepted a loss, with the hope that it would eventually receive a payout of the

contingent consideration (which it did).  Tr. at 586:13-587:5 (Casey).  Trireme also leveraged

the request for consent to obtain a removal of the deadline for the Baron Winds project's

milestone payments.  Tr. at 197:7-13 (Brinklow); 589:4-12 (Casey: "Trireme insisted that we

eliminate the milestone sunset provision for the Baron Winds project, which basically meant

that if we built Baron Winds at any time within a year, within five years, or 10 years or 20

years, they would receive an earnout . . . ."); DX 169 at 2.  IRUS rejected, however, Trireme's

request that it be added as a party to the Asset Sale and Purchase Agreement with PacifiCorp.

DX 153 at 6.  Instead, IRUS assured Trireme that it would provide "appropriate successor

PCG assurance from innogy and RWE to make sure our payment and other obligations are

sufficiently backstopped" and to "provide payment certainty to TED for its share of the

proceeds" of the sale.  *Id*.  Trireme recognized that proceeding with the sale was in its best

interest.  *See* DX 169 at 2.  If it refused the sale, "there would be very little prospect of

receiving any earn-out payment on Mud Springs" because it was "extremely unlikely" that

Innogy would build the project themselves.  *Id.*

The parties drafted a second amendment to the Merger Agreement ("Second

Amendment") to memorialize Trireme's consent to the Mud Springs sale, as required under

Section 7.6(c).  Tr. 194:7-13 (Brinklow).  The parties executed the Second Amendment on

May 17, 2019.  PX 003 at 1.  The Second Amendment revised the language of Section 7.6(c)

to account for the extension of the Baron Winds milestone, but otherwise retained the "sell,

assign, transfer, or otherwise dispose of" language incorporated in the parties' original Merger Agreement without change.  *See* PX 003 at 3 ("Purchaser shall not sell, assign, transfer or otherwise dispose of any of the assets, rights and other properties of a Target Project or the equity interests of Development Company. . . ."); Tr. at 197:1-14 (Brinklow).  The Second Amendment did, however, incorporate a new Section 7.6(d) to memorialize the effect of any Mud Springs transaction.  *See* PX 003 at 3.  Section 7.6(d) provided that, "[i]n the event the Mud Springs Wind Project is sold, assigned, or transferred by Purchaser to PacifiCorp," IRUS would pay Trireme $3.7 million within two business days of closing.  *Id.*

Notably, in September 2019, the parties drafted another amendment to the Merger Agreement ("Third Amendment") to memorialize Trireme's consent to a potential sale of the Mason Dixon project to sPower.  PX 367; PX 367A at 1-2; Tr. at 602:2-8 (Casey).  As with Mud Springs, IRUS needed consent from Trireme to execute the sale because it did not anticipate receiving the full milestone payment from sPower.  Tr. at 603:15-22 (Casey).  However, because IRUS ultimately abandoned the sale of Mason Dixon, the Third Amendment was never executed.  Tr. at 358:17-25 (Brinklow); 461:10-15 (Spencer); 603:23-604:3 (Casey).

## VIII.    Plaintiffs' Regulatory Filings in Connection with the Asset Swap

As expected for a transaction of the Asset Swap's scale, RWE AG and E.ON (along with other subsidiaries) made several public filings with the PSC and the Federal Energy Regulatory Commission ("FERC") in preparation for the transaction.  First, on May 7, 2019, RWE and E.ON filed a public application with FERC pursuant to section 203(a)(1) of the Federal Power Act, requesting authorization for RWE AG to indirectly acquire a 100 percent interest in E.ON's renewable-energy businesses, including E.ON Climate and Renewables

North America, LLC ("EC&R").[11]  PX 340 at 1, 37.  The FERC filing provided a

comprehensive overview of the structure of the Asset Swap and the various transaction steps

involved therein, concluding with RWE's re-acquisition of IRUS:

- Step 1: E.ON will acquire a 76.8 percent shareholding from RWE, and additional

    shares pursuant to a voluntary public takeover offer launched by E.ON, in RWE's

    publicly-listed subsidiary Innogy;

- Step 2: RWE will acquire a 16.67 percent interest in E.ON;

- Step 3: RWE will acquire a 100 percent interest in substantially all of E.ON's

    renewable-energy business;

- Step 4: RWE will "re-acquire" a 100 percent interest in Innogy's renewable-energy

    business.

PX 340 at 16; *see id.* at 15 ("The Proposed Transaction will take place on a global basis in

four discrete steps . . . .").  The filing noted that, "[a]s an interim step, E.ON *temporarily* will

acquire an indirect majority interest in innogy's U.S. renewable energy business — all

involving projects under development — in the United States."  *Id.* at 17.  With respect to

RWE's reacquisition of IRUS, the filing noted that, "i[n] order to protect its interests and

preserve the value of the global innogy renewable energy business until RWE re-acquires that

business in Step 4, RWE will retain certain rights with respect to [IRUS]" in the intervening

period.  *Id.* at 16 n.38.

Notably, the FERC filing also incorporated pre- and post-transaction organizational

charts setting forth organizational structures within the respective entities prior to and

following the Asset Swap.  *Id.* at 41-43.  In the "Simplified RWE Pre-Transaction

---

[11] After the Asset Swap's first closing, EC&R was renamed RWE Renewables America
("RWE US").  DX 205 at 1-2; DX 213 at 2; Tr. at 745:16-746:9 (Brusius).

Organizational Chart," the Development Companies appear under IRUS subsidiaries as

"[n]on-[j]urisdictional" wind and solar assets because, as of the date of the filing, IRUS had

no operational wind or solar farms subject to FERC jurisdiction.  PX 340 at 5, 41; Tr. at

409:16-410:13 (Spencer: testifying that non-jurisdictional wind assets are "assets not subject

to FERC jurisdiction, which I can infer are the development companies").  In the "Simplified

Post-Transaction Organizational Chart," IRUS has no direct subsidiaries.  PX 340 at 43.

Although the parties dispute whether the chart shows the transfer of the Development

Companies post–Asset Swap, the chart clearly depicts IRUS without any direct subsidiaries or

non-jurisdictional assets.  *Compare id.* at 40 ("Simplified E.ON Pre-Transaction Organization

Chart"), *and id.* at 41 ("Simplified RWE Pre-Transaction Organizational Chart"), *with* PX 340

at 43 ("Simplified Post-Transaction Organization Chart").

On May 30, 2019, Cassadaga Wind LLC, Baron Winds LLC, IRUS Wind

Development LLC, RWE AG, and E.ON SE submitted a second public filing, this time with

the PSC.  Dkt. 341 at 1, 9.  The parties sought a declaratory ruling that a temporary transfer in

Cassadaga and Baron Winds' upstream ownership would not require additional review under

section 70 of the New York Public Services Law.  *Id.* at 2.  The application reiterated that

E.ON's ownership of the development companies would only be "temporar[y]," and that the

projects would ultimately be transferred back to RWE AG.  *Id.* at 2-3.  The PSC filing also

appended the same pre-and post-closing organizational charts as incorporated in the FERC

filing, which reflected IRUS no longer holding the Development Companies post-transaction.

*Id.* at 11-15.  Notably, this request was substantially similar in form to the PSC request jointly

filed by IRUS and Trireme in advance of IRUS's acquisition of the Development Companies.

DX 363 at 11.

On July 8, 2019, FERC authorized the proposed transaction, DX 366 at 3-8, and on September 10, 2019, the PSC likewise authorized the temporary transfer in Cassadaga and Baron Winds' upstream ownership, DX 367.  Nearly a year later, on June 26, 2020, IRUS Development Company Cassadaga Wind LLC filed another FERC filing.  PX 452; Tr. at 724:2-726:23 (Casey).  In contrast to the earlier FERC filings, this filing represented that, following the consummation of the Overall Transaction between RWE, E.ON, and Innogy SE, Cassadaga Wind LLC would "continue to be an indirect subsidiary of [IRUS], which [REDACTED TEXT] will be a wholly-owned subsidiary of RWE [AG]."  PX 452 at 5.

## IX.    Request for Novation of the PCG to RWE AG

In advance of the Asset Swap and the sale of Innogy SE to E.ON, Innogy SE and IRUS approached Trireme about substituting Innogy SE with RWE AG as the parent company guarantor.  Tr. at 200:9-19 (Brinklow: discussing PX 204, IRUS's request to change the PCG).  On August 5, 2019, Young forwarded Spencer a memorandum in connection with Innogy SE's request to change the PCG.  PX 204; PX 204A.  In his cover email, Young wrote: "[W]e are preparing for the Merger of innogy's renewables group under RWE, and will need to transfer the PCG obligations innogy has to TED under the AURA Merger to RWE."  PX 204.  The attached memorandum characterized the E.ON and RWE transaction, defined as the "Overall Transaction," as proceeding in two steps: first, RWE would transfer its 76.8 percent stake in Innogy's shares to E.ON.  PX 204A at 2.  "In a second step, in line with the Overall Transaction Objectives . . . the renewables business of innogy ('innogy RES Business') shall be carved-out from innogy and also be operated by [a] subsidiary of RWE" in the future.  *Id.*  Specifically, the memorandum represented that, "after the transfer, the innogy RES Business will be operated by a separate legal entity within RWE group operating the new business segment renewable energy, the RWE Renewables GmbH."  *Id.*  The memorandum

also flagged that the completion of RWE's re-acquisition of IRUS would take place only after the companies received "particular antitrust clearances and the implementation of the necessary preparations for the transfer." *Id.* Brinklow admitted that he did not ask any questions at the time directly related to the statement that IRUS would be operated by a separate legal entity post-close. Tr. at 347:21-348:11 (Brinklow).

Trireme and Terra Firma therefore understood that, following the consummation of the Asset Swap, IRUS would no longer be held by Innogy SE. Spencer Dep. Tr. at 256:20-257:17; Tr. at 345:24-346:16 (Brinklow: Terra Firma was generally aware that the Asset Swap would involve carving out IRUS and operating it under an RWE subsidiary.); Tr. at 337:5-10 (Brinklow: It was "represented" to Trireme that IRUS's direct parent would change.). Upon receiving notice of the Asset Swap and Innogy SE's proposal for a novation of the PCG, Trireme engaged legal counsel to assess whether the PCG request and the broader Asset Swap violated Section 7.6(c). Tr. at 451:12-452:18, 455:5-13 (Spencer); DX 355 at 3. Counsel determined there was no violation, and Trireme and Terra Firma therefore sought no legal recourse under Section 7.6(c) at the time. Trireme 30(b)(6) Spencer Dep. Tr. at 72:4-73:3 (Spencer: "[T]he upstream transfers didn't violate Section 7.6, which, you know, I was not happy about.").

Replacing Innogy SE as IRUS's guarantor made good sense, IRUS argued, because "once [IRUS] has been carved out from innogy SE to RWE AG, innogy SE will cease to be the parent company of Innogy Renewables US LLC." DX 175 at 4. Young relayed to Spencer that at that point, the "innogy RES Business [would] be operated by a separate entity within [the] RWE group operating the new business segment renewable energy, RWE Renewables GMbH." *Id.* at 3. As a result, if Trireme did not consent to the PCG transfer, the Guarantee would be held by a company that no longer owned the development assets. As

Casey, IRUS's former General Counsel, explained at trial, at the close of the Asset Swap transaction, Innogy SE would no longer have any renewable-energy assets, effectively rendering it a "shell company" without the financial capacity to continue to back the parent guarantee. Tr. at 595:11-17; *see* DX 248 at 1 (May 12, 2020 email from Innogy SE corporate finance employee to Spencer: "It is planned to terminate the credit ratings of innogy SE and to merge [Innogy SE] into another E.ON company."). For that reason, IRUS proposed RWE AG — at the time, the largest German utility and a publicly traded company — as the new guarantor. Tr. at 595:14-21 (Casey).

Even though the novation would provide Trireme with a "better parent," Tr. 664:11-22 (Casey), Trireme sought to use the novation request as "leverage" to obtain the Cassadaga milestone payment before the first milestone trigger on October 1, 2019. DX 176 at 1; Tr. at 601:12-18 (Casey). On August 13, 2019, Trireme served an election notice on IRUS, claiming that the Payment Milestone with respect to the Cassadaga Project had occurred. DX 177; DX 178; Tr. at 599:1-600:3 (Casey). IRUS disagreed and rejected Trireme's demand. DX 179; DX 180 at 2; Tr. at 600:4-10 (Casey). The Cassadaga Project had not yet even received the Army Corps of Engineers permit necessary to commence construction. Tr. at 600:22-601:6 (Casey).

Less than a week later, on August 19, 2019, Trireme responded in kind by rejecting Innogy SE's request to transfer the PCG to RWE AG. PX 212; PX 212B at 1; Tr. at 596:7-597:8 (Casey). Trireme claimed that it lacked "sufficient information about the Overall Transaction" and therefore could not determine whether a novation of the agreement "would adversely affect [its] rights under the Guarantee." PX 212B at 1. Trireme also alleged that it lacked "sufficient information to evaluate the creditworthiness of the entity that [IRUS] proposed to be the New Guarantor pursuant to the proposed Novation Agreement." *Id.* To

fully evaluate the request, Trireme sought: (i) "a description of each of the steps in the proposed Overall Transaction"; (ii) "a structure chart showing the resulting structure upon completion of the Overall Transaction"; and (iii) "complete financial information about the proposed New Guarantor." *Id.* Although Brinklow testified that Trireme sought to understand "the overall new structure" and "how it would affect the development companies," he acknowledged that Trireme's focus was on "receiving [its] milestone payments under the merger agreement from IRUS." Tr. at 203:3-7, 204:16-21 (Brinklow). Brinklow expressly stated that Trireme wanted to understand how the transaction "would impact [Trireme's] milestone payments from IRUS." Tr. at 205:3-8 (Brinklow).

The Court does not find credible Brinklow's claim that Trireme was seeking information regarding the particular ownership structure for the Development Companies within the post-transaction corporate family. Rather, given the context of IRUS's novation request, Brinklow's testimony that Trireme was concerned about the milestone payments supports the inference that Trireme was primarily interested in evaluating the new proposed parent guarantor of those payments. Similarly, the Court does not find credible Spencer's testimony that his August 19, 2019 letter to Innogy SE requesting three categories of information was intended to solicit information about whether the Development Companies would be "transferred out of IRUS." Tr. at 413:7-17 (Spencer). Trireme's appeal for information was sent in the context of IRUS's request for a novation of the upstream parent guarantee. Nothing in the request relayed that such downstream information was sought by, or of interest to, Trireme.

On September 26, 2019, Trireme withdrew its Election Notice with respect to the Cassadaga Project. DX 191; Tr. at 601:7-11 (Casey). IRUS did not provide information in response to Trireme's request for additional information for several months. At trial, Casey

credibly attributed this delay to, first, Trireme's unreasonable demand for payout of the Cassadaga Milestone, and second, to "significant delay[s]" that arose thereafter in connection with the Asset Swap. Tr. at 604:12-605:20 (Casey). Casey testified that because it was understood that the overall Asset Swap was not going to imminently close, "administrative topics and activities such as replacement guarantees were put on the side burner until later." Tr. at 605:17-20 (Casey). In February 2020, IRUS restarted the process of seeking parent company guarantee consents for replacement. Tr. at 607:1-7 (Casey). Casey therefore followed up with Spencer on Innogy SE's request to substitute RWE AG as IRUS's guarantor. DX 198; DX 199; Tr. at 608:11-609:5 (Casey). Spencer responded that Trireme had "requested information and it was never provided," but that in any event, it was "unlikely that [it] w[ould] release Innogy from their guaranty obligations." DX 199 at 1. Casey represented that IRUS would provide the requested information and underscored that IRUS's "ultimate goal" was to "assure that you have a PCG backstop that properly covers our obligations until they are fulfilled." PX218.

On April 22, 2020, Susan Jeffrey, an IRUS employee acting on Casey's behalf, forwarded Spencer the requested materials. PX 350. This included attachments to public websites that contained "details regarding the new Company structure after the transfer of the innogy Renewables to RWE AG" and "details of the financial worthiness for RWE AG." *Id.* Included among the attachments was a simplified organizational chart reflecting IRUS's upward corporate structure post–Asset Swap:



PX 351.

The chart reflects that IRUS would be treated as a subsidiary of RWE US and that it would continue to have 100 percent interest in "Innogy Subsidiaries," a term it does not otherwise define. *Id.*  No reference is made to the Development Companies. *Id.*  Casey testified that the chart was intended to show the upstream ownership of the Innogy Subsidiaries that housed the Development Companies in order to illustrate that RWE AG would remain the ultimate parent.  Tr. at 614:6-12, 670:16-21 (Casey: "Since the original request from us was replacement [of the] parent guarantee, to me it was . . . pretty obvious that [Spencer] was looking to make sure that . . . [RWE] AG would ultimately be the parent.").  Casey explained that, as of April 2020, IRUS's downward ownership structure post-close was "fluid," Tr. at 615:5-9, and that he "did not have a clear understanding of what restructuring would take place." Tr. at 673:12-18.  Trireme did not seek further information with respect to the corporate structure.  Tr. at 615:10-20 (Casey: "I never received any followup with respect to this particular org chart or that topic in romanette No. 2.").  Spencer conceded that, although he requested additional financial information from RWE, he did not ask for further information regarding the organizational chart or the meaning of "Innogy Subsidiaries."  Tr. at 458:6-16, 459:3-17.

Ms. Jeffrey's email also appended a presentation overviewing the RWE-E.ON transaction. PX 352. The presentation explained that the closing of the transaction would occur in two phases: in Closing I, RWE would sell its 76.8 percent interest in Innogy SE to E.ON, *id.* at 6; at Closing II, RWE would purchase E.ON renewables and IRUS, *id.*[12]

IRUS warned that a failure to novate the PCG would place Trireme in an "undesirable position," as it would be "stuck with an E.ON subsidiary as guarantor whilst the underlying contract with [IRUS] itself shifts to RWE." DX 245 at 1. IRUS's concerns, however, went unheeded. Trireme ultimately did not consent to the novation of the PCG, citing concerns with respect to RWE AG's creditworthiness and maintaining that RWE AG's financial position fell short of Innogy SE's. DX 248. Trireme's refusal to novate the PCG meant that the guarantee remained with a company that no longer had any interest in the assets it was securing. Tr. at 349:6-15 (Brinklow). The PCG remains with Innogy SE to this day, notwithstanding that Innogy SE no longer has any assets in any companies worldwide and is effectively a shell company. Tr. at 617:1-7 (Casey).

## X.    RWE US (f/k/a EC&R) Plans an Internal Reorganization of IRUS's Subsidiaries

The Asset Swap proceeded over the course of several months. In the first stage of the Asset Swap, on September 18, 2019, RWE transferred its interest in Innogy SE to E.ON SE. PX 398C at 3. Around the same time, E.ON SE carved out its renewable-energy business units in Europe and the United States and transferred them to RWE AG. E.ON SE's U.S.-based subsidiary, EC&R U.S., became a wholly owned RWE AG subsidiary and was renamed

---

[12] While Brinklow testified on direct that the information IRUS provided in connection with the novation of the PCG was misleading and inaccurate as to the disposition of the development companies, Tr. 208: 5-212:25, Brinklow admitted on cross that he never received or reviewed these — or any — documents in connection with the request to transfer the PCG. Tr. at 355:7-18.

RWE Renewables Americas ("RWE US"). PX 238 ("Klempir Dep. Tr.") at 114:21-115:1;

PX 398C at 3; PX 240 ("Ortin-Rios Dep. Tr.") at 21:7-11.

However, due to "significant delay[s]" in connection with regulatory considerations,

the subsequent phases of the Asset Swap — including the carve-out of IRUS and its transfer

to RWE AG — did not take place for several months. Tr. at 604:22-605:4 (Casey). During

this holding period, E.ON had only a temporary ownership interest in the Development

Companies; IRUS was always expected to reacquire the Development Companies. PX 340 at

2 (FERC regulatory filing describing E.ON as "temporarily" acquiring an indirect majority

interest in IRUS); *id*. at 16 n.38 (noting that, in this interim period, RWE would "retain certain

rights with respect to" IRUS "[i]n order to protect its interests and preserve the value of

the . . . business"). Given the transitory nature of E.ON's ownership interest in IRUS, IRUS

implemented "clean rooms" and "restrictive processes and rules for communications" to

prevent the disclosure of confidential information. Tr. 605:4-17 (Casey). Casey testified that,

in practice, E.ON had "absolutely no authority or power or management of any of the Innogy

businesses" during this interim period. Tr. at 687:17-25.

In anticipation of the Asset Swap closing and RWE's reacquisition of IRUS, in early

2020, IRUS and RWE US started planning a post-close internal reorganization, including a

restructuring of corporate subsidiaries. RWE US and IRUS clearly demarcated between

closing and the post-closing reorganization, referring to the former as "Project Tailwind" and

the latter as "Day One." DX 225 at 1 (outlining "critical day 1 steps," including "[m]ov[ing]

respective disregarded entities below IRUS to corresponding locations within chart"); Tr. at

750:2-7 (Rodriguez: "Day one would refer to the day after the asset swap transaction was

finished."); Klempir Dep. Tr. at 29:13-30:4 ("[T]he closing is when we actually would then

own IRUS and then the assignments and mergers is something you can only do after you own

the asset."); Tr. at 787:11-24 (Nicholson: "As part of the asset swap, we had to get the company set up. The second part was taking that to the newly formed organization, which would mean post day one structure.").

The parties formed a working group to plan and execute the post-close integration of IRUS's legal entities within the RWE US umbrella, with the objective of eliminating redundancies and driving efficiencies with respect to taxes, accounting, and HR operations. DX 225 at 1 (outlining "critical day 1 steps . . . driven mainly by transaction/tax considerations"); Tr. at 689:5-21(Casey: The working group was focused on "how can we merge in . . . entities and make things, either from a tax or administrative ease perspective, work well . . . ."); Tr at 787:25-788:9 (Nicholson: "What we wanted to do is reduce the inefficiencies and redundancies from a systems perspective, from a process perspective, as well as from a general reporting perspective."); DX 197 at 4; DX 235 at 1 (emails discussing post-close IRUS organizational-structure proposal). The parties sought to eliminate and combine redundant IRUS and RWE US entities, including, for instance, by combining disregarded subsidiaries[13] holding the renewable-energy assets. Tr. at 750:8-14, 753:11-754:2 (Brusius); DX 236 at 3 (pre-close IRUS org chart with proposals for restructuring disregarded subsidiaries within RWE); DX 235 at 1 (Brusius: noting that the IRUS subsidiaries are "under tiers, so we can just move the Development entity under our Development and we're done"); Tr. at 787:16-789:10 (Nicholson). The objective was to "minimize the legal entities under the RWE umbrella" to reduce "tax requirements," "legal requirements," and associated "administrat[ive] cost[s]." Tr. at 794:3-14 (Nicholson).

---

[13] For federal income tax purposes, a "disregarded" entity is a company that does not file a tax return with the IRS but instead has its activity reported under its parent. Tr. at 753:5-10 (Brusius).

From a tax perspective, RWE US and IRUS sought to execute a post-close reorganization that would not create any tax liability.  Rodriguez testified that it is "common" for developers to "move" assets between holding companies and to "introduce a new LLC as a direct owner of [a] project" to "facilitate tax equity financing."  Tr. at 512:2-6; *see* Tr. at 511:16-512:9.  Here, to ensure the transaction occurred on a tax-equitable basis, IRUS and RWE US sought to effectuate the reorganization through assignments, or "contributions,"[14] of certain IRUS disregarded subsidiaries immediately after the Asset Swap closed and RWE US acquired IRUS.  Tr. at 761:23-762:1; 764:18-765:7 (Brusius: explaining that effectuating assignments immediately post-close would ensure that there was no "gap or an interim period" for tax reporting purposes).  These assignments would in turn reduce administrative burdens and facilitate corporate-culture integration.  Tr. at 753:21-754:2 (IRUS and RWE were "looking for . . . synergies" such that they "didn't have parallel structures where [they] would have . . . additional administrative burden in the future.").  The alternative — duplicative, parallel structures — would have required, at a minimum: (i) filing twice as many tax returns; (ii) cabining RWE US development and operations teams from parallel IRUS teams; (iii) having RWE US and IRUS employees employed by different legal entities; and (iv) operating two separate accounting systems.  *See* Tr. at 748:14-749:6; Tr. at 787:17-789:10.

---

[14] As Brusius explained at trial, from a federal tax perspective, a "contribution" is a nontaxable transaction under section 351 of the Internal Revenue Code.  Tr. at 762:2-763:7. For a transaction to classify as a section 351 contribution: (i) there must be no exchange of monetary consideration, that is, only shares are provided in exchange for the assets; and (ii) the transferor must own 80 percent of the assets moved before and after the transaction.  Tr. at 763:9-19; 764:11-17.

On June 16, 2020, the Working Group circulated near-final charts reflecting the assignment of disregarded IRUS entities to RWE US subsidiaries.  DX 264.  Critically, RWE US's internal reorganization did not occur until *after* the Asset Swap closed and RWE AG acquired Innogy SE's membership interest shares in IRUS through its subsidiary, RWE US. DX 197 at 4; DX 225 at 1; PX 463 at 1; Tr. at 561:9-18, 761:19-762:1; 746:16-20.  On June 30, 2020, RWE AG completed the acquisition of IRUS and closed the transaction, thereby concluding all four steps of the Asset Swap.  PX 453 at 2.[15]  In exchange for the acquisition of IRUS, RWE US paid Innogy SE approximately $500 million.  Tr. at 776:10-16 (Brusius). The immediate effect of RWE US's acquisition of IRUS was that IRUS became a wholly owned subsidiary of RWE US.  DX 273 at 3; Tr. at 618:23-25 (Casey).  At that point in time, the Development Companies were still held under IRUS subsidiaries.  *Id*.  Notably, RWE US's purchase of the membership-interest shares in IRUS and the subsequent transfer of IRUS under RWE US is not at issue in this litigation.  Plaintiffs do not allege that Innogy SE's sale of IRUS to RWE AG breached Section 7.6(c) or any other provision of the Merger Agreement.  SAC ¶¶ 60-63 (alleging that "IRUS breached . . . the Merger Agreement when it effected the assignment, conveyance, and transfer of all right, title, and interest in the membership interests" to the Development Companies, *id.* ¶ 60); Reply Mem. at 6-7, *Trireme I*, No. 20-cv-05015, Dkt. 154 ("It bears emphasis that Trireme's claims for breach of Section 7.6(c) are not based on the fact that RWE acquired IRUS.").

---

[15] At trial, Plaintiffs sought to establish that the Asset Swap closed on July 1, 2020, not June 30, 2020.  While the closing of the Asset Swap may have been publicly communicated on July 1, 2020, DX 268, the underlying transaction documents clearly show the transaction closing on June 30, 2020.  PX 453 at 2.  The Court therefore credits Casey's testimony on this subject, including Casey's statement that public announcements often post-date the official closing of a transaction.  Tr. at 642:3-7 (Casey).

The next day, on July 1, 2020, IRUS's direct subsidiaries, IRUS Wind Holdings LLC and IRUS Solar Holdings LLC, assigned their membership interests in IRUS's wind and solar development and operations holding companies to parallel RWE US subsidiaries. PX 342; PX 343; PX 344; PX 345; DX 269. IRUS's disregarded entities were therefore contributed into RWE regarded entities. Tr. at 765:9-14 (Brusius). The recitals in each assignment of membership-interest agreement reflect that the assignments were made "in consideration of the mutual covenants and for other good and valuable consideration." PX 342 at 1; PX 343 at 1; PX 344 at 1; PX 345 at 1; DX 269 at 1. However, there was no monetary or cash consideration exchanged between IRUS and RWE US. Tr. at 796:7-12 (Nicholson); Klempir Dep. Tr. at 54:18-22. Rather, the consideration exchanged was a recital of RWE US's assumption of the IRUS subsidiaries' rights and obligations under the Merger Agreement. Tr. at 618:23-25 (Casey). Thus, after these assignments, the Development Companies were owned by a variety of RWE US subsidiaries. RWE's purchase of IRUS's asset shares and the subsequent contribution of IRUS's disregarded entities to RWE regarded subsidiaries were therefore distinct and sequential events. Tr. at 770:4-14 (Brusius: "[T]he ordering is a critical point, because if the ordering were done in a different manner, . . . it could have a very different tax treatment.").

At all times post–Asset Swap, however, RWE US and RWE AG remained the indirect parents of the Development Companies. For that reason, for tax and accounting purposes, the assignments of IRUS's disregarded subsidiaries were treated as internal transactions between entities under the same parent company. Specifically, the internal reorganization qualified as a tax-neutral section 351 transaction because the same entity — RWE US — owned the subsidiaries making and receiving the assignments. Tr. at 763:8-764:17; 765:11-19 (Brusius). Likewise, for accounting purposes, the transaction involved entities — IRUS and RWE US —

that were under "common control,"[16] since "the company was still under the RWE

Renewables Americas umbrella, it really just was an internal reorg to settle up for accounting

controlling and tax purposes."  Tr. at 796:19-21 (Nicholson); *see* Tr. at 796:13-22; 791:18-

793:11 (Brusius: explaining that no P&L was calculated and that there was no impact on

income statements because the effect of the transition was "just moving things internally

around"); PX 397A at 3 ("We in the US assume that 'transactions under common control'

guidance applies as this is a combination of two fully consolidated RWE AG subsidiaries.").

Following the reshuffling of its disregarded entities on July 1, 2020, IRUS retained

only two subsidiaries, neither of which held Development Companies: IRUS Wind Holdings

LLC and IRUS Solar Holdings LLC.  PX 015 ¶ 038; PX 016 ¶ 38.  On September 25, 2020,

RWE subsidiaries filed public Delaware Certificates of Merger announcing the merger of

IRUS's remaining intermediate subsidiaries with RWE subsidiaries.  *See* DX 277; DX 278;

DX 279; DX 280.  And in December 2020, RES filed a Delaware Certificate of Merger

announcing IRUS's merger into RES.  DX 283.  IRUS's merger into RES was completed to

consolidate all RWE US employees under the same legal entity.  DX 205 at 2 (Klempir:

"RWE Renewables Services, LLC is employer of all of our employees . . . . After

moving/merging various subsidiaries to the right location in the org structure, it seems like a

reasonable step would be a merger of IRUS with RWE Renewable Services, LLC . . . .");

Klempir Dep. Tr. at 19:2-15.  RES was the surviving company at the close of the merger and

---

[16] At trial, Nicholson explained that, for accounting purposes, a "transaction under common control is a transaction where there is a transfer of assets and equity liabilities between two companies under the same parent and a common control."  Tr. at 792:3-5.  "Business combination" accounting, in contrast, is the standard that governs where one "acquire[s] a third-party business through a purchase."  Tr. at 792:19-793:1 (Nicholson).

adopted IRUS's obligations and liabilities, including all obligations to perform under the Merger Agreement.  Dkt. 283 at 2; SAC ¶ 12; Dkt. 108 ¶ 12 (Answer).

Following RWE's internal reorganization, progress on the Development Companies continued as before.  Casey testified that post–Asset Swap, RWE US was responsible for the development and the construction of the Aura projects; that remained true after the internal reorganization.  Tr. at 619:1-10 (Casey); *see* DX 386; DX 387; Tr. at 366:10-13 (Brinklow: agreeing that DX 387 shows RWE developing the projects after the internal reorganization).  Moreover, prior to and following the internal reorganization, RWE US remained responsible for paying Trireme any Milestone Payments triggered under the Merger Agreement.  Tr. at 619:11-18 (Casey).  And RWE continued to provide Trireme with quarterly development updates, as required under Section 7.6(b) of the Merger Agreement.  DX 382; DX 383; DX 386; DX 387; DX 390; DX 391; Tr. at 362:14-22 (Brinklow).

## XI.    History of the Litigation

On June 30, 2020, Plaintiffs commenced *Trireme I.*  In *Trireme I*, Plaintiffs alleged that the defendants therein, who are in privity with RWE US and RES, breached their obligation to exercise commercially reasonable efforts and their reporting requirements under the Merger Agreement.  *See generally* Compl., *Trireme I*, No. 20-cv-05015, Dkt. 1.  Plaintiffs amended the complaint in *Trireme I* once as of right, *see* Am. Compl., *Trireme I*, No. 20-cv-05015, Dkt. 9, and filed a Second Amended Complaint with Defendants' consent on January 13, 2021, *see* Second Am. Compl., *Trireme* I, No. 20-cv-05015, Dkt. 43 ("*Trireme I* SAC").  That complaint asserted a host of new claims, including contract reformation, unjust enrichment, and tortious interference.  *See id.* at 31.  Trireme did not, however, assert a claim for breach of Section 7.6(c).

In November 2020, IRUS produced documents in that litigation showing that, for purposes of a tax-equity investment in connection with the Cassadaga project, RWE US would replace IRUS as the "sponsor" of the Agreement. *See* JX 001 ¶ 2; DX 399 at 2-3; DX 400 at 1. The "sponsor" was therein defined as the indirect parent of Cassadaga Wind LLC, one of the Development Companies. DX 400 at 1-2. As Defendants note, the document shows that IRUS was removed from Cassadaga's ownership chain altogether. Dkt. 168 ¶ 148 n.45. Specifically, the document provides that RWE US indirectly or directly owned 100 percent of the interests in Cassadaga Class B Holdings LLC, which owned 100 percent of the equity interests in Cassadaga Wind Holdings LLC, which in turn owned 100 percent of the interest in Cassadaga Wind LLC, the holding company for the Cassadaga project. DX 359 at 1-2. IRUS is therefore not reflected in the ownership chain. This document was provided to Plaintiffs in discovery in *Trireme I*, prior to the filing of the SAC on January 13, 2021. JX 001 ¶ 2.

Moreover, in February 2021, non-party Marathon Capital responded to Plaintiffs' subpoena by producing organizational charts to both parties reflecting the structure of RWE AG and the Development Companies post–Asset Swap. *See* JX 001 ¶ 3. The organizational charts show that IRUS, IRUS Wind Holdings, LLC, and IRUS Solar Holdings, LLC, no longer hold any interest, direct or indirect, in the Development Companies. DX 406 at 2; DX 407 at 3. Plaintiffs previously claimed — including in the present litigation — not to have received information to this effect until November and December 2021. DX 324 at 2; SAC ¶ 56. In September 2021, IRUS's corporate representative also testified in the *Trireme I* action that IRUS had merged into RES and therefore "ceased to exist." Opp. at 7-8, *Trireme I,* No. 20-cv-05015, Dkt. 151 (quoting Marmon Decl. Ex. 11, at 42:17-44:12, *Trireme I,* No. 20-cv-

05015, Dkt. 150-12).  Plaintiffs took no action to pursue a claim for breach of Section 7.6(c)

upon receipt of the foregoing information.

Instead, on April 8, 2022, weeks after the close of fact discovery and eighteen months

after the deadline to move to amend pleadings, Plaintiffs moved for leave to amend the

complaint a third time in *Trireme I* to add a claim for breach of Section 7.6(c) of the Merger

Agreement — the claim that Plaintiffs now assert here.  *See* Mem., *Trireme I,* No. 20-cv-

05015, Dkt. 150.  Plaintiffs alleged that they first learned of facts to support a claim for breach

of Section 7.6(c) during discovery in late 2021.  *Id.* at 1; Opp. at 6-7, *Trireme I,* No. 20-cv-

05015, Dkt. 151; SAC ¶ 42.

On August 5, 2022, the Court denied Plaintiffs' motion for leave to file a Third

Amended Complaint in *Trireme I* from the bench, stating in part:

> First the Court finds that plaintiffs have not shown good cause to
> modify the scheduling order under Rule 16.  Good cause is
> primarily a question of diligence.  *See Parker v. Columbia
> Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000)[.] . . .
> [P]laintiffs have not shown diligence here.  As defendants argue,
> plaintiffs were on notice of a potential breach before this case was
> even filed.  Public documents from May 2019 filed with the New
> York State Public Service Commission show that the
> development companies were outside of IRUS' control at that
> time. . . .
>
> But, even without that, they were on notice earlier in the
> discovery period, as soon as defendants submitted organizational
> charts and documents in April of 2020 and July of 2021 showing
> that the development companies were outside of their control, and
> certainly by September 2021 when a witness testified that the
> development companies were outside of IRUS' control. . . .
>
> Diligence would counsel that plaintiffs investigated the potential
> breach much sooner than they did; but even if they were not on
> notice until the end of 2021, as they admit, the four-month delay
> between when they believe they were officially on notice and
> when they moved to amend is inconsistent with the diligence
> required to demonstrate "good cause."  *[S]ee, [e.g.], Gullo v. City
> of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) (holding that the

district court "acted well within its discretion" in concluding that plaintiff's three month failure to move for amendment prevented plaintiff from demonstrating the diligence necessary to satisfy Rule 16).

When a party "had an opportunity to assert [an] amendment earlier" in a case but failed to do so, as plaintiffs did here, "a court may exercise its discretion more exactingly" in deciding whether to grant leave to amend. *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008). The Court therefore finds, because plaintiffs have no plausible explanation for their delay, they have not shown good cause to modify the scheduling order under Rule 16.

Although the Court need not reach the [R]ule 15 inquiry, the Court knows that even if plaintiff had demonstrated good cause to modify the scheduling order, the Court would deny leave to amend pursuant to Rule 15 because amendment would unduly prejudice defendants[.] *Foman v. Davis*, 371 U.S. 178, 182 (1962). Whether the amendment is or is not futile, discovery has long since closed and plaintiffs are asserting an entirely different breach than the one that is in their existing complaint. Although plaintiffs assert that no additional discovery would be necessary, defendants are entitled to seek additional discovery to present defenses to this new factually distinct claim. The Court finds that because granting leave would be unduly prejudicial to defendants, plaintiffs are not entitled [to] leave to amend pursuant to Rule 15. As a result, plaintiffs' motion is denied.

Dkt. 33-1 at 40:2-42:2 (internal record citations omitted).

*Trireme I* was reassigned to the undersigned on September 27, 2022. Dkt. 173.

Between November 13 and November 17, 2023, this Court held a bench trial on Trireme's

remaining claims in *Trireme I* for breach of the implied covenant of good faith and fair

dealing and breach of contract regarding certain reporting obligations. Dkt. 256 at 2. On

December 14, 2023, following trial, closing arguments, and post-trial submissions, this Court

entered judgment in favor of defendants, finding that "Plaintiffs have failed to prove by a

preponderance of the evidence that IRUS acted in bad faith to delay construction of the

Cassadaga Project for the purpose of depriving Plaintiffs of the milestone payment" and separately finding "no breach of contract as to IRUS's reporting requirement." *Id.*

On January 12, 2024, Plaintiffs timely filed a notice of appeal.  Dkt. 262.  Plaintiffs initially preserved three issues for appeal: the Court's dismissal of Trireme's claim for contract reformation, the Court's denial of leave to amend, and the Court's post-trial opinion finding no breach of the implied covenant.  *See* Form C at 187-88, *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 24-159 (2d Cir. 2024), Dkt. 7.1.  Ultimately, Plaintiffs briefed only the third issue.  *See* Brief for Pls.-Appellants at 6, *Trireme*, No. 24-159, Dkt. 53.1.

## XII.    Procedural Background of Present Action

Three weeks after the Court denied leave to amend in *Trireme I*, on August 31, 2022, Plaintiffs filed this separate lawsuit.  *See generally* Compl.  The action was reassigned to the undersigned as a related case on September 28, 2022.  Dkt. 20.  Plaintiffs filed an Amended Complaint on October 4, 2022.  Dkt. 21 ("Am. Compl."), which was corrected on November 4, 2022.  Dkt. 36 ("SAC").  The Amended Complaint asserts a single claim for breach of contract arising from Section 7.6(c) of the Merger Agreement, the same claim that the Court denied Plaintiffs leave to amend in *Trireme I*.  *See id.* at 12-13.  Plaintiffs seek $112,000,000 in damages.  *Id.* at 13.

On August 24, 2023, this Court denied Defendants' motion to dismiss.  Dkt. 61.  In so ruling, the Court concluded that Plaintiffs' claim for breach of Section 7.6(c) of the Merger Agreement was subject to the rule against claim splitting because it arose from the "same set of transactions as Plaintiffs' claim for breach of Sections 7.6(a) and 7.6(b) of the Merger Agreement," *id.* at 14.  However, the Court held that a factual question remained as to whether an exception to the rule applied.  *Id.* at 23-24.  With respect to Plaintiffs' breach of

contract claim, the Court held that Section 7.6(c) "does not unambiguously apply to *third party* transfers only and exclude intracompany transfers," *id.* at 27, and that the Merger Agreement is "at most ambiguous on this issue," *id.* at 28.  On November 20, 2023, the Court denied Defendants' motion for reconsideration.  Dkt. 91 at 18:11-12.  On January 16, 2024, the Court denied Plaintiffs' motion for partial judgment on the pleadings, *see* Dkt. 73.  Dkt. 101.  In denying judgment on the pleadings, this Court found that "[Section] 7.6(c) is ambiguous and open to an interpretation by which defendants' intracompany transfers of the IRUS subsidiaries did not breach the merger agreement."  Dkt. 104 (Oral Arg. on Motion for Partial Judgment on the Pleadings) at 30:19-22.

## CONCLUSIONS OF LAW

As discussed above, Trireme brings a single claim for breach of contract under Section 7.6(c) of the parties' Merger Agreement.  Specifically, Trireme asserts that IRUS's intracorporate reshuffling of assets violated Section 7.6(c)'s prohibition on the sale, assignment, transfer, or other disposition of IRUS's interests in the Development Companies.

As a preliminary matter, the parties agree, and the Court concludes, that New York law governs this dispute.  Generally, a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *See Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 467 (2d Cir. 2022).  Under New York choice-of-law rules for cases involving a contract with a choice-of-law clause, such as the Merger Agreement, courts "apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).  Here, the Court finds sufficient contacts between New York and the transactions undertaken through the Merger Agreement to justify the parties' chosen application of New York law.  At least two of the Development Companies at issue, the

Cassadaga and Baron Winds projects, are located in New York.  DX 403 at 4.  The Merger

Agreement's choice-of-law clause also applies to Plaintiffs' claim for a breach of Section

7.6(c) of the Merger Agreement — a claim that by definition "aris[es] out of th[e]

Agreement."  PX 001 §13.5.

## I.    Res Judicata

First, Defendants raise the defense of *res judicata*, arguing that Plaintiffs' claim is

barred because it arises from the same transaction at issue in *Trireme I* — IRUS and

Trireme's Merger Agreement, dated December 21, 2017.  Drawing from the Court's earlier

discussion of the application of claim splitting to this action, Defendants maintain that

because there is a now final judgment in *Trireme I*, the Court must apply the mandatory and

non-discretionary *res judicata* rule to bar this action, and that no exception to the rule applies.

The Court is in the unusual procedural posture of ruling on *res judicata* at the same

time as it considers the merits of the parties' claims.  This is because fact issues that were

relevant to a determination of fraudulent concealment and other aspects of claim splitting, and

now *res judicata*, were intertwined with facts related to the merits of the action.  It was

therefore more efficient to conduct a comprehensive bench trial in this case.  Dkt. 104 at 54:6-

8 (Trireme: "[L]et us take discovery, we will present all the facts to you at once, and your

Honor can decide."); *id.* at 66 (ordering discovery on entire case because "it would be

inefficient to proceed . . . on separate tracks); Dkt 124 (Discovery Conference) at 48:24-49:4

(defendants reserving the right to file summary judgment but agreeing that it may be more

efficient to conduct a prompt bench trial).  Therefore, the rationales that ordinarily counsel in

favor of *res judicata*, such as "judicial economy" and "efficiency," *Duane Reade, Inc. v. St.

Paul Fire & Marine Ins. Co*., 600 F.3d 190, 199-200 (2d Cir. 2010), apply with less force

here, where the parties have already presented evidence on the contract interpretation issue at

the core of this case.  Nonetheless, because *res judicata* is a non-discretionary bar, the Court considers its application and finds that it precludes Plaintiffs' claims, for the reasons set forth below.  However, because of the unusual procedural posture here, the Court also reaches the merits of Plaintiffs' breach of contract claim and holds in the alternative that Plaintiffs have not met their burden of proving their claim against Defendants.

## A. Applicable Law

Under *res judicata*, "a valid final judgment bars future actions between the same parties on the same cause of action." *Simmons v. Trans Express, Inc*., 170 N.E.3d 733, 736 (N.Y. 2021) (quoting *Parker v. Blauvelt Volunteer Fire Co.*, 712 N.E.2d 647, 649 (N.Y. 1999)).  "This rule applies if the subsequent claim was 'actually litigated' in the prior action or if it merely 'could have been raised in the prior litigation.'"  *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, No. 22-cv-3132, 2024 WL 3529080, at *14 (2d Cir. 2024) (summary order) (quoting *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005)).  "New York courts use a 'transactional approach' to determine whether a claim 'could have been raised in the prior litigation.'"  *Id*.  "Under this approach, any subsequent claim that 'aris[es] out of the same transaction or series of transactions' as the adjudicated claim is barred, 'even if based upon different theories or if seeking a different remedy.'"  *Id*.

Notably, and most relevant here, the preclusion rules apply "even where new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence."  *Cho v. Blackberry Ltd*., 991 F.3d 155, 168 (2d Cir. 2021) (quoting *L-Tec Elecs. Corp. v. Cougar Elec. Org.*, 198 F.3d 85, 88 (2d Cir. 1999)).  While it may be true that newly discovered evidence will, in some cases, "prevent the application of *res judicata* if 'the evidence was either fraudulently concealed' or 'could not have been discovered by due diligence,' that exception only applies

if the concealment prevented the Plaintiff from being able to raise the issue at the first

proceeding." *Caron v. TD Ameritrade*, No. 19-cv-09015 (AJN), 2020 WL 7027593, at *7

(S.D.N.Y. Nov. 30, 2020) (citation omitted) (quoting *In re Layo*, 460 F.3d 289, 293 (2d Cir.

2006)). "A plaintiff seeking to apply the fraud exception to *res judicata* must 'allege with

particularity' what the defendant 'did to conceal any material information' and why it 'was

unable to discover' defendant's actions." *Ningbo Prods. Imp. & Exp. Co. v. Eliau*, No. 11-cv-

00650 (PKC), 2011 WL 5142756, at *9 (S.D.N.Y. Oct. 31, 2011) (quoting *Rafter v. Liddle*,

704 F. Supp. 2d 370, 377-78 (S.D.N.Y. 2010)). "If the plaintiff could have uncovered the

allegedly concealed evidence 'with minimal diligence' or upon reasonable inspection, the

fraud exception to claim preclusion will not apply." *Id*. (quoting *Rafter*, 704 F. Supp. 2d at

378).

### B.  Analysis

This Court has already determined — and will not revisit its ruling — that Plaintiffs'

claim for breach of Section 7.6(c) of the Merger Agreement is "part of the same set of

transactions as Plaintiffs' claims for breach of Sections 7.6(a) and 7.6(b) of the Merger

Agreement in *Trireme I*." *Trireme Energy Dev. LLC v. RWE Renewables Ams., LLC*, No. 22-

cv-07439 (JLR), 2023 WL 5469662, at *7 (S.D.N.Y. Aug. 24, 2023).  Indeed, the "contract

claims in both actions involve the same Merger Agreement" and arise from Section 7.6 of the

agreement.  *Id.*  While the Court's ruling at the pleading stage was premised on the doctrine of

claim splitting and not *res judicata*, the Court's reasoning just as readily applies here.

*Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 505 (2d Cir. 2019) ("Because

[claim preclusion and claim-splitting] are animated by similar policy goals and concerns, we

frequently apply principles governing the doctrine of claim preclusion to the rule against

duplicative litigation."); *TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 500-01 (2d Cir.

2014) ("[I]f a party sues for a breach of contract, '*res judicata* will preclude the party's subsequent suit for any claim of breach that had occurred *prior* to the first suit.'" (quoting *Prime Mgmt. Co. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990))).

However, unlike at the pleadings stage, the Court now lacks any discretion to consider the equities of the situation. "There is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*.'" *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (quoting *Heiser v. Woodruff*, 327 U.S. 726, 733 (1946)). The Court therefore finds itself bound by *res judicata* despite Plaintiffs' prior efforts to amend their complaint. *See, e.g.*, *N. Assurance Co. v. Square D Co.*, 201 F.3d 84, 88 (2d Cir. 2000) ("[C]laims will be barred through the normal rule barring claims that should have been brought, regardless of whether the plaintiff seeks to add them to the initial suit."). In any event, the Court is not persuaded that, as Plaintiffs argue, the application of *res judicata* produces any serious unfairness. Dkt. 167 at ¶ 282. As set forth in greater detail *infra*, the trial evidence shows that Plaintiffs knew or should have known of a potential breach of Section 7.6(c) by at least November 2020, and yet they waited nearly half a year and well past the amendment deadline to move to amend. Moreover, on appeal, Plaintiffs abandoned their challenge to the denial of the motion to amend, thereby "fail[ing] to avail [themselves] of an opportunity to pursue a remedy in the [first] action." *EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394, 400 (2d Cir. 1997) (holding that "application of *res judicata* is warranted" where plaintiffs fail to challenge the denial of a motion for leave to amend on appeal). Therefore, barring an exception, *res judicata* applies, and there is no grave injustice in so holding.

To escape *res judicata*, Plaintiffs must show either that IRUS or its agents "fraudulently concealed" IRUS's transfer of the Development Companies, or that the transfer of the Development Companies was "impossible to 'discover[] with due diligence.'" *Cho*,

991 F.3d at 169 (quoting *L-Tec Elecs. Corp.*, 198 F.3d at 88).  Neither exception applies.  The relevant inquiry is whether Plaintiffs had "sufficient notice at the time of the [prior action] of the essential facts that are now alleged."  *Saud v. Bank of N.Y.*, 929 F.2d 916, 920 (2d Cir. 1991).  That means that Trireme "need not show precisely *how* the Development Companies were disposed of," so long as it knew or should have known that "IRUS no longer had any ownership interest in them."  Dkt. 74 (Plaintiffs' Motion for Judgment on the Pleadings) at 4 n.3.

Here, the publicly available filings and documents produced in litigation were sufficient to put Trireme on notice that IRUS may not retain an ownership interest in the Development Companies post–Asset Swap.  Plaintiffs insist that their theory of the case is straightforward: "Prior to July 1, 2020, IRUS owned all of the 'equity interests' in the Development Companies.  After that date, it did not . . . ."  Dkt. 167 ¶ 183.  That is precisely what is shown in the organizational charts incorporated in IRUS's public FERC and PSC filings in May 2019.  The "Simplified RWE Pre-Transaction Organizational Chart" shows IRUS subsidiaries holding the Development Companies.  PX 340 at 41; PX 341 at 13.  Conversely, in the "Simplified Post-Transaction Organizational Chart," there are *no* subsidiaries depicted beneath IRUS.  PX 340 at 43; PX 341 at 15.  That IRUS's corporate structure post–Asset Swap was not yet finalized at the time of these filings is immaterial.  There was enough information in the public filings to engender a "suspicion[]" that the Development Companies would be transferred, even if the exact chain of ownership post-close was not detailed.  *Caron*, 2020 WL 7027593, at *6.

Plaintiffs underscore that, when asked, neither Young nor Casey could identify where on the chart the post-transaction ownership of the development companies was reflected.  Dkt. 167 ¶ 296 (citing deposition and trial testimony).  But the appropriate question for the

purposes of *res judicata* is whether a person could reasonably ascertain the "essential fact" underlying this litigation, that is, whether a reasonable person could conclude from the organizational charts that *IRUS* no longer held the Development Companies. Casey readily answered that narrower question and confirmed that the chart showed what was set forth on the face of the document — that there were no subsidiaries listed under IRUS. Tr. at 738:22-739:10 (Q: "And if you look over at Innogy Renewables US LLC to the right, can you tell me, sir, in this post-transaction organizational chart, what subsidiaries you see listed as being under IRUS?" A: "I do not see any.").

Moreover, in December 2020, RES filed a Certificate of Merger with the State of Delaware stating that IRUS and RES were merging, and that RES would be the surviving company. PX 347. This was sufficient to put Plaintiffs on notice that IRUS, which was not the surviving company after the merger, would not continue to own the Development Companies. Plaintiffs contend that the merger certificate would not have notified them of a breach of Section 7.6(c) because the Merger Agreement permitted the parties to have successors. Dkt. 167 ¶ 136 ("The Merger Agreement specifically contemplated that the parties could have a successor." (citing PX 001 at 69)). Even if successors were contemplated by the Merger Agreement, Plaintiffs, sophisticated entities familiar with M&A in the renewable-energy sector, should have anticipated that given that RES was the surviving entity of the merger, IRUS's assets would necessarily be restructured under RES such that further inquiry was warranted.

Finally, Defendants introduced at trial additional documents produced during the *Trireme I* litigation that put Trireme on notice as to a potential breach of Section 7.6(c), namely a tax-equity financing agreement that removed IRUS from the chain of ownership for

the Cassadaga project, DX 400 at 1-2.[17]  *C.f., e.g., Levitin v. Homburger*, 932 F. Supp. 508,

517 (S.D.N.Y. 1996) (Sotomayor, J.) (notice of judgment via service of process sufficient for

application of *res judicata*, irrespective of whether notice was reviewed), *aff'd*, 107 F.3d 3 (2d

Cir. 1997); *L-Tec Elecs. Corp.*, 198 F.3d at 87-88 (claim barred where plaintiff could have

ascertained newly discovered information through "due diligence, including . . . discovery

upon the original complaint," *id.* at 88).  The production of these documents in discovery and

their receipt by counsel are sufficient to charge Plaintiffs with notice.  *See, e.g.*, *Veal v.*

*Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("In general, when an agent is employed to represent

a principal with respect to a given matter and acquires knowledge material to that

representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third

person the agent's knowledge is imputed to the principal."); *Well-Made Toy Mfg. Corp. v.*

*Lotus Onda Indus. Co.*, No. 02-cv-01151 (CBM), 2003 WL 42001, at *10 (S.D.N.Y. Jan. 6,

2003) (applying *res judicata* where "[t]he record suggest[ed] that during the discovery phase

of [the prior litigation], plaintiff may have been aware of the alleged . . . infringement which

was subsequently advanced in the instant action").

Plaintiffs argue that there was conflicting information about the Development

Companies' ownership in public filings.  *See*, *e.g.*, PX 452 at 5 (FERC filing stating that

Cassadaga would continue to be an indirect subsidiary of IRUS after the Asset Swap).

However, given the totality of the publicly filed information and discovery produced to

---

[17] The Court gives no weight to Plaintiffs' argument that they were not on notice because
"IRUS's counsel did not 'discover'" these documents until the eve of trial.  Dkt. 167 at ¶ 142.
Plaintiffs, not Defendants, are seeking to invoke an exception to the otherwise mandatory *res
judicata* rule, and Plaintiffs, not Defendants, are expected to actively litigate their claims.
Defendants' efforts or lack thereof are therefore not an appropriate benchmark.

Plaintiffs in *Trireme I*, Plaintiffs had at least "sufficient information" to give rise to a "duty of further investigation" for purposes of *res judicata*. *Saud*, 929 F.2d at 921.

Plaintiffs, however, disclaim any affirmative obligation to uncover a potential breach of Section 7.6(c) and assert that Defendants never shared, forwarded, or otherwise directed Plaintiffs to the relevant public filings. Plaintiffs' argument misses the mark for at least two reasons. First, Plaintiffs misconstrue the law. In the *res judicata* context, courts often require Plaintiffs to undertake a searching inquiry as to potential litigation claims, on the expectation that plaintiffs are well incentivized to "actively litigate" their claims. *Saud*, 929 F.2d at 921-22 (barring fraud claim where plaintiff had a "strong incentive to actively litigate his defense and further uncover evidence of fraud" given "the substantial amount of money at stake" in prior proceedings); *see also In re Layo*, 460 F.3d at 293 (barring claim where party previously failed to check public records, which "is the most basic type of due diligence"); *Warmin v. N.Y.C. Dep't of Educ.*, No. 16-cv-08044 (KPF), 2019 WL 3409900, at *5-6 (S.D.N.Y. July 29, 2019) (holding that plaintiff could have discovered document earlier had he filed freedom-of-information request with government agency); *L-Tec Elecs. Corp.*, 198 F.3d at 88 ("[Plaintiff] could have ascertained" newly discovered evidence earlier "through due diligence, including pre-filing investigation or discovery upon the original complaint."); *Cho*, 991 F.3d at 169 (barring claim where newly discovered evidence was "publicly available"). Indeed, the Second Circuit recently confirmed that the "fraudulent concealment and non-discoverability exceptions to *res judicata* do not apply" when the plaintiff "had access to sufficient public information" to bring her present claims at the time of the earlier action. *Araoz v. New Alb. Co.*, No. 24-00748-cv, 2024 WL 4533333, at *2 (2d Cir. Oct. 21, 2024) (summary order).

In arguing otherwise, Plaintiffs cite "[g]eneral principles about notice, reasonable reliance, and due diligence" that are untethered from the *res judicata* context and are therefore inapposite. Dkt. 167 at ¶ 288. Plaintiffs rely, for instance, on *Meyer v. Seidel*, 89 F.4th 117 (2d Cir. 2023), to argue that the public filings Defendants cite did not give sufficient notice, because they did not speak "directly" to Trireme's Section 7.6(c) claim and did not make it "more likely than not" that Trireme had a claim for breach of Section 7.6(c). *Id.* ¶ 296 (quoting *Meyer*, 89 F.4th at 135-36). *Meyer* is not, however, a case applying the *res judicata* doctrine; rather, *Meyer* addresses inquiry notice for purposes of tolling the statute of limitations for a plaintiff's fraud claim. *Meyer*, 89 F.4th at 130. Unlike in *Meyer*, the standard here is not whether Trireme was on notice that a breach was "more likely than not," *id.* at 136, but whether Trireme had "sufficient notice" of the "essential fac[t]" — that is, that IRUS no longer held the Development Companies. *Saud*, 929 F.2d at 920; *see also Caron*, 2020 WL 7027593, at *9 (applying *res judicata* notwithstanding newly discovered evidence where defendant's statements in prior litigation "demonstrated his awareness of the *possibly* fraudulent nature" of defendant's representations (emphasis added)); *cf. Meyer*, 89 F. 4th at 135 ("To constitute inquiry notice [for equitable tolling], '[t]he fraud must be *probable*, not merely possible.'" (emphasis added) (alteration in original) (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003))). For the reasons set forth above, that standard is readily cleared.[18]

Second, Plaintiffs are sophisticated business entities that were at all relevant times represented by counsel — this fact, too, cuts against them. "Where sophisticated businessmen

---

[18] As Defendants note, requiring "sufficient" notice of just the "essential facts" also comports with Federal Rule of Civil Procedure 11, which requires only that that factual allegations in a pleading will "likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3); *see* Dkt. 168 ¶¶ 218-219.

engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984). Trireme effectively seeks to discharge itself of any responsibility to investigate or inquire about a potential breach by citing IRUS's obligations to seek consent and provide quarterly updates, *see* Agreement § 7.6(a),(c). But IRUS did not view the internal reorganization of the assets as falling within either its obligation to obtain consent or to provide information. Trireme's witnesses in turn repeatedly testified that they did not undertake any inquiry into a potential breach of Section 7.6(c). *See, e.g.*, Tr. at 360:6-16 (Brinklow: did "not personally investigate the breach that's alleged in the case"); Brinklow Dep. Tr. at 296:6-23 (did not review FERC, Delaware Secretary of State, or PSC filings); Tr. at 460:2-8 (Spencer: did not recall anyone at Trireme "ask[ing] for additional information relating to the request to transfer the parent company guarantee"); Trireme Spencer 30(b)(6) Dep. Tr. at 91:7-92:5 (Trireme's investigation into a potential breach consisted solely of asking Young whether the Development Companies would be transferred). Trireme's attempt to wash its hands of any duty to investigate runs contrary to the well-established proposition that "the greater the sophistication of the investor, the more inquiry that is required," *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d. Cir. 2006). Moreover, as sophisticated players in the renewable-energy business, Trireme and Terra Firma were well-acquainted with FERC, had themselves filed documents with the PSC and the Delaware Secretary of State in connection with the Aura transaction, and understood that those filings are publicly available. Trireme was not expected to "scour the Earth" for information, Dkt. 167 ¶ 312, but Trireme was required to exhaust the resources available to it. It did not do so.

In fact, the course of conduct between the parties throughout the term of the Merger Agreement demonstrates that these particular Plaintiffs, represented by sophisticated counsel, were seemingly scouring the Merger Agreement for potential claims, leverage, or possible triggers for the milestone payments. *See, e.g.*, DX 176 at 1 (Spencer email regarding the PCG novation request: "Let's see if we can use this consent they need to leverage them. I have a litigator looking at the circumstances."); *id.* (Brinklow email: "I think we should get more aggressive with them."). Examples of this include Trireme demanding the Cassadaga Milestone in August 2019 and promptly withdrawing the request when it was clear the milestone payment had not been triggered, and filing claims for breach of contract in the earlier action that were later withdrawn. Plaintiffs therefore had both incentive and means to actively investigate potential litigation claims. Their failure to apply those resources to conduct even basic due diligence here, such as checking public filings, is therefore unreasonable. *See Saud*, 929 F.2d at 99.

Separately, while Plaintiffs largely retreated from their claim of fraudulent concealment at trial, the Court nonetheless finds that Plaintiffs have failed to show either that IRUS acted with fraudulent scienter, or that Trireme reasonably relied on IRUS's allegedly contrary representations. *See Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (setting forth elements for a claim of fraud under New York law). For one, Plaintiffs' fraudulent concealment claim rests on just two pieces of evidence: (1) Young's purported verbal assurances to Spencer that the ownership of the Development Companies would remain the same; and (2) the organizational chart IRUS circulated to Trireme on April 22, 2020, in connection with the request to novate the PCG, PX 350; PX 352; Trireme 30(b)(6) Spencer Dep. Tr. at 63:18-64:12. As to the former, the parties' meeting was, by both side's accounts, an informal catch-up. The Court does not believe that Young made detailed

and specific statements as to IRUS's corporate structure or gave assurances that the milestones would not be triggered. The more plausible inference is that Young sought to assure Spencer of IRUS's continued commitment to the Aura transaction and the Development Companies. As for the organizational chart sent to Plaintiffs on behalf of Casey in April 2020, the Court finds the context in which it was provided to be important: Trireme, anxious about the potential creditworthiness and financial strength of a new guarantor, sought additional information to better assess IRUS's proposal to substitute RWE AG as the parent company guarantor. The Court credits Casey's testimony that he understood Trireme's request to be seeking information about IRUS's upstream corporate structure. Tr. at 614:8-12; 670:16-21 (Casey). Indeed, documents regarding the upstream corporate structure would be the most appropriate and responsive information to questions regarding the novation of the parent guarantee.

In any event, the Court finds that IRUS's representations — even if they were misleading, which the Court holds they were not — amount to little more than "expressions of opinion of present or future expectations" and therefore "d[o] not constitute actionable fraud." *Boone v. Codispoti & Assocs.*, No. 15-cv-01391 (LGS), 2015 WL 5853843, at *3 (S.D.N.Y. Oct. 7, 2015) (quoting *Adrien v. Est. of Zurita*, 814 N.Y.S.2d 709, 710 (App. Div. 2006)); *see also Naturopathic Lab'ys. Int'l, Inc. v. SSL Ams. Inc*., 795 N.Y.S.2d 580, 581 (App. Div. 2005) (statement by president of defendant's subsidiary that financing the proposed acquisition "'would be no problem' . . . amount[ed] to no more than statements of prediction or expectation"); *McFarland v. Loan Care*, No. 12-cv-02847 (JPO), 2013 WL 2355453, at *7 (S.D.N.Y. May 29, 2013) ("[U]nder New York law, 'a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud.'"). Young's oral statements and IRUS's diagrams of the post-transaction

organizational structure were rendered well in advance of the close of the Asset Swap —

indeed, Young's statements were made more than a year prior.  Witnesses testified that the

post-close corporate structure remained in flux well into 2020.  Tr. at 615:5-9 (Casey).  Such

early representations are not sufficient to establish fraud.

In sum, the evidence shows that Trireme knew or should have known about the change

in the Development Companies' ownership as of the filing of the operative complaint in

*Trireme I* in January 2021.  Trireme has not shown that evidence necessary to bring its

Section 7.6(c) claim was "'fraudulently concealed' or impossible to 'discover[] with due

diligence'"; "accordingly, it cannot prevent the application of *res judicata*."  *Cho*, 991 F.3d at

170 (alteration in original) (quoting *L-Tec Elecs. Corp.*, 198 F.3d at 88).

## II.    Breach of Contract Under Section 7.6(c)

Even if Plaintiffs' claim was not barred by *res judicata*, Plaintiffs alternatively have

not proven their breach of contract claim.  Plaintiffs argue that Defendants breached Section

7.6(c) when the Development Companies were shifted from IRUS as part of the Asset Swap.

According to Plaintiffs, the language of Section 7.6(c) unambiguously restricts *all* movements

of the Development Companies from under IRUS, without exception.  Dkt. 167 at 54-56.

Defendants disagree and maintain that Section 7.6(c) only applies to transactions that

approximate sales to third parties.  Dkt. 168 at 126-128.  Since this was a purely internal

reshuffling of disregarded entities within the same corporate family after the Asset Swap

concluded, Defendants contend that there was no breach.

Based on thorough consideration of all the evidence and arguments presented, and for

the following reasons, the Court finds that Defendants did not breach Section 7.6(c) of the

Merger Agreement when they internally restructured the corporate ownership of the

Development Companies.

**A.  Legal Standard**

Under New York law, the elements of a claim for breach of contract are "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022).  The parties do not dispute the first two elements of Trireme's claim.  The Merger Agreement is a valid, enforceable agreement, and Trireme performed its contractual obligations by transferring its projects under development to IRUS.  The central inquiry before this Court, then, is the meaning of Section 7.6(c) and whether IRUS breached that provision when the Development Companies were internally reorganized within the same corporate family.  For the reasons set forth below, the Court concludes that the parties did not intend for Section 7.6(c) to apply to the purely internal reassignment of assets.  The Court therefore finds no breach of Section 7.6(c).

Courts are to give the "words and phrases in a contract . . . their plain meaning" and construe the contract "so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations adopted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)).  Therefore, a "contract should be read as a whole, and every part will be interpreted with reference to the whole" and "to give effect to its general purpose." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1214 (N.Y. 2007) (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003)).  Notwithstanding the parties' express language, contract interpretation is an exercise in "common sense" and so "words should be considered, not as if isolated from the

context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014) (quoting *Duane Reade, Inc. v. Cardtronics*, 863 N.Y.S.2d 14, 19 (App. Div. 2008)). "[It is a] well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023) (alteration in original) (quoting *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (App. Div. 2012)). "Only where a contract's terms are ambiguous can extrinsic evidence be used to aid interpretation." *Tang Cap. Partners v. BRC Inc.*, 661 F. Supp. 3d 48, 61 (S.D.N.Y. 2023). "Contract language is unambiguous only 'where the contract language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" *RCJV Holdings*, 18 F. Supp. 3d at 546 (internal quotation marks omitted) (quoting *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). Conversely, contract terms are ambiguous if they "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co.*, 595 F.3d at 466 (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). "The question whether a writing is ambiguous is one of law to be resolved by the courts." *RCJV Holdings*, 18 F. Supp. 3d at 541 (quoting *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995)).

"[I]f ambiguity exists, then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). "Review of extrinsic evidence may include

looking to 'negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms.'" *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 277 (S.D.N.Y. 2022) (omission in original) (quoting *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991)).  "The review of the surrounding facts and circumstances may also include consideration of industry custom and practice, and any relevant course of performance or course of dealing." *Id.* (citations omitted). Courts have deemed parties' course of performance as the "best evidence of the intent of the parties to a contract," finding that such post-contract conduct is "highly probative of [the parties'] state of mind at the time the contract was signed." *China Privatization Fund (Del.), L.P. v. Galaxy Ent. Grp. Ltd.*, 135 N.Y.S.3d 18, 20 (App. Div. 2020) (first quoting *Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (App. Div. 2008); and then quoting *Gulf Ins. Co. v. Transatl. Reinsurance Co.*, 886 N.Y.S.2d 133 (App. Div. 2009)); *see also Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) ("[C]ourse of performance is weighty evidence of a party's intent in entering a contract" (citing *Rec. Club of Am., Inc. v. United Artists Recs., Inc.*, No. 72-cv-05234 (WCC), 1991 WL 73838, at *10 (S.D.N.Y. April 29, 1991))).

### B.  Section 7.6(c) Is Ambiguous

This Court previously held at the pleadings stage that Section 7.6(c) is ambiguous. *See Trireme*, 2023 WL 5469662, at *12-13; Dkt. 104 at 30:19-37:1 (denying judgment on the pleadings because Section 7.6(c) is ambiguous).  Plaintiffs ask the Court to revisit this determination.  Having scrutinized the contract language again and on further consideration, the Court continues to hold that Section 7.6(c) is ambiguous and reference to extrinsic evidence is therefore appropriate.  *See, e.g., United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024) ("[W]hile the law-of-the-case doctrine does not bind th[e] court," it "reflect[s] a 'sound

policy' that [courts] "'should depart from sparingly and only when presented with cogent and

compelling reasons.'" (first quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000);

and then quoting *Puricelli v. Argentina*, 797 F.3d 213, 218-19 (2d Cir. 2015))).  It is not clear

from the four corners of the Merger Agreement whether the parties intended Section 7.6(c) to

apply to *all* sales, assignments, transfers, and other dispositions of IRUS's interests in the

Development Companies, as Plaintiffs urge, or to a more limited subset of transactions, as

Defendants contend.  *Compare* Dkt. 167 ¶ 38, *with* Dkt. 168 ¶ 245.

Turning first to the text of Section 7.6(c) itself, the Court accepts that the terms "sell,"

"assign," "transfer" or "otherwise dispose of" carry commonly understood and distinct

meanings.  In evaluating whether a purely internal corporate transfer would qualify, the Court

notes that Section 7.6(c) does not clarify to whom IRUS is prohibited from selling, assigning,

transferring, or otherwise disposing of the development projects.  Courts allow extrinsic

evidence to resolve ambiguity resulting from a contract's silence on a term "necessary to

construe an agreement's written provisions." *Jacobs v. Carsey-Werner Distrib., Inc*., No. 93-

cv-06825 (LMM), 1994 WL 116077, at *2 (S.D.N.Y. Mar. 30, 1994) (emphasis omitted).

Plaintiffs themselves concede that reference to extrinsic evidence is appropriate in these

circumstances.  *See, e.g*., Dkt. 167 ¶ 202 (a court can consider extrinsic evidence where "the

silence itself causes the written terms of the agreement to be ambiguous." (quoting *Acranom

Masonry, Inc. v. Wenger Constr. Co.*, No. 14-cv-01839 (PKC), 2017 WL 4358751, at *13

n.22 (E.D.N.Y. Sept. 29, 2017))).  For instance, in *Record Club of America, Inc. v. United

Artists Records, Inc*., the Second Circuit found ambiguity where a contract provided for

royalty payments but was silent as to the timing of those payments.  890 F.2d at 1269-71.  The

Court held that, because the contract was silent as to the timing of royalty payments, it was

"reasonably susceptible to more than one interpretation," *id.* at 1270; for example, that those

payments had to be made on a quarterly basis *or* that the payments were due at the expiration

of the initial term of the agreement, *id*. at 1268.  And in *Brass v. American Film Technologies,*

*Inc*., the Second Circuit found ambiguity where a contract required the reservation of shares

of a corporation's common stock, but "there [was] nothing said in the contract about restricted

or unrestricted common stock."  987 F.2d 142, 149 (2d Cir. 1993).  The Second Circuit noted

that, while the district court "concluded that nothing in [the contract] 'indicates that the stock

at issue will be unrestricted and freely transferable[,]' . . . it seems equally true that nothing in

this phrase indicates that the stock will be unencumbered."  *Id*.  Here, Section 7.6(c) limits

sales, assignments, transfers, or other dispositions without consent but does not state to whom

those limitations apply.  *See also Allstate Ins. Co. v. White Metal Rolling & Stamping Corp*.,

466 F. Supp. 419, 421 (E.D.N.Y. Mar. 8, 1979) (finding ambiguity where agreement set forth

insurer's right to retain outside counsel but then "contain[ed] no words" as to under which

circumstances that right could be exercised).

      In light of the lack of clarity in the language of Section 7.6(c) itself, the Court also

looks to the purpose and context of the Merger Agreement, which suggests that the parties did

not intend it to apply so broadly as to restrict even intracorporate restructurings.  "In

determining whether a contract is ambiguous 'a court need not turn a blind eye to context.'"

*Dreni v. PrinterOn Am. Corp*., No. 18-cv-12017 (MKV), 2021 WL 4066635, at *3 (S.D.N.Y.

Sept. 3, 2021).  Despite the broad unqualified language used in Section 7.6(c), "[t]he meaning

of a contract . . . is not 'necessarily to be fixed in absolute accordance with the literal meaning

of the language used,' for the words of a contract must be given a 'fair and reasonable

meaning' in accordance with the parties' intent."  *In re World Trade Ctr. Disaster Site Lit*.,

754 F.3d 114, 122 (2d Cir. 2014) (internal quotation marks omitted) (citation omitted) (first

quoting *In re Bond & Mortg. Guar. Co.*, 196 N.E. 313 (N.Y. 1935); and then quoting *Sutton v.*

*E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982)).  The Court therefore need not

follow the literal meaning of the language used if doing so would, based on the structure and

purpose of the agreement, produce a result that is "absurd, commercially unreasonable, or

contrary to the reasonable expectation of the parties."  *RCJV Holdings*, 18 F. Supp. 3d at 545.

For instance, in *RCJV Holdings*, the Court reviewed a contract provision to determine if it was

ambiguous and noted that "[b]ecause contract interpretation is an exercise in 'common sense'

rather than 'formalistic literalism,' 'words should be considered, not as if isolated from the

context, but in the light of the obligation as a whole and the intention of the parties as

manifested thereby.'"  *Id.* (quoting *Duane Reade, Inc.*, 863 N.Y.S.2d at 19).  While the Court

found that there was a reading that was "more faithful to the plain text," an alternative reading

that was "more commercially reasonable" was also at least possible.  *Id*. at 546.  The Court

therefore deemed the provision at issue ambiguous and turned to extrinsic evidence to clarify

its terms.  *Id*.

So too here.  Section 7.6(c) is part of a broader Merger Agreement under which IRUS,

as purchaser, acquired the assets in question and agreed to contingent milestone payments

associated with their development.  *See, e.g.*, *Chesapeake Energy Corp.*, 773 F.3d at 114;

*Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as

a whole, and if possible, courts must interpret them to effect the general purpose of the

contract.").  "It is 'elementary' that 'clauses of a contract should be read together contextually

in order to give them meaning.'"  *Chan v. Smith*, No. 13-cv-04724 (HB), 2013 WL 5290717,

at *2 (S.D.N.Y. Aug. 19, 2013), (quoting *Diamond Castle Partners IV PRC, L.P. v.

IAC/InterActiveCorp*, 918 N.Y.S.2d 73, 75 (App. Div. 2011)), *aff'd, Chan v. Smith*, 550 F.

App'x 58 (2d Cir. 2014) (summary order).  Section 7.6(c) is included in Section 7.6 of the

Merger Agreement, titled "Payment Milestone."  Agreement § 7.6.  When viewed alongside

its neighboring subprovisions, it is clear that Section 7.6 of the Merger Agreement was drafted to safeguard Trireme's interests in the Development Companies, and ultimately, in the earnout payments. For instance, under Section 7.6(a), IRUS was required to exercise "commercially reasonable efforts" to develop the renewable-energy projects. Agreement § 7.6(a). Pursuant to Section 7.6(b), Trireme was entitled to quarterly updates regarding the development of the projects so that Trireme could stay apprised of progress towards the milestones. It follows, then, that Section 7.6(c)'s prohibition on sales, assignments, transfers, and other dispositions was likewise intended to safeguard Trireme's interests in the "Payment Milestones," namely, by restricting those transactions that threatened to jeopardize Trireme's ability to recover the earnouts. It defies common sense that the parties would have intended to restrict, at the time of contracting, an internal reorganization with no measurable impact on either the Development Companies or Trireme's ability to recover earnout payments under the contract.

To understand the implications of Plaintiffs' contrary reading, the Court finds instructive the hypothetical set forth by Defendants in closing statements. Suppose that, solely for administrative purposes, IRUS sought within one month of closing to form a new shell company, "IRUS II." For all other purposes, the entity remained the same as its predecessor — the same employees, the same upstream and downstream corporate structure, and the same management team. Under Plaintiffs' restrictive interpretation that *any* movement of the development companies from IRUS triggers Section 7.6(c), a transfer of the development assets to IRUS II without consent would necessarily breach Section 7.6(c), thereby entitling Plaintiffs to a $112 million payout. That is the necessary result of a literal reading of Section 7.6(c)'s terms, but such an interpretation arguably strains common-sense and amounts to an exercise in "formalistic literalism." *RCJV Holdings*, 18 F. Supp. 3d at 545.

The Court is obligated to avoid a "result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties," *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-cv-07134 (VM), 2015 WL 4940126, at *5 (S.D.N.Y. Aug. 10, 2015) (quoting *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 346 (App. Div. 2010)).  Here, therefore, there are at least two possibilities.  On the one hand, given that Section 7.6(c) does not indicate with whom it intends to prohibit sales, assignments, transfers, or other dispositions, that provision may be interpreted as adopting a blanket prohibition on all such transactions.  This reading is arguably "more faithful to the plain text," *RCJV Holdings*, 18 F. Supp. 3d at 546, but its application to the present circumstances strains commercial reasonableness and common sense.  On the other hand, there is a reasonable interpretation — based on the structure and context of the Merger Agreement — that the provision does not apply to internal reorganizations because such transactions would not impact the milestone payments due under the contract.  Thus, the provision is ambiguous, and it is appropriate to consider extrinsic evidence to determine the intent of the parties.[19]

The Court is unpersuaded by Plaintiffs' arguments in support of finding the contractual language unambiguous.  As noted above, Plaintiffs are not entitled to rely on the "plain meaning" of the contractual language if that meaning leads to an outcome that is commercially unreasonable.  *See, e.g., Zest Anchors, LLC v. Biomet 3i, LLC*, No. 23-cv-07232

---

[19] *Donohue v. Cuomo*, 184 N.E.3d 860 (N.Y. 2022), cited by Plaintiffs, does not counsel otherwise.  *Donohue* is readily distinguishable.  The court therein declined to adopt a mechanical inference in favor of the vesting of retiree health insurance benefits when the underlying collective bargaining agreement did not expressly provide for vested rights.  *Id.* at 868-69.  Setting aside the disanalogous context, *Donohue* underscored that contractual ambiguities arise not from silence alone but from "what was written so blindly and imperfectly that its meaning is doubtful."  *Id.* at 867 (quoting *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 173 (N.Y. 2002)).  Section 7.6(c) falls within the latter category given the context of the overall Merger Agreement.

(JLR), 2024 WL 4008164, at *8 (S.D.N.Y. Aug. 30, 2024) (holding that distribution

agreement was ambiguous where, despite not explicitly incorporating certain trademark

registrations, exclusion of those trademarks "appear[ed] contrary to the parties' intent and

[was] commercially unreasonable"); *Shipping & Fin., Ltd. v. Aneri Jewels LLC*, No. 19-cv-

01293 (NRB), 2019 WL 5306979, at *2 (S.D.N.Y. Oct. 21, 2019) ("When evaluating whether

a contract is ambiguous, '[i]t is black letter law that courts must reject interpretations of

agreement provisions that are commercially unreasonable or illogical.'" (alteration in original)

(quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173

(S.D.N.Y. 2015))); *Elsky v. Hearst Corp.*, 648 N.Y.S.2d 592, 310-11 (App. Div. 1996)

(holding that nondisclosure provisions in termination agreement prohibited public statements,

not internal discussions within the company and its subsidiary, because "[a]ny other

interpretation would lead to [a] commercially unreasonable restriction").[20]

Plaintiffs make much of the fact that IRUS did not contemporaneously suggest during

negotiations that Section 7.6(c) was ambiguous or unclear.  Tr. at 123:10-15 (Bharadwaj);

179:10-19; 197:16-19 (Brinklow).  The Court gives this evidence little probative weight.

IRUS would not have had any reason to contemporaneously express that the provision was

ambiguous if, based on the parties' negotiations, IRUS understood that it only applied to

third-party transactions.  Indeed, Casey testified that he never expressly conveyed that Section

7.6(c) should be limited to sales outside of IRUS because he "didn't think it was necessary" to

---

[20] As Defendants note, none of Plaintiffs' cited authorities address whether the plain language
of a contract results in absurdities or commercially unreasonable outcomes.  Dkt. 168 at 121
n.65 (distinguishing cases).  Nor does *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274
(2d Cir. 1984), help Plaintiffs' cause.  Plaintiffs cite *Hunt* for the proposition that, where terms
have a "commonly understood meaning," extrinsic evidence is inadmissible to vary the
meaning of those terms.  Dkt. 167 ¶¶ 197-98.  There is no suggestion in *Hunt* that the
"commonly understood meaning" of the provision at issue would produce an unreasonable or
absurd result.

do so.  Tr. at 630:8-11 (Casey); *see also* Second Young Dep. Tr. at 123:9-124:17 (Young: IRUS never asked what the words "assign" or "sale" meant because IRUS "assumed that . . . sell and assignment was specifically to third parties").  In any event, whether the negotiating parties deemed the provision ambiguous has little relevance for the purposes of the Court's analysis.  *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) ("Whether contract terms are unambiguous presents 'a question of law that is resolved by reference to the contract alone.'" (quoting *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994))).

Finally, while Plaintiffs accurately assert that "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation," Dkt. 167 at ¶ 196 (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)), the Court's finding of ambiguity does not turn on the fact that the parties disagree. The Court's finding is instead rooted in the tension between the contractual provision's literal terms and the structure of the broader Agreement.

For all of these reasons, Section 7.6(c) is reasonably susceptible to more than one interpretation and it is appropriate to consider extrinsic evidence of the parties' intent.

### C.  The Extrinsic Evidence

After reviewing all the extrinsic evidence submitted by the parties, the Court finds that the parties intended for Section 7.6(c) to apply to transactions with third parties and not to internal reorganizations such as the one challenged here.  IRUS's intracompany transfer of the Development Companies therefore did not constitute a breach of the provision.  This interpretation is supported by contemporaneous evidence of the parties' negotiations and the drafting history of Section 7.6(c); the parties' course of conduct; the structure and purpose of the Merger Agreement; and industry custom and practice.

75

The Court turns first to the drafting history of Section 7.6(c), including the parties'
communications during negotiation of Section 7.6(c).  "[I]n interpreting a contract, a court
may look to all the relevant circumstances surrounding the transaction," including "the prior
negotiations."  *Rec. Club of Am.*, 1991 WL 73838, at *9.  The Court finds significant that
Plaintiffs have not presented any competent evidence showing that the negotiating parties ever
discussed that Section 7.6(c) would apply to internal reorganizations.  There is, however,
contemporaneous evidence in support of the alternative reading.  In fact, the parties directly
involved in negotiations only ever discussed Section 7.6(c) in reference to asset sales to third
parties.  Various internal documents over the span of several months, drafted by both parties,
refer to Section 7.6(c) as a provision governing "asset sales" or "sale of projects to third
parties."  *See, e.g.*, PX 108 at 2; DX 015; DX 034; DX 064; DX 078; DX 080.

Plaintiffs seek to undermine the probative value of these contemporaneous documents,
arguing that they are shorthand, were not part of the parties' agreement, and that they in any
event cannot alter the terms of the parties' fully integrated contract.  The Court disagrees.
Several of the issue lists were drafted at Terra Firma's direction, and the Court finds
compelling that those documents *uniformly* refer to Section 7.6(c) in the context of third-party
sales.  Nor does the Merger Agreement's integration clause bar consideration of the parties'
contemporaneous transaction documents.  The Court has already deemed the contract
ambiguous; therefore, extrinsic evidence may be considered.  "Even though a document may
be fully integrated with respect to the ultimate terms of the agreement, the meaning of those
terms may remain unclear."  *U.S. Fire Ins. Co.*, 949 F.2d at 571.  "Therefore, '[e]ven where
there is a complete integration, the rule will not rise up to bar . . . [the consideration of
extrinsic evidence] if the terms of the prior agreement are not consistent with the terms of the
written integration."  *Id.* (alterations and omission in original) (quoting *Lee v. Joseph E.*

*Seagram & Sons, Inc.*, 413 F.Supp. 693, 701 (S.D.N.Y. 1976), *aff'd*, 552 F.2d 447 (2d Cir. 1977)); *see also Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 409 (S.D.N.Y. 2016) (permitting extrinsic evidence notwithstanding merger clause where such evidence "[was] needed to clarify the meaning" of contractual terms "rather than augment the terms of the contract").

Also telling are the parties' negotiations with respect to the "Approved Third Party Buyer" concept discussed in earlier drafts of Section 7.6(c). As an initial matter, the language of the first iteration of the "Third Party Buyer" concept is notable. In the draft circulated by IRUS's counsel on October 9, 2017, Section 7.6(c) (then Section 7.6(e)) provided that IRUS could not "sell[,] assign, transfer or otherwise dispose of" its interests in the Development Companies unless it "cause[d] *such Third Party Buyer* to assume [IRUS's] obligations to pay" the associated earnout. PX 110B at 56 (emphasis added). The latter clause properly modifies the former: "such Third Party Buyer" references and qualifies the aforementioned sale, assignments, transfers, and other dispositions. *See, e.g.*, *In re Lehman Bros. Mortg. Backed Sec. Lit.*, 650 F.3d 167, 176-77 (2d Cir. 2011) (finding that "such undertaking" "plainly references the aforesaid purchases, offers, or sales relating to the distribution of securities"); *Such*, Merriam-Webster, https://www.merriam-webster.com/dictionary/such [https://perma.cc/23DS-568F] ("of the character, quality, or extent *previously indicated or implied*" (emphasis added)). IRUS's proposed language therefore reinforces that the parties understood Section 7.6(c) to apply to third parties.

The chronology surrounding the parties' continued negotiation of the "Approved Third Party" buyer concept further underscores that the parties understood Section 7.6(c) as constraining third-party sales. *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (turning to the "drafting history and chronology" of negotiations to ascertain the

parties' intent).  The drafting of the "Approved Third Party" concept dovetailed with, and was directly informed by, parallel discussion with third-party entities PacifiCorp and AEP regarding one-off sales of the Development Companies.  For that reason, IRUS proposed a definition of the "Approved Third Party" that expressly incorporated PacifiCorp and AEP as preapproved buyers.  *See* PX 116; PX 116B at 8, 47.  IRUS thrice attempted to define a subset of preapproved buyers that would satisfy Trireme's concerns with respect to the purchasers' financial strength and development expertise.  Although Trireme ultimately rejected those provisions, it inserted a consent clause that granted it the option to authorize sales to third parties when it was in its economic interest to do so.  The consent provision was therefore Trireme's means of a compromise and allowed Trireme to authorize third-party sales based on the specific characteristics and finances of a prospective buyer, without preapproving a blanket definition of an "Approved Third Party."  Taken together, this sequence of events demonstrates that the parties contemplated one-off sales of the development projects to third parties, and drafted language to protect their respective interests in that eventuality.

The Court rejects Plaintiffs' post-hoc assertions that they rejected the "Approved Third Party" buyer concept because they wanted to ensure that the "development projects . . . [were] not moved in any way outside of IRUS."  Tr. at 100:17-24 (Bharadwaj).  At trial, Plaintiffs' witnesses claimed that Trireme and Terra Firma wanted to ensure that IRUS was and would remain the direct parent of the Development Companies.  *See, e.g.*, Tr. 88:3-19 (Bharadwaj: The identity of the bidder was "absolutely" important to Terra Firma, because Terra Firm "need[ed] to know that they ha[d] the capabilities, the credentials, the expertise, . . . and the interest . . . to actually follow through with the development of those assets."); 101:1-10 (Bharadwaj: "[I]n our diligence, [IRUS was] the party that we had established after a lot of hard work, that ha[s] the capabilities to develop the project, they have the strategic interest.");

177:18-19 (Brinklow: "The purpose of 7.6(c) is to make sure — to ensure that IRUS remains the owner of the development companies, the projects."). The Court does not find this testimony credible in light of all of the evidence presented at trial, especially given that the testifying witnesses each have a direct, individual financial interest in the outcome of the present litigation. Moreover, Trireme's purported fixation on IRUS as the Development Companies' parent does not comport with Brinklow's concessions at trial that, at the time the Merger Agreement was executed, he did not know whether IRUS had development assets, how many employees IRUS had, or "anything about [IRUS]'s financials." Tr. 261:3-20 (Brinklow). In fact, at the time of the merger's execution, IRUS had been in existence for less than a year, had not yet established any renewable-energy projects in the United States, and had no assets in development. Trireme and Terra Firma knew this. Tr. at 387:10-14 (Spencer: acknowledging that IRUS was a new company at the time of the merger and "didn't have a track record in the U.S."). That is precisely why Trireme insisted on a PCG during negotiations. *See, e.g*., Tr. at 109:29-110:4 (Bharadwaj: IRUS was "a relatively new company at the time" and Trireme wanted to ensure "there was a higher entity that backs up their financial obligations."). Given all of this, the Court simply does not believe the testimony that Trireme and Terra Firma were focused on ensuring that the Development Companies remained at all times with IRUS in particular (as opposed to any other entity within the RWE corporate family). Rather, the totality of the record evidence demonstrates that Trireme and Terra Firma were intent on safeguarding their contractual ability to recover earnout payments if the Development Companies were sold or transferred to a third party.

With respect to internal corporate transfers and reorganizations, there was overwhelming trial evidence of Plaintiffs' knowledge of the Asset Swap and related changes in the corporate structure. Plaintiffs knew, for instance, that IRUS would be carved out from

Innogy SE; that IRUS would be reacquired by RWE; and that IRUS would be operated by an RWE subsidiary. It is hard to imagine that the parties would have nevertheless executed a Merger Agreement intended to restrict the prospect of internal transfers, when such transfers are customary business practice in mergers and acquisitions, especially within the renewable-energy industry. Multiple witnesses testified to this effect, and Plaintiffs themselves engaged in internal restructuring as part of the merger transaction with Defendants. *See* Tr. at 512:2-6 (Rodriguez: It is "common" to "move" assets between holding companies to "facilitate tax equity financing."); Second Young Dep. Tr. at 58:6-7 ("[I]nternal mergers and reorganizations are very commonplace in our business."); Tr. at 149:12-24 (Bharadwaj: Trireme undertook an intracorporate reorganization in preparation for the parties' merger).

The Court also finds significant that the parties' only instances of performance under Section 7.6(c) have been in the context of third-party sales. Third-party sales of the development companies were in the works during the negotiations and discussed by the parties — indeed, they were part of Trireme's sales pitch. The parties therefore anticipated third-party sales of the projects, and discussed enforcing Section 7.6(c) to effectuate those sales, including the sales of the Mud Springs and Mason Dixon projects. Post-close, they implemented Section 7.6(c) in precisely that context. The parties twice drafted amendments memorializing Trireme's consent to sales pursuant to Section 7.6(c): once, for the sale of Mud Springs to PacifiCorp, *see generally* PX 003, and then again for the prospective sale of Mason Dixon to sPower. PX 367; PX 367A. Plaintiffs attempt to minimize the relevance of the parties' post-contract conduct by again appealing to the "plain language" of Section 7.6(c). Dkt. 167 ¶ 227. However, having deemed the contractual language ambiguous, the Court can (and indeed must) consider extrinsic evidence. That the parties only ever enforced Section 7.6(c) in the context of asset sales is "persuasive evidence of [the parties'] agreed intention."

*Appaloosa Inv. L.P.I. v. Fed. Home Loan Mortg. Corp.*, No. 20-1708-cv, 2022 WL 2720520, at *3 (2d Cir. 2022) (summary order) (quoting *Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S.2d 508, 512 (App. Div. 1999)).

Furthermore, and as noted *supra*, the Court finds that the broader objectives of the Merger Agreement and common-sense support limiting Section 7.6(c) to third-party transactions.  Reading the agreement to exclude intraorganizational transfers "most closely effectuate[s] the purpose" of Section 7.6(c).  *Teig v. Suffolk Oral Surgery Assocs.*, 769 N.Y.S.2d 599, 601 (App. Div. 2003).  Section 7.6(c) was designed to "prevent the loss of critical project assets without the triggering of the Payment Milestones."  PX 108 at 2 (referring to Section 7.6(e), Section 7.6(c)'s predecessor).  As Plaintiffs themselves argue, Trireme wanted to ensure that it was "not forced to look to a stranger for payment of the Milestone Payments."  Dkt. 167 ¶ 46; *see* Tr. at 108:20-25 (Bharadwaj).  Here, the internal restructuring of the Development Companies involved neither the "loss of critical project assets" nor the introduction of a "stranger" Trireme did not know.  To the contrary, at all relevant times — from the execution of the merger, to the close of the Asset Swap and the consummation of the internal reorganization — the Development Companies remained in the RWE family, with RWE as their ultimate parent.  Nor did the intracorporate transfers impact Trireme's pursuit of the merger milestones, or Trireme's rights under the contract.  Trireme continues to receive development updates pursuant to Section 7.6(b) of the parties' Merger Agreement from RWE post-close, including, among other things, updates on the steps RWE is taking with respect to key projects.  Trireme has not been hindered in its ability to enforce its legal rights under the Merger Agreement; quite the opposite, Trireme pursued litigation against IRUS in *Trireme I*, without eliciting any objection from Defendants.  Moreover, after the Asset Swap, RWE US remained responsible for the development of the projects and, if

triggered, for payment of the milestones; that did not change after the reorganization. The concerns that motivated Section 7.6(c) are therefore not implicated by the purely internal reshuffling of IRUS's disregarded entities. Allowing Plaintiffs to nevertheless invoke Section 7.6(c) in these circumstances would result in a "windfall to the defendants that is absurd, not commercially reasonable and contrary to the express terms of the agreement and thus the intent of the parties." *Cole v. Macklowe*, 953 N.Y.S.2d 21 (App. Div. 2012); *cf. CP III Rincon Towers, LLC v. Cohen*, No. 10-cv-04638 (JMF), 2022 WL 61318, at *13 (S.D.N.Y. Jan. 6, 2022) (rejecting broad interpretation of the term "transfer" in loan agreement where such interpretation would result in "*any* lien recorded against the property — even if for a dollar or if fraudulent —  trigger[ing] full recourse liability").

The Court is not persuaded by the extrinsic evidence Plaintiffs proffer to urge a broader reading of Section 7.6(c), which consists of markedly different provisions and contracts. In their initial pretrial submission, for instance, Plaintiffs pointed to the contracting parties' use of the term "affiliates" elsewhere in the Merger Agreement. Dkt. 136. at 14-15. Not only did Plaintiffs drop this argument in their post-hearing submissions, but the cited provisions impose standard obligations that customarily extend to affiliates and bear no relation to Section 7.6(c). *See, e.g.*, Agreement § 7.2(a) (mandating basic terms of employment for EverPower employees who accept employment with IRUS or its affiliates); *id.* § 7.4 (Trireme and Trireme's affiliates shall have reasonable access to records and to IRUS's and IRUS's affiliates' personnel who have knowledge of records); *id.* § 9.2 (parties and affiliates shall provide the other party with the cooperation and information necessary for filing of tax returns).

Plaintiffs also introduced other contracts between Trireme and IRUS, executed on the same day as the merger, to show that the parties were "capable of drafting carveouts" for

affiliates and "did so when mutually agreeable."  Dkt. 167 ¶ 219.  Those contracts include a

transition-services agreement, *see* Agreement at 111-20, and a confidentiality,

noncompetition, and nonsolicitation agreement between Spencer and IRUS, *see* PX 046.

Similarly, Plaintiffs contend that because IRUS sought consent from Trireme to transfer the

Parent Company Guarantee to an affiliate, RWE AG, IRUS was likewise required to seek

Trireme's consent for the transfers of the Development Companies.  *See* Dkt. 167 ¶ 23.  These

contracts and the Guarantee, however, involve different subject matter and different

contractual provisions.  Most importantly, the standard boilerplate assignment clauses in the

contracts upon which Plaintiffs rely are different in form and function from a provision

constraining the transfer of particular assets, with corresponding contingency milestone-

payment triggers.  *Cf. MVP Health Plan, Inc. v. Optuminisight, Inc*., No. 13-cv-01578, 2017

WL 3669558, at *12 (N.D.N.Y. Aug. 24, 2017) ("The parties' conduct under *similar*, prior

contracts with each other can be of great assistance to a court which must determine the

parties' intended meaning." (emphasis added)), *aff'd*, 765 F. App'x 615 (2d Cir. 2019).  The

Merger Agreement also contains a separate boilerplate assignment clause.  *See* Agreement

§ 13.4.  To the extent that the other contracts on which Trireme relies have any probative

value, it is with respect to the appropriate interpretation of the parallel assignment clause in

the Merger Agreement, *not* Section 7.6(c).[21]

---

[21] Plaintiffs' citation to *Faulkner v. National Geographic Society* is inapposite.  452 F. Supp.
2d 369 (S.D.N.Y. 2006), *aff'd sub nom. Ward v. Nat'l Geographic Soc'y*, 284 F. App'x 822
(2d Cir. 2008) (summary order).  Plaintiffs cite to *Faulkner* for the proposition that evidence
of subjective intent and post-signing characterizations of an agreement are inadmissible to
ascertain a contract's meaning.  Dkt. 167 at 66-67.  The Court, however, relies on neither
category of evidence in rendering its decision, and in fact, rejects or gives little probative
weight to such evidence offered by *Plaintiffs*.

For the aforementioned reasons, the Court finds that the parties intended Section 7.6(c) to apply only to transactions with unaffiliated third parties, not to a purely internal restructuring of assets as occurred here.  The former, but not the latter, risks potentially hindering the development of the projects and payment of the milestones, which was Section 7.6(c)'s primary concern.

### D.  Breach of Section 7.6(c)

Plaintiffs separately argue that, even accepting Defendants' narrower interpretation of Section 7.6(c), Defendants have still breached that provision because the transfers of the Development Companies were effectively a sale to a third party.  For the reasons set forth below, the Court rejects Plaintiffs' characterization of the restructuring and finds no breach of Section 7.6(c).

In Plaintiffs' telling, the "acquisition of IRUS by third party RWE US and the subsequent transfer of the Development Companies to RWE US subsidiaries were prearranged parts of a single transaction" — that is, the broader Asset Swap.  Dkt. 167 ¶ 238.  Plaintiffs maintain that the internal reorganization was preplanned and therefore indistinguishable from the broader Asset Swap between E.ON and RWE.  *Id.*  Plaintiffs suggest that the Development Companies were transferred to RWE US as partial consideration for the last step of the Asset Swap transaction.  *Id.* ¶¶ 95, 236, 238.  Moreover, according to Plaintiffs, "[b]ecause RWE US was not affiliated with IRUS until the transaction occurred, the transaction was a sale to a third party for purposes of triggering earnout payments pursuant to Section 7.6(c) of the Merger Agreement."  *Id.* ¶ 238.

Plaintiffs' argument fails for at least three reasons.  First, the Court rejects Plaintiffs' characterization of the internal reorganization and the Asset Swap as a single, unitary transaction.  As represented in each of IRUS's and RWE AG's filings with regulatory

agencies and in all the public statements pertaining to the Asset Swap, the transaction consisted of four steps, which concluded with RWE US's reacquisition of IRUS. *See, e.g,* PX 340 at 16; PX 341 at 7. The legal transaction consummating the Asset Swap closed on June 30, 2020 — prior to the reassignment of the Development Companies. PX 453 at 2. IRUS's assignment of its membership interests in the Development Companies to RWE US subsidiaries occurred only after the closing of RWE AG's purchase of the assets. Tr. at 770:4-14 (Brusius). This subsequent internal assignment of IRUS's disregarded entities involved different entities and different assets from the Asset Swap, and no exchange of monetary consideration. Moreover, Defendants' witnesses credibly testified that it is common practice post-M&A to undertake integration efforts such as those at issue here. Tr. at 512:2-6 (Rodriguez); 750:2-7 (Brusius). Plaintiffs concede that they do not take issue with the Asset Swap itself, but nothing changed materially thereafter: RWE US remained the ultimate parent of the development companies pre- and post-reshuffling; IRUS's rights and liabilities under the Merger Agreement were assumed by RWE US; and RWE US remained responsible for the payment obligations under the Merger Agreement.[22]

Second, the Court disagrees with Plaintiffs' characterization of the RWE US subsidiaries and IRUS as unaffiliated and unrelated parties. At the time of the transfer of the Development Companies, the RWE US subsidiaries and IRUS were undeniably under the same common ownership — RWE US. The transfer of IRUS's disregarded subsidiaries was therefore executed and received by entities within the same corporate family, with a common parent entity. For that reason, the assignment of IRUS's membership interests to parallel

---

[22] Plaintiffs' citation to the "step transaction" doctrine does not alter the Court's analysis. Plaintiffs' cited authority involves markedly different contexts and transactions, with the doctrine applied primarily (although not exclusively), in tax-avoidance actions. The Court declines to extend the doctrine's application to this breach of contract action.

RWE US subsidiaries was treated both as a tax-neutral contribution and a transaction under "common control" for accounting purposes.  Tr. at 763:8-14; 765:17-19 (Brusius); 796:13-22 (Nicholson).  Plaintiffs contend that the tax treatment and legal treatment of a transaction are distinct and that the tax treatment of the transaction "does not dictate the outcome of this case."  Dkt. 167 ¶ 241.  Even accepting that proposition, however, RWE's treatment of the transaction from a tax and accounting perspective is still relevant because it bears upon the transacting parties' relationship with one another.  The transaction was treated on a tax-neutral and common-ownership basis because the assignments of IRUS's interests in the Development Companies occurred between affiliates under the same corporate parents — RWE US, and ultimately, RWE AG.  For that reason, for instance, at least 80 percent of the assets were held by the "transferor" — RWE US — before and after the transaction, as required to constitute a section 351 transaction.  Tr. at 763:8-19 (Brusius).  Therefore, the assignments were not with third parties for purposes of Section 7.6(c).

Finally, if Plaintiffs characterize the transfer of the Development Companies as part and parcel with the broader Asset Swap transaction, they once more confront *res judicata*.  Plaintiffs seek to effectively recharacterize the scope of the Asset Swap as incorporating the transfer of IRUS's development companies, thereby suggesting that this portion of the broader transaction between E.ON and RWE violated Section 7.6(c).  But Plaintiffs indisputably had notice of the Asset Swap years prior, as of at least March 18, 2018, when the Asset Swap was publicly announced.  At that time, IRUS also notified Plaintiffs that E.ON and RWE's assets would be combined under the RWE umbrella.  Plaintiffs cannot simultaneously maintain that the transfer of the Development Companies and the Asset Swap are one and the same transaction for the purposes of triggering Section 7.6(c) but not for *res judicata* notice purposes.

For the aforementioned reasons, the Court finds that the assignments between affiliated entities with the same corporate parent did not constitute a breach of Section 7.6(c).[23]

## CONCLUSION

For the reasons set forth herein, the Court concludes that Plaintiffs' breach of contract claim is barred by *res judicata*.  The Court holds in the alternative that Plaintiffs have failed to prove that IRUS breached Section 7.6(c) of the Merger Agreement.  Therefore, the Clerk of Court is respectfully directed to enter judgment in favor of Defendants on Plaintiffs' breach of contract claim and to close the case.

Dated: November 19, 2024
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

---

[23] Because the Court finds that there was no breach of Section 7.6(c), the Court does not reach the appropriate calculation of damages or address whether Section 7.6(c) constitutes an unenforceable penalty.